**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JACK STONE,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF STATE CA/OCS/CI, AND U.S. EMBASSY TOKYO,<br><br>Defendants. | ) | Case No. CV 19-3273 |

**PLAINTIFF'S DECLARATION REGARDING LETTER SENT TO SCOTT RENNER, DIRECTOR OF OFFICE OF CHILDREN'S ISSUES AND HAGUE CONVENTION CENTRAL AUTHORITY DIRECTORS GREG BRIZZEE, AND GREGORY GARDNER**

Petitioner Jack Stone (Mr. Stone), hereby states under oath as follows:

I am a citizen of the United States, and I am over 18 years of age. I make this Declaration based on personal knowledge and I am competent to testify to the facts set forth herein and would testify as to their truth if called to do so. This Declaration is made in support of Plaintiff's Second Amended Complaint, Hague Convention Return Order motion filed November 18th 2019, and Writ of Mandamus filed April 20th 2020, with the U.S. District Court, Appellate Division, District of Columbia, USCA No. 20-5102.

Attached as Exhibit A., is a true and correct copy of a June 11th 2019 letter I mailed directly to Scott Renner (Renner). Renner was the Director of Office of Children's Issues, at the Bureau of Consular Affairs, U.S. Dept. of State at the time the letter was sent. He apparently holds the same title as of this filing.

The same letter was also sent to Greg Brizzee, and Gregory Gardner, directors of Hague Convention (Convention), U.S. Central Authorities. A copy of the same letter was also sent to Shuji Zushi, Japan's Central Authority director. A copy of the letter was also sent to U.S. Ambassador to Japan, Bill Hagerty.

Renner, Brizzee, Gardner, Zushi and Hagerty failed to respond to the letter.

Exhibit B., is a copy of Renner's Certification of the Administrative Record provided to this court via Defendant's [DE 113].

My June 11th 2019 letter is provided to show Renner, was aware my firstborn child was abducted into Japan, yet, the Office of "Children's Issues" took no action to block abduction, even where Renner had been provided THREE DAY ADVANCE NOTICE, to take action and prevent my child from boarding a plane, and from being abducted out of the state of Florida, and into a country Renner was aware was on the Dept. of State's (DOS) Hague Convention Noncompliant List. The failure of Renner, Brizzee, and Gardner to block abduction upon notice, November 8th 2018, with three-day advance notice the abduction was going to occur November 11th 2018 amounts to malfeasance.

Renner, Brizzee, Gardner, Suzanne Jacobs (Jacobs), and Suzanne Lawrence (Lawrence), all DOS Office of Children's Issues officials have failed thousands of parents of abducted children. There are currently at least 1200 U.S. citizen children abducted into Japan that Renner, Brizzee, Gardner, Jacobs, and Lawrence have failed.

As director, Renner he has the power to utilize sanctions provided by Congress against Japan due to the nation's woeful, and wilful disregard for fundamental parental rights that apply to The Hague Convention Treaty, which both the U.S. and Japan are signatories to. Renner, Brizzee, Gardner, Jacobs, and Lawrence have repeatedly failed to impose sanctions, even after being repeatedly brought before Congress to testify as to why they have not.

Renner was aware Japan was noncompliant to the Convention, that Japan didn't return abducted children, thwarted all efforts to return children, and doesn't criminalize domestic or international child abduction, yet, Renner, the director of the Office of Children's Issues took no action to prevent my child's abduction.

Thereafter, Renner failed to initiate Hague Convention return proceedings, or aid in locating my child.

Thereafter, Renner refused to reissue passport, after I took physical custody of my child January 2nd 2019, and had done so because the Office of Children's Issues has repeatedly proven Renner and other management level employees are incompetent in carrying out their duties, mandated under said Treaty, and relevant Acts of Congress, notably the International Child Abduction Remedies Act, and the Sean and David Goldman International Parental Child Abduction Prevention Act.

Renner is interviewed in the following video, speaking about the "harm" abducted children suffer. See: https://www.youtube.com/watch?v=5Xrxz3kCxcI.

During the interview Renner states, "One of our key issues is to work on international child abductions, by helping families that have been impacted, and HELPING THEM BEFORE ABDUCTION OCCURS." Renner goes on to state, "What we all want is to prevent child abduction in the first place. Even if we were able to recover a child there's still damage, hardships, drama, that occurs with that child. The happiest ending is when that child is not abducted to begin with."

Renner discusses the exact measures I took I on November 8th 2018, which was to inform the Office of Children's Issues "Prevent Abduction Program", that an abduction was underway. Even so, no action was taken to aid in blocking the abduction.

Renner claims the Office of Children's Issues is partnered with Customs and Border Protection of the Dept. of Homeland Security to prevent child abductions. Renner states, "This program is designed to prevent ABDUCTIONS IN PROGRESS."

Renner also states that the Prevent Abduction Program "is designed for someone in a situation where they are really concerned that an abduction is imminent, or even likely."

Renner states, "WE CAN STOP THIS IN ADVANCE IN MANY CASES."

Renner states he has approximately 60 staff whose job it is to prevent children from being abducted out of the United States.

As well, Renner states, "The program has vastly improved."

Renner states, "Don't suffer in silence. We will give you the best information we can."

Renner continues by discussing the role of Central Authorities. He states, "We work with the parents, explain the requirements, what documents they need to fill out… in the application process. We then will forward that on, on behalf of the parent, to the foreign Central Authorities."

Renner claims the process is "simple", and, the child should be returned to their "habitual residence."

As this Court has already been made aware, I filed THREE RETURN ORDER APPLICATIONS WITH U.S. CENTRAL AUTHORITIES, BUT NOT ONLY HAD I NOT RECEIVED ANY RESPONSE WHATSOEVER, BUT AS WELL, NO APPLICATION WAS FORWARDED TO JAPAN'S CENTRAL AUTHORITIES.

Renner claims he sends officers to "attend Convention hearings, and monitors proceedings", and, "making sure things are moving as they should."

Renner also states, **"WE ARE AT ALL LEVELS PUSHING ON THESE CASES BECAUSE, THERE SHOULDN'T BE DELAYS."** He also states, **"CASES THAT GO ON AND ON, FOR MONTHS AND YEARS, THAT SHOULDN'T BE HAPPENING, BECAUSE IT HURTS EVERYBODY INVOLVED."**

Renner, Brizzee, Gardner, Jacobs, Lawrence and Hagerty failed my family.

The Defendants, Dept. of State, U.S. Embassy in Tokyo, U.S. Central Authorities to The Hague Convention, and the Office of Children's Issues, failed my family, and failed on many levels.

Failures include not finalizing my wife's spouse visa, failure to block abduction out of Florida, failure to take any applicable Hague Convention action, failure to issue passport early on, to prevent furtherance of financial harm, and prevent psychological, emotional and developmental harm my child suffered, which Renner recognized in the aforementioned interview was a responsibility that laid on his shoulder.

Defendants continued and continue to permit harm, knowing full well, and being full advised that myself and my child are under threat of eviction, and that I'm under threat of arrest and deportation in Japan, a country that has a long history of violence toward non-Japanese, where there are no rights that protect minorities.

Defendants, have taken no action to mitigate any damages they alone are the proximate cause of creating.

Defendants are the direct and proximate cause of all harm my family has suffered since November of 2018.

As I write this Declaration, nearly every city in the U.S. is on fire, and those afflicted by the systemic failures of government actors are maligned as terrorists, looters, rioters and opportunists. At every level those who were empowered to prevent such calamities failed.

As police stations and court houses are set ablaze, those entrusted with such powers refuse to acknowledge these failings, just ad Defendants refuse to acknowledge their failings toward my family.

Renner, Brizzee, Gardner, Jacobs, Lawrence, Hagerty, The U.S. Dept. of State, the Office of Children's Issues, U.S. Central Authorities to The Hague Convention, and the U.S. Tokyo

Embassy must be held accountable, and must pay for the damages they are responsible for causing my family to suffer.

I, Jack Stone, under penalty of perjury and under the law of the United States of America states that the foregoing is true and correct.

May 31st 2020

Jack Stone
S/ Jack Stone
Maison Sato 101
2-2-15 Tsunogoro
Aoba, Sendai, Miyagi
Japan 980-0874
Email: mail@stackjones.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31st 2020, I served a copy of this Declaration via CM/EC on the following persons, Katherine B. Palmer-Ball, Assistant United States Attorney at katherine.palmer-ball@usdoj.gov.

/s/ Jack Stone

# EXHIBIT A (Composite)

To: Scott Renner, Director, David Brizzee and Gregory Gardner
CC: Shuji Zushi
From: Jack Stone

**RE: Abduction of Minor Child and Wrongful Retention in Regards to The Convention on the Civil Aspects of International Child Abduction**

**A. Statement in Regards to Unnecessary Delays in Obtaining Order for Child to be Returned to U.S.**

My child was abducted to Japan by his mother on November 11th 2018. After being abducted, my child was wrongfully retained at an undisclosed location for nearly two months. As well, my child's U.S. issued passport was destroyed by the mother, for purposes of wrongfully retaining the child in Japan, as a passport requires both parents to approve issuance, and reissuance. No doubt the writers of the Convention considered the destruction of a passport as part of the broad term in the Convention's language, in regards to wrongful retention, as after abduction, the first thing the abductor will do is destroy the child's passport.

As you are aware, the Convention requires abduction OR wrongful retention, not both for the Convention to have jurisdiction, so as to initiate proceedings for the return of the child to the country of "habitual residency."

I filed an application for the return of my child, and submitted a myriad of exhibits, yet no action has been taken to aid me in getting this matter resolved, and my child returned to a normal life in the U.S. These lengthy, and costly delays are inexcusable.

As a result of abduction, wrongful retention, and needless delays, my child is suffering psychological, emotional, and has suffered physical harm due to the reckless, criminal, and inexcusable conduct of the Yonezawa police, who assaulted my child on May 1st 2019. As well, numerous business contracts have had to be postponed, with other business, and employment opportunities being irreparably lost.

The states that have acceded to the terms of the Convention on the Civil Aspects of International Child Abduction (Convention) include both the U.S., and Japan. The preamble states that protecting "children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."

The petitioner has spent more than half a year, and numerous attempts to return to the U.S. with his minor child, initially four-years-old, and now age five, after the child was abducted to Japan, and

wrongfully retained where the child's passport was intentionally destroyed by the abductor, so as to ensure the child could not return to the U.S., where the child habitually resided prior to abduction. **Without doubt, the destruction of a passport, so the child cannot leave Japan, amounts to wrongful retention**. The destruction of a passport so a child cannot leave the country where he was abducted to amounts to wrongful retention, no matter who has physical custody of the child, after the abduction occurred.

**There is no requirement under the Convention that the abductor retain physical custody after abduction.** The language in the preamble states "**wrongful removal OR retention**." The willful, and intentional destruction of a passport for purposes of a child remaining in the state where he/she was abducted is without doubt wrongful retention, and falls under the parameters that provide jurisdiction to the Convention.

No action has been taken by either the U.S., or Japanese Central Authorities to expedite the swift return of the child. Instead, the child has been left to suffer the continued affects of being without passport, and without the ability to return to a stable live in the U.S., where the child habitually resided prior to abduction.

The failure of a quick response by the Office of Children's Issues of the U.S. Dept. of State, upon notice that the child's mother intended to abduct the child on November 11th, 2018, resulted in abduction. The petitioner notified U.S. officials on November 8th 2018, that the abduction was to occur, and provided the airport information in which the mother was to exit the U.S. with the child. The petitioner provided photographs of the child, and a copy of the child's U.S. passport. As well, the petitioner provided a copy of the abductor's Japanese passport, and photograph. Regardless, no action whatsoever was taken to bar the child from boarding an airplane and departing from the Orlando, Florida airport. Even with ample notice that the child would be abducted, and the airport the child would be leaving from, the U.S. Dept. of State took no action whatsoever, except to tell the petitioner to "hirer a lawyer." Hiring a lawyer would not have prevented the abduction on said date. The Central Authorities, and the U.S. Dept. of State are supposed to have implemented systems to prevent abduction. These government agencies have failed the petitioner. No doubt, scores of other parents who have made the same contacts have suffered abductions as well.

There is apparent no system implemented to block abductions. It appears the only system implemented is subsequent to the abduction, which means in many cases, it's too late for any state to act.

**B. Applicable Provisions as Per the Convention**

Article 1 of the Convention states:

The objects of the Convention are:

a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Abduction of the petitioner child occurred on November 11th 2018. The date as of this communication is June 10th 2019, more than half a year has passed without any action taken by either U.S. or Japanese Central Authorities.

As a result of these lengthy, and unjust delays, my child has suffered psychologically, emotionally, and physically, due to two reabduction attempts, and assault, resulting in injuries by Japanese police in Yonezawa, Yamagata Prefecture.

The Yonezawa police attacked the petitioner, attempting to rip the child from his arms, resulting in serious injuries to the child. The detailed facts, including exhibits, have been presented to the U.S. District Court, District of Hawaii Case No. 19-00065 JAO-WRP, in regards to action brought against the U.S. Dept. of State and the U.S. Embassy in Tokyo, due to these agencies refusal to reissue a passport for the minor child. The mere issuance of a passport would have prevented nearly all harm suffered, early on. At present, the U.S. District Court in Hawaii has ordered Pro Bono Counsel to represent the petitioner in compelling the defendants to reissue the child a passport.

Article 2 calls for the Contracting State to use the most expeditious procedures available. Upon learning the child was abducted, and that the child is unable to return to the U.S. where he "habitually resided" prior to abduction, the U.S. Dept. of State and Japan's Passport Agency have refused to issue a passport for the child, resulting in the child being stranded in Japan, the nation the child was abducted to, without recourse, and without identification, which is required by both "contracting states."

Article 3 of the Convention address wrongful removal OR retention of a child:

The removal or the retention of a child is to be considered wrongful where:

a) it is in breach of rights of custody attributed to a person under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

The petitioner had already provided the applicable Florida statute pertinent to his custodial rights to the Convention in his application. As well, the petitioner has been the sole financial provider of the child since birth. The mother has not been employed since November of 2013. At the time of abduction, the mother was in the final stage of approval for permanent residency in the U.S., having already interviewed, and had already submitted the required biometrics. There can be no argument by the abductor that there was no intention on the part of the petitioner or the abductor that they had intended to permanently reside in the U.S.

Article 4 applies to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights. **The petitioner's child resided in the city of Miami for nearly one year prior to abduction.** The petitioner provided ample evidence in the application as such, proving the child had dental appointments in Miami and had a pediatrician assigned as the primary doctor by the insurer, that the petitioner was a registered voter in the city of Miami, had a Florida driver's license, and less than three months prior to abduction, leased with the option to purchase a brand new Ford EcoSport, which was delivered to the petitioner on August 1st 2018. The petitioner paid full coverage insurance in advance for a period of six months, which is the maximum length allowed by the state of Florida. The petitioner also paid 6000.00 USD as a deposit on the Ford EcoSport.

Article 5, under subsection (b) addresses the right of the petitioner to take his child, for a limited period of time to a place other than the child's habitual residence. At the time of abduction, the petitioner was in Japan for the sole purpose of renewing his spouse visa, and was set to return on the same date the child was abducted. The child, and mother were visiting the petitioner's sister at the time of abduction. This arrangement was made prior to the petitioner going to Japan to renew his spouse visa. Renewal of the spouse visa is required by Japan's Immigration Bureau. But for the renewal of this visa, the petitioner would not have been in Japan, and did not want to be in Japan as well. At the time of abduction, it was obligatory for the petitioner to renew his visa in Japan. Renewal could not be done outside of Japan.

Article 6 states that a Contracting State is to designate a Central Authority to discharge the duties which are imposed by the Convention. **Central Authorities are to co-operate with each other and secure the prompt return of the petitioner's child**. The petitioner has had contacts with both Central Authorities, and to date, they are not working together to resolve this matter. Specifically, applicable to the Contracting States' failure to take action in the petitioner case fall under Article 7:

b) to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;

No provisional measures have been taken to prevent further harm of the child, or the petitioner.

> c) to secure the voluntary return of the child or to bring about an amicable resolution of the issues;

No measures have been taken by Central Authorities to secure the voluntary return of the child, or to bring about an amicable resolution.

> f) to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child ...

No measures have been taken to initiate, or facilitate any judicial, or administrative proceeding for purposes of having the child return to the U.S., where the child habitually resided prior to abduction.

> g) where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;

No measures have been taken to provide or facilitate legal aid or legal advice, or the participation of legal counsel and advisers;

> h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;

The safe return of the minor child has been impeded by both Contracting States failure to act expeditiously as per the terms of the Convention. Both Contracting States have impeded the right of the petitioner to obtain a passport for the minor child, even where exigent circumstances have clearly been presented to both Contracting States.

Apparent to any novice unfamiliar with the rule of law, or the terms of the Convention, the minor child cannot return to the U.S., without a passport issued, and without a passport, the child is clearly being wrongfully retained in Japan, a foreign state. The governmental agencies that have impeded the petitioner's right to obtain a passport for travel, and identification purposes includes the U.S. Dept. of State, Japan's Ministry of Foreign Affairs, and Japan's Passport Agency, agencies REQUIRED under the Convention to expeditiously work together to ensure the quick return of an abducted child, to the state where the child habitually resided.

Due to the inactions of these agencies, both the petitioner, and the minor child have become virtual hostages in Japan, a nation that neither the petitioner, nor the child want to be located in for any purpose whatsoever.

Below is a transcript of one, of a myriad of audio/video recordings where the child states clearly his desire to return to leave Japan and to return to the U.S.

**TRANSCRIPT BEGINS**

__

Child.
When are we going to get out of this place? OK?

Petitioner.
OK, wait a minute. Let me ask you this. Do you want me to get an apartment in Sendai?

Child.
No.

Petitioner.
Do you want to live with Baba, and Gigi? (grandparents)

Child.
No!

Petitioner.
OK, you keep asking me when are we going to get out of this place. Do you want to stay here any longer, or do you want to leave immediately?

Child.
I want to leave immediately. OK?

Petitioner.
Do you want to stay here longer, and longer, or do you want to leave Japan soon?

Child.
I want to leave Japan tomorrow.

Petitioner.
You want to leave tomorrow?

Child.
Yes. Bad place.

Petitioner.
OK.
And if we can leave tomorrow, where do you want to go?

Child.
Hawaii, of course.

Petitioner.
Look at the camera. Let the camera see your face. You want to leave Japan tomorrow. You just said. Is that correct?

Child.
Yes.

Petitioner.
You want to get out of this country?

Child.
Yes.

Petitioner.
You're tired of these trains, and busses, and long walks?

Child.
YES!

Petitioner.
Yeah! Does it make you feel bad?

Child.
Yes, it makes me feel really angry.

(My child punches the seat)

Petitioner.
Does it make you feel like a prisoner?

Child.
Yes, it feels like… Yes. It feels like, this place, my mind thinks this place is garbage. That's what my mind thinks it is.

Petitioner.
It's garbage?

Child.
Yes.

Petitioner.
Well, Japan's not garbage. Japan is a good place for Japanese people. It's not a good place for people like me and you. Because they don't like foreigners here, and they don't like you. You're a hafu! OK? That's what they call you. It's an ugly racist word, and I don't like it. And that's why I left Japan in the first place. Because I don't want you to be around racists. And this place is filled with racists. The other day me and you were walking through the train station. And a man with a black van was screaming, "Whito Pigu Gou Homu." Well, he's calling me

white pig. He wants me to go home. I want to go home. He was calling on the Koreans to be lynched, that means hung over the telephone wires. He was calling for Korean businesses to be burned down. What do you think about listening to those words? Do you feel safe?

Child.
I don’t feel safe in this country.

Petitioner.
Do you feel good when you hear those horrible words?

Child.
NO!

Petitioner.
It’s time to leave isn’t it?

Child.
Yes. It’s already.

Petitioner.
OK, thank you buddy. Yes, it’s already time to leave. Thank you.

__

**TRANSCRIPT ENDS**

Article 7b addresses under subsection i) that, Central Authorities are "... to eliminate any obstacles to its application."

Instead of taking action to eliminate obstacles, the U.S. Dept. of State, the U.S. Embassy in Tokyo, and the Central Authorities in the U.S., and Japan have violated subsection i, by not taking any action at all, and instead have refused to act, so as to prevent any further harm suffered by the minor child.

Article 8 states, "Any person... claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child."

Under Article 8, the petitioner has filed an application with the Central Authority in the U.S., and has contacted, and provided the same documentation to the Central Authority in Japan. Neither Contracting State has taken any actions whatsoever to ensure the safe return of the minor child, but instead have acted in a manner to impede the rights of the petitioner in regards to the terms of the Convention.

Under Article 9 the Central Authority of the U.S. was to contact the Central Authority of Japan. As of June 10th 2019, the Central Authority in Japan has not received any communication whatsoever from the U.S. Central Authority, to secure the return of the petitioner's child.

Article 10, states, "**The Central Authority of the State where the child is shall take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child**." Japanese officials have not taken any action whatsoever to obtain the voluntary return of the child.

The petitioner Ccd, all communications with the U.S. Central Authorities to the Central Authorities in Japan. Japan's Central Authorities have taken no action whatsoever to ensure the safe return of the petitioner's minor child.

Neither the U.S., or Japan Central Authorities under Article 11, have acted, **"expeditiously in proceedings for the return of children'**, thereby causing the child to suffer psychological, and emotional trauma on a continuous basis, as well, harm to the petitioner, which extends to the minor child. The harm suffered by the petitioner and minor child, which continues unabated, is, and has been entirely avoidable. The proximate cause of all harm suffered subsequent to abduction has been caused by both U.S. and Japanese Central Authorities, due to these authorities failing to act appropriately, and expeditiously.

Article 12 addresses wrongful removal or retention as per the terms of Article 3. Under Article 12, **"Where a child has been wrongfully removed or retained... and the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith."**

The initial filing with the Central Authority and further applications, all fall under this one-year period. Regardless, no actions have been taken to order the return of the child. The petitioner **DEMANDS AN ORDER ISSUED FOR THE IMMEDIATE RETURN OF PETITIONER'S MINOR CHILD TO THE U.S., AS PER THE TERMS OF THE CONVENTION, WITHOUT ANY FURTHER DELAY.**

Under Article 13, the abductor, the child's mother cannot raise any valid claim under subsection (a), as the petitioner has exercised his custodial rights at all times, since the birth of the minor child, and has been the sole financial provider since birth. The mother has not worked since November of 2013, and the petitioner has been the sole financial provider of the mother as well since that time.

Article 13 states, under subsection (b), "there is a grave risk that his or her return would expose the child to physical or

psychological harm or otherwise place the child in an intolerable situation."

Subsection (b), opens Pandora's Box, as **it is the nation of Japan, and the child's Japanese family that impose grave risks to the child.** Returning the child to the U.S. will prevent any further physical harm, emotional harm, psychological harm, or other intolerable situations, and prejudice the child currently suffers being wrongfully retained in Japan.

The petitioner has published more than 150 articles on Japan's history, Japan's culture, and Japan's violence, abuse, hate crimes, and exploitative working conditions heaped upon non-Japanese and hafus, (a racist terms the Japanese call children like the child of the petitioner). Non-Japanese, and hafus suffer endless discrimination, which is well known to the United Nations, and which holds annual meetings, and assigns special rapporteurs, appointed to address the rise in hate crimes, and other violent crimes in Japan, aimed at non-Japanese.

**The petitioner** has been subjected to an endless array of assaults, abuse, employment discrimination, false arrests, constant harassment, theft of property, unpaid pension money, unpaid health insurance, refused housing, and other atrocities while working and residing in Japan in the past. **Petitioner's child**, prior to the age of three, had been **assaulted no less than three times including being kicked in a stroller at age two, while commuting through the Akihabara train station, and having a cigarette burned into the chest area of a winter coat he was wearing at age two, while commuting through Tsujido station, during a hate rally.**

**The petitioner's child has witnessed hostile conditions in Japan, refused service at restaurants, refused housing, and witnessed hate speech, directed at the child, and petitioner, including threats of physical assault, and shouts over bullhorns including, "Whito Pigu Gou Homu." There is a large segment of the Japanese population that are vile and savage, and at any time circumstances of hate and violence arise, without warning, and the ability to avoid it. Japanese officials, including police and legislators take no action whatsoever to protect non-Japanese, or to criminalize such hateful conduct.**

"Hafu" children are subjected to constant bullying, and beatings. They are ostracized, outcast, and ridiculed to scorn on a constant basis at school and in other public locations. **Racist schools, and racist teachers demand "hafu" students, who do not have black hair to dye their hair black, or face being expelled.** The documentary film, "Hafu" addresses the realities of life for children like that of the petitioner, and the **problems begin at the administrative level, including those at the highest level of Japan's Ministry of Justice, and Japan's legislatures, where the vast majority are members of a radical right-wing, racist organization, a front group for the Shinto Cult, known as Nippon Kaigi.**

The petitioner is not ill-informed on such matters as he has interviewed former Yokohama prosecutor Hiroshi Ichikawa, who publicly admits that he was trained by the Supreme Prosecutor's Office, that all **foreigners are not considered human beings under Japan's Constitution**, and therefore any tactics, including the threat of death and beatings is acceptable when it comes to coercing confession statements from foreign detainees, whether true or false. More often than not, foreign detainees are the true victims of crimes committed by Japanese who initiated those crimes against the foreigner, and thereafter relied on the prejudice of Japanese officials to sanction and protect the Japanese from their criminality.

The purpose of obtaining "confessions" through the acts of violence and threats by Japanese officials, are to obtain a conviction, and thereafter use that conviction to initiate deportation proceedings.

In most cases, as the United Nations is entirely aware of, false confessions have led to scores of innocent people confessing under conditions of duress, even where Japanese officials knew those detained and forced to sign confessions statements were innocent.

**The petitioner audio and video recorded a two-hour interview with Hiroshi Ichikawa, and the communications made by Ichikawa are shocking and should be of great concern to any foreigner residing, or visiting Japan.** Ichikawa's exposure of his "training", resulted in prosecutor's having interrogations audio and video recorded. Regardless, a detainee can be held in police detention (daiyo kangoku), a system condemned by the United Nations, in isolation, for 23 days and extended indefinitely, often resulting in false coerced confessions, written exclusively by Japanese officials, not the detainee, as police interrogations do not require audio/video recordings during interrogations.

The petitioner has also interviewed retired Tokyo District Court Judge Hiroshi Segi, in regards to his book, "Court of Despair." In Segi's interview he stated what he wrote in his book, and received numerous death threats for publishing Court of Despair. Segi stated, **all foreigners are treated much more harshly than Japanese, and their treatment is unjust.** Segi blamed a "dark force", which controls all judicial decisions, and results in the destruction of a judge’s career if that judge exercises independent decision making. Segi was especially critical of Japan's Supreme Court Chief Justice, who suddenly "retired" upon the discovery that Segi's book was about to be released.

Finally, the "dark force" Segi alludes to in his book, was revealed as Nippon Kaigi, in the book, "Nippon Kaigi No Kenkyu." This book was banned from publication by Japan's Supreme Court, even after becoming a best seller. The writer, a former high ranking member of the secretive organization, Nippon Kaigi, was a former ally of prime minister Shinzo Abe. After the release of the book, Abe calls the author a "traitor". After the release of Nippon Kaigi No Kenkyu, Abe's ruling party passed

Japan's "Secrets Law." Every member of Abe's ruling LDP party, are members of Nippon Kaigi. Nippon Kaigi is a front organization for Japan's Shinto Cult, which lost its political status as state religion, as the first directive of the Allied Forces at the end of WWII. The core of the Shinto Cult is emperor worship, and that Japanese are destined to rule over the "hoards of barbarians", which would include the petitioner and child. There are only two countries in the world that profess their "emperor" is a god; North Korea, and Japan.

It is not unknown to the United Nations, and the Central Authorities that Japan has one of the worst records for child abduction. Child abduction is as much a part of Japan's culture, as is suicide. Tokagawa Ieasu, Japan's most admired shogun was abducted twice, prior to age five. Ieasu never knew his mother, having lived his entire youth in the state of abduction.

**No responsible parent whose child was half Japanese, would subject their child to being raised in a country like Japan.** It is a fact, that every major corporation in Japan blacklists "hafus' from employment, and consider them on par with the Burakumin (Japan's untouchables), and the Ainu, two minority groups who suffered from Japan's Eugenics Law, which only recently was found to be unconstitutional. The law had permitted the Japanese government to sterilize those who had "hereditary" disorders. Hereditary disorder, of course, included children like the petitioner's child.

Japan is an arcane, backwards looking nation. The majority of Japanese unjustly fear foreigners, and the Japanese inability, or better put, refusal to communicate in the language of the world, English, is the direct cause of their irrational fear, violence, and racist tendencies toward people like the petitioner and the petitioner's minor child.

In regards to the abductor, under Article 13 subsection (b), she now resides in Yonezawa, at her parents' home, unable to provide for herself, or for her child financially. The abductor's parents are poor. The abductor's father is a high school dropout, and had forced the abductor to abort petitioner's first child, and lied for a period of five years that the abortion had been a miscarriage. As well, the abductor's grandfather recklessly got drunk, and drowned in the bathtub of his own house.

The abductor's parents are also well into retirement age, and their business, (cleaning harvested rice and putting it in bags), has failed to the point they had to close their storefront shop, and terminate employment of their sole employee, who had worked part-time.

The home is not an environment conducive to the health and safety of a child. It is unsafe, dilapidating, a fire hazard filled with fuel

containers and other hazardous items, and would not pass inspection from the Fire Department, or Health Department.

The abductor's parents are hoarders, and the home is stuffed with useless objects that are obsolete, and should have been discarded long ago. Moreover, the petitioner has already presented ample evidence in his application that the **child has suffered gross neglect whenever at that house.** This neglect, which the **Sendai Police Department has categorized as abuse**, always results in the petitioner having to have those injuries treated medically. Further, the Japanese "grandparents" have never done anything with the child. The child resided in Japan for four years. Not once had either grandparent ever come to visit the child during that time. They have never given the child a gift, birthday present, or New Years gift money, which is a tradition in Japan.

The petitioner has audio/recorded the child stating that his Japanese grandparents have never done anything with him, not taken him for a walk, to the park, etc. Finally, the **petitioner's child is a native English speaker** and the Japanese grandparents cannot speak English, and make no attempts to speaks English to communicate with the child. The child has made it clear that he **does not want to live with his grandparents, or in Yonezawa, as he has numerous bad memories of constantly being cold, and suffering from it, especially during winter. The last straw was when the child was assaulted by reckless Yonezawa police.** The child has also stated, in audio/video recordings that he is more often that not, left alone when in Yonezawa.

**The abductor is a flight risk, as she, her parents and her sisters are members of a religious cult known as Rhissho Kosei Kai.** The abductor's sister, and her husband are long time employees of this cult as well. This cult has interfered with the petitioner's parent rights to the point that the petitioner had to write a CEASE AND DESIST DEMAND, UNDER THE THREAT OF COURT ACTION, if it did not cease in interfering with the parental rights of the petitioner. This cult, which has had numerous run ins with Japan's Ministry of Justice, has branches all over Asia. At any time, the child could be removed from Japan to one of these nations, may being third world nations, not signatories to the Convention. The petitioner rightfully fears removal from Japan would result in the petitioner never seeing the child ever again. This is not unreasonable as Japan is one of the worst violators of parental rights, and until recently, Japan has never aided any parent in abduction related matters. Even more, according to attorney Yohei Suda, a Japanese attorney who is an expert on the Convention and child abduction, no child has ever been awarded to the non-Japanese parent by any Japanese court. This includes family court, appeals courts and Japan's Supreme Court.

**Under no circumstance will the child remain in Japan, to be subject to a life of ridicule, racism and scorn. Japanese officials have no desire to protect the petitioner's child's human and civil rights, and have instead taken measures to ensure such children continue to suffer.**

The OECD, which Japan is a member nation, reports that **Japan, one of the wealthiest nations in the world, has the worst poverty conditions out of all OECD nations when it comes to single parents.**

While Japan boasts a 99.97% conviction rate, in reality, 94.7% convicted on nothing more than coerced confessions. Japan boasts a 99.97% literacy rate, in reality the Japanese are incapable of communicating in the world's language, English. Japan is silent on the fact that poverty is a cruel reality for children who suffer from no social programs to assist single parents.

Article 15 requires a Contracting state to obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

The Central Authorities of the U.S. and Japan have not aided, or initiated any legal proceedings in the state of Florida to aid the petitioner in obtaining a judicial order that removal or wrongful retention violated state, or federal law. Without doubt, 28 U.S.C. §1204 was violated, which is essentially the terms of the Convention codified as federal law.

Article 18 provides, "The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."

Article 19 states, "A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."

Japanese family courts have a long history, as previously touched upon herein, in refusing to grant parental authority or custody to any non-Japanese parent. Attorney Yohei Suda, an expert on the Convention, told the petitioner that he has never seen any case in Japan's history where the non-Japanese has ever obtained parental authority in a custody dispute. This has resulted in numerous disasters where children have been murdered by the Japanese parent, or abused and murdered by the person the Japanese parent has a relationship with, always a Japanese citizen. Some of these children victims have frozen to death, after being forced to "reside" on a balcony during winter, while others have been starved to death, or beaten to death, or forced into prostitution.

Japan is internationally recognized as the top producer of sickening child pornography. Only recently had Japan's court "criminalized" possession of child pornography, ensuring that viewing child pornography online, was not criminalized.

C. **Harsh Realities of Life for Children in Japan, and Unjust Treatment of Non-Japanese Residing in Japan**

Cruelty to children is a "traditional" part of Japan's institutionalized treatment of children, and cannot be overlooked. Bullying of children like that of the petitioner, often resulting in suicides, are higher in Japan than any other nation. Japanese officials never take serious any complaints in regards to mistreatment especially non-Japanese, and hafu. In 2019 alone, there were two high profile cases where children were murdered by their parents, and the mistreatment of those children was reported to officials, prior to murder. One little girl who suffered starvation, and torture by her Japanese parent, was returned to the Japanese parent, after that parent had coerced the little girl into signing a statement that she had lied about being starved, abused, and and beaten.

Prior to habitually residing in the U.S., the petitioner resided in Chigasaki, Japan. The petitioner was employed as an educational writer at that time. Unknown at that time to the petitioner is the fact that the "educational entity" had a long history of violence and abuse toward children age 1-6. The petitioner witnessed ongoing abuse, on a near daily basis, and began photographing, and retaining exhibits as proof of abuse, and the results of the affects of the physical and psychological trauma those children endured. Photographs included the injuries suffered by a child of age two who was **dragged out of a chair, thrown across the room, and then thrown out the door to the room. This resulted in the child losing half of his nose, which was torn off during the assault**. Another incident occurred where a child of four-years had just passed a 50 question science test that most high school students would fail. After the child received 100% on the 50 questions, she was asked a question, which she did not know the answer to. **The child was verbally abused to the point she took all ten of her fingernails and ripped deeply into her face from the top of her forehead, to below the neck, and screamed maniacally, due to the relentless pressure she could no longer endure**. The petitioner was particularly fond of this child as she was eloquent, charming, and read at a near high school level of English, which was not the child's native language. **The petitioner watched in horror, as in a short period of time this beautiful child was systematically destroyed, for nothing more than obsessive parents bragging rights**.

The petitioner brought his evidence to Japanese officials, including the Hodogaya Police, Chigasaki Police and Child Welfare Services. No official took any action whatsoever. As a result, the petitioner was terminated from employment without cause. The petitioner took the matter to Japan's Labor Bureau, and the Employment Office. After they performed an extensive investigation, the petitioner was ordered back to work. The petitioner notified the employer that he would be returning to work the following day, as per this order. On the following morning, while exiting the Hodogaya train station to return to work, the petitioner was surrounded, detained and assaulted by no less than thirty

police officers. **The petitioner was detained for 21 days, because the employer had told the police that she was "scared" of a foreigner and because of this fear, was unable to leave her home. The employer failed to tell the police the matter was a labor dispute, and that the "foreigner" was an employee ordered back to work by Japan's Labor Bureau.**

For 21 days the petitioner was subjected to conditions that amount to torture. Prosecutors and police relentlessly interrogated the petitioner about, "saying the employer was a bad mother", even where they were entirely aware the matter initiated as a child abuse investigation, that the petitioner was wrongfully terminated from employment, and that officials ordered him back to work. No doubt the petitioner would have been convicted of whatever bullshit the police and prosecutors could have created out of thin air, but for former prosecutor Hiroshi Ichikawa going to the Hodogaya Police Department for purposes of legal representation. Ichikawa arrived on day 20 of wrongful detention. The abusive conditions ceased immediately, and the petitioner was released the following morning without charge. This makes the petitioner one of the .03%, who have been detained in Japan where a conviction was not obtained.

During detention the petitioner, who never acted violent for fear of having further bogus charges brought, was assaulted, held in isolation, in 24/7 lighting, and threatened constantly. For 21 days the petitioner did not eat. On day 14, the petitioner went temporarily blind, and had kidney failure. No medical treatment was provided whatsoever, as interrogations continued unabated. Upon release from detention, the petitioner was unable to walk. The Hodogaya police drove the petitioner to his residence. Once at the residence, **the petitioner was forced to delete all images of the abused children, which the petitioner had provided to Japanese officials.** Wrongful detention in Japan requires compensation. Japan's Ministry of Justice refused to compensate the plaintiff for being wrongfully detained, and instead, threatened to rearrest the petitioner if he continued to seek compensation.

The petitioner has been assaulted in Japan, resulting in injuries, no less than six times, with Japanese police and prosecutors never taking any action whatsoever against the criminal perpetrator. The above stated facts are conditions the petitioner endured while residing in Japan. **The above stated facts are exactly how foreigners are treated in Japan by employers, and Japanese officials, at all times.** The petitioner when he had resided in Japan was constantly harassed by police, demanding to see his identification, and checking to see if he had overstayed his visa. These matters are extensively covered in the mass media, and are well known to the United Nations.

After numerous assaults resulting in serious injuries, being subjected to endless hate crimes, refused housing (the petitioner held a California Broker's License and Real Estate Sales License in Florida, and has a Juris Doctorate in Law Degree), employment discrimination,

theft of salary, poor salary, and the above stated facts, the petitioner left Japan permanently. It is absurd for anyone to claim the petitioner intended to reside in Japan, after liquidating all assets, and leaving with no intention to ever return to Japan to reside, which had been documented extensively, prior to abduction.

**D. Other Applicable Terms of the Convention**

Article 22 states the Convention does not require a security, bond or deposit, or any guarantee of payment of costs and expenses in the judicial or administrative proceedings falling within the scope of the Convention.

Article 24 doesn't require the petitioner to submit any document in the Japanese language. Article 22 in regards to Article 24, does not require the petitioner to cover any costs associated with translations into the Japanese language.

**Japanese officials always use the language barrier as a means to thwart justice for non-Japanese.**

The petitioner does not read, or write in the Japanese language. It is the responsibility of as per Article 24 to provide translations for Japan's Central Authority. As well, the petitioner will not pay the excessive fees demanded of Japanese attorneys who place their own interests over that of their clients. The Convention is not about financial gain for attorneys, the treaty was designed for the expeditious return of abducted children, and children who are wrongfully retained in a foreign country, and nothing more.

As per Article 24, the petitioner will only submit documents and exhibits in regards to this matter in his original language, which is English. There is no provision under the Convention that the petitioner must bare any costs in translating documents, or exhibits into Japanese, a language the petitioner does not communicate in.

Under Article 25, the petitioner is entitled to legal aid and advice in any Contracting State on the same conditions as if they themselves were nationals of and habitually resident in that State. Under Article 26, both the U.S. Central Authority and Japan Central Authority are to cover any costs related to this matter. "Central Authorities and other public services of Contracting States shall not impose any charges in relation to applications submitted under this Convention. In particular, they may not require any payment from the applicant towards the costs and expenses of the proceedings or, where applicable, those arising from the participation of legal counsel or advisers."

There will be no expenses incurred by the Contracting States in regards to the costs associated with the return of the child. The petitioner will arrange for air flight for both petitioner and child.

Article 27 states, "When it is manifest that the requirements of this Convention are not fulfilled or that the application is otherwise not well founded, a Central Authority is not bound to accept the application. In that case, the Central Authority shall forthwith inform the applicant or the Central Authority through which the application was submitted, as the case may be, of its reasons."

Given that this matter has gone on for more than half a year, with no Central Authority denying the petitioner's application, it is time for this matter to move forward and for the petitioner to receive an order for the child to return to the U.S., without any further delays.

The petitioner has already complied with the requirements of Article 28, having provided authorization for the Central Authority to act on behalf of the petitioner.

In accordance to the provisions of Article 29, the petitioner has applied directly to the judicial or administrative authorities of both the U.S. and Japan. Under Article 30, the manner in which the petitioner has submitted the application and supporting exhibits is satisfied.

Finally, the petitioner does not want his child to be in a nation like Japan for any purpose whatsoever. Japan is a dangerous, hostile, and exploitative country for foreigners, non-Japanese, and “hafus”. As well, hate crimes are escalating, and Japanese lawmakers take no action to criminalize hate speech, and hate crimes, even where the United Nations has called upon Japan to do repeatedly.

**The petitioner’s child will not be relegated to the back seat of the bus, as Rosa Parks, and African Americans had to endure, during the Civil Rights Movement of the 1950s and 1960s**. It’s time for the Central Authorities to take appropriate action, to permit no further delays, and to protect petitioner’s minor child by expeditiously ordering the child to be returned to the U.S. Appropriate action is long overdue!

**DEMAND**

The petitioner demands Central Authorities to act expeditiously, and provide an IMMEDIATE ORDER for petitioner’s child to return to the U.S., where the child habitually resided, prior to abduction and wrongful retention in a foreign nation the petitioner, and child do not want to remain in any longer. Any further delays are impermissible under the terms of the Convention, and such delays will only result in the continuance of petitioner’s minor child suffering irreparable psychological and emotional harm.

Please respond accordingly,

Dated: June 11th 2019.

Jack Stone
(TEMPORARY ADDRESS)
Maison Sato #101
2-2-15 Tsunogoro
Aoba-ku, Sendai-shi
Miyagi-ken, Japan
980-0874

# EXHIBIT B (Composite)

UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jack Stone,<br><br>Plaintiff,<br><br>v.<br><br>United States Embassy, Tokyo, *et al.*,<br><br>Defendants. | ) | Civil Action No. 19-cv-3273 (RC) |

**CERTIFICATION OF THE INDEX OF THE ADMINISTRATIVE RECORD**

Pursuant to 28 U.S.C. § 1746, I, Scott Renner, do hereby declare and state as follows:

1. I am the Acting Managing Director of the Office of Overseas Citizens Services within the U.S. Department of State's Bureau of Consular Affairs. The Directorate of Overseas Citizens Services includes the Office of American Citizens Services and Crisis Management, which assists U.S. citizens overseas directly and through support to U.S. Embassies and Consulates abroad. My duties include ensuring that the Directorate of Overseas Citizens Services provides consistent and timely guidance to our overseas posts on issues affecting U.S. citizens overseas, including the provision of emergency services, the adjudication of passports, and the documentation of births and deaths of U.S. citizens overseas. Based on my professional skills, training, experience, responsibilities and personal knowledge, I have been designated to provide this declaration.

2. I am the primary employee responsible for the certification of the Administrative Record in the above captioned case with respect to Jack Stone and the minor child M.S.

UNDER SEAL

3. I certify that the attached index is a true and accurate list of all documents relating to the denial of Jack Stone's passport application on behalf of his minor child, M.S., executed at the U.S. Embassy in Tokyo on February 13, 2019 and denied on June 4, 2019.

Executed on this 27th day of May, 2020, in Washington, DC.

SCOTT RENNER
Acting Managing Director
Office of Overseas Citizen Services