TRAVEL.STATE.GOV

A SERVICE OF THE BUREAU OF CONSULAR AFFAIRS

U.S. Department of State

U.S. Embassy Tokyo
1-10-5 Akasaka
Minato-ku, Tokyo 107-8420 JAPAN

**ACS Appointment System -**

## APPOINTMENT DETAILS

PLEASE PRINT THIS PAGE AND BRING IT WITH YOU WHEN YOU APPEAR AT THE EMBASSY OR CONSULATE.

| | |
|---|---|
| **Date of Appointment:** | **Friday, February 08, 2019** |
| **Time of Appointment:** | **2:45:00 PM** |
| **Appointment UID:** | PA30795347 |
| **Appointment Password:** | Mxr69viJdo |
| **Applicant's Surname:** | S[redacted] |
| **Applicant's Given Name:** | M[redacted] |
| **Applicant's DOB (dd/mmm/yyyy):** | [redacted] |
| **Contact Telephone Number:** | [redacted] |
| **E-mail Address:** | MAIL@STACKJONES.COM |
| **Name of non-applicant who will be appearing for this appointment:** | ATTORNEY YOHEI SUDA<br>J[redacted] S[redacted] |
| **Number Of Services Required:** | 1 |
| **Type Of Services Required:** | Passport services other than adding pages. |

**IMPORTANT:**

1. Please read all the instructions and complete all forms for the service you have requested. Failure to submit a complete and correct application will delay your case. To minimize the time you will need to spend at the Embassy or Consulate on the day of your appointment, please fill in application forms prior to arrival.
2. If you need to make another appointment for someone else, please click here.
3. If your plans change, please click here to cancel your appointment prior to the date you are scheduled to appear. You must first cancel your existing appointment in order to make a new one.

**"U.S. Embassy Tokyo ACS" <TOKYOACS@state.gov>**

Message from U.S. Embassy Tokyo Passport Unit

To: "mail@stackjones.com" <mail@stackjones.com>

Sent: 2.15.19.

Dear Mr. S[redacted],
Greetings from U.S. Embassy Tokyo's American Citizen Services section. Thank you for submitting your son's passport application with us last week. Unfortunately, it has been determined that we are unable to process M[redacted] S[redacted]'s passport application without receiving consent from Masayuki's mother. We are sorry that this is not the news you were hoping to hear.
**In order to move forward, please submit the following documents:**

1. Notarized parental consent document DS-3053 and a photocopy of the mother's identification.

We must have the original notarized document before we can issue Masayuki's passport. It can be mailed to the following address:

U.S. Embassy Tokyo, Passport Unit
1-10-5 Akasaka, Minato-ku
Tokyo 107-8420

**Please note that failure to submit the requested documents within 90 days from the day we accepted the application may result in the denial of your application(s).** For your records, we have also attached a scanned copy of our request letter. Thank you in advance for your prompt attention to this matter. We look forward to hearing from you.

Sincerely,

American Citizen Services
U.S. Embassy Tokyo
Follow us on twitter: https://mobile.twitter.com/acstokyo

Like us on Facebook: https://www.facebook.com/ACSTokyo

**PLEASE DO NOT RESPOND TO THIS EMAIL.** This email is provided for your information only. For questions regarding information that is not on our website or listed in our Frequently Asked Questions, please contact us via http://japan2.usembassy.gov/e/acs/tacs-form-inquiries.html. We only respond to inquiries generated through our inquiry form on the website.

<me_u_kis@yahoo.co.jp>
Re: Re:
To: mail@stackjones.com
Date: January 8th, 2019

I don't know their address where they live.

<mail@stackjones.com>
(No Subject)
To: "<me_u_kis@yahoo.co.jp>"
Date: January 8th, 2019

I need the addresses of your family members, and their telephone numbers.
Make sure to send me M[redacted]'s passport.

Your parent's must make their home appropriate for a young child. No chemicals, or diesel cans laying around the house. Turn on heaters, and make it warm, and safe. The current conditions are an unsafe environment for children. They should replace all that aging tatami, and get rid of all the dusty junk in that house. It's no place for a child and you know it.

On Jan 6, 2019, at 4:06 PM, <me_u_kis@yahoo.co.jp> wrote:

I'm thinking our life and I can't continue my life with you any more.
i have mental problems.
of course I want to be with M[redacted] and hug him.

tell him I love you, I miss you and I'm be with you,

Jan 4, 2019, at 10:53 AM, <me_u_kis@yahoo.co.jp> wrote:

I can't live with you anymore.
I will send M[redacted]'s clothes.

mail@stackjones.com
(No Subject)
To: "<me_u_kis@yahoo.co.jp>"

[redacted] is your son's FIFTH birthday.
He wants to make that birthday cake with you today.
You promised him that.
I have called your phone several times, and it is off.
It is always off.
What is your plan?

**From:** [redacted]
**To:** Tokyo Consular ACS Officers DL
**Cc:** [redacted]
**Subject:** FW: Seeking Diplomatic Channel Aid
**Date:** Tuesday, March 05, 2019 7:53:04 PM
**Attachments:** image001.jpg
image002.jpg
image003.jpg
image004.jpg
image005.jpg

---

Hi [redacted]: See below for situational awareness correspondence J S sent to the Italian Embassy in Tokyo. Their consul forwarded to [redacted] and I. Regards, [redacted]

**Official**
**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Wednesday, March 06, 2019 9:49 AM
**To:** Lattanzi Marco; [redacted]
**Subject:** RE: Seeking Diplomatic Channel Aid

Hi Marco: Thank you for sharing this information. Regards, [redacted]

**Official**
**UNCLASSIFIED**

---

**From:** Lattanzi Marco [mailto:marco.lattanzi@esteri.it]
**Sent:** Wednesday, March 06, 2019 8:58 AM
**To:** [redacted]
**Subject:** FW: Seeking Diplomatic Channel Aid

Dear [redacted]

Just for your information, I have received the e mail below from an American citizen living in Japan. Of course we will not allow him to enter in our Embassy, but we would like to inform you on the matter.

Best Regards

Marco Lattanzi

---

**From:** Ambasciata d'Italia in Giappone Tokyo
**Sent:** Tuesday, March 05, 2019 11:35 AM
**To:** Lattanzi Marco
**Subject:** FW: Seeking Diplomatic Channel Aid

**From:** mail@stackjones.com [mailto:mail@stackjones.com]
**Sent:** Tuesday, March 05, 2019 10:26 AM
**To:** J[redacted] S[redacted]
**Subject:** Seeking Diplomatic Channel Aid

Hello,

My name is J[redacted] S[redacted]. I am a U.S. citizen.

My child was abducted into Japan, in violation of The Hague Convention on Child Kidnapping, November 11th 2018.

My child's passport was destroyed by his Japanese mother. I have tried fo resolve the problem, but the mother suffers mental illness, had neglected the child, and is not willing to repair the relationship.

I have been in legal physical custody of my child since Jan. 2nd 2019, but I'm at a temporary residence, and I must leave.

Under circumstances obvious to anyone, I have interviewed with the U.S. Embassy in Tokyo to have my child's passport reissued under exigent circumstances, so I can leave Japan with my child, but the U.S. Dept. of State refuses to reissue the passport.

The U.S. government has abandoned me and my child in a foreign country. This is not unusual, as the United Stated government has never almost never come to the aid of a "citizen" in danger abroad.

I'm stranded in the foreign country of Japan, and I'm desperate, and we are frightened. I cannot speak, or read the language, and my child is suffering safety and health concerns due to the current situation. My child wants to return to the U.S., as we lived in Hawaii, but I cannot travel without my son's passport.

I have thought to use a kayak to paddle across 15 miles of open sea to reach the Russian territory of Kunishir Island, and seek help from Russia, a country that seems to always come to the aid of those in danger, but I fear the consequences of taking such a risk.

My son and I cannot remain in Japan. I'm seeking aid from a foreign embassy, so my child and I can enter the embassy, and have the matter handled through diplomatic channels.

My son and I are not criminals, and we have not done anything unlawful.

I have already been in contact with a Japanese attorney, who is willing to represent me and my child.

I cannot, and will not recognize any Japanese court, as they are racists, and have always ruled against the foreign parent in regards to custody matter, and Hague Convention Kidnapping cases. Only a fool would rely on a country that has a long history of kidnappings, as there are currently hundreds of children kidnapped into Japan.

I'm an educator, I have a law degree, and I have funds to provide for my child while under your care, if your country would be willing to help us.

Protecting a child is a parent's most sacred duty. All I want to do is return my child to the life he knew before being abducted.

Below is a statement I received from a Japanese attorney. I received it as I was writing this statement.

"Given the jurisprudence [in Japan], the mother usually has the priority over the father as to the custody. Also, if you have your parents/relatives living nearby, the court will consider it as an advantage. Therefore, both Mr. Katsuta and I agree that this is going to be an uphill battle."

I am not willing to allow the Japanese government to use irrational "legality" to kidnap yet one more of the several hundred children already kidnapped into Japan. None have ever been returned to their home country.

Please, permit me, and my child to enter your embassy, and protect us. I have no other recourse.

Thank you,

J[redacted] S[redacted]

cid:image001.jpg@01D4D401.A9077100

cid:image002.jpg@01D4D401.A9077100

cid:image004.jpg@01D4D401.A9077100

cid:image005.jpg@01D4D401.A9077100






鶴峯山稲荷社




STATE-0514


STATE 0515

**From:** [redacted]
**To:** [redacted]
**Cc:** JapanIPCA
**Subject:** Re: FW: Alarming call with parent (PII)
**Date:** Tuesday, March 12, 2019 4:37:48 PM

---

Hello [redacted]

Thank you for letting us know. Post is intimately aware of Mr. S ’s current situation and concerns.

Regards,

[redacted]

---
Sent from Workspace ONE Boxer

On March 13, 2019 2:53:18 JST, [redacted]@state.gov> wrote:

> Hi [redacted] – For your information, we just wanted to give you a heads up on a threatening phone call we received from J S , who might very well contact you. I believe you’ve already notified him about what he needs to do, and at this point, there is no further action for CI. I am separately notifying DS about his threats.
>
> Regards,
>
> [redacted]
>
> **Official**
>
> **UNCLASSIFIED**
>
> ---
>
> **From:** [redacted]
> **Sent:** Tuesday, March 12, 2019 1:23 PM
> **To:** [redacted]
> **Cc:** JapanIPCA
> **Subject:** RE: Alarming call with parent
>
> Let’s let DS follow up but if he calls again, please hang up and do not speak with him.

Once they threaten we no longer need to speak to him.

[redacted]

This email is UNCLASSIFIED.

---

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 1:21 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

I will loop in our DS POC, [redacted], and give [redacted] in Tokyo a heads up.

**Official - Privacy/PII**

**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 1:20 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

[redacted], I am sorry you had to deal with that. Mr. S does not have a CI case. If he needs specific assistance with his passport case, or for other urgent ACS matters, since he is in Tokyo he should contact the Embassy. Otherwise, I think we should let DS know about the threat.

Japan team: if Mr. S calls again, please refer him to the Embassy for assistance and terminate the call - [redacted]

**Official - Privacy/PII**

**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 12:21 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

Sure! No problem ☺

Parent's name: J S

DPOB

Email: mail@stackjones.com

Child's name: M S (Male)

Child's DOB:

[redacted] has already notified the parent of what steps he needs to take to get his son a passport. There isn't anything our office can do besides provide him with Post's contact information which the parent already has.

Best,

[redacted]

**Official - Privacy/PII**

**UNCLASSIFIED**

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 12:14 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

Hi [redacted] – I'm sorry that you had to deal with such an alarming call. Could you please provide the parent's name and any other details you may have – child's name?

Thanks,

[redacted]

Branch Chief

EAP Abductions

Office of Children's Issues

[redacted]

**Official**

**UNCLASSIFIED**

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 12:11 PM
**To:** [redacted]
**Cc:** JapanIPCA
**Subject:** Alarming call with parent

Hey [redacted],

Just wanted to let you know that we just got off a phone call with a very upset parent. [redacted] and [redacted] have dealt with him in the past – he does not have an IPCA case (nor is his current situation an abduction matter).

The parent made some threatening comments such as, "You better pray that I never see you in person" after a very profane outburst concerning State Department officials.

Thought it would be good to keep you in the loop.

Best,

[redacted]

U.S. Department of State

CA/OCS/CI

[redacted]

**Official**

**UNCLASSIFIED**

**From:** [redacted]
**To:** Tokyo Consular ACS Passport DL; [redacted]
**Cc:** [redacted]
**Subject:** Phone Call - Mr. S
**Date:** Tuesday, March 12, 2019 8:41:37 PM
**Importance:** High

---

Dear CCU/passport team,

If you receive a call from Mr. J S in the future, please forward the call to an Officer. Thank you.

[redacted]

**From:** [redacted]
**To:** [redacted]
**Subject:** RE: Alarming call with parent
**Date:** Thursday, March 14, 2019 5:05:33 PM

---

Hello [redacted] and [redacted],

We have not brought this to the RSO’s attention as Mr. S has not yet threatened any officers or LES in mission Japan.

Regards,

[redacted]

---
Sent from Workspace ONE Boxer

On March 15, 2019 2:47:46 JST, [redacted]@state.gov> wrote:

> Great, thank you for the info.
>
> [redacted]
>
> **Official**
>
> **UNCLASSIFIED**
>
> **From:** [redacted]@state.gov>
> **Sent:** Thursday, March 14, 2019 1:46 PM
> **To:** [redacted]@state.gov>
> **Cc:** [redacted]@state.gov>
> **Subject:** RE: Alarming call with parent
>
> Hi [redacted],
>
> Thank you for your reaching out to us. I’ve let [redacted] in Consular Tokyo know as he’s very familiar with Mr. S’s case. I’m not sure if he’s already notified RSO, so I’ve cc’d him here. I agree that the RSO would be the appropriate office to be informed about Mr. S. Thank you in advance for contacting RSO in the event they have not been notified.

If my team has any more issues with Mr. S (hopefully not), we will let you know, and ask Post to inform [redacted] on their end as well. Thank you again,

Regards,

[redacted]

Branch Chief

EAP Abductions

Office of Children's Issues

[redacted]

**Official**

**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Thursday, March 14, 2019 1:12 PM
**To:** [redacted]
**Subject:** RE: Alarming call with parent

[redacted],

I'm a DS agent in our Office of Protective Intelligence and will be the office POC if there are any more issues with Mr. S. At this point considering the threat that was made and the fact that he is in Tokyo, the RSO office will be the best entity to deal with the behavior as long as he is in their area. Do you happen to know if the Tokyo RSO office has been made aware of this issue? If not, I'm happy to contact them.

Thank you,

[redacted]

Special Agent – Diplomatic Security Service

Protective Intelligence Investigations (PII)

[redacted] [redacted]

Email: [redacted]

---

**From:** [redacted]@state.gov>
**Date:** March 13, 2019 at 6:40:44 PM EDT
**To:** [redacted]@state.gov>
**Subject:** FW: Alarming call with parent

Hello,

I wanted to make you aware of an AmCit that may be threatening CA employees. Please reach out to [redacted] directly, should you have any questions. Thank you.

Best,

[redacted]

Special Agent – Diplomatic Security Service

Criminal Investigative Liaison to:

Consular Affairs-Office of Children's Issues

FBI- Violent Crimes Against Children Section-Major Case Coordination Unit

National Center for Missing and Exploited Children-Family Abductions-Hague Countries

[redacted]

**Official**

**UNCLASSIFIED**

**Official**

**UNCLASSIFIED**

**From:** [redacted]@state.gov>
**Sent:** Tuesday, March 12, 2019 7:00 PM
**To:** [redacted]@state.gov>
**Cc:** [redacted]@state.gov>
**Subject:** FW: Alarming call with parent

Hi [redacted]

I just wanted to make you aware of a threatening phone call that one of my officers received from an American citizen, who we believe is currently in Tokyo (info below). We've told him that he needs to contact the U.S. Embassy in Tokyo for assistance with his child's passport, and I've given Consular there a heads up about his offensive phone call, in the event he may similarly threaten them also.

Please let us know if there's any additional information you might need.

Regards,

[redacted]

Branch Chief

EAP Abductions

Office of Children's Issues

[redacted]

**Official - Privacy/PII**

**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 1:20 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

[redacted], I am sorry you had to deal with that. Mr. S does not have a CI case. If he needs specific assistance with his passport case, or for other urgent ACS matters, since he is in Tokyo he should contact the Embassy. Otherwise, I think we should let DS know about the threat.

Japan team: if Mr. S calls again, please refer him to the Embassy for assistance and terminate the call - [redacted]

**Official - Privacy/PII**

**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 12:21 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

Sure! No problem ☺

Parent's name: J S

DPOB

Email: mail@stackjones.com

Child's name: M[redacted] S[redacted] (Male)

Child's DOB: [redacted]

[redacted] has already notified the parent of what steps he needs to take to get his son a passport. There isn't anything our office can do besides provide him with Post's contact information which the parent already has.

Best,

[redacted]

**Official - Privacy/PII**

**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 12:14 PM
**To:** [redacted]
**Cc:** JapanIPCA; [redacted]
**Subject:** RE: Alarming call with parent

Hi [redacted] – I'm sorry that you had to deal with such an alarming call. Could you please provide the parent's name and any other details you may have – child's name?

Thanks,

[redacted]

Branch Chief

EAP Abductions

Office of Children's Issues

[redacted]

**Official**

**UNCLASSIFIED**

**From:** [redacted]
**Sent:** Tuesday, March 12, 2019 12:11 PM
**To:** [redacted]
**Cc:** JapanIPCA
**Subject:** Alarming call with parent

Hey [redacted],

Just wanted to let you know that we just got off a phone call with a very upset parent. [redacted] and [redacted] have dealt with him in the past – he does not have an IPCA case (nor is his current situation an abduction matter).

The parent made some threatening comments such as, "You better pray that I never see you in person" after a very profane outburst concerning State Department officials.

Thought it would be good to keep you in the loop.

Best,

[redacted]

U.S. Department of State

CA/OCS/CI

[redacted]

**Official**

**UNCLASSIFIED**

**From:** [redacted]
**To:** Tokyo Consular ACS Officers DL; Tokyo Consular ACS SCS DL; [redacted] CA-OCS-ACS-EAP-Team2
**Subject:** Call from Mr. S re: his son and his son"s passport application
**Date:** Friday, April 05, 2019 4:39:26 AM

---

Mr. S called Post to claim additional –or "stronger"—exigent circumstances as to why his son's passport should be issued immediately without the wife's consent.

He stated that he has had physical custody of the child since he forcibly took the child from the mother's residence on January 2nd, but that she "re-abducted" the child on March 29th. After going through their attorneys, he went to the wife's residence (with her parents) and she "let him go", along with a backpack that she had packed for him. He claimed that in the few hours he was gone, his skin was dry and peeling again, and that it was so cold at the in-law's house that he "had frostbite coming out of my mouth".

He further stated that she had voluntarily gone to the municipal building to submit the forms showing that the child was now residing with the caller (at his residence), which enabled him to get a replacement insurance card, and had helped them move into another apartment, including assisting with getting the utilities turned on (since it was all in Japanese).

He spoke at length about the job he would have upon returning to Hawaii, how his sister would support them initially (in their $1.5M home) and how much money he would make going forward. He felt that this "new information" constituted "stronger exigent circumstances" that should compel the issuance of his son's passport without the mother's consent.

During a previous phone call, he had advised that his wife and child had returned to Japan without his knowledge while he was personally visiting Japan for about a month to renew his spousal visa. He now claims that he "only has one shirt" and "one pair of sneakers", and did not bring more because he "only came to renew his visa." He then contradictorily stated that his employer—who was also a single father—was "very supportive" and had offered to "ship all their belongings" to him in Hawaii once he is able to return.

He stated that he had learned from his attorney (through the wife's attorney) that she was considering allowing him to return to the U.S. with their son if he 1) agreed to divorce her, and 2) agreed not to hold her financially liable for "damages" and for monies lost or spent in this endeavor.

Conoff noted that if the wife was as amenable to his departure as it sounds, he may have several options available:

1) Obtain the original passport from the wife and depart immediately (best option).

2) Obtain the divorce domestically in Japan, get sole custody of the child, and reapply for a passport as sole custodial parent (second best option).
3) He could reapply with his new information, and see if Department Attorneys have a different opinion (not most clear-cut option).
4) He could continue with his lawsuit to compel the Department to issue the passport (most onerous, time-consuming, and expensive option).

He further stated that Japanese public school starts on Monday, April 8th, and that his wife had intended to attend the "first day of school ceremony" at their son's new school, but that he had thought he would be returning home soon and had not paid the fee for him to attend school.

INTERNAL NOTE: Despite his claim that the wife "re-abducted" the child, her return of the child with a full backpack, her helping him to get the forms and documentation they need for insurance and utilities, along with helping them to move, etc., it appears that she is accessible, engaged and supportive (although perhaps not to the degree he would prefer). It's unlikely that this new information would be sufficiently exigent to overcome the two-parent consent requirement.

**Official - Privacy/PII**
**UNCLASSIFIED**

**From:** [redacted]
**To:** [redacted] Tokyo Consular ACS Officers DL
**Subject:** RE: Concurrence request: DS-11 minor denial
**Date:** Wednesday, May 08, 2019 3:42:33 AM

FYI - We received a lengthy handwritten letter from Mr. S today.
I placed this document in our pending case with his daughter's passport application.

[redacted]

**Official**
**UNCLASSIFIED**

---

**From:** AskPPTAdjudication
**Sent:** Thursday, February 14, 2019 12:03 AM
**To:** [redacted] AskPPTAdjudication
**Cc:** Tokyo Consular ACS Officers DL; [redacted]
**Subject:** RE: Concurrence request: DS-11 minor denial

Greetings,

Thank you for the extensive and helpful breakdown of the situation. Based on the extreme lack of credibility of the DS-5525 and the mother's express concerns to issuance, we concur with the denial. Not seeing your child for a month would not be considered abandonment, especially when there is evidence that there is still contact between the parents, and the "transfer of legal rights" submitted is not from a court of competent jurisdiction so it would not be acceptable for our purposes.

We recommend referring the mother to OCS/CI Prevention Matters for a possible C hold to prevent the father from trying to circumvent 2PC in the future and vice versa since she originally brought the child to Japan. There is a public-facing page on IPCA for prevention matters:
https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction.html

Best regards,
[redacted]

[redacted]
Program Analyst
U.S. Department of State
Bureau of Consular Affairs, Passport Services
Office of Adjudication- Policy Division
Office: [redacted]
BB: [redacted]
Email: [redacted]

Privacy/PII
This email is UNCLASSIFIED.

**From:** [redacted]
**Sent:** Wednesday, February 13, 2019 12:53 AM
**To:** AskPPTAdjudication
**Cc:** Tokyo Consular ACS Officers DL; [redacted]
**Subject:** Concurrence request: DS-11 minor denial

Dear PPT colleagues,

Post requests concurrence in the denial of a DS-11 minor passport application executed by the father with a DS-5525. The father, J S, is well-known to the ACS unit here in Tokyo and has previously filed legal complaints against the Department for a variety of reasons, so we want to make sure that we check all the boxes before moving forward.

All of Mr. S's submitted documentation is attached to this email. The situation is as follows:

Mr. Stone came to Japan by himself to renew his spousal visa. He planned to be here for a month. His Japanese national wife and dual national child (M S, the applicant in this case) came to Japan from the United States without his knowledge during this time. Mr. S discovered their presence in Japan, and canceled his return flight to CONUS. He got a job in Japan and has remained here since.

At some point afterwards, apparently towards the end of December/beginning of January, Mr. S took physical custody of M. M has lived with him since then. Mr. S claims that he has had no contact with his mother, but also contradicts himself and indicates that the mother had stayed with them in his home as recently as last month. After Mr. S's interview on Friday, he stated that he and M were on the way to visit the mother in her hometown.

Mr. S claims that the mother has ceded custody to him, and provides an email purported to be from her to this effect. However, the mother has repeatedly called and emailed Post to tell us that she does not consent to the issuance of a passport and does not/not want M to leave Japan. She has possession of M's valid U.S. passport, as well as his Japanese passport.

Mr. S's DS-5525 indicates that he has tried to contact the mother over 200 times without success, but as mentioned this contradicts his statements to the officer about how frequently he has seen/spoken to the mother. He also indicated that the needs a U.S. passport issued in order to facilitate M's enrollment in school/in order to obtain medical care. In previous cases, post has determined that this is not necessarily true, and that other avenues exist. We find that the burden of proof for issuance under exigent/special family circumstances has not been met.

Based on the mother's express wishes against passport issuance, as well as a failure to meet the burden of proof for a DS-5525, we plan to deny the passport. Does PPT concur?

Please let me know if you have any questions or need any assistance.

Thanks!
[redacted]

[redacted]
Deputy Chief, ACS

**From:** [redacted]
**To:** [redacted] Tokyo Consular ACS Officers DL
**Subject:** RE: Concurrence request: DS-11 minor denial
**Date:** Wednesday, May 08, 2019 6:10:49 AM

Thank you, [redacted] I'll take a look at it tomorrow. Given the liklihood of another FOIA request, we should plan to scan and attach it to the passport service in ACS+.

[redacted]

---
Sent from Workspace ONE Boxer

On May 8, 2019 16:42:32 JST, [redacted] <[redacted] wrote:

> FYI - We received a lengthy handwritten letter from Mr. Stone today.
> I placed this document in our pending case with his daughter's passport application.
>
> [redacted]
>
> **Official**
> **UNCLASSIFIED**
>
> ---
>
> **From:** AskPPTAdjudication
> **Sent:** Thursday, February 14, 2019 12:03 AM
> **To:** [redacted] AskPPTAdjudication
> **Cc:** Tokyo Consular ACS Officers DL; [redacted]
> **Subject:** RE: Concurrence request: DS-11 minor denial
>
> Greetings,
>
> Thank you for the extensive and helpful breakdown of the situation. Based on the extreme lack of credibility of the DS-5525 and the mother's express concerns to issuance, we concur with the denial. Not seeing your child for a month would not be considered abandonment, especially when there is evidence that there is still contact between the parents, and the "transfer of legal rights" submitted is not from a court of competent jurisdiction so it would not be acceptable for our purposes.
>
> We recommend referring the mother to OCS/CI Prevention Matters for a possible C hold to prevent the father from trying to circumvent 2PC in the future and vice versa since she originally brought the child to Japan. There is a public-facing page on IPCA for prevention matters: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction.html
>
> Best regards,
> [redacted]
>
> [redacted]
> Program Analyst
> U.S. Department of State

Bureau of Consular Affairs, Passport Services
Office of Adjudication- Policy Division
Office: [redacted]
BB: [redacted]
Email: [redacted]

Privacy/PII
This email is UNCLASSIFIED.

**From:** [redacted]
**Sent:** Wednesday, February 13, 2019 12:53 AM
**To:** AskPPTAdjudication
**Cc:** Tokyo Consular ACS Officers DL; [redacted]
**Subject:** Concurrence request: DS-11 minor denial

Dear PPT colleagues,

Post requests concurrence in the denial of a DS-11 minor passport application executed by the father with a DS-5525. The father, J S , is well-known to the ACS unit here in Tokyo and has previously filed legal complaints against the Department for a variety of reasons, so we want to make sure that we check all the boxes before moving forward.

All of Mr. Stone's submitted documentation is attached to this email. The situation is as follows:

Mr. S came to Japan by himself to renew his spousal visa. He planned to be here for a month. His Japanese national wife and dual national child (M S , the applicant in this case) came to Japan from the United States without his knowledge during this time. Mr. S discovered their presence in Japan, and canceled his return flight to CONUS. He got a job in Japan and has remained here since.

At some point afterwards, apparently towards the end of December/beginning of January, Mr. S took physical custody of M . M has lived with him since then. Mr. S claims that he has had no contact with his mother, but also contradicts himself and indicates that the mother had stayed with them in his home as recently as last month. After Mr. S 's interview on Friday, he stated that he and M were on the way to visit the mother in her hometown.

Mr. S claims that the mother has ceded custody to him, and provides an email purported to be from her to this effect. However, the mother has repeatedly called and emailed Post to tell us that she does not consent to the issuance of a passport and does not/not want M to leave Japan. She has possession of M 's valid U.S. passport, as well as his Japanese passport.

Mr. S 's DS-5525 indicates that he has tried to contact the mother over 200 times without success, but as mentioned this contradicts his statements to the officer about

how frequently he has seen/spoken to the mother. He also indicated that the needs a U.S. passport issued in order to facilitate M's enrollment in school/in order to obtain medical care. In previous cases, post has determined that this is not necessarily true, and that other avenues exist. We find that the burden of proof for issuance under exigent/special family circumstances has not been met.

Based on the mother's express wishes against passport issuance, as well as a failure to meet the burden of proof for a DS-5525, we plan to deny the passport. Does PPT concur?

Please let me know if you have any questions or need any assistance.

Thanks!
[redacted]

[redacted]
Deputy Chief, ACS

**From:** [redacted]
**To:** [redacted] Sakurai, Jeffrey P
**Cc:** [redacted] JapanIPCA; [redacted] CA-OCS-ACS-EAP-Team2
**Subject:** W/W: Masayuki STONE DOB 4 JAN 2014
**Date:** Friday, May 17, 2019 3:23:15 PM

---

Dear colleagues,

Greetings from CA! I am writing to request Post's input on a possible welfare/whereabouts visit to M S , son of U.S. citizen J S . I understand that Post is already familiar with the circumstances. In recent correspondence with my colleagues in OCS/CI (below), Mr. S used language such as "resort to unconscionable means" and "I will resort to force." I am concerned that, given the threats of violence and his history of violent altercations, there is a chance that Mr. S 's son is at risk. His most recent address is:

I understand that Mr. S may complicate our ability to visit his son, and that there may be a need to involve CPS and/or local police. Please let us know your thoughts on how best to approach the situation.

[redacted]

[redacted]
Citizen Services Specialist
Office of American Citizens Services and Crisis Management
U.S. Department of State
Phone: 202-485-6353
E-mail: [redacted]@state.gov
www.travel.state.gov

BEGIN CORRESPONDENCE

**From:** Stack Jones [mailto:stack.jones@mail.com]
**Sent:** Thursday, May 16, 2019 1:01 AM
**To:** JapanIPCA
**Subject:** Re: Office of Children's Issues - Received Application

5.16.19.

I have filed this Hague action to have my child returned to the U.S. The abductor, my wife, has attempted to reabduct my child at least twice since filing this action. Now she has filed action in Sendai Family Court to have my child returned to her, attempting to use Japan's racist courts to intervene. This is a Hague action, and Sendai Family Court has no jurisdiction, as this action was filed long before my wife's frivolous claims that she now wants a divorce, and sole custody of my child. Sole custody means I'll never see my child again, and that will not happen, even if I have to resort to unconscionable means.

Under no circumstances will I turn my child over to my wife, as she is a flight risk, and I will surely

never see my child again. As well, I have learned she is now five months pregnant.

I do not want a divorce, or see the destruction of my family. I have taken all reasonable measures to try and resolve this matter. I am ONLY in Japan to ensure my child is not abducted again. I am ONLY in Japan to ensure my child is returned to the U.S, where my child habitually resided.

My wife engaged in conduct that required attorneys, and police intervention. She was forced to have my child returned to me, after abducting my child on May 29th 2019, and again on April 19th 2019.

On May 1st 2019, my wife contacted police, claiming I had abducted my child. She made an emergency call, where there was no emergency. The police surrounded me and my son. The police, not knowing the facts and not caring, as Japanese officials are all savage racists, seriously injured my child's face, neck, and back, trying to extract him from my arms. My child screamed in pain, and cried repeatedly. Finally, I was able to show documents that my wife had agreed for me to return to the U.S. with my child, and had signed documents to permit my child to live with me in Japan, while resolving this matter.

At the Sendai Family Court, my wife had agreed for me to return to the U.S. with my son, and then changed her mind AGAIN, and she has done countless times.

My wife's attorney admits she is unstable. The Sendai Court can see she is unstable, unemployed, has no money, has no place to live, but with her parents, and is now FIVE MONTHS pregnant with a second child that may, or may not be mine.

I have clearly communicated again, and again that my life, and my son's life are in peril. We are intentionally being financially destroyed, and are in a foreign country, with no help whatsoever from the U.S. Dept. of State, or the U.S. Embassy.

We are in Japan as virtual hostages, trying to leave with no one helping us whatsoever.

Apparently, this matter is supposed to be submitted to the Japanese "Hague" Court. A Japanese Hague Court is no different than the racist district courts, and racist supreme court that always rules against foreigners. Me, and my son will not be victimized by Japan's hateful, and racist courts.

My wife destroyed my child's passport, after returning to Japan. I have sought being reissued a passport for my son so we can leave, but that has been refused, as not "exigent" circumstances.

Because I am with my son, I am unable to work, and unable to get a passport to leave, as the U.S. Dept. of State refuses to reissue the passport.

If any Japanese court attempts to aid my wife in obtaining physical custody, I am warning now, that I will resort to force, including whatever force is necessary, to ensure my child is not subjected to any further abuse.

After sending this communication, I will be attempting to seek refuge in a foreign embassy, as clearly the U.S. government has abandoned myself, and my child. Both U.S. citizens.

J S

**Official - Privacy/PII**
**UNCLASSIFIED**

**From:** [redacted]
**To:** Tokyo Consular ACS Officers DL; [redacted]
**Cc:** Tokyo Consular ACS SCS DL
**Subject:** FW: W/W: Masayuki STONE DOB 4 JAN 2014
**Date:** Sunday, May 19, 2019 7:47:52 PM

---

Received this over the weekend from OCS desk officer covering Japan since [redacted] departed. Let's discuss. -[redacted]

Privacy/PII
This email is UNCLASSIFIED.

**From:** [redacted]
**Sent:** Saturday, May 18, 2019 4:23 AM
**To:** [redacted]
**Cc:** [redacted] JapanIPCA; [redacted] CA-OCS-ACS-EAP-Team2
**Subject:** W/W: Masayuki STONE DOB 4 JAN 2014

Dear colleagues,

Greetings from CA! I am writing to request Post's input on a possible welfare/whereabouts visit to M S, son of U.S. citizen J S. I understand that Post is already familiar with the circumstances. In recent correspondence with my colleagues in OCS/CI (below), Mr. S used language such as "resort to unconscionable means" and "I will resort to force." I am concerned that, given the threats of violence and his history of violent altercations, there is a chance that Mr. S's son is at risk. His most recent address is:

I understand that Mr. S may complicate our ability to visit his son, and that there may be a need to involve CPS and/or local police. Please let us know your thoughts on how best to approach the situation.

[redacted]

[redacted]
Citizen Services Specialist
Office of American Citizens Services and Crisis Management
U.S. Department of State
Phone: 202-485-6353
E-mail: WeltzienAM@state.gov
www.travel.state.gov

BEGIN CORRESPONDENCE

**From:** Stack Jones [mailto:stack.jones@mail.com]
**Sent:** Thursday, May 16, 2019 1:01 AM
**To:** JapanIPCA
**Subject:** Re: Office of Children's Issues - Received Application

5.16.19.

I have filed this Hague action to have my child returned to the U.S. The abductor, my wife, has attempted to reabduct my child at least twice since filing this action. Now she has filed action in Sendai Family Court to have my child returned to her, attempting to use Japan's racist courts to intervene. This is a Hague action, and Sendai Family Court has no jurisdiction, as this action was filed long before my wife's frivolous claims that she now wants a divorce, and sole custody of my child. Sole custody means I'll never see my child again, and that will not happen, even if I have to resort to unconscionable means.

Under no circumstances will I turn my child over to my wife, as she is a flight risk, and I will surely never see my child again. As well, I have learned she is now five months pregnant.

I do not want a divorce, or see the destruction of my family. I have taken all reasonable measures to try and resolve this matter. I am ONLY in Japan to ensure my child is not abducted again. I am ONLY in Japan to ensure my child is returned to the U.S, where my child habitually resided.

My wife engaged in conduct that required attorneys, and police intervention. She was forced to have my child returned to me, after abducting my child on May 29th 2019, and again on April 19th 2019.

On May 1st 2019, my wife contacted police, claiming I had abducted my child. She made an emergency call, where there was no emergency. The police surrounded me and my son. The police, not knowing the facts and not caring, as Japanese officials are all savage racists, seriously injured my child's face, neck, and back, trying to extract him from my arms. My child screamed in pain, and cried repeatedly. Finally, I was able to show documents that my wife had agreed for me to return to the U.S. with my child, and had signed documents to permit my child to live with me in Japan, while resolving this matter.

At the Sendai Family Court, my wife had agreed for me to return to the U.S. with my son, and then changed her mind AGAIN, and she has done countless times.

My wife's attorney admits she is unstable. The Sendai Court can see she is unstable, unemployed, has no money, has no place to live, but with her parents, and is now FIVE MONTHS pregnant with a second child that may, or may not be mine.

I have clearly communicated again, and again that my life, and my son's life are in peril. We are intentionally being financially destroyed, and are in a foreign country, with no help whatsoever from the U.S. Dept. of State, or the U.S. Embassy.

We are in Japan as virtual hostages, trying to leave with no one helping us whatsoever.

Apparently, this matter is supposed to be submitted to the Japanese "Hague" Court. A Japanese Hague Court is no different than the racist district courts, and racist supreme court that always rules against foreigners. Me, and my son will not be victimized by Japan's hateful, and racist courts.

My wife destroyed my child's passport, after returning to Japan. I have sought being reissued a passport for my son so we can leave, but that has been refused, as not "exigent" circumstances.

Because I am with my son, I am unable to work, and unable to get a passport to leave, as the U.S. Dept. of State refuses to reissue the passport.

If any Japanese court attempts to aid my wife in obtaining physical custody, I am warning now, that I will resort to force, including whatever force is necessary, to ensure my child is not subjected to any further abuse.

After sending this communication, I will be attempting to seek refuge in a foreign embassy, as

clearly the U.S. government has abandoned myself, and my child. Both U.S. citizens.

J S

**Official - Privacy/PII**
**UNCLASSIFIED**

**From:** [redacted]
**To:** [redacted] Tokyo Consular ACS Officers DL; Tokyo Consular ACS SCS DL
**Subject:** J S : Telecommunication with M S
**Date:** Sunday, May 19, 2019 10:17:27 PM

---

[redacted]san,

On May 20, I talked to Mr. S 's wife, M Su ( ).

She did not say much. She complained that Mr. S is not consistent with what he says and what he does.
She thought that I called her about the Hague process. I briefly explained her about the Hague and informed her that generally, it is MOFA, not the Embassy, who contact the parents in Japan.

When asked, Ms. S said that she meets with M about once a month, and she just met him yesterday (5/19/19) in S . Regarding M , she did not have concerns she wanted to report to the Embassy other than that he does not go to a kindergarten or daycare center. Ms. S reported that she and Mr. S wanted M to go to a kindergarten for two years and decided to move to the U.S. However, she said that M did not go to a kindergarten while they were in the U.S. Recently, Mr. S has been telling her that he did not want to spend money to enroll M in the kindergarten/daycare center since they may return to the U.S. shortly. Ms. S hopes that Mr. S coordinates with his employer so that he can work and let M go to the kindergarten/daycare center.

Ms. S said that she is proceeding divorce in Japan in the hope to obtain M 's custody and continue to live in Japan.

Before we finish the conversation, she again confirmed with me that a U.S. passport has not been issued to M . I did not reply to her inquiry but again informed her of the requirement of both parents' consent.

[redacted]

**Official - Privacy/PII**
**UNCLASSIFIED**

**From:** [redacted]
**To:** [redacted]; Tokyo Consular ACS Officers DL; Tokyo Consular ACS SCS DL
**Cc:** [redacted]
**Subject:** RE: Jack Stone: Telecommunication with Miyuki Suzuki
**Date:** Sunday, May 19, 2019 10:27:12 PM

---

Thank you, [redacted]-san,

This is exactly the information we were needing.

[redacted]

**Official - Privacy/PII**
**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Monday, May 20, 2019 11:17 AM
**To:** [redacted] Tokyo Consular ACS Officers DL; Tokyo Consular ACS SCS DL
**Subject:** J S : Telecommunication with M S

[redacted] san,

On May 20, I talked to Mr. S 's wife, M S ( ).

She did not say much. She complained that Mr. S is not consistent with what he says and what he does.
She thought that I called her about the Hague process. I briefly explained her about the Hague and informed her that generally, it is MOFA, not the Embassy, who contact the parents in Japan.

When asked, Ms. S said that she meets with M about once a month, and she just met him yesterday (5/19/19) in Sendai. Regarding M , she did not have concerns she wanted to report to the Embassy other than that he does not go to a kindergarten or daycare center. Ms. S reported that she and Mr. S wanted M to go to a kindergarten for two years and decided to move to the U.S. However, she said that M did not go to a kindergarten while they were in the U.S. Recently, Mr. S has been telling her that he did not want to spend money to enroll M in the kindergarten/daycare center since they may return to the U.S. shortly. Ms. S hopes that Mr. S coordinates with his employer so that he can work and let M go to the kindergarten/daycare center.

Ms. S said that she is proceeding divorce in Japan in the hope to obtain M 's custody and continue to live in Japan.

Before we finish the conversation, she again confirmed with me that a U.S. passport has not been issued to M . I did not reply to her inquiry but again informed her of the requirement of both parents' consent.

[redacted]

Official - Privacy/PII
UNCLASSIFIED

**From:** [redacted]
**To:** [redacted]
**Cc:** [redacted]
**Subject:** RE: J S Denial
**Date:** Thursday, May 30, 2019 8:09:49 PM

---

+[redacted]

[redacted] will be back Monday, so can review any updated information received by Mr. S and decide course of action.

+[redacted]

**From:** [redacted]
**Sent:** Friday, May 31, 2019 9:08 AM
**To:** [redacted]
**Cc:** [redacted] Salibur, Spencer A; Kimura, Keizo
**Subject:** Re: Jack Stone Denial

[redacted] san,

I believe we were waiting to let [redacted] san deny it since he was the interviewing officer.

[redacted]

---
Sent from [Workspace ONE Boxer]

On May 30, 2019 19:59:39 EDT, [redacted] <[redacted] wrote:

> [redacted] san,
>
> Can we deny the case as we normally do after 90 days? Or should we wait until you come back?
>
> [redacted]
>
> **Official**
> **UNCLASSIFIED**

SBU
This email is UNCLASSIFIED.

**From:** [redacted]
**To:** [redacted]
**Cc:** [redacted]
**Subject:** RE: J S Denial
**Date:** Thursday, May 30, 2019 8:10:49 PM

---

+[redacted]

Enjoy training [redacted]

This email is UNCLASSIFIED.

---

**From:** [redacted]
**Sent:** Friday, May 31, 2019 9:09 AM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** RE: J S Denial

That's right! Thank you for clarifying again [redacted] san.
Sorry for the bother.

[redacted]

**From:** [redacted]
**Sent:** Friday, May 31, 2019 9:08 AM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** Re: J S Denial

[redacted] san,

I believe we were waiting to let [redacted] san deny it since he was the interviewing officer.

[redacted]

---
Sent from Workspace ONE Boxer

On May 30, 2019 19:59:39 EDT, [redacted] <[redacted] wrote:

> [redacted] san,
>
> Can we deny the case as we normally do after 90 days? Or should we wait until you come back?
>
> [redacted]
>
> **Official**

| UNCLASSIFIED

**Official**
**UNCLASSIFIED**

Mr. J[redacted] S[redacted]

Dear Sir,

We have read your letter.

Please be informed that the National Public Safety Commission is an administrative organization responsible for supervising the National Police Agency and that the Commission has no authority to handle each individual case.

We will make a copy of your letter and send it to the Chiba Prefectural Public Safety Commission for their reference.

Best regards,

August 7, 2014

National Public Safety Commission

NPSC
No investigation

May 22, 2014

Mr. J[redacted] S[redacted]

We received and read your letter, but the National Police Agency is not in a position to deal with individual matters.

The issue you indicated in your letter should be addressed by the Chiba Prefectural Police. So could you contact the Narashino Police Station in Chiba Prefecture or the Narashino Prefectural Police Headquarters directly to consult about your problem?

The letter you sent us will be distributed to Public Hearing Division of the Chiba Prefectural Police Headquarters.

Regards. END

Public Relations Office, General Affairs Division,

Commissioner General's Secretariat,

National Police Agency of Japan

NPA
No investigation
Referred to CPHQ
No investigation

From: Azalea 佐倉校 <sakura@azaleaenglish.com>
To: email@stackjones.com
Re: Tsudanuma Station Employees
February 14, 2014 6:34 PM

Hi, J[redacted]

The station employee you had trouble with your bike called me up.
He said he, and his station master is demanding you to give them money.

I told him J[redacted] may leave Japan in a few months and he doesn't have money.

I think that made them give up to do so.

Hitomi

Extortion $ ¥

Supreme Court Appeal
Case No. 394
Attorney Okoshi Statement
Translated 10.25.14.

On Sept. 30th, 2014, my wife received a phone call from Okoshi, the Supreme Court attorney who was appointed to handle the appeal of the lower court conviction of two counts of petty assault. Okoshi said he quit the case. The filing deadline was October 14th. Since hearings in Japan cannot be held without a Japanese attorney, we contacted the Supreme Court via telephone to find out what to do next. We were told to wait for a response from the court. We never received that response. Instead, on Oct 21st, 2014 I received a letter in the mail from attorney Okoshi telling us that the Supreme Court rejected his dismissal, and that he submitted an appeal to the Supreme Court, having never once communicated with, or even met with me regarding the facts of the case. Okoshi gave his appeal statement to the court to protect his own interest, not that of his client. This is in direct violation of The Lawyer Act, Article 1.

Okoshi submitted his appeal statement without any supporting evidence whatsoever. He merely gave the court a three-page document, which addressed none of the core constitutional or procedural issues that mattered the most. Okoshi cited no applicable laws other then briefly mentioning Article 31 of Japan's Constitution. Again, and again he stated there were law violations, but never provided any Criminal Code, Criminal Procedure, or other constitutional issues that he states were violated. The filing deadline of Oct. 14th happened to be my 56th birthday. On Oct. 16th, two days after the filing deadline had passed, we learned that Okoshi had reinstated himself as the attorney, never gave notice, and submitted the appeal. My wife and I immediately went to the Supreme Court, filed a complaint, and a motion to have the deadline moved forward, so I could provide the court with real evidence, documents, photographs, communications, etc., which were related to the case.

STATE-0565

On Oct. 21st we received a statement from the Supreme Court that they approved the motion for an extension, and gave a deadline of Oct. 31st, 2014. I can clearly recall last Halloween being locked in an isolation cell, being starved, already bleeding internally from being placed in an isolation cell, 24/7 that had no furnishings. The cell flooring was tatami mats covered in a thin green plastic that made the floor unbearable to sit on. By Oct. 31st of 2013, I had also been hospitalized four times as a result of physical torture heaped upon me, courtesy of the Narashino police, guards, and prosecutors at a detention center that exists at the police station. The system of holding detainees at the police station is called Daiyo Kangoku, translated as substitute prison. This is a controversial system that is condemned by the Japanese Federation Bar Association, Tokyo Bar Association, and international human rights organizations, as well as the UN. Even while being hospitalized for numerous injuries that included kidney failure, I was dragged to interrogation rooms to sign false confessions, and taken in handcuffs, and ropes to the prosecutors to be interrogated, and threatened further with endless prepared false confessions presented for me to sign.

Regarding Okoshi's interpretation, it was performed by my wife, and according to her, she said that even in her native Japanese some of the language in the document is difficult to understand, or interpret. She stated that the language was arcane, and often vague, or ambiguous as to its meaning. Further, Okoshi's statement was incomplete, non-linear, and referred to someone, an office, or government official, but didn't state who, or what office he was addressing.

The following is a chronological breakdown of Okoshi's appeal statement translated into English.

Please, keep in mind that this is not my appeal, and I had no prior knowledge of this appeal being released. I heard many of the "facts" in his statement for the first time, and it's been over a year, and already passed through a lower court trial, and High Court proceeding where a panel of three judges refused to look at any new evidence, or anything that was presented to them.

The facts, as presented by police, and prosecutors have mired their claims in even more shit, as they continue to heap on lies trying to address issues that I have raised. Ironically, what has been stated by the victims, and a witness, who I learned about for the first time, after reading Okoshi's document, and whose statement was not read at court, and who had not testified in the lower court proceeding is impeached by a cursory inspection of videotapes that the prosecution refuses to release. One example is the statement that the station employee, Ogura was wearing a hat. Ogura was not wearing a hat, and the videotape shows this as fact. Of course, I will be asking Japan's highest court to do what no other judge has done, and that is to address the real evidence that is available to them.

I added numbers to Okoshi's statement, to break down the issues that he has raised.

Okoshi's Supreme Court Written Appeal Statement

1. Narashino police are required to keep records while someone is being detained and interrogated. Okoshi demanded Narashino police turn those records over to him to address procedural violations of law. Narashino police refused to cooperate with Okoshi regarding any aspect of the case, and produced nothing. Okoshi communicated to the Narashino police that he was the attorney representing the defendant for a Supreme Court appeal. Even so, they still refused to provide Okoshi with anything. Okoshi wrote this is a violation of law, and said this was a clear showing that the Narashino police are attempting to cover up their criminal conduct. Okoshi cited no criminal code as to what that law violation is purported to be.

2. Okoshi stated that it is a fact that the Narashino police tortured the defendant, resulting in serious injuries. As a result both the police, and prosecutors violated the defendant's rights. No citation was given as to what procedural, or constitutional law was violated.

3. Okoshi stated that the police, and prosecutors early on were fully aware that the facts supported the defendant's position, and refused to do a proper fact finding investigation into the case. Okoshi cited Article 31 of Japan's Constitution which reads, No person shall be deprived of life or liberty, nor shall any other criminal penalty be imposed, except according to procedure established by law.

4. Regarding the details of questioning at trial: The defendant's lower court statement is not reliable because he kept detailed notes that go against his in court statement. An example is where the defendant noted that the police used two black nylon ropes to tie him up by his legs, separating his knees, resulting in a broken right leg, while attempting to force extract a false confession. The defendant experienced so much malfeasance, that he recorded it in great detail. The illegal custody methods caused great mental, and physical suffering, and as a result the defendant's in court, lower court statement is not reliable.

5. In the lower court the defendant was unable to make any statement regarding the use of torture to extract false confessions, and other illegal conduct because the defendant was being held by those that tortured him in detention, and was suffering greatly mentally, and physically as a result of that treatment.

6. Narashino police Notebook No. 201410190. This notebook pertains exclusively to the defendant while being held in detention. This includes the interrogation notes, case information, and injuries suffered while in custody. There are no entries of violations to the defendant, or any statements whatsoever regarding injuries the defendant sustained while in custody. The police refuse to release this notebook to Okoshi stating that they are worried about an invasion of privacy, and therefore refuse to turn it over to the defense counsel. Okoshi said the law permits him to have access to that notebook because it is evidence of proof of procedural violations, and that Okoshi being the defendant's lawyer needs that information for the Supreme Court appeal. Still, the Narashino police refuse to release that information. There is no citation as to what code the Narashino police are in violation of.

7. In a statement provided to the court by the station employee (Takeuchi) (Sept. 12th incident), he admits to pushing the defendant first, and the defendant responded by pushing him back. The defendant stated that, "The worker pushed me, so I pushed him back." This shows that the defendant did not accept that he was the guilty party. This statement is consistently clear from the beginning of the investigation, and during every interrogation thereafter. The defendant repeated the same information, and never signed any confession. The defendant also constantly stated that he never spit on the station employee (Oct. 19th incident). From Oct. 19th, 2013, the notebook (unknown what notebook Okoshi is referring to) the defendant continuously stated that he did not spit on the station employee. On Oct. 19th, the police prepared a confession statement, which was read to the defendant, and he refused to sign it. On the same date, Oct. 19th, the defendant's statement read, "Two weeks earlier a station employee was following me, and when I passed through the gate, the station employee grabbed me from behind, which caused my folding bike to fall down. So, I felt fear." Regardless, the police prepared confessions for the defendant to sign, but he refused to sign them because he said, "These are not my words. These are your words. This is not my statement."

STATE-0066

8. On Oct. 28th, 2013. Prosecutor notes show that the defendant said "I spit at a garbage can that was on my left, and behind the station employee." Another statement recorded said, "Maybe my spit may have come in contact with the station employee, but I didn't spit at the station employee." The defendant said, "I had no intention of spitting on the station employee." But in the defendant's lower court statement it was recorded that he "admitted" the facts, but his words were stated in a clearly vague, and ambiguous manner that the court should never have interpreted as a confession.

9. In a lower court statement the defendant was asked by the judge if he was guilty, the defendant said, "I can't fight this." This is not an admission of guilt. This was stated because he was clearly being held in an abusive situation. Further, the defendant was a foreigner, and couldn't understand the Japanese language that was spoken during the lower court proceedings. The lower court judge should have admitted that there was inevitable problems with the reliability of the in court statements, and that there were also interpretation issues, and the judge should have recognized there was something wrong when the defendant said, "I can't fight this", instead of maintaining that this was a statement of guilt.

10. If the defendant hadn't admitted the facts, the prosecution would lose the case. The prosecutor had authority, abused it, and performed an illegal investigation.

Translation from online service. "The abuse of power by the prosecution is unacceptable. They lost control, and failed to investigate this matter properly, and no amount of state compensation could repair the damages suffered by the defendant."



11. The lower court attorney, Kushida made an in court statement saying the sentencing was unjust. Kushida insisted that the defendant suffered mental, and physical suffering while held in custody. (Someone) didn't investigate. Further, the court (which court the lower court, or High Court?), did not investigate as to the severity of the sentencing, which was clearly unjust. The assault against the defendant, and the injuries he sustained show the sentencing is unfairly heavy.

12. If the defendant's statement was investigated, the violation, his injuries, and sentencing are clearly excessive. The prosecution was invalid, and the case should have been dismissed against the defendant during the investigative stage. This is contrary to justice, and the defendant's rights. No citation as to what the law is that was violated.

13. On Oct. 19th, at the time of the defendant's arrest, the station employee's appearance showed that he had a minor injury on the right side of his forehead. There are two photos provided by the prosecution that show this injury. On Oct. 25th, the station employee made a company report regarding the incident, and only talked about the spit. He never discussed any other injuries. No mention was made about this forehead injury on Oct. 19th. It was only made after the police, and prosecution began communicating with the station employee, and only after the defendant kept refusing to sign, or put his fingerprint on false confessions. It's unnatural the station employee made an office report on Oct. 25th, and did not mention receiving a forehead injury on Oct. 19th. (This means the station employee never discussed any injury until after the police began communicating with him.) The original charge was a spit, which was later elevated to include three punches. This is suspect. There are also no video recordings of any of these punches. (Only photo reenactments made by a police officer that participated in breaking the defendant's leg, and the station employee.

14. On Oct. 21st, the defendant requested an attorney, but police, and prosecutors refused to provide one. The defendant continued to refuse to sign false confessions. It's important for a defendant to have an attorney during the investigation stage. This shows the police, and prosecutors invaded the defendant's right to have an attorney represent him. At this point, the investigation is illegal, and the defendant's leg is then later broken, and (they) invaded the defendant's right to have an attorney. The defendant's rights should be admitted under law. There is no citation of law, but Okoshi is referring to Article 34, the immediate appointment of counsel.

15. The two train workers work for the same company. This should be of concern to the case because they can prepare statements for the police, protect each other, and make statements that give them an advantage over the defendant. The station employee's don't understand English, and they misunderstood the defendant's words believing they were insulting. As a result, because the station employees do not understand the true words, or their meaning, the station employee could tell the police the defendant's words were worse than what they actually were.

16. After two months into the investigation, a "witness" suddenly appeared, and gave a detailed statement about the case. The details spoken are unnatural, and suspect.

17. The station employee claimed the defendant spit on the middle of his chest. But the station employee was wearing a tie, so how could he get the defendant's spit on the center of his chest? It's unnatural.

18. On Oct 19th, defendant's DNA was found on the station floor by the police. This is located where the defendant said he spit. On that same day the station employee gave his shirt to the police. But, on Oct. 29th he (whoever he is) tried to find the spit on the shirt. For ten days the police, and prosecutors could not discover the defendant's spit on the shirt. Yet, ten days later, the

shirt was checked, and that is when the DNA appeared at the center of the shirt.

19. Photos and security camera. Police removed 22 stills from a videotape recording of the station window. Photo number 17 shows what the police claim to be when the defendant spit on the station employee, but the video still is unclear. On the concourse there is a security camera that shows the station employee wearing a hat, and the defendant engaging in no violation of law.

20. A coworker claims he saw the defendant spit on the station employee. He thought this was a dangerous situation. He said when the station employee, and the defendant left the window area, he followed them. But, the coworker said he did not see the defendant punch the station employee, only that the defendant picked up the station employee's hat, and glasses, and tried to give them to the station employee, which the station employee refused to accept. This statement is very unnatural because if he followed the defendant, and station employee he would not only see the defendant pick up the glasses, and hat, but also the assault.

21. After following the defendant, and the station employee, the coworker returned to call for help. But this is an unnatural action.

22. It was 9:00 a.m. on a Saturday. The station was crowded. It's unnatural that there are no witnesses to corroborate the station employee's statement being that the station was crowded at the time.

23. Spitting at a garbage can is not an intentional act that is required for an assault charge.

24. The sentencing is unjust. The lower court said the defendant's actions were evil. The station employee said he wanted exact punishment given to the defendant. They never received any consolation money, or an apology from the defendant. They never saw the defendant's regret.

25. The defendant doesn't have a history of criminal activity, and he has a Japanese wife, and they have a child, and this is a first judgment.

26. The defendant doesn't understand Japanese, making it difficult to communicate. On the other hand, the Japanese worker doesn't understand English either, and misunderstood the defendant's words.

27. The defendant thought he could get his bike in the station, but the station worker suddenly stopped the defendant, and his folding bike quickly fell down. The defendant thought this was a serious violation on the part of the station employee.

28. Oct. 28th. The prosecutor's notes show the defendant's statement that the station employee kicked the defendant, and the station employee also tried to punch the defendant, but the defendant tried to avoid begin punched, and the station employee's glasses fell down. The defendant picked up the station employee's glasses, and tried to hand them to him, but he refused to take his glasses from the defendant. The defendant thought he was the victim.

29. The Tokyo Bar Association is investigating the Narashino police misconduct, but the Narashino police refuse to cooperate with them.

30. We can't see the use of any abusive words from the defendant in the videos. But, in court, the defendant final statement was that he must learn Japanese, and that he regrets what happened.



31. Any penal servitude is unjust, and considering the defendant has a family, the punishment should have been a mere monetary fine.

SC Statement
ct. refused time for translation
After Oskoshi quit 1. never met / never responded to phone calls.
2. Quit 2 days before filing deadline
3. No translation.

10.28.14.
J[redacted] S[redacted]
[redacted]

Case No. 394
Appeal to the Supreme Court

**I. Facts Of The Case.**

Prior to detention on Oct. 19th, 2013, for several weeks the defendant had been complaining to his employer, Hitomi Katsuyama, owner of Azalea Language School, and advertiser at several Keisei Electric Railway Company (KERC) stations, and to his fiancé now wife, and mother of their nine month old son, in both oral, and written form that the defendant in this case had been systematically harassed, and targeted with aggressive behavior by KERC employees whose conduct was similar to that of the Zaitokukai, and other hate groups that have created international consternation for Japan. This violent conduct has resulted in numerous calls from the U.N. Human Rights Committee, and the U.N. Committee on the Elimination of Racial Discrimination, for Japan to ban all propaganda advocating racial superiority, and hatred towards foreigners, and punish the perpetrators. Yuval Shany, of the U.N. Human Rights Committee reported that in 2013 alone, the U.N. received more than 360 reports regarding violent hate crimes that took place in Japan, all against foreigners.

Exhibit A. Email communications between the defendant, and his former employer, and fiancé. These communications include the defendant complaining about racially motivated harassment, and assault perpetrated by the KERC employees. Exhibit A also shows that KERC employees [illegible]ura, and Takeuchi contacted the defendant's employer to extort money from their ongoing criminal conspiracy.

STATE-0569

Sept. 12th, 2013.

After being physically assaulted on Sept. 12th, 2013, and having his bicycle thrown to the ground at Keisei Tsudanuma station, the defendant called for the police to intervene. They didn't. The station employee Takeuchi was reprimanded by his supervisor, and sent away. It was made known to Takeuchi's supervisor that the defendant was physically disabled. The supervisor apologized for Takeuchi's poor conduct, and allowed the defendant to board the train. The defendant reported this incident to his employer on the following day. Two eyewitnesses also reported the incident to the defendant's employer. In the eyewitness report they stated that a crazy homeless person had attacked the defendant. The information was turned over to the police, and prosecutors, by the defendant, his fiancé, and employer, but they refused to investigate in the matter, and refused to contact the witnesses.

Harassment took place nearly every time the defendant used the Keisei Tsudanuma station after that incident. As a result, the defendant quit his job on Oct. 4th, 2013. Communications that took place between the defendant, his employer, and fiancé as shown in Exhibit A proves this to be factual. Further, Tim Havil-Austin who had trained the defendant when he began working at Azalea language school had warned the defendant about the conduct of KERC employees. The defendant asked Havil-Austin why he was quitting his job at Azalea, and leaving Japan. Havil-Austin stated that he was returning to New Zealand because of being the victim of numerous assaults on the Keisei train line. Exhibit A email communications between the defendant and his employer, and fiancé address the communications between the defendant, and Havil-Austin, and the fact that the employer was aware that there were problems at the station even before the defendant began working for the company.

Question. If the defendant had assaulted Takeuchi on Sept. 12th, 37 days before he was detained, why was he allowed to continue to board trains on the Keisei Line? Why was the defendant not arrested on Sept 12th, if the defendant had committed a crime? Why was the defendant allowed to continue to use the KERC line, and travel to, and from that station at least six times a week prior to Oct. 19th? A police box is located at the Keisei Tsudanuma station, and the police, whom the defendant called on Sept. 12th, took no action. Further, the defendant's place of employment was located directly across the street from the police box. The officers could see the defendant as he walked to and from work, and at his working space in the Azalea school location. The defendant also walked past that police box nearly everyday, going to work, returning home, and during work breaks, such as during lunch breaks. If a crime had occurred on Sept. 12th, the defendant would have been arrested. But, he was not arrested because he had committed no crime.

In Takeuchi's statement to prosecutors, and which is in their report, he admitted to pushing the defendant first, and grabbing the defendant's bicycle, trying to wrestle it from the defendant's hands, which ended up falling to the ground. This was a brand new, and expensive bike. It is also stated in Takeuchi's company report that he pushed the defendant, and grabbed the bike from the defendant's hands. Regardless prosecutors charged the defendant nearly two months into detention with an assault charge. Certainly, when a much younger man, pushes around an elderly disabled person who is trying to commute home, and that person tries to prevent themselves from being injured further, cannot rise to a criminal offense. At most it is a justified use of self defense when the defendant, who admitted to the prosecutors he pushed Takeuchi because 1. He feared falling down the steps that led to the platform, 2. Was already suffering from a well-documented long-term physical injury. Takeuchi's claim that he was pushed, and punched in the chest, head and face several times by the defendant is ludicrous. The prosecutor claims that these numerous punches left no injury. How does one punch someone numerous times, and it result in no injury? There is no evidence to back this fabrication, and Takeuchi's attempt to extort money from the defendant's employer attacks his motive for filing the false charge, and makes this claim suspect.

Question. Where are the videotapes to prove that this assault took place?

Exhibit B. Support that shows the defendant was disabled at the time of the Sept. 12th incident includes X-Rays of the defendant's right leg, which were taken by Dr. Daichi Komei on July 29th, 2013. These X-rays show that prior to the defendant being detained, his leg was not broken, as will become an important matter in this case. Exhibit B also includes a copy of the indictment delivered to the defendant while being detained at the Narashino daiyo kangoku detention facility.

Dr. Komei's is the owner of a clinic, and an orthopedic surgeon who the defendant visited regarding a serious right leg injury. This injury occurred when the defendant had the right-of-way while walking across a street on his way to work. While crossing the street the driver of a late model light blue Honda ran a red light, lost control of the vehicle, and hit the defendant, causing serious injury to his right leg. When police arrived at the scene, the driver claimed that the defendant punched him. Yet, three eyewitnesses who worked at a nearby real estate office who saw the entire event said that the defendant did not punch the driver, and that it was the defendant had asked them to call the police. Prior to the police arriving at the scene the driver of the car, tried to use force, and the threat of force to chase the defendant away from the scene so the driver could avoid being cited. The police took no action against the driver regarding his recklessness.

The police took no action regarding the driver's attempt at filing a false police report. The defendant pointed out cameras on the street, and told the police the only thing those cameras would show is the culpability of the driver. The police told the defendant he should pay for the damage to the car. The defendant refused to acknowledge the police's irrational remarks, and responded by saying the driver would pay his medical expenses, and damages, which would be much higher. The police told the defendant that the driver, drove professionally for a delivery company and if they ticketed him for causing an accident, he'd lose his job. This is typical police misconduct when it comes to the treatment of foreigners in Japan. It was this injury that caused the defendant to spend 1600.00 USD to order a quality folding bicycle from the U.S. so he could use it to commute to work, because the injury left him nearly unable to walk. It was this folding bicycle that Takeuchi grabbed from the defendant's arm, and threw to the ground, after pushing the defendant near the top of the stairs that headed downward toward the train platform. During the Sept. 12th incident, the defendant showed Takeuchi's supervisor medical devices that he was carrying in his bag, and painkillers, which were prescribed by Dr. Komei. All of this would be made known to the police, and prosecutors who failed to investigate this matter. In fact, it was the defendant that brought up the Sept. 12th, incident to the police, not Takeuchi. The defendant was trying to cooperate with police officer Mizokuchi, who early on in the investigation promised the defendant that he would be unbiased and do a proper investigation. Mizokuchi didn't. He and the prosecutor Kume, took the defendant's words, and used them against him to file a false charge of assault, nearly two months into being detained at Narashino Detention Center, on Oct. 19th, 2013.

Exhibit C. Photo of the defendant's folding bicycle that he had been allowed to use at Keisei Usui Station to board the train that he took to work. Later that same day as the defendant tried to return home with the same folding bicycle he would be assaulted by Takeuchi at the Keisei Tsudanuma station. All of this was made known to police, and prosecutors who refused to investigate. Exhibit C includes an article written by the defendant about the folding bike for Nihongo News, which was published Oct. 3rd, 2103. http://nihongonews.wordpress.com/2013/10/03/montague-folding-bike.

STATE-0570

Question. Why was the defendant allowed to board the train with the folding bicycle at the Keisei Usui station with no issues, yet upon returning home from the Keisei Tsudanuma station on the same line, the defendant would be treated so violently, with the bicycle being Takeuchi's excuse? The answer is because the Keisei Usui station employees are not racists, and had not been targeting, and harassing the defendant as the Keisei Tsudanuma employees had been. Further, since that incident defendant has used that same folding bicycle numerous times on various lines, and has never been stopped.

There was no reason for Takeuchi to act in such a violent manner toward the defendant, and the fact that the defendant was not arrested, and the actions of Takeuchi's supervisor, apologizing, and allowing the defendant to board the train is proof of this fact. Further, the statements of two eyewitnesses who thought the wrongful conduct of Takeuchi was that of a crazy, homeless person testifies to his assaultive conduct, and sloppy police, and prosecutor's handling of the matter.

In the indictment, which was handed to the defendant on Dec. 3rd, 2013 while still detained at the Narashino Detention Center, it stated that the defendant "thirsted", which the prosecutor meant to record as "thrusted" the bicycle at Takeuchi's face, with his hands. This meant that the defendant had to raise the bicycle up in the air, and lift it over his head to perform such act. This is absurd, as the bicycle weighs 17.2 kilograms, and the act itself was impossible given the fact that the defendant could barely walk. See Exhibit C. Note: The language of the second indictment mirrors the language of the first charge, as will be discusses below.



**II. Facts of case No. 1566.**

The prosecutor's indictment reads in part:

*The defendant committed a battery against Tetsuya Ogura, by spitting on his chest. Furthermore, the defendant punched him once in the face, and once in the head in the concourse area of the station. The defendant also punched Ogawa once in the head of the pedestrian walkway on the Yatsu No. 5 railway crossing road. As a result of the aforementioned unlawful use of force, Ogawa sustained a bruise on the head, and face, which would take approximately one week to heal completely. Crime committed Article 204 of the Penal Code.*

Question. Who is Ogawa? If the prosecution can't get a name correctly stated on a poorly executed indictment for assault that theoretically carried a lengthy prison sentence. which the prosecution was seeking, how can anything the prosecution claims to have occurred be relied upon?

The defendant is accused of assaulting Ogura with a spit that a videotape recording released by KERC shows never occurred. Ogawa several days later would claim to have been punched three times by the defendant. There is no evidence on either of the two videotapes released by KERC to the prosecution that the defendant had assaulted anyone named Ogura, or Ogawa. The two recordings only show Ogura assaulting the defendant, while the defendant, who was fully aware that CCTV cameras were recording the incident, had not even relied on using self-defense.

The indictment contains factual impossibilities, as there is no known victim that goes by the name Ogawa in this case. If there is a third party named Ogawa that claims to have been assaulted by the defendant, it was never raised at trial. If the prosecution's work is so sloppy that they can't recall the names of their own victim, when preparing an indictment for a charge that carries with it the possible sentence of 30 days to 15 years in prison, this raises the issue of competency, and the Court should consider if there is anything in the indictment that could withstand the requisite legal standard for the finding of guilt, beyond a reasonable doubt.

Exhibit D Indictment delivered to the defendant while detained at the Narashino Detention Center. This indictment was served on Nov. 8th, 2014. The same day the police, and guards tortured the defendant, broke his leg, and small finger on his right hand trying to force extract false confessions regarding this case. Certainly, an indictment should be written as concise as possible, and in a manner that the charges accurately reflect the parties involved. There exists no person in this case named Ogawa. Therefore it is a legal impossibility for the defendant to have punched someone in the head, and face three times that does not exist. As a result, Case No. 1566 must be overturned. Article 37 states that in all criminal cases the accused shall be permitted the opportunity to examine all witnesses. A defendant cannot examine a witness that does not exist. Article 34 states that no person shall be detained without immediately being informed of the charge against him. The defendant was held for two weeks before these phony punches were added to the initial charge. Ogura never mentioned being punched by the defendant when he reported this to his KERC superiors. These fabrications came about after Ogura, and Takeuchi began to conspire about extorting money for their false claims, which is a far more serious crime than what the defendant is being charged with.

Oct. 19th, 2013.

On the day the defendant was detained, the ticket machine that he purchased a ticket from on the KERC line malfunctioned, and as a result he had to purchase a ticket that cost more money. The

defendant's employer paid for work related transportation fees, and the defendant wanted to assure that there was no accounting issue regarding transportation costs. Upon arrival at the Keisei Tsudanuma station the defendant tried to get a reimbursement, but was refused service by Ogura. The defendant was told to get out of the station.

Question. Who treats a customer like that? Especially one whose employer advertises on several KERC lines?

After being told to get out of the station, the defendant asked to speak to Ogura's supervisor, which was refused. Ogura then called the defendant a stupid foreigner, (baka gaijin) and yelled at him to go. Then defendant didn't go. He repeated that he wanted to speak with the supervisor. Ogura told the defendant, "Your fault. Go!" At this point the defendant had seen enough unjustified conduct by KERC employees, and other assaults, and injustices heaped upon him. In great disgust the defendant turned to his left, and spit at a garbage can. The spit came in contact with no one, as can be seen in a videotape recording that captured the event at the station window.

The defendant then picked up the overpaid ticket, and left the window to exit the station. To the defendant, the incident was over. He met rudeness heaped upon him with a symbolic act that was equally as rude. Regardless, spitting at a garbage can is not a crime, and certainly does not rise to the level of an assault.

STATE-0071

After the defendant left the window, the same videotape recording shows Ogura racing toward a door that exited the window area, and into the concourse, for no other purpose but to try and provoke the defendant into engaging in a physical altercation. A second videotape recording that shows Ogura racing out that same door, and violently assaulting the defendant, who is refusing to engage in a physical altercation, supports this. This recording was turned over to the police, and prosecutors who saw the defendant had committed no crime, and from that point onward, began to engage in a phony reenactment, claiming that all of the incidents that are in dispute, occurred outside of camera view, which the defendant will prove is false, as several cameras captured the incident, and have been intentionally withheld from the defendant.

The only thing the defendant asked the lower court attorney, Kushida to do at trial was to show the videotape recordings to the judge, which easily prove the defendant engaged in no violence, and defeated the prosecutions claim by the standard required in a finding of guilt, which is beyond a reasonable doubt. He did not. The defendant couldn't communicate with the attorney due to the language barrier, and the way courtrooms are set up, the defendant couldn't communicate with the defense attorney anyway, as they are forced to remain apart during proceedings. Article 37 states that at all times the accused shall have the assistance of competent counsel assigned by the state. Is this not a violation of The Lawyer's Act? Kushida was aware of numerous matters pertaining to the defendant including the state's use of physical torture, psychological torture, and extreme duress to coerce the defendant to comply with what the prosecution wanted. This will be discussed in detail below.

The second videotape recordings show the defendant using great restraint, and that he refused to engage in a fistfight. The recording shows the defendant on the defensive, always moving backwards, as he headed toward the exit stairwell, and always avoiding any contact with Ogura, as Ogura attempted to throw kicks, and punches at the defendant.

Question. Is racism so inherent in Japanese society, that the police, prosecutors, and courts, those with authority, would rather turn a blind eye to the criminal acts of a Japanese when it is being used against a foreigner, and in the process, protect that violent conduct, thereby aiding, and



abetting in the furtherance of that criminal process, rather than admit that Ogura's conduct was entirely inappropriate, and would inevitably be the direct result of everything that transpired in the chain of events that resulted in great harm to the defendant?

Ogura repeatedly tried to punch, and kick the defendant as he continued toward the station exit. Finally, at the top of the steps that led two flights down to the street below the defendant raised the large bag that was in his right hand to block yet another one of Ogura's punches that was aimed at the defendant's face, and which was intended to knock the defendant down the two flights of stairs. Ogura's own forward movement caused his forehead to hit the bag the defendant was carrying, as the defendant tried to avoid Ogura's wild swing. During the attack, Ogura's glasses fell to the ground, and the defendant picked them up to hand them to Ogura, while simultaneously telling Ogura to stop attacking him. As the defendant bent over to pick up Ogura's glasses, Ogura tried to kick the defendant in the face. Ogura refused to take his glasses from the defendant, and prepared to engage in another physical assault. The defendant placed Ogura's glasses on his arm, and quickly proceeded to hop down the steps. The defendant hopped down the steps because of the physical disability to his right leg that was described above. Further, the defendant has injured the leg further as he tried to run away from Ogura in the concourse area, as he avoided Ogura's assault, and as the defendant attempted to run away. None of this can be disputed as fact, as this is clearly visible in the videotape recording of the concourse area.

When the defendant arrived at the bottom of the steps the police had already arrived, and the incident was over. Ogura ran down the steps after the defendant, and immediately told the police that the defendant spit on him. He said nothing about being punched. In fact, the defendant was detained because Ogura had claimed to have been spit on.

There are at least three other videotape recordings that caught the incident from beginning to end. These videotapes were turned over to the prosecutor according to KERC management. The Chiba Public Prosecutor's office claims that the defendant can have access to the evidence package once the appeal to the Supreme Court has been finalized. This is incredibly unjust.

Question. What authority gives prosecutors the right to intentionally withhold evidence necessary for a defendant to prepare and adequate defense, have a fair proceeding, and address core issues such as misconduct regarding procedural, and constitutional errors? Certainly the Constitution was never written to allow for such gross imbalances in adjudicating a criminal proceeding. Article 14 states that the people are equal under the law and there shall be no discrimination in social relations, or social status. Certainly a social relationship has been forged where prosecutors drag a defendant into a criminal proceeding, even where that relationship is an adversarial one.

The videotape recording at the window shows Ogura hadn't been spit on, which means he lied to the police, and filed a false police report. The prosecutors relying on Ogura's statement before engaging in an adequate investigation saw that the recording disproved Ogura's claim, and instead of submitting a copy to the lower court judge, removed a static image out of the video, and claimed that it showed the defendant had spit on Ogura. That still is so blurry that no judge could rely on that given the high threshold in determining guilt in a criminal proceeding.

**III. Suspect evidence.**

A DNA test performed on Ogura's shirt shows the defendant's DNA at the center of the shirt. This sounds convincing However, Ogura was wearing a tie at the time of the incident. When the defendant brought this up to the High Court, that court allowed Ogura to amend his statement. Ogura then claimed that he "anticipated" that the defendant was going to spit on him, so he

quickly moved out of the way, and the tie moved, and that's how the DNA sample got on the center of the shirt. A cursory viewing of the window videotape recording shows how absurd this fabrication is. The lower court attorney stated that the defendant had not spit on Ogura in his closing statement, yet the lower court judge refused to acknowledge this statement. At the High Court, the defense attorney who saw the videotape recordings stated in his appeal that what the defendant was accused of was impossible, that he had not spit on anyway. The second videotape recording shows Ogura as the sole assailant, kicking, and punching the defendant. Both the lower court defense attorney Kushida, and the High Court defense attorney Kato, who have reviewed those recordings told the courts that what the defendant is accused of is highly suspect. The defendant will tell you emphatically, as he had always stated in every interrogation, and even after suffering extreme duress, and physical torture that he had not engaged in any criminal activity at any time. So, why the sudden change at the initial trial proceeding? That will be discussed below in great detail.

Question. Why have the courts been derelict in their duties? Why are they allowing Ogura to continue to perjure himself, by continuing to fabricate testimony? Ogura has impeached himself numerous times, yet no person in a judicial capacity has bothered to look into the matter. Why has every judicial officer refused to acknowledge the existence of those videotape recordings, and take the time to view them?

Exhibit E. The defendant is a professional audio-video engineer, and received certification as such in 1996. The defendant received his BA (honors) in Communications for studying film production. The defendant has written 16 full-length feature films, edited award winning feature films, and at one time was partners with Junichi Mimura, a well-known Japanese film producer, and director. The defendant is an expert cameraman, and is an award-winning, published photographer. The defendant knows cameras, and he knows the cameras located near the stairwell, and on the street at the Keisei Tsudanuma statin are CCTV video cameras with wide-angle lenses that captured the entire area where Ogura claims to have been punched three times. The defendant has contacted the prosecutors numerous times to obtain the evidence package, the phony reenactments in which Ogura, and Takeuchi took part in, and the video recordings that are known to exist. The defendant has also sought to gain possession of the videotape recordings that captured the incident near the stairwell, and the street below. The two punches that Ogura claim to have occurred, happened right below a CCTV camera located near the steps leading to the street. The defense has been refused access to these videotape recordings, and this is suspect. If what Ogura claims happened near those steps, let them prove it. Why is it the defendant, and not the prosecutor demanding those videos to be released? This is insulting to logical reasoning.

On 10.17.14., 10.21.14., 10.23.14., 10.24.14., 10.27.14., 10.28.14., the prosecution has stonewalled the defendant, with Kataoka, stating that he will investigate the matter, and return calls to verify his findings. Kataoka never returns those calls. On 10.23.14., the defendant tried to set up an appointment to view the evidentiary material, as originally the prosecutors office agreed to. Kataoka said he would call back to schedule. He did not. The defendant contacted him again, and Kataoka said he needed to contact the Tokyo prosecutor's office, investigate the matter, and would call back after the 27th. Again, he did not. On 10.28.14., Kataoka said the office would give answers about being able to see evidence on 10.29.14. Yet they did not return the call. By 10.29.14., it would be too late to meet the Supreme Court appeal filing deadline, and have the information translated. The prosecutor brought the case. They intentionally failed to do a full investigation, and now they don't want to allow the defendant pick apart their procedural, and constitutional errors. This is unacceptable. Finally, the prosecution states that the defendant can have access to all of the evidence one the Supreme Court case appeal has been exhausted.



Included in Exhibit E are photographs of three cameras at the KERC station that would have captured where Ogura claims the defendant punched him. With at least five cameras that captured the incident, the prosecutor has released but two recordings, and both of those show the defendant committed no crime. The defendant has sought the release of these other recordings to vindicate himself since his reputation has been destroyed, and to show that Ogura has perjured himself, and as a result none of what he has stated is credible. A defendant should be given full opportunity to impeach a witness, especially when the defendant knows that the charges brought against him are false. Criminal Code 281 (4) requires all evidence in their possession to be turned over to the defense for any legal proceedings, including appeals. The only reason the prosecution has given the defendant for refusing to allow access to evidence in their possession is that they are worried that the defendant will go to the media with it. If the police, and prosecution have nothing to hide, and did such a wonderful job on their case then why would they have any concerns about the defendant going to the media? Withholding disputable evidence is denying the defendant the opportunity to raise a valid defense, and to have a fair proceeding. Article 21 of the constitution states that no censorship shall be tolerated, and that no secrecy of any means of communication be violated.

Question. At what point is evidence to be turned over to the defendant? During proceedings when it aids the defendant in preparing an adequate defense, or prepare for an appeal? Or once all proceedings have been exhausted, and where that evidence can no longer serve any purpose? There can be little wonder why less than 1% of cases result in an acquittal, and less than 3% of cases are overturned on appeal when courts allow this level of gross abuse of authority to exist.

Police never questioned the defendant at the scene. Police immediately allowed Ogura to taint their investigation where he claimed the defendant called him a monkey. Weeks later this would change to "yellow monkey." It's ironic when a racist who comes from a nation whose politicians promote race hate, attempts to use it to their advantage, alluding that the defendant is racist. The true racist aspect of this case is where Ogura called the defendant a stupid foreigner (baka gaijin) and where the police, and prosecutors were made fully aware of this intentionally omitted this fact from record. Yet, both the lower court, and the High Court judges mentioned this fabrication in their rulings. No doubt the prosecution intended to incite the judiciary, and confuse the issue, and the courts took the bait. Regardless, if the defendant had called Ogura a monkey, that statement is not a requisite element in determining if the defendant is guilty of assault. The case was entirely tainted with this false information. The Supreme Court defense attorney Shinji Okoshi stated in his appeal that at no time during the videotape recordings is the defendant seen making any offensive gestures, or saying bad things to Ogura.

**IV. Detention at Narashino Detention Center under the Daiyo Kangoku.**

The police detained the defendant without asking the defendant a single question at the scene of the incident, and without adequate probable cause. Along with prosecutors they would intentionally fail to record evidence that proved Ogura had in fact assaulted the defendant. Ogura had kicked the defendant leaving a bloody hole in his left shin. The kick was so hard that it was still visible 46 days later when it was finally recorded through the Narashino police station interview window on a cell phone that had poor photographic quality. The court appointed interpreter Shoko Doi, who assisted attorney Kushida in communicating with the defendant, took the photo.

What's the rational in failing to preserve evidence? Certainly, the police, and prosecutors were the only one that could have preserved that evidence since the defendant was being detained, and illegally withheld from legal representation. The only reason this evidence was not preserved was

to ensure that the defendant could not make a showing that he was a victim of assault. What if the injury was a stab wound from a knife? Or a gunshot wound? What if the defendant was a woman who had resorted to using force to stave off a rape, but the police and prosecutors refused to preserve as evidence proof that she had been the victim of rape?

Question. Are criminal proceedings so pathetic that a defendant having to face a 99.9% conviction rate, with an inherent stigma attached to the proceedings due to the fact that the defendant is a foreigner, and on top of that, face intentionally acts of police, and prosecutors refusing to preserve evidence, when they are the only ones in a position to do so, and for no other purpose but to ensure a defendant could not raise a valid defense, or have a fair trial?

Exhibit F. Photograph of a kick wound the defendant received by Ogura, and which police, prosecutors, and three pretrial judges refused to preserve as evidence for trial. Note that the kick wound was so severe that the injury was still noticeable, and the bruising had yet to subside after 46 days. Compare this to Ogura's claim to have received a red mark that took less than a week to entirely heal. A mosquito bite takes longer than that to go away. As proof that this photograph is authentic, the defendant includes a document provided by defense attorney Kushida, which accompanied the photo when it was provide to the defendant.

**V. Legal representation.**

The defendant sought, and was refused legal representation at every stage of the investigation. He would not see an attorney until day 38, a full 15 days after being indicted, and long after police had broken the defendant's leg attempting to force the defendant to use his index fingerprint to sign false confessions. It took the U.S. Embassy contacting the Chiba district court, protesting the prosecutor's refusal to appoint counsel, and demand the defendant be provided legal representation. Every day the defendant was obtained he sought legal representation. Article 34 calls for the immediate privilege of the appointment of counsel. Yet, the prosecution would make a mockery of this provision. If an attorney was provided, which is constitutionally mandated, much of the damages suffered by the defendant would have been avoided, such as being subjected to torture because police, and prosecutors were angered when the defendant refused to cooperate, and sign false confessions. The defendant wouldn't have raised other issues such as the prior bad acts of Takeuchi, which resulted in a second bogus charge being filed. There would never have been the second charge, and the defendant would have been released, and at his wife's side during the birth of their child.

The defendant is 56 years old. At the time of detention he was 55. This was the first time he had fathered a child. The state stole the right of the defendant to be at the side of his wife, and to be present at the miracle of his son's birth. The defendant will never forgive Japanese authorities egregious, abominable, and unconscionable acts, violating this once in a lifetime opportunity.

The defendant notifies the Court that long after every government official that took part in their despicable, and criminal acts, it will remain in the front of the defendant's mind. The defendant is not guilty, and suffered great indignity, and untold losses as a result of this matter. The defendant has suffered character assassination, financial ruin, the loss of more than 30,00,000 yen in salary earnings, the loss of a home that he was renting, and the security deposit. After being financially ruined the defendant had to relocate, laying down a large sum of money for a security deposit on a rental property that costs the defendant 31,200 yen more than his previous rent. The defendant had to rent a van to move his belongings. The defendant had to spend countless hours, and continues to do so trying to clear his name. The defendant has laid out an enormous amount of money to pay for the material necessary to prepare this appeal. The defendant lost his car as a



result of a snowstorm that destroyed it when the carport of the home he was renting collapsed as he was being detained. The defendant's wife lost all of her personal being eight months pregnant when she had to leave her company job to prepare to give birth to their child. The defendant lost the opportunity to bond with his unborn son, and has suffered numerous physical injuries, which the police and prosecutors continue to try and hide from the courts. And for what? To have false charges filed, and for police and prosecutors to intentionally perform an insufficient investigation into those false claims? To be seriously injured in the process, and have every fundamental right denied in the process?

The prosecutors attempted to have the defendant deported during the proceeding. The prosecution was aware that the defendant's visa would expire relatively soon after, or even while he was held in detention. Even where his fiancé, who the defendant was to marry before she gave birth to their son, wanted him to remain in the country, and provide for his family. It came down to 11 days that the defendant's visa was to expire, and then face deportation. Furious, the defendant wrote letters to Justice Minister Tanigaki, the Supreme Prosecutor's Office, the National Police, the Chiba Public Prosecutor's Office, and other governmental agencies, clearly stating that if the Japanese officials tried to interfere with his relationship with his son, he'd resort to whatever means necessary, including the use of deadly force if they tried to use state sponsored abduct child to destroy his family unit. Japan has become the scourge of the planet regarding state sponsored child abduction. Even after Japan signed The Hague Convention regarding child abduction, not one child has been returned to the parent that won custody in other countries. Since ratifying The Hague Convention, not one child has been reunited with their family, and not one parent has even obtained parental visitation rights. The defendant mailed, and hand delivered these communications to numerous officials. Is this what it takes for the Ministry of Justice to understand that there are people in society that will not tolerate gross injustice, and malfeasance heaped upon them?

Question. What is it that the state seems to think it gained in this matter other than bragging rights over a claim of obtaining a false conviction against a U.S. citizen that has a law education, and had worked as a public defender? The defendant has suffered great emotional trauma, including more than a year of sleepless nights continuing to relive this façade. The defendant, and is wife have been financially ruined as a result of this gross injustice. If the Court of last resort refuses to properly address this matter, and overturn this false conviction, and compensate the defendant for the harm he and his wife have suffered, there can be no other recourse but for the defendant to seek retribution.

Early on during the investigative stage, the defendant demanded the prosecutor provide legal representation. The prosecutor would only mock the defendant, and tell him to get his embassy to provide an attorney. The defendant would say that the embassy wasn't detaining him on false charges. The prosecutor would shout back, YOUR GOOD AT WRITING LETTERS. WRITE TO YOUR EMBASSY AND GET THEM TO GET YOU AN ATTORNEY. What this outburst was referring to is the fact that the defendant had already contacted a former prosecutor named Tsutomu Nakamura, the JFBA, the Tokyo Bar Association, the Prison Rights Group, and the U.S. Embassy, giving a detailed account as to the conditions the defendant was being detained under. Those documents would eventually catch the Narashino detention center supervisor, Fujisaki in lies where he told the U.S. Embassy, that he himself, and guards he was responsible for, had not engaged in tying up the defendant, and torturing him. When Fujisaki was made aware that details describing the room where the torture took place, the guards involved, and the devices used, he finally, and in writing, admitted to the U.S. Embassy that in fact, what the defendant had claimed in those communications had occurred, and resulted in the defendant having his right leg broken.



STATE-0573

While in detention the defendant had contacted those agencies, and asked each one to hold onto those documents, and return them to the defendant upon his release so they could be used in further proceedings, including petitions to the U.N. Human Rights Committee, and U.S. Federal Court actions based on long arm statutes, and The Alien Tort Act, which give the U.S. courts authority over individuals who act in an illegal capacity no matter where the harm occurred. Those documents, including defense notes of interrogation methods recorded while detained at Narashino, abusive prison rules that violate human dignity, and human rights, and which are nothing less than cruel and unusual. Other illegal conduct the defendant was subjected to includes the abuse of authority, torture used against the defendant, and other detainees that he witnessed, most notably Korean, Chinese and Africans who were being detained at Chiba Prison.

The barbaric treatment of the defendant was so horrific that he was unable to walk after being released from detention on Feb. 4th, 2014, which was one month after the birth of his son. The Japanese authorities stole one month from the defendant and his child. This is unforgiveable. They didn't even have the dignity to inform the defendant of the birth of his son. The defendant's statements about the inhumane, and illegal treatment he suffered is written in such detail that numerous international reporters that are covering the story, along with Colin Jones, Professor of Law at Doshisha Law School state that they have never heard such details regarding the procedures, and detention of those that are held in Japan's Daiyo Kangoku "substitute prison system, and the interrogation methods used by prosecutors.

Roseann Rife of Amnesty International Japan wrote to the defendant that, "Amnesty International has been following the issue of hate speech in Japan and have long documented the flaws in the criminal justice system including ill-treatment, forced confessions and prolonged interrogations without access to counsel. AI has urged the Japanese government to bring these procedures into line with international law and standards. We have noted your concerns and will keep them in our records. Amnesty International will continue to raise our concerns about human rights violations in Japan with the Japanese authorities and in reviews of Japan's human rights record at the United Nations."

STATE 0574

Rabbi Binyomin Edery who often visits detainees, and prisoners who are incarcerated in Japan, spoke of a prisoner he has been intervening for who is detained in Hokkaido that is forced to remain stripped naked by guards, and remain that way, even while he works. The guards beat him, and have singled him out for massive abuse. They even force him to take his meals on the floor, eating them like a dog out of a bowl. If he wants to eat, he must crawl to the meal.

David McNeil teaches political science at Sophia University, and is a journalist for The Guardian, a prominent UK publication who has been following the defendant's case, and is reporting on the case for that publication. Miami New Times, Trevor Bach is reporting on the defendant's case. Esther Solomon is covering the case for Haaretz for Israel. Justice Campaign out of Ireland is following the case, as well as Fair Trials out of the UK, and other prestigious human rights organizations. Temple Law School Japan, professor of law, Thomas Dreves stated that what has occurred in the defendant's case is shocking and outrageous. Scott Simon is covering the case for The Japan. The defendant is receiving numerous requests to speak at embassies, and on TV, and radio regarding the horrible conditions that exist in Japan's prison, and legal system, which turns a blind eye to it all. The defendant has also filed a petition with the U.N. through the Civil Society regarding numerous treaties the nation has ratified regarding the treatment of detainees, and which it is in direct violation of. See more on this below.

Exhibit G. Statements by human rights, the media, and legal scholars regarding the treatment of the defendant in this matter.



Exhibit H. Tsudanuma General Hospital medical report, and X-rays that show the defendant's leg was broken while detained at Narashino. Exhibit F includes pages from a 63-page document sent to former Tokyo based prosecutor Tsutomu Nakamura that describes the torture in detail. To save the court time, the defendant is only including pages 56-62. This document was sent to Nakamura prior to having been appointed legal representation. The defendant chose Nakamura out of a list of attorneys that he received at Narashino detention that was provided to him by the U.S. Embassy, not the Japanese government. The defendant chose to contact Nakamura because they both had received the same law school fellowship. Exhibit H also includes a statement regarding the use of torture, and police, and prosecutor's attempting to coerce extract false confessions, which were sent to the JFBA, an organization that should be known to the Court and which is currently performing an investigation into this case, which police, and prosecutors refuse to cooperate in. The Tokyo Bar Association is also performing a full investigation separate from the JFBA.

Exhibit I. Documents the defendant sent to the U.S. Embassy, and had returned to him under the U.S. Freedom of Information Act (FOIA). These documents show that the U.S. Embassy consulate Leslie Glass had confronted Guard B at the Narashino detention center, about his involvement in the use of torture, breaking the defendant's leg, and trying to force the defendant to sign false confessions. On Nov. 22nd, 2013, Ms. Glass noted to her superiors in a written communication that when she confronted Guard B about is involvement in torturing, and breaking the defendant's leg, he smelled of alcohol, and that it was hard to miss. It must be noted that Guard B is a transport driver who drives detainees to be interrogated at the Chiba Public Prosecutor's Office, and to the Chiba District Court. While inebriated, Guard B revealed to the defendant that he lives in Sakura City, drinks California Red Wine, and is attracted to men, not women. Guard B escorted the defendant to trial on Dec. 19th, which is described in detail below. Exhibit I documents include letters sent by the U.S. Embassy to Narashino chief of police, Yoshiharu Yano asking questions about mistreatment suffered by the defendant, the use of torture, and the refusal of providing medical treatment. Narashino detention supervisor, and the chief of police have not responded to the embassy, and are not cooperating with the JFBA, and the Tokyo Bar Association in the investigation into guard, and police misconduct. Further, both have refused to cooperate with defense attorney Okoshi in his investigation into police, and prosecutorial misconduct by refusing to turn over their procedural notes, including Notebook No. 201410190, which proves that the detention center supervisor ordered the torture that took place on Nov. 8th, and interrogation sessions that the Chiba Public Prosecutor Kume had attended, as well as other videotape recordings that show the detention center guards threatening violence against the defendant when he refused to be taken into interrogations in the police building with both police, and prosecutors present together. Exhibit I includes a photograph of the Narashino Police Station, which shows the location where the defendant was detained, in cell 6-1, and the room where the defendant was subjected to the use of physical torture.

Exhibit I includes letters written from Narashino Detention Center, and Chiba Prison to the defendant's fiancé that guards used torture, and describes it as he had in the Nakamura document. Others include Narashino Detention Center refusing to mail letters to Ms. Suzuki during the period the detention center attempted to cover up breaking the defendant's leg. Other letters include the Chiba Prison officials refusing to notify the defendant that his son was born, instead keeping the defendant in frozen isolation conditions, and subjecting the defendant to even more disturbing illegal conduct. This exhibit also includes excerpts from the defendant's personal notebooks that he maintained while being detained.

Question. Should police transportation drivers be permitted to drink alcohol, and drive even if

they are police officers?

Question. Should police, and prosecutors be able to hide videotape recordings the prove the defendant was tortured while being held in the controversial Daiyo Kangoku detention system that is the subject of great debate in both Japan, and the international communities?

Question. Should the presumption of guilt be applicable where police, prosecutors, and guards who are accused of using torture, and other forms of duress, deny doing so, and refuse to cooperate a defense attorney who is working on a Supreme Court appeal, and where they refuse to cooperate with professional organizations such as the JFBA and the TBA, who are investigating their illegal conduct, and trying to improve Japan's international image regarding the use of torture, coercion to obtain false confession, and other illegal activities that violate the rules of criminal procedure?

Question. At what point is the defendant allowed access to an attorney? According to Article 34 of Japan's Constitution the privilege of appointment of counsel applies immediately after a defendant is detained. What authority is greater than the constitution regarding a defendant's right to legal representation, especially during the investigative stage? Article 98 states that any act of government contrary to the constitution has no validity. Further, the exclusionary rule must apply when evidence, and coerced confessions are used against a defendant, especially where coerced confessions are not reliable whatsoever.

STATE-0875

Question. It is during the investigation stage that a defendant needs an attorney the most. What authority permits the prosecutors to hold a defendant without legal representation? Certainly not the Japanese Constitution. At what point is being held without an attorney too long? What does the court consider prolonged detention, which results in excluding invalid statements at trial? After initial detention? After the first 72 hours? After the 21 day investigative period? 38 days? If an indictment results after a defendant has been intentionally refused an attorney to represent them then what need does a defendant have legal representation? Especially when they are probably going to be found guilty when the judiciary in Japan almost always sides with the prosecution, and proof of that is the 99.9% conviction rate, which is unheard of in other civilized nations.

Here, the defendant was held 38 days without legal representation, which was denied him each and every day. The defendant did request an attorney each, and every day. Certainly, 38 days of being denied an attorney, held in isolation 24/7 without the ability to communicate in the Japanese language, and being denied contact with the defendant's embassy, under a technique prosecutors call a "hostage technique", tortured to coerce false confessions resulting in serious harm, and not receiving legal representation until 15 days after indictment violates Article 34. It violates Article 11, and Article 36, both constitutional provisions that address the use of torture, and cruel and unusual punishment. Anyone with minimal understanding would immediately realize that the use of isolation, physical torture, and duress threats, the threat of deportation, and state sponsored kidnapping of the defendant's child would result in unreliable statements, and immeasurable anxiety.

Question. At what point does the exclusionary rule apply in Japan? At what point is evidence so tainted that it cannot be relied upon? At what point does Japan's highest court lower their head, and say this system doesn't work?

Former prosecutor Hiroshi Ichikawa who has consulted with the defendant on this case agrees that the system is a failure. Retired judge Hiroshi Segi, professor at Meiji Law School agrees that



the entire system is hopeless. In fact the title of Segi's book, which was released in February of 2014, the same month the defendant was released from Chiba Prison is, Court Of Despair. I believe former Supreme Court Chief Justice Hironobu Takesaki is familiar with Professor Segi's book?

Question. How many Iwao Hakamada's remain in prison while prosecutors continue to intentionally withhold evidence that is key to a defendant being able to raise a valid defense, thereby deceiving the courts, and deceiving the public, for no other reason but to win a case regardless of it merits? How is it that this court cannot grasp how the international communities, and every respectable human rights organization spends countless thousands of dollars, and hours writing annual reports that condemns Japan for such egregious, and draconian practices that continue unabated?

The police and prosecution produced a myriad of false confessions for the defendant to sign. They tampered with witness statements, intimidated witnesses, engaged in phony photo reenactments, which are entirely contrary to evidence that remains in their possession, and which they have denied the defendant access to.

The police entered the defendant's home ransacked it, and took possession of the defendant's folding bicycle without a warrant, and then failed to use it in their phony reenactment because it weighs 38 pounds, (17.23651 kg) and is too large for the defendant to have raised it over his head, and "thrust" at Takeuchi, who is much larger, and much younger than the defendant. Apparently, the police in their shoddy work also failed to mention that the defendant was disabled at the time, and that he could barely walk regarding the Sept. 12th incident. The defendant would not even learn the police illegally entered his home, and seized his bicycle until after returning home from Chiba Prison on Feb. 4th, 2014. The police never gave notice to the defendant that they had entered his home, and seized his property. How gullible are the courts? Or is it the judiciary is so overloaded with cases that they just don't have the time to look at what is presented to them? If that is the case, Japan needs to introduce plea deals that net the state monetary gains, and presents the kind of damage that scores of defendant's continue to suffer. Article 29 states that the right to own or to hold property is inviolable.

Question. Is a search, and seizure valid when police enter a defendant's home, without a warrant, ransack it, looking for non-related contraband, and seize a defendant's property, never using it in their reenactments, and also never give the defendant notice they are in possession of that seized property? Article 35 states that all persons have the right to be secure in their homes, and effects against entries, searches and seizures, except upon warrant issued for adequate cause and particularly describing the place to be searched and things to be seized. If the police entered the house to seize a bike without a warrant that is bad enough. But, to ransack that home searching for unrelated matters is a violation of this article.

The police and prosecutors conspired, and planted DNA evidence to obtain the requisite element of intent for the crime of assault, which they knew the defendant had not committed. The police and prosecutors refused to accept witness statements regarding prior bad acts of Ogura, and Takeuchi, failed to perform a proper, and thorough investigation, and threatened to deport the defendant through state sponsored child abduction because the defendant refused to cooperate, refused to sign false confessions, which inevitably resulted in the use of various forms of torture that caused the defendant to be hospitalized seven times while held at Narashino detention center. Those injuries included kidney failure, internal bleeding, nerve damage to the defendant's right hand, and a broken leg.

**VI. Cruel and Unusual.**

October 26th, 2013.

As the defendant lay in a near comatose state from already being hospitalized several times, Guard B came to the cell the defendant was held in, and told the defendant that the detention center guards were to transport him to the Tsudanuma General Hospital to have his kidneys checked. The defendant believed this statement factual, as the doctor at the hospital warned the defendant that he had 5-7 days before his kidneys would fail, resulting in permanent damage.

The guards handcuffed, and placed a black nylon rope around the defendant's waist. Due to the defendant's extremely weakened physical condition the guards had to practically carry the defendant to the exit doors, which led out of the back of the detention center. As soon as the rear detention center doors opened, the defendant was met by a group of police, and several flashes from a camera. Mizokuchi blocked the doorway, and read a warrant that stated that the defendant was to immediately be taken to Tsudanuma General Hospital, and forcefully have blood extracted to be used as evidence against him in the ongoing investigation. Apparently, Mizokuchi sought, and obtained a warrant to seize the defendant's property, his blood, without being appointed an attorney, and without being present at the hearing. Accompanied by an interpreter, six officers, and a police photographer would use force to take the defendant to Tsudanuma General Hospital where he would be subjected to one of the most brutal, unconscionable, and humiliating violations of basic human rights imaginable.

Upon arrival at the Tsudanuma General Hospital, the handcuffed, and tied up defendant was chained to a wheel chair, and taken into the main public waiting area, in full view of patients, their families, and whoever else was present. One of the doctors at that hospital, a pediatrician was the defendant's student. So was her son. This abusive, and intentionally humiliating experience would repeat itself again, and again, as the defendant was subjected to numerous coerced visits to the Tsudanuma General Hospital, and treated as a public spectacle.

The defendant was forced to sit in a wheelchair, and wait in an open public area while obvious handcuffed, and with a rope tied around his waste, which was held by Guard B. The photographer kept taking photos of the defendant. Finally, the defendant was wheeled into an examination station, where a trembling elderly female nurse was waiting. It was clear she had not been notified that police were involved in the matter. She stood stunned as the six guards, the interpreter, photographer, and the defendant entered the small room. There was barely room for anyone to stand, and the guards crowded around the nervous woman. Immediately, Mizokuchi stepped forward, and read the warrant while the police photographer continued taking photos. The nurse cautiously stepped forward in an absolute state of fear, and panic. She was trembling so terribly that she dropped the devices that she had in her hands onto the floor. Those devices were to extract blood from the defendant's arm. The defendant stooped, and picked up the devices, and placed them onto the countertop. Several police would force the defendant's left arm onto the countertop, which was entirely unnecessary. The nurse stabbed the defendant in the inside elbow area of the left arm, missing the vein. She then pulled the needle out, and repeated this same process, missing the vein again, and again, pulling the needle out. It was clear to everyone present that the woman was entirely incompetent to perform the task required of her, as she remained in a state of fear, and panic. On her third attempt the woman missed a vein again, and began twisting the needle in the defendant's arm to try and forcefully locate a vein. This was so painful that the defendant, acting in reflex, pushed the needle out of his arm. By this time there were three holes bleeding down the defendant's left arm, and pooling into the palm of his hand. In complete disgust at this barbaric treatment, the defendant turned to Mizokuchi and said, *"Are you happy?"*



Mizokuchi responded by grunting, *"Yes."* The defendant then turned to the dejected nurse who bowed her head downward. She once again dropped the syringe onto the floor. The defendant bent down, and picked it up a second time, and placed it on the counter. The defendant asked Mizokuchi again, *"Does this make you happy?"* The corrupt, and filthy, poor excuse of a human being grunted even louder, *"Yeah."* The defendant turned to the other guards, and glared at them. Each, and every one of them was so ashamed at their conduct that they all had their heads bowed to the floor, unable to look up. The defendant took the nurse by the hand, and in Japanese calmly said, *"Daijobu. Honto, daijobu."* The defendant offered the nurse his right arm, where she would eventually extract three vials of blood.

When the nurse had completed the task of extracting blood in such a violent, and incompetent manner, the defendant was horrified to see Mizokuchi take possession of those three vials, place them in a small, unsealed, light blue Styrofoam cooler, and exit the hospital with no one to oversee where he was going, or what he was going to do with those samples of the defendant's blood. This is exactly why a defendant must have a hearing, to be assured that samples of their DNA, intended to be used as evidence against them in a legal proceeding are transported in a secured, and proper manner, and that corrupt, and violent officials acting on behalf of the state won't have the opportunity to tamper with that material. This is why a constitutionally mandated hearing is essential to determine the intended purpose of property that is to be seized, to limit its scope, and to assure corrupt officials like Mizokuchi who enjoy abusing their authority at every turn do not tamper it with. Article 36 states that the infliction of torture by any public officer, and cruel punishments are absolutely forbidden.

Article 35 states that all persons are to be secure against illegal searches and seizures, and that a warrant must be issued for adequate cause and particularly describing the place to be searched and describing the things to be seized. Each search must be made upon separate warrants issued b a competent judicial officer.

Question. Why would any judicial officer order a warrant to extract blood from a defendant, and allow them to be dragged through a public area of a hospital and be subjected to such barbarity, and treated as a public spectacle when the police could have obtained the same results at the detention center by having the defendant place a cotton swab in his mouth, and be done with it? Shouldn't the police use the least intrusive method to obtain a DNA sample?

Question. Should a defendant be present at a warrant hearing to assure that minimal guidelines are followed when blood is to be seized, and where it is to be used against the defendant in a criminal proceeding? Mizokuchi transported the defendant's blood without any form of supervision. Mizokuchi's conduct was so often so violent, so reprehensible so corrupt, so reckless, and entirely unbiased from the beginning, lacking any sense of rationality, and morality that not only should he never have been assigned to this case, he should be the subject of a full investigate of the court, and removed from being able to act as a public servant. Mizokuchi is a bad cop.

The court owes a duty to the defendant to inquire as to the whereabouts of this third vial of blood. Does the court believe the police acted properly by subjecting the defendant to a continuous barrage of violence, and brutality merely because he insisted that police, and prosecutors follow the rules of criminal procedures, and the constitution? Does the court believe the police acted properly by subjecting the defendant to a continuous barrage of violence, and brutality merely because he refused to confess to crimes he had not committed? Couldn't the Narashino police have just as easily used a much less intrusive manner of achieving the same goal?

Question. Is it acceptable that the police, and prosecutors engage in committing numerous felonies, in order to obtain a conviction for the misdemeanor crime of petty assault?

According to the Correction Bureau Ministry Of Justice's Penal Institutions In Japan, "*Restrictions on unsentenced inmates have been relaxed.*" Just how horrific, and inhumane were those conditions prior to these "*relaxed restrictions*" if the conditions the defendant suffered were so egregious? According to that same publication it states, "*It is often said that how offenders are treated is a reflection of the state's socio-cultural conditions. Administration of penal institutions are carried out to the best of its ability in order to offer appropriate and effective treatment for offenders supported by the values, and views on punishment.*"

One doesn't have to look beyond recent events to understand the disturbing "*socio-cultural conditions*" that have mired the international communities perspective of Japanese society today. Criminals, such as those responsible for the nuclear debacle at the Fukushima, Daiichi Nuclear Facility, that has caused 267,000 evacuees to continue to remain in dilapidating "temporary" shelters, as entire communities remain in a state of limbo, more than three years on, have never been indicted on any charge. Other disturbing "*socio-cultural conditions*" include, reprehensible prosecutors that lump foreigners, and yakuza into the same non-human category. How can abject government authorities get away with training newly appointed prosecutors that foreign teachers should be lumped into the same category as gangs that peddle child pornography, prostitution, and illicit drugs? Other disturbing "*socio-cultural conditions*" that exists in Japan include popular politicians such as Hashimoto, and Ishihara that fuel racism through unconscionable hate speech the rest of the world finds objectionable, unconscionable, and condemns. Then there are the hundreds of fabricated doctorate, and research work from the University of Tokyo that exposes a mountain of fraud, and deception in the educational industry, not to mention the STAP cell debacle. Recently, Mitsubishi, and Hitachi conspired to price fix, and steal billions from American, and other national consumers of their products. Then there was the Olympus' 1.7 billion accounting fraud scandal, Mamoru Samuragochi, the fraudulent "deaf" composer, biologist, police foreign crime wave falsehoods that promote racism against foreigners, Yoshitaka Fujii data fabrication on more than one hundred and seventy two research scientific research papers, the Takeda Pharmaceutical, and Astellas Pharma falsified Alzheimer's studies, add the fact that Japan has the highest alcoholism, tobacco addiction, and suicide rate per capita, as well as the lowest ability to communicate in a foreign language than any other nation in the world, which causes great shame to the Japanese, that often results in fear, hatred, bullying, and segregation. Clearly, Japan's "*socio-cultural conditions*" appear to be at an all time low. So, why would any court automatically believe whatever the police, or prosecutors claim occurred in a case when there is evidence available to refute it, but the courts refuse to do so?

**VII. Use of torture.**

Throughout history, torture has been used as a method of interrogation, punishment, and coercion. Often, the motive is an abuse of power in a sadistic gratification of the torturer, most often police, public prosecutors, and military personnel. Torture is prohibited under both international law, and domestic law. Torture is a violation of human rights, and is declared unacceptable by Article 5 of the United Nations Universal Declaration of Human Rights. Torture is also prohibited by the United Nations Convention Against Torture, which has been ratified by 147 states. The use of torture is addressed in three constitutional provision in Japan's Constitution, Article 11, Article, 36, and Article 38. Article 36 states that the infliction of torture by any public officer is absolutely forbidden.

Question. What part of the constitutional provision regarding the use of torture, *absolutely*



*forbidden*, does the police, prosecutors, and judiciary not understand?

National and international legal prohibitions on torture derive from a consensus that torture, and similar ill treatment is immoral, and impractical. Despite these international conventions, organizations that monitor abuses of human rights, such as Amnesty International, and the International Rehabilitation Council for Torture Victims report widespread use condoned by states in many regions of the world. Amnesty International estimates that at least 81 world governments currently practice torture, some of them openly. Japan is considered one of the worst offenders.

The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, known as the United Nations Convention against Torture is an international human rights instrument, under the review of the United Nations, that aims to prevent torture and cruel, inhuman degrading treatment or punishment. Japan as a signatory nation and is therefore obligated to adhere to the rules therein. The Convention requires states to take effective measures to prevent torture within their borders.

Part I (Articles 1–16) defines torture (Article 1), and commits parties to taking effective measures to prevent any act of torture in any territory under their jurisdiction (Article 2). These include ensuring that torture is a criminal offense (Article 4), establishing jurisdiction over acts of torture committed by or against a party's citizens. (Article 5), ensuring that torture is an extraditable offense. (Article 8), and establishing universal jurisdiction to try cases of torture where an alleged torturer cannot be extradited. (Article 5). Parties must promptly investigate any allegation of torture. (Articles 12 and 13), and victims of torture must have an enforceable right to compensation. (Article 14), Parties must also ban the use of evidence produced by torture in their courts. Parties are obliged to prevent other acts of cruel, inhuman or degrading treatment or punishment, and to investigate any allegation of such treatment within their jurisdiction. (Article 16).

Article 1 of the Convention defines torture as: Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining information or a confession, punishing him for an act they may have committed, or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. Convention Against Torture, Article 1.1

Article 2 of the convention prohibits torture, and requires parties to take effective measures to prevent it in its jurisdiction. The prohibition of torture is absolute. There are no exceptional circumstances whatsoever to invoke justifying its use.

Question. Is the judiciary using its best efforts to eradicate the use of torture, and to refuse to accept confessions as a form or evidence used to convict a defendant? Article 38 states that no person shall be compelled to testify against themselves. Confession made under duress, torture, threats, or lengthy detention shall not be admitted in evidence. Is 38 days without legal representation anything but a lengthy detention? Does the court believe that being tied up, restrained, videotaped, humiliated, starved, frozen, kept from bathing, clean clothing, reading, and writing material, contact with the U.S. Embassy, and prevented from preparing for trial are acceptable conditions of detention? Who gave the power to police, and prosecutors to withhold evidence, and to force confessions when a defendant refuses to cooperate? Certainly, the constitution wasn't written to provide government officials with that level of power. Quite the

contrary, the constitution was written, as a line drawn in the sand regarding what kind of conduct is tolerated by government actors, and what is not.

Is the Middle East more stable after nearly two decades of American involvement in the region, and where the government detains, and tortures "enemy" combatants to bring "democracy" to parts of the world that don't want it? Are those tactics working? No they're not. Radical extremism is all that has resulted in America's failed foreign policy. The region is far less stable today than at any point in history with ever increasing hostilities that have absolute implications on a global scale. Torture doesn't work. It doesn't net true results!

Article 3 of The European Convention on Human Rights shows that Japan is in violation regarding inhumane and degrading treatment. There is a mountain of evidence obtained by the U.N. regarding ongoing, and systemic human rights violations. The Human Rights Committee states that violations of even the most basic rights are "the rule." According to the Universal Declaration Of Human Rights, justice is the most fundamental human right.

The police refused to allow the defendant to contact the U.S. Embassy after breaking his leg, as police and prosecutors tried to cover of their malfeasance, and criminal conduct by forcing the defendant to sign a false statement that he "promised not to injure himself again." The defendant was forced to sign similar statements three different times, until the police thought they got the wording stated in a way that would protect them from prosecution. Yet, those documents, along with the videotape recordings of the torture now seems to have vanished into thin air. This is why Daiyo Kangoku "substitute prison" system is condemned by the international community, and doesn't work. This is why the Narashino chief of police has refused to cooperate with the JFBA, and the Tokyo Bar Association, and refused to turn over Notebook No. 201410190 to attorney Okoshi so he could address the illegal conduct the defendant suffered under. Can there still be any wonder why the defendant entered the lower court proceedings, trembling, in a clear state of emotional, and psychological trauma, and stated, "I can't fight this."

The defendant's leg was broken on Nov. 8th, 2013. He was refused medical treatment for six days. Thereafter the defendant was dragged in chains, and handcuffs to interrogations at the Narashino police station, which the prosecutor attended, and to interrogations at the prosecutor's office. Even pretrial judges refused to provide the defendant medical treatment for his broken leg. The pretrial judges were aware the defendant was injured. He was wheeled into the Chiba District Court in a wheel chair, obviously unable to walk. He was brought before those pretrial judges, and the defendant notified them that the Narashino guards, and police had broken his leg. Regardless, the pretrial judges took no action.

On Nov. 12th, a Tsudanuma General Hospital doctor who was making his bi-monthly visits to the detention center to inspect detainees inspected the defendant. When it came time for the defendant to see the doctor, the detention center supervisor, and Guard B, who were most responsible for the torture that took place on Nov. 8th, told the defendant not to discuss his leg injury. The doctor immediately noticed that the defendant was unable to walk, and inspected the leg, which had doubled in size, and turned a dark purple, blue, and green in color. The doctor asked the supervisor what happened? The supervisor only lowered his head and gave no response. The doctor told the supervisor to get the defendant to the hospital immediately because his leg was broken. The supervisor would not have the defendant taken to the hospital. Fearing that his leg might have gangrene due to the exceeding level of pain, on the following day, Nov. 13th, the defendant crawled to the cell bars that faced a guard catwalk. On the other side of that catwalk were large smoked glass windows. The defendant began screaming out toward those windows for help. The police ran to the cell bars, and shouted at the defendant to shut up, but the defendant did



not shut up. He feared for his life, knowing that the Chiba Public Prosecutors office had covered up the murder of the Ghanaian man Suraj who had died in a brutally horrific torture, and where guards had attempted to smuggle his dead boy on a plane to hide their criminal conduct. In great fear, the defendant would not, and could not stop screaming for help. To get the defendant to shut up, he would finally be taken to the hospital, and have his leg X-rayed. The Tsudanuma General Hospital doctor that ordered those X-Rays determined that the broken leg had recently occurred. One of the guards that accompanied the defendant in handcuffs, and chains to the hospital was Guard B. There also was an interpreter who told the defendant that Guard B told the doctor that the defendant had kicked the wall. The defendant told the doctor that Guard B, and others broke his leg. The leg was cast, and when the defendant returned to Narashino, he was immediately charged with a second crime, and handed the charge by officer Mizokuchi, The arrest warrant read that the defendant had "pushed" the Tsudanuma station employee, Takeuchi. The defendant was taken through booking procedures again, and immediately dragged in handcuffs and roped into interrogations, and tied to a chair. The defendant was grilled for hours by officer Mizokuchi, and would learn that he was being charged with assault regarding the Sept. 12th incident that the defendant himself had reported to Mizokuchi himself. This was the incident where KERC employee, Takeuchi had shoved the defendant, who was disabled, grabbed at his bicycle, yanking it from his arm, and tossed it to the ground. Takeuchi would admit that he pushed the defendant, and grabbed his bike from his arm causing it to fall to the ground. Two eyewitnesses who reported the incident to the defendant's employer, Katsuyama stated that a crazy homeless person has assaulted the defendant. The police, and prosecutors never attempted to contact those witnesses to get their statements, even though the defendant provided them with Katsuyama's contact information. The police, and prosecutors were not interested in facts. They were only interested in convicting the defendant.

Question. Why did police and prosecutors bring false charges against the defendant when during their investigation they would become aware that Ogura had filed a false police report, and that videotape recordings available to them did not match Ogura's statement? Why does everything that the defendant was accused of just so happen to appear off camera, or at least not available in the videotape recordings that the prosecution released to the defense? Why did police and prosecutors bring false charges against the defendant when a station employee who claimed to be a witness said he followed Ogura, and the defendant, and saw the defendant pick up Ogura's glasses, but stated that he did not see the defendant assault Ogura? The defendant picking up Ogura's hat came after Ogura had tried to punch the defendant as described above, and shown in Exhibit D. Picking up Ogura's hat came after Ogura had claimed to have been punched twice. How is it that this station employee, eyewitness did not see these two punches? The reason he did not see them is because they never occurred.

At each interrogation the defendant had the interpreter read back what the police, and prosecutors were recording. The police, and prosecutors were always intentionally deceptive, manipulate statements made by the defendant, mislead, intentionally try to confuse the defendant to no avail, and try to intimidate, and force the defendant to confess to something he had not done. When the defendant would ask for pencil and paper to take notes, this request would be denied. When the defendant had the interpreter reread statements prepared by the police, and prosecution, they would become enraged, shout at the defendant, and demand him to sign the statement. During one session the defendant was prepared to sign a document because it was close to the facts, but the defendant wanted one paragraph reworded. Officer, Mizokuchi, who was most corrupt, and most violent, would pretend to edit the statement, while yelling at the defendant. Mizokuchi would reprint the statement, and place it before the defendant to sign. When the defendant would have the interpreter read the statement, the wording was changed where the defendant was now confessing to the crime of assault. When the defendant would have the interpreter reread the

statement again, Mizokuchi would threaten the defendant with violence. At one point, Mizokuchi slammed his fist down on the defendant's right hand. The defendant picked up the paper, and wrote, Your Corrupt. The defendant had the interpreter read the "signature" and Mizokuchi crumpled the paper, and ended the interrogation.

The police always used the same interrogation room. During one session, the window was open behind where the defendant was handcuffed, and tied to the seat. When Mizokuchi went into a violent rage, and threatened the defendant, the defendant began shouting out the window for help. Immediately several officers, and Mizokuchi's supervisor entered the room, shut the window, and threatened the defendant to sign the statement. He refused. The interpreter was a man who wore glasses, and had a child. He had gone to Georgia University in the U.S., and the defendant told him to remember all that he could, as what the police were doing was illegal, immoral and corrupt. The defendant told Mizokuchi's supervisor that they had the station videos by then, and he was certain they knew Ogura's statements were false. The supervisor told the defendant, "The videos don't show everything." The interrogation was ended.

After that interrogation ended the defendant's was taken into the interview room where the defendant's pregnant fiancé was located. She told the defendant that as she walked up the street to the police station she could hear the defendant screaming. This frightened her. As the defendant sat in the interview room, his fiancé repeated to him that he must confess, and that the police again told her that if he didn't confess, they would not let him go.

**VIII. False charges.**

The more the defendant refused to cooperate, the more the charges were elevated with the original charge of a spit, changing to include three punches. These three punches would not be mentioned in Okoshi's report to his company. The second charge, originally a push, changed to pushing, and then to pushing, and numerous punches to the face, head, and chest, without causing injury. How one receives numerous punches to the face, head and chest, and walks away unscathed is unknown to the defendant. The only known is that the entire case is fraudulent, and Ogura, and Takeuchi tried to monetarily gain from their fraud by contacting the defendant's employer, and attempt to extort money, which is a lot more serious than anything the defendant was charged with.

The police assured the defendant that because he refused to cooperate, and accept the original charge, they would prolong his detention, and that he would not be present at the birth of his child. This is the only truth the police have stated in this case.

Despicable police conduct included guards using driving detours to get to the prosecutor's office by taking local streets, and driving past a large billboard of an illustration of a pregnant woman. They thought driving me past that billboard each day was funny. The defendant even told the embassy consulate that if he had a chance to escape he would take it. The defendant's former girlfriend was Hye Young Choi. She is the only Korean film producer in the world, and her father is a retired Seoul senator. The defendant thought that by stealing a boat, and taking it across the Japan Sea would bring him to the freedom that he desired. After being held in isolation for so long, and under the conditions described herein, this is the state of mind that one eventually succumbs to.

Interrogations at the prosecutor's office always resulted in the defendant being subjected to threats, intimidations, deportation, mockery, humiliation, and the threat of a lengthy prison sentence. The prosecutor was clearly filing false charges, and the prosecutor told the defendant



that they would manufacture the element of intent to obtain a conviction of assault if they had to. At one point the defendant told the investigating prosecutors assistant, "This is not how prosecutions should be done. Don't become someone like them. Their actions are not only illegal, but highly immoral."

The United Nations Committee Against Torture has castigated Japan's criminal justice and prison system, listing a wide range of issues including the lack of an independent judiciary, an extremely low rate of acquittal and most notably human rights abuses among detainees, the lack of appointment of legal counsel, and chronic attempts by police and prosecutors to extract false confessions. There have been numerous calls from the international community, and UN Committees calling on Japan to end police, and prosecutorial false confessions. The committee's most recent findings are revealed in the following online post:

**Committee Against Torture Examines Report Of Japan**
http://ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=13344&LangID=E

**Japan Urged To End False Confessions**
http://news.bbc.co.uk/2/hi/8290767.stm

**Japan: Briefing To The UN Committee Against Torture**
http://refworld.org/docid/517e22df4.html

**UN Standard Minimum Rules For The Treatment Of Prisoners**
Japan has also ratified the UN Standard Minimum Rules for the Treatment of Prisoners and is violation of these charters in almost every aspect.
https://unodc.org/pdf/criminal_justice/UN_Standard_Minimum_Rules_for_the_Treatment_of_Prisoners.pdf

**Convention Against Torture And Other Cruel, Inhuman Or Degrading Treatment Or Punishment**
Japan ratified the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and is in violation of these charters in almost every aspect as well.
http://ohchr.org/EN/ProfessionalInterest/Pages/CAT.aspx

**UN Body Attacks Japan's Justice System**
http://ft.com/intl/cms/s/0/692b3c92-0875-11dc-b11e-000b5df10621.html

**NGO Report** on the Issue of Hate Speech in relation to Issue No. 10 of the List of Issues adopted by the Human Rights Committee
http://imadr.org/wordpress/wp-content/uploads/2014/07/Hate-Speech-in-Japan_ERD-NET_Human-Rights-Committe_111th-session.pdf

**UN Panel Urges Japan To Enact Laws To Prohibit Hate Speech**
http://ajw.asahi.com/article/behind_news/politics/AJ201408300039

**Asia-Pacific Human Rights Information Center**
http://hurights.or.jp/archives/focus/section2/2013/12/rise-of-hate-speech-in-japan.html
**The Justice System Reform Council**
Recommendations of the Justice System Reform Council from June of 2001 have yet to be considered.
http://japan.kantei.go.jp/judiciary/2001/0612report.html

**IX. Injured third parties.**

The defendant committed no crime. He is the victim of what began as a hate crime that escalated to the filing of a false police report, and criminal conduct on the part of numerous government officials, acting on behalf of the state. Yet, he is not the only victim. His employer who had advertised for several years on the Keisei line, and had paid all employee related fees was a victim as well. After more than one year, the defendant's former employer has been unable to replace him, as she continues to pay for advertisements searching for a qualified candidate. Highly educated, and highly qualified employees are extremely difficult to find in Japan, as gross violations of Japan's labor laws, and exploitation of foreign workers force perspective employees to look elsewhere. Tim Havil-Austin the former employee of Katsuyama's company left his employment, and Japan as a result of bad acts of KERC employees. A cursory inspection of the internet shows that foreigners who had once been employed in Japan write extremely negative reviews of their experiences in Japan, and vehemently warn others that the nation is a hostile, and exploitative environment to live, and work in. This shows that the defendant is not the only party to suffer damages from this kind of gross injustice. There are scores of foreigners that have posted their experience in Japan's judicial system relating similar stories of that of the defendant, including police, and prosecutors coercing false confessions, prolonged detention, failure to provide legal representation, and the use of torture. On the day the defendant was released from Chiba Prison, Feb. 4th 2014, two foreigners detained at an Ibaraki detention center died under suspicious circumstances in two different, and unrelated matters.

Exhibit J. An Ohayo Sensei advertisement placed by the defendant's former employer. Showing the company has yet to find a replacement for him, more than one year later.

**X. The defendant's fiancé.**

During the first week of detention, the police, and prosecutors, who were aware that the defendant, and his fiancé's first child had miscarried, refused to contact her to let her know that the defendant had been detained. To the defendant's fiancé it appeared as if he had disappeared off of the face of the earth, or got cold feet, and ran off. She spent the entire week frantically trying to locate him. The email communications she left for the defendant during that time showed the great state of panic that she was in, and which surely was endangering the health and safety of their unborn fetus.

Question. Should police, or prosecutors be allowed to have such power that they can knowingly place the health, safety, and life of an unborn fetus at risk of stillbirth or miscarriage over extremely petty offenses when a mere phone call could prevent all of this? One would think not, in a civilized society anyway. However, the world community is fully aware that Japan never considers the human rights, and dignity of foreign detainees, who are always treated as something less than a human being, as former public prosecutor Hiroshi Ichikawa, who consulted with the defendant in this case, and who he himself admitted that prosecutors are taught that foreigners have no human rights. When the defendant discussed this reality with attorney Ichikawa, he admitted that, "foreigners are not human to public prosecutors, they are closely associated with yakuza, and it's acceptable to use any tactic, including threatening them with murder to obtain false confessions, and be done with it. The only thing that a prosecutor is concerned with is winning the case. They are not concerned with whether a defendant is guilty or not. Prosecutors are trained to believe this." Ichikawa resigned from office as a public prosecutor after threatening to murder a defendant who would not sign a false confession.



The police, and prosecutors were fully aware that the defendant's fiancé, who he was to marry in November of 2013, was to move out of her company apartment on Nov. 15th, 2013. By this time, Ms. Suzuki was eight months pregnant, could barely walk, and was supposed to move into the defendant's home, and give birth at a clinic in Chiba, which they had paid a deposit to. By Nov. 15th, the police, and prosecutors had already indicted the defendant, and were already in possession of videotape recordings that proved Ogura had filed a false police report, and his statements, which kept changing, were suspect, and therefore not reliable. As noted by Okoshi in his appeal to the Supreme Court, there was enough evidence available at that time that the prosecutors should have dropped the charge during the investigative stage, and released the defendant. They didn't. As a result, the defendant's fiancé had to leave her company apartment, and in the late stage of pregnancy was unable to move any of her property. Ms. Suzuki lost everything she owned, leaving the apartment with only what she could carry away in a handbag.

When the defendant's fiancé tried to bring evidence to the police, and prosecutors that the information they were receiving from Ogura was false, and attempted to show them email communications between herself, and the defendant that the station employee's including Ogura were guilty of assault, and other prior bad acts. The police refused to accept any evidence that she tried to turn over to them, and instead told her, "Tell him he's guilty, and to confess, or we'll bring new charges, and keep him here longer."

The defendant's fiancé had no other option but to return home to Yonezawa, and had great difficulty finding a hospital that would take her since she was in such a later stage of pregnancy.

Exhibit K. The defendant's fiancé's statement the police, and prosecutors refused to accept, and investigate during the initial stages of their investigation.

**XI. International headlines.**

There have been hundreds of cases of coerced false confessions in Japan that made international headlines including several where police, and prosecutors had intentionally fabricated evidence, and or hid evidence from the defendant. The Iwao Hakamada case is but one example of such gross injustice. The defendant's story is set to be released first by Japan Times with writer Simon Scott reporting on the case. The defendant is a reporter who has reported for numerous Japanese publications. His work has appeared in the Japan Times as well. Both NHK, whom the defendant has worked with in the past, and TBS have stated that they will cover the story when it reaches the civil proceedings stage. Writers from The Guardian, the New York Times, Miami New Times, and Israel's Haaretz will be covering the story as well. There are also numerous human rights organizations that have asked the defendant to provide them with his detailed statement, which he has done. The defendant is also writing a book on the matter, and currently engaged in producing a documentary on Japan, and the nation's history on deceptive prosecution, and convictions.

The U.S. Dept. of State annual report of 2013, reported facts that were obtained by Japan's Ministry of Justice. Those facts include of 400,000 cases that resulted in a 99.9% conviction rate, 91.7% of those cases resulted in convictions where there was no evidence presented by the prosecution. Those convictions resulted in nothing more than mere signed confessions. How many of those confessions were coerced, and false? With 91.7% of criminal cases resulting in convictions where no evidence was presented at trial other than the defendant's own confession, means that prosecutors only won cases where they presented evidence in 8.2% of criminal cases. The defendant had worked as a public defender at the San Bernardino County Public Defenders Office in both the adult misdemeanor, and juvenile divisions before relocating to Japan to work in

education. In that capacity, the defendant had only taken two cases to trial. He won both of them. Yet, of the three attorneys that have worked as defense counsel in this case, Kushida in the lower court, Kato at the Tokyo High Court, and Okoshi for the Supreme Court, and a combination of more than 37 years of experience working as defense attorneys, not one of them have ever won a case.

Question. If an attorney who has worked in the field of criminal defense for a decade or more, and has never won a case, possibly be considered competent, as is required by Article 37?

**XII. Human rights.**

After numerous requests to obtain the lower court decision, the defendant finally received a copy of it on 9.28.14., which was more than seven months after being released on 2.4.14., and after the High Court had made its ruling.

Question. How can a defendant properly review and address prosecutorial, and judiciary procedures when the defendant hadn't ever even received a copy of the lower court decision? The defendant wasn't even notified that the lower court decision included receiving hard labor attached to the 1.5 year, 4 year suspended sentence. Further, after the proceedings, the lower court attorney Kushida, never met with the defendant, and an interpreter to have the decision read to him. He was swiftly escorted out of the courtroom, and ushered back to Chiba Prison to be processed for being released.

The Daiyo Kangoku system is a failure. The Internal Commission of Jurists, and Lawasia, and the Japan Federation of Bar Association have long condemned it as such. The recent cases of Iwao Hakamada, Abubakar Awudu Suraj, and Govinda Prasad Mainali are prime examples of the failure of such a system. Upon release from Chiba Prison on Feb. 4th, 2014, the first thing the defendant learned was that two detainees at an immigration center in Ibaraki had been "found dead" in their cells. These men were not criminals. They were seeking political asylum from the countries that had tortured them, and came to Japan seeking refuge. Instead, they found themselves locked in isolation 24/7, psychologically, physically, and emotionally tortured, and left in an obvious state of financial ruin just as the defendant was in this case. The defendant's case is yet but another in a long line of abuses of authority, malfeasance, and corruption where defendant's are afforded the right to present an adequate defense, or receive a fair trial before an unbiased tribunal.

Question. Speedy trials are afforded to all defendants, not only ones the prosecutor impose terms that are unfavorable to the defendant, such as waiving the right for an appeal, and accepting a conviction of guilt. Article 37 calls for a speedy trial in all criminal cases. The defendant asks the court, first where does the constitution provide for the prosecutor the power to pick and choose what cases merit the constitutional provision of a speedy trial? Second, what is a speedy trial?

There are numerous violations of Japan's Rule of Criminal Procedure, Rules of Criminal Code, and the Constitution, which is the supreme law of the land. Article 98 of the constitution states that it is the supreme law of the nation, and no law, or act of government, contrary to these provisions, shall have legal force or validity. The defendant in this case could be blindfolded, and spun around three times, and then pin a dart on the constitution, and probably hit one of the myriad of violations that exists in this case, given the fact that there are so many. Article 11 states that the people shall not be prevented from enjoying any fundamental human rights. They are guaranteed by the constitution, and include the right from being subjected to torture, and include all of the rights that pertain to a defendant presenting an adequate defense, and having a fair trial.



Article 14 states that all people are equal under the law. Therefore there shall be no discrimination between a Japanese national and a foreigner. Article 31 states that no person shall be deprived of life or liberty, nor shall any criminal penalty be imposed upon them except according to procedure established by law, with the constitution being the supreme law of the land. Article 34 states that no person shall be detained without immediately being informed of the charges against them or without the immediate privilege of counsel; nor shall they be detained without adequate cause; and upon demand such cause must be immediately shown in open court in their presence, and the presence of their counsel. The defendant would raise this issue at every interrogation, which would always result in the prosecutor laughing, and telling the defendant he had "a lot to learn about Japan's procedures." It seems the prosecutor has a lot to learn about the rules of procedure, that, or they are so entirely belligerent, that they are unable to be taught morality, and proper conduct in an official capacity.

From the real facts of this case, not the ones fabricated by the prosecutor who conspired with police, and what the rules of procedure state, it is clear that the prosecutor is both corrupt, and incompetent and should be removed from office, as a precautionary measure to protect those who are unable to endure illegal interrogations. Incompetence is where one doesn't have the required skill to perform a particular task. Corruption is where one has that skill, but refuses to use it. Article 35 states that all persons have the right to be secure in their homes, and effects against entries, searches and seizures, and shall not be impaired except upon warrant issued for adequate cause, and particularly describing the place to be searched and things to be seized. Police entering the defendant's home, ransacking it to search for unrelated matters, no doubt to try and find other charges to bring against the defendant, and seizing a bicycle, taking possession of it, and then not even using it in the police phony photo reenactment is illegal, and a gross abuse of discretion, and authority. If the police, namely office Mizokuchi, and his supervisor have such disrespect for the laws of the land that are written to prevent them from obtaining evidence illegally, shouldn't the exclusionary rule apply? If so, the exclusionary rule would have to apply from the initial period of detention where the injury the defendant sustained by Ogura was intentionally not recorded, and preserved for evidence. Shouldn't the court investigate illegal conduct, and if they find such illegal conduct have them removed from office? What other cases are the police, and prosecutors involved in where they have planted evidence, or refused to record facts, and do a full, and proper investigation? What rape cases? What murder cases?

Article 36 states that the infliction of torture by any public officer, and cruel punishments are absolutely forbidden. The term absolute leaves no room for debate. Tying up the defendant, torturing him, breaking his leg, and causing other serious injuries for no other reason but because they are frustrated that the defendant relied on his constitutional rights, is a gross violation of Japan's criminal laws, criminal procedures, constitution, and human rights. No one should be allowed to remain in office after committing such heinous acts. Article 37 states that in all criminal cases the accused shall have a right to a speedy, and public trial by an impartial tribunal. Speedy trials are held to prevent irreparable damage to all parties in a case. The defendant was left in financial ruin while being detained for petty assault that wouldn't net a fifty-dollar fine in the U.S., or even a single day in jail. The defendant would have bailed out after a couple hours, and appeared in court, most likely to plea deal, and avoid a trial.

**XIII. Character evidence.**

The defendant has never been convicted of a crime. The defendant has worked in both the adult, and juvenile divisions of the San Bernardino County Public Prosecutor's Office, and with the Pomona City Family Law Court. The defendant has won the IVAMS Award in mediation, and arbitration, and American Jurisprudence Awards in Conflicts Of Law, and Lawyering Skills

Practicum. The defendant is a published writer, and photographer. Despite these facts, the defendant has suffered numerous assaults while residing in Japan. As surprising as this may first appear to the Court, it is not. Being subjected to hate crimes is a common occurrence in Japan. Japan's government officials, in collusion with the major media outlets fail to report on this incidents, downplay their significance. In one incident that took place recently in Korea town, thousands of Japanese marched along major streets. Some with bullhorns called for the execution of the Korean community. Others called for them to be immediately dragged into the street and murdered, and their businesses burnt to the ground. The international media covered these frightening events as what they were, unwarranted hate crimes. The Japanese media mostly would not cover the incident. The few that did called the Japanese "protesters." In nearly every other society, these volatile elements would be rounded up, tried, and convicted of hate crimes.

Being assaulted by Japanese nationals is not the exception, but has become the rule. The defendant has lived in Japan nearly eight years, and has been subjected to hate crimes on numerous occasions.

Fukui. In July of 2008, the defendant was in an automobile accident in Fukui. In that matter the occupant of the other vehicle immediately made a phone call. Soon, two of his friends arrived at the scene. Police arrived, and so did the defendant's insurance company with another vehicle, since the one he was driving was destroyed. An ambulance arrived and all three men got into an ambulance claiming to have been injured in the accident. All three men had neck braces placed on them, and claimed to have been injured in the accident. The police charged the defendant who refused to cooperate, or sign insurance forms to pay out damages to the criminal coconspirators. The police threatened the defendant with a court hearing and a 60,000 ¥ fine if he would not comply with the insurance companies demands. The defendant adamantly refused to sign anything. This resulted in the insurance company, and police finally performing a proper investigation where they eventually discovered the three men had been in three separate other accidents in less than a one-month period. The insurance company was about to pay out on one of those separate claims to those same three men. Those men were subsequently arrested for causing an accident, and filing three separate false insurance claims. The defendant was not charged with the accident.

Yamagata. In August of 2009, at approximately 1:00 a.m., the defendant was in his apartment watching a movie with his girlfriend, who is now his wife, and mother of his son. The doorbell rang, rang, and kept ringing. The defendant answered the door, and discovered two drunken woman that he did not know. One of them shouted that there were female shoes located in the ginkan area of the defendant's home, and then suddenly punched the defendant in the face. The other woman began to cry. The one who punched the defendant in the face attempted to enter the defendant's home, to assault his girlfriend. The defendant pushed her out the door, and closed it. Minutes later the police arrived because the two women had called them. The women told police the defendant had punched one of them in the face. He, and his girlfriend were taken to the Yamagata police station. Eventually, the police discovered that one of the women, who was married, and had a one-year-old son, had been stalking the defendant. Both women finally admitted that the defendant had not punched the woman, but that the woman had in fact punched him. The police asked the defendant if he wanted to press stalking, and assault charges against the woman. The defendant refused to do so, and asked to be taken home.

Ibaraki. During the immediate aftermath of 3.11.11., the defendant had been building a private international school in Sendai. The triple disaster of 3.11.11. destroyed the business, and the defendant had to resort to taking a job in Ibaraki as an English teacher. After shooting photography, and reporting in Sendai immediately following 3.11.11., and sleeping in his car for



several days, the defendant returned home to Ibaraki. He washed his car at an all night Shell Gas Station, and then pulled up to the pump, paid 3,000¥ for gas, and began pumping. Suddenly, a station employee exited the station wielding two metal pipes, yelling at the defendant that the station refused to serve gaijin. The employee swung the larger metal pipe about, crashing it down on a toolbox near the defendant's front left bumper of his car. Upon finishing the fueling of the car, the defendant took out a camera, and photographed the station employee. He sent the photographs to Shell headquarters in the Netherlands, and continued to fuel his car at that station for the next two years. The station employee was fired.

Note: During this time the defendant appeared two times on MSNBC's Nightline with Brian Williams, America's top news broadcast. The defendant helped raise millions of dollars for Japan's relief aid.

Nagano. While doing photography, and reporting for Tokyo Weekender magazine, on the tourist destination Kigokudani Yaen Koen, the defendant was seriously assaulted by a Nagano bus driver who worked for Nagaden bus company, after asking if that bus went to the Yudanaka station. After the attack, which left the defendant seriously injured, the bus driver went into the station area, and began spewing hate speech at all foreigners in the station. The police took no action, but upon learning that the defendant was in town to write about the tourist attraction, and the bus company not wanting to receive bad publicity, the bus company offered to pay 50,000 ¥ which covered the defendant's medical bills. The defendants sent an email to Yoshifumi Shinoda an executive of the company stating that he would accept the offer, and not write negatively about the company only if they promised not to fire the man because he appeared to be about 60 years old, and it would be nearly impossible for him to find other employment. The article appears at the following link: http://tokyoweekender.com/2014/03/snow-monkey-paradise-in-hell-valley-jigokudani-yaen-koen

The defendant has been refused service at restaurants, and shops, and while shooting photography at a public beach in Chiba was told that foreigners were not permitted at that beach. Earlier when he had attempted to park in a public pay lot, an elderly man ran out of his house screaming at the defendant that foreigners were not allowed to park in those public parking space. The defendant immediately took out a movie camera, and the man's demeanor immediately changed from assaultive, and aggressive to kind, and understanding. The defendant still has that video footage.

Yokohama. The defendant was on his way to the Supreme Court to file a motion of extension regarding this case appeal. The defendant's wife, and nine month old son was also on the train with him. The defendant's wife was holding their son when a Japanese man entered the train, and wanted the seat next to the defendant's wife, which was located in the seats reserved for women with children, and the disabled. Next to my wife was my son's diaper, and bottle bag. The man picked up the bag, and shoved it onto my wife's breast area, and slammed it into my son's head. The defendant was standing at the time, holding onto the baby stroller.

Japan's courts can pretend otherwise, but you would only be pretending that Japan has become an intolerable racist nation. Japan's judiciary, and politicians are the responsible for the rise in hate crimes because they have the power to invalidate it, and invalidate it as the U.S., UK, Australia, Germany, France, and every other civilized nation have.

The defendant has reported in various publications how the Japanese legal system destroys lives. He has interviewed people who have had to resort to living in blue tarp tents along rivers, after having had minor issues with the law, becoming unemployed, and who were too ashamed to return home to their family as a result. Many have never seen their spouses, or children after

suffering that injustice that was heaped upon them. The fact is, the Japanese legal system gives a life sentence of poverty, humiliation and shame to those that have suffered as a result of being refused competent legal representation, the right to raise an adequate defense, and a speedy trial so as to avoid the excessive damages that they would not have suffered had the courts adhered to the letter of the law, and held police, and prosecutors to hire standards.

**XIV. Damages.**

This matter has financially ruined the defendant and his wife. They defendant has lost more than 3,400,000 yen, as a result of this current case, as he continues to fight for a just verdict. Yet, the Japanese prefectural office continues to demand the defendant pay taxes that the Supreme Court has recently ruled that he benefits nothing from because he is not Japanese. The defendant is unable to provide for the Court a translation for this appeal statement, and supporting evidentiary material. He simply does not have the funds. Article 37 states that this is a public expense.

The defendant's wife, and he have a nine-month-old son. They have not paid their November rent, with winter well on its way. The defendant used large sums of money in gathering the medical reports, paying consulting fees, and for other expenses related to this defense, necessary to file this appeal. The defendant has used funds to pay for matters related to this proceeding that the Japanese Constitution requires the state to pay for, such as consulting fees to attorneys, obtaining photographic evidence to show the Court that certain evidence has been intentionally hidden from the courts, and medical records that would easily prove to an unbiased judiciary, that the defendant's sentence should stand. Article 37 states that in all criminal cases the accused shall have a right to an impartial tribunal. He shall have the right of compulsory process for obtaining evidence, and witnesses on his behalf at public expense.

The defendant requests full compensation for all monetary losses including salary, transportation related to this matter, medical expenses, fees related to this matter, and other expenses as a result of the harm caused by the Keisei Electric Railway Companies employers who are racist, liars, and have knowingly committed perjury, and the knowingly filed false charges to convict an innocent human being, despite what the prosecutors are taught during their training, which is supposed to benefit society.

The defendant's younger brother, a police officer, underwent chemotherapy treatment for throat cancer, during the time the defendant was being detained. The defendant wasn't available to encourage his brother in his time of need. The defendant's California brokers license was to be renewed during the time he was held in detention. The defendant had that license for years. Because he was unable to renew the license, which he had done every four years since obtaining it, the defendant would have to return to California to retake the exam, and pay large fees in the process.

The defendant returned home on Feb. 4th to find the unseasonal snow that hit Japan had caused the carport to collapse, resulting in the car being totally destroyed.

Exhibit K. Photos of the defendant's brother, both before, and after suffering through chemotherapy treatment. Exhibit K includes a photo of the defendant's destroyed car. The Court will also find photos of the physical condition of the defendant upon leaving Chiba Prison, and medical descriptions describing neurological injuries the defendant suffered at the hands of prison guards that never considered that the defendant was merely a detainee, and had not been found guilty of anything at the time of treating him in such unconscionable manner. Exhibit K includes a copy of the defendant's broker's license, which was to be renewed at the time he was being



detained in Chiba Prison. On the day the license renewal was required the defendant's son was already two days old, but prisons authorities refused to notify the defendant as to the birth of his son. Included are conversations with the Nagano bus driver that racially targeted, spewed hate speech, and assaulted the defendant. These conversations show that the defendant handled an assault in a gentlemanly manner. This exhibit also includes evidence of the defendant's work as a writer with Japan's media.

The defendant's mother had her 80th birthday, and spent it learning that the defendant was being detained for crimes he had not committed, and had been tortured, receiving serious injuries, including a broken leg. The defendant was to go to his mother's celebration with his fiancé to meet his mother for the first time. Happy birthday mom!

On Jan. 4th the day the defendant's son was born, which is a time of joy, and celebration, the defendant had been held in isolation since Dec. 31st at Chiba Prison, and again had been physically tortured resulting in serious neurological damage to his right wrist. The defendant recorded the daily temperatures while detained in Chiba Prison with the warmest temperature being recorded at 4 degrees Celsius. The average indoor temperature was 2 degrees Celsius. The defendant was stripped naked, and held in isolation without even a pair of socks. Again, much of this illegal treatment was captured on videotape recorded by Chiba guards. The defendant could identify each officer that took part in that torture, as the one who put two pairs of metal handcuffs behind his back, and locked them down as tight as possible, under instructions by Cellblock C supervisor, had escorted the defendant to court on Feb. 4th, 2014, the day the defendant was released. While being held in Chiba Prison's isolation torture rooms, the defendant witnessed a Korean man chained to the wall, and another led around in chains, and an African man being beaten for no reason other than he couldn't understand what the guards were asking him.

The defendant stopped at cells to look inside and see the conditions that the detainees were being held under. He would be beaten for this, as it is forbidden for detainees to look to their sides, and into the other cells. In every cell, the detainees wore shabby, thin, and torn gray prison outfits that were decades old. Their bodies bobbed up, and down like a complete and utter lunatic. They trembled in a frozen state, and all suffered from extreme frostbite, ass they were forced to sit on the floor, in front of cell doors, in freezing conditions, while blankets that could warm them were folded, and paced on the other side of the cell, forbidden to be used until bed time. Each detainee was in a psychologically deteriorating condition. Men who had enough, and began screaming, and who broke the silent rule, were removed quickly and taken to isolation chambers that existed on the other side of the prison. The defendant would be taken there two times while being detained from Dec. 20th, until Feb. 4th. The first time the defendant was held for five days in utter isolation, with bright lights on 24/7. The conditions violated every human condition imaginable.

The defendant was systematically being frozen, starved, and received even worse physical torture than what he suffered at Narashino Detention Center. At both Narashino Detention Center, and Chiba Prison these tortures sessions would be videotape recorded, and sought by his attorneys to present to the courts, yet both refuse to cooperate, citing privacy rights of the perpetrators. Today, the Chiba Public Prosecutor's Office, the Narashino Police Department, and Chiba Prison refuse to cooperate with the Japan Federation Bar Association, and the Tokyo Bar Association regarding their investigations into police, and prosecutorial illegal conduct. They all refuse to cooperate with the defense attorney Okoshi in his professional capacity to adequately represent the defendant in his appeal to the Supreme Court.

The defendant lost his job with Azalea language school, and in the year to follow his detention has vigorously sought employment, submitting hundreds of resumes to gain employment, and to

take care of his wife, and son. The defendant has worked a total of twelve weeks since being released, with bills, and expenses having to be paid, and with much of his meager saving left being spent to have these false convictions overturned.

After losing his job, his former employer pressured the defendant to leave the home he was renting from her mother. While in detention the former employer sent the defendant a document asking the defendant to allow him to remove from the home all of his property, and dispose of it. This included the defendant's entire life's work, including storage drives that held all of his photography, master audio files, family photos, degrees, certification, and professional audio, and video equipment and a brand new computer. The defendant received that document even though while being detained he continued to pay every bill, including rent that came due on that property. The defendant sought the return of his security deposit when he left the home in better condition that he received it but this request would be ignored. Without employment the defendant relocated to an apartment, and had to pay security deposits and pay rental fees that were much larger than the house that he was renting. The damages suffered by the defendant are enormous.

**XV. Further proceedings.**

Because the defendant has been unable to have a fair proceeding in Japan he has filed a petition for the matter to be heard before the International World Court. The defendant is also bringing charges against the Keisei Electric Railway Company, and its employees for race hate crimes, and colluding to file false police reports, and for their attempt to extort the defendant, and financially gain from their fraud. The lawsuit will include naming as defendants those who acted on behalf of the Japanese government, in an individual capacity. The U.S. Federal Courts have subject matter jurisdiction, and long arm statues apply. The action will also include civil liability charges under The Alien Tort Act. The rules of discovery are stringently adhered to in U.S. courts, and the defendant will seek to obtain all evidence in possession of the prosecutors that the defendant is aware they have intentionally withheld from the defendant.

In numerous communications with the Chiba Public Prosecutors Office to obtain that evidence, the representatives that have communicated with the defendant's wife only state that they will not release any evidence to the defendant until after all proceedings have been exhausted. Translated into plain English what this means is the prosecutors wants to ensure they continue to deny the defendant the opportunity to present an adequate defense, and to have a fair proceeding, and to assure they win, at any cost. The prosecutors, Narashino detention center, and Chiba Prison will turn over evidence in their possession to the defendant, or KERC, and the defendants will face contempt proceedings, and surely a summary judgment ruling.

The media, and public will eventually discover the great depths of corruption that exists in Japan's Ministry of Justice, and the defendant will not be censored in this regard. The Chiba Public Prosecutor have stated that they don't want to turn over the evidence they have to the defendant because they state that the defendant will turn it over to the media. Regardless of what the defendant will do with evidence once it is in his possession, the defendant must be given the opportunity to prepare and adequate defense, and Criminal Code 281 (4) requires this.

Article 38 states that, no person shall be compelled to testify against themselves. Any confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence. Yet, at the lower court proceeding with no evidence presented by the prosecutors at trial, no witnesses were called to testify, or to be subject to defense questioning, or impeachment, with no videotapes viewed by the judge or any other evidentiary material presented to the court, the defendant was found guilty. Even where the defendant, as Okoshi stated in his



brief to the Supreme Court, had not admitted guilt, but instead, his words, "I can't fight this" were taken as an admission of guilt. The fact is, on Dec. 18th, late in the evening before the morning of trial, the defendant was taken to Tsudanuma General Hospital under the guise of having his cast replaced with a new one because it was "too dirty for the court", instead had it removed so the judge wouldn't see the defendant wheeled into the courtroom with a cast on his legs and asks questions. The defendant was warned not to discuss his broken leg with the judge under the threat of physical violence, and the guard most responsible for breaking the leg was the guard who ushered the defendant into the court, and held the rope that was attached to the defendant's waist during trial. The defendant was forced to walk into the court, and was unable to stand, so he had to sit behind the podium during trial. The defendant was trembling violently, and clearly psychologically, and emotionally terrorized, yet the judge, who no doubt was trained that the defendant was not a human being never took notice of any of this. With the defendant not willing to fight the charges, due to an extreme level of duress, and relying on the words of his defense counsel that told the defendant that if he didn't fight the charges he would be released within ten days. With the defendant's wife scheduled to give birth to their son on Dec. 27th, the defendant listened to his lawyer. Without fighting the charge, the defendant was held over for another 34 days, for an unnecessary continuance. The judge was aware that the defendant's wife was to give birth sometime that week, and cared not. He stood, and walked out of the court.

On Dec. 20th, the morning after the first trial date, the defendant was ordered taken to Chiba Prison by the prosecutor, and held in isolation until after his son was born on Jan. 4th, 2014. The defendant was withheld knowledge of the birth of his son until Jan. 9th. On the day the defendant's son was born, he had been held in an isolation chamber since Dec. 31st, 2013. On the day the defendant's son was born, he had not eaten for five entire days. The Chiba Prison warden personally removed the defendant out of isolation for fear the defendant would die that evening.

Chiba Prison refused to give the defendant the photo of his son, which was sent to him by his wife. The defendant was subjected to numerous bouts of torture, resulting in numerous injuries. The defendant didn't eat approximately one-third of the days he was detained at both Narashino and Chiba Prison, and this was recorded as fact in statements given to the U.S. Embassy by detention center supervisor Fujisaki.

While detained at Chiba Prison a U.S. Embassy consulate Thomas A. Duval came to the prison to inspect the defendant. The defendant's condition was so extreme that Mr. Duval took photos of the frostbite he was suffering from, and smuggled them out of the prison, and turned them over to his superiors, who turned them over to a doctor for his personal opinion as to whether the defendant was being tortured while being detained in Japan's draconian, and outdated prison system. The Embassy set a protest letter to the Chiba Prison warden stating that Mr. Duval had personally witnessed the emaciated, and wasting condition of the defendant, and that the defendant was unable to walk. Mr. Duval stated that the defendant's left leg, (not the right leg that was broken at Narashino), which he had photographed as proof of torture, and violations of international laws related to prisoners treatment, was swollen at the ankle, and three toes were covered in black skin, which means the toes were not receiving any circulation, and dying. When the defendant was released from Chiba Prison on Feb. 4th, 2014 he was unable to walk. The defendant spent four days going cold turkey from all of the drugs the prison was forcing the defendant to take, including injections of some kind of opiate. The defendant was unable to sleep for those four days, and spent much of that time communicating online with his sister overseas, who did her best to try, and help the defendant go through that horrible detoxification process.

Article 76 states that all judges shall be independent in the exercise of their conscience and shall be bound only by this constitution and the laws. The judge allowed the prosecutor to taint the case



STATE-0584

with false accusation that the defendant made an offensive statement to Ogura. This was made for no other purpose but to incite the court, and to confuse the issue, which was assault. Assault required the element of intent. There is no element of offensive statement for a charge of assault. The judge deciding to walk out of the trial was an abuse of discretion, given the circumstances of the case. One being the charges was extremely petty. Two, that the defendant had no prior record. Three, that the defendant's fiancé, who he was supposed to marry and where marriage documents were presented to the judge allowed this farce to continue another 47 days.

Article 37 states that in all criminal cases the accused shall enjoy the right to examine all witnesses, and he shall have the right of compulsory process for obtaining witnesses on his behalf at public expense. The defendant has been financially ruined as a result of this matter, and has doesn't have the ability to pay fees related to translating these documents. It is therefore the state's responsibility to pay for the costs related to translating the documents the defendant is submitting to Japan's highest court for their review. After all, it was the state that has brought these false charges, and has forced the defendant to spend countless hours preparing for this final appeal. All out of pocket expenses incurred in preparation of appeals, are sought to be reimbursed by the state as the defendant would not have incurred those costs, but for the illegal conduct on the part of Japanese government officials acting on behalf of the state.

Exhibit L. Documents that support the poor treatment of the defendant while detained at Chiba Prison, including photographic evidenced of severe injuries that could have easily been avoided had prison officials used common sense.

**XVI. Inquiry into the facts.**

In seeking relief, and an investigation by government authorities into the illegal treatment the defendant suffered, he wrote a detailed description, and facts of the case to numerous governmental agencies, including the Supreme Prosecutor's Office, Head of MOJ, Tanigaki, the National Police Agency, etc. No agency has taken this matter seriously as shown by the following documents.

Exhibit M. Documents that support the poor treatment of the defendant while detained at Chiba Prison, including photographic evidenced of severe injuries that could have easily been avoided had prison officials used common sense.

**XVII. Expenses.**

Exhibit N. Expenses incurred as a result of these proceedings supported by receipts.

Exhibit O. The actual statement that the defendant carried into court, which was prepared for the defendant by the lower court attorney Kushida, and Chiba Prison guard, the floor manager of Cellblock C.

Exhibit P. A copy of the Supreme Court appointed attorney Shink Okoshi's appeal statement.

**XVIII. Closing.**

The Supreme Court, Japan's highest honor in the area of law has posted individual statements online regarding their duty in handing down decisions that affect other people's lives, and not that of their own. Many who were dragged into legal proceedings they wanted no part of, and as the defendant can attest, received ill treatment at the hands of those that swore to uphold the



Constitution, and laws to prevent travesties of justice.

Chief Justice Terada, Itsuro. Throughout its long history, Japan has devised ways to ensure that the various disputes among people are settled fairly and that those persons who violate the rules of society are dealt with properly. He states that after the Meiji Restoration, Japan began to steer its course towards the direction of becoming a modern nation and, ever since, tireless and strenuous efforts have been made by our elders in order to build a modern judicial system alongside politics and administration of government.

Justice Sakura, Ryuko. Thinking deeply about the gravity of judging people, I will try to improve myself and pursue my duty carefully so as to make fair and equitable judgments. I think it is important to deal with each and every case with care, while hearing opinions from as many people as possible, thereby accumulating well-balanced court decisions.

Justice Kanetsuki, Seishi. Through my life as a judge over the past forty years, I have engaged in my duties, trying to be faithful and impartial, and to have as broad a perspective as possible. I want to keep this attitude in my future career. In order to make appropriate judgments as a judge in this age of rapid changes.

Justice Chiba, Katsumi. Courts must not merely follow precedents, but strive to meet the needs of a new era, while looking ahead to the future and having flexible ways of thinking and broad perspectives. With this in mind, I will deal with each and every case with a humble attitude and work hard to make better judgments and find better solutions.

Justice Shiraki, Yu. The mission of the court is, in whatever age, to find an appropriate and reasonable solution to each and every case brought to it. It is said that Kyoto Shoshidai governor stationed in Kyoto, when holding a trial, heard the arguments of both parties to a dispute behind a paper screen, grinding tea, so as not to become biased by looking at their faces. This episode describes Itakura's intention of trying to be as fair and sincere to both parties as possible. In my 40-year career as a judge, I have also been engaged in judging cases sincerely and devotedly. I aim to serve my duty, keeping this attitude.

Justice Okabe, Kiyoko. I will try to be impartial and deliberate earnestly to reach a conclusion.

Justice Otani, Takehiko. Hear opinions of both parties impartially. See things straight from a fair and neutral standpoint. Make judgments in accordance with law and following my honest feelings.
Justice Ohashi, Masaharu
See things from many aspects, hear opinions with an open mind, keep trying to find a better way until the last minute, and have the courage to make decision in this manner, and with sincerity.

Justice Yamaura, Yoshiki. Are citizens truly protected by law? Are they substantially guaranteed the right of access to the courts? In order to achieve justice through the law, it is necessary that both parties be equally equipped. I intend to do my best in considering how to truly ensure due process is realized.

Justice Onuki, Yoshinobu. I will look at the facts with a sense of humility and try to be fair when making judgments.

Justice Onimaru, Kaoru. I take care to deal with each case from a neutral and fair perspective, and make a careful and thorough judgment, with the role as guardian of the Constitution in mind at all



STATE-0585

times.

Justice Kiuchi, Michiyoshi. I will hear every case with an open mind and make decisions that can gain public trust.

Justice Yamamoto, Tsuneyuki. Being assigned to the post of Justice of the Supreme Court is really more of an honor than I deserve. I will do my best to fulfill my duties, making the most of the knowledge and experience in law that I have acquired through my career as a bureaucrat for more than 40 years, and aiming to make fair and equitable decisions based on law, evidence and my own conscience.

Justice Yamasaki, Toshimitsu. Don't forget the resolution with which you started out. I am determined to handle each and every assigned case faithfully, without easily relying on my experience, by excluding self-conceit, and with the resolution I embraced when I first became a judge.

Justice Ikegami, Masayuki there is no information given about you. You may be interested to know that the defendant named his son Masayuki, which in Japanese means leader, and one who has an innate gift of communicating through speech, and who gains the trust of those that choose to follow him through his leadership role.

The defendant noted some common themes in the justice's statements. They discussed modern trends in a rapidly changing society. They discussed the constitutionally mandated requirement of remaining unbiased in making a determination in a case that affects the lives of others.

The defendant would like to tell Japan's highest, and most influential court to not only study how some former military officer ruled in Japan's military past, as we all know the final results of that era which is now behind us, but to study the most respected, and influential court that there ever was in this world, and ever-changing society. A Court whose collective determination affected million of lives. T Court was the Warren Court that existed between 1953, and 1969. U.S. Chief Justice Earl Warren used his judicial power in dramatic fashion, to the consternation of his conservative opponents. The Warren Court expanded civil rights, civil liberties, and most notably judicial power. The Warren Court brought an end to segregation, which eventually led to a great reduction in hate crimes, and raised the bar for tolerance. The Warren Court is recognized as a high point in judicial authority that has been eroding ever since. Regardless, the Warren Court influence remains, resonating in a substantial manner. In that, it is Japan's Highest Court that has the duty to rule on precedence, and to uphold true constitutional principles.

The defendant has asked this honorable Court to address numerous issues that affects all of us today, and will affect generations to come in a most profound way. Justice Onimaru said it best that you are the guardians of the Constitution. Justice Yamasaki, please don't forget the resolution with which you started out your legal career with.

Urgent

Attention - Carolin

American Embas

Consular Section

10-5 Akasaka

Minato-ku, Tok

107-842

I have a law d

specte of law

county

urgent
Attention - Caroline Kennedy

American Embassy
Consular Section
10-5 Akasaka 1-chome
Minato-ku, Tokyo
107-8420, Japan

1

My name is [redacted] [redacted] I'm an American citizen, I've lived in Japan, and worked as a teacher 7+ years.

I graduated law school in 2007 from the University of La Verne College of Law (ABA accredited). I have a BA in Communications, Loyola Marymount (honors), and a California brokers license.

For Japan I have a contract where I represent U.S. non-government politicians, and UN officials in non-official capacity. This includes former U.S. presidents, and vice presidents, Jimmy Carter, Dick Cheney, Al Gore, etc.

I'm also a contributing writer for Tokyo Weekender, Japan Times, Japan Today, etc. My articles, and photography appear in numerous publications, & broadcasts ABC, PBS, NHK, MSNBC. I also represent Brian Williams of MSNBC for Japan territory.

(2)

My wife is 8 months pregnant. she is Japanese. i'm 55 years old, and reside at [redacted]

(I'm writing this in the dark, without glasses, so please forgive any sloppiness, as I cannot see well.)

On Oct. 19th I was arrested for an extremeley minor "probable cause" investigation. One month later, I am still held in prison, in isolation 24/7 and have yet to see a lawyer.

The charges I'm ~~accused~~ accused of are physically impossible as I had a broken leg at time of being taken to Narashino Police Detention Center. I also have a right arm that is incapacitated, and legally disabled in the U.S. I need cortisone shots to use my arm, and while in law school had to take all exams orally because I could not use my right arm.

My lawyer in
the U.S. for disabilities
is William Gregory in
Coral Gables, Florida.
I have had more than 6 years
of intensive physical therapy.
I could not walk for a 6 year period,
I've had 4 knee surgeries, etc.

3

~~Nov.~~ Oct. 19th

first, I was accused of spitting on a trainworker. This is not ~~the~~ true, I spit toward a garbage can. Because I refused to confess, I have been systematically charged with (2 assaults), and their spit.

(clear abuse of power)

I am being starved to death slowly. (I eat approximately 15-20% of the food here.) I also had my foot broken, and my hand broken while being tortured. At no time have I been a threat to anyone at this detention center.

For the 1st 2 weeks I was denied pencil & paper. For the first 5 days I could not contact my wife. It was the Embassy/Consulate that demanded her phone number from my cell phone that she was finally contacted. But for that, she still would not know where I am.

(charges to date no one has ever discussed with me, and which required legal representation by Japanese constitution.)

one charge is 30 days to 15 years, requiring legal representation

The teacher, replaced
left Topper because of
numerous assaults 119 same
as the Travis lines
Haug's II
Tim went New Zealand

(4)

There have been numerous (at Keisei Tsudanuma train station) unprovoked attacks on me where this event arised.) including being kicked, punched, pushed, pulled and not being reimbursed overpayment where the train company machine malfunctioned.

on oct. 19th I was seeking reimbursement, and told to get out by a train worker that had previously been racist, and provocational. I tried again, he was more rude and I was told to get out, 3 times. There was a garbage can, so I spit at the can and walked away. I was exiting when this worker ran to me and began kicking and punching me. Two wild punches I pushed him back. Never once acting offensively!

from him and

Now I am ~~the~~ indicted with assault and the spit.

(5

I asked these injuries to be photographed as evidence and in the presence of cameras—several times to investigator, officer Mizokuchi doing my "investigation" has spoken of nearly nothing except accusing me of being a racist, which is absurd. He has intentionally withheld evidence such as damage to my ~~right~~ left leg where the train worker kicked me, and punched me in an unprovoked incident. I have been assaulted at this station Keisei Tsudanuma in previous incidents, and provoked on numerous occasions. All of this had been reported to my employer, and to my wife on numerous occasions, prior to ~~my~~ being detained.— indicted. All related events.

prosecutor and 2 judges. I have had no response, or denied.

At this point I greatly fear for my life. I have had no trial, and detention keeps being

All guards
knew my foot
was already
broken as I had
been using medication
medical padding,
and clearly had
great difficulty
walking.

(6

↗ Nov. 8th

extended. My wife is due to give birth ~~Dec. 25th~~.
The torture applied was a rope that was
wrapped around my broken foot. The supervisor
knew my foot was already broken. 10-12 men
took me into a silent isolation chamber, and
applied ropes to my knees, and feet. They also
placed straps on my hands, which were improperly
used, and led to my right hand being broken. My
right foot which was already broken, had a
rope wrapped around it. It was pulled as tightly
as possible & my two ankles were then pulled
together by detention staff. The rope was
then tied around my legs as tight as possible
forcing my ankle bones against each other.
This resulted in my bones - above my ankles
to twist inward. Ropes were also tied



The entire time)
was tied like that
my legs & feet were pain
swelling. this caused
so intense because the rope had
been so tight. I
couldn't do anything
to alleviate the swelling
which caused rope
tightening even
greater.