**Dubois, Richard L**

**From:** Tokyo, CCU
**Sent:** Friday, December 12, 2014 5:16 PM
**To:** U.S. Embassy Tokyo ACS
**Subject:** FW: Chiba Bar Association Investigation

FYI
-----Original Message-----
From: J[redacted] S[redacted] [mailto:email@stackjones.com]
Sent: Friday, December 12, 2014 4:14 PM
To: J[redacted] S[redacted]
Subject: Chiba Bar Association Investigation

12.12.14.

I just received a letter from the Chiba Bar Association president. We called them, and they confirmed they are also investigating my case. CBA has licensing authority over the Chiba Public Prosecutor Kume, the trial lawyer, and Kushida the incompetent lower court lawyer that removed evidence from my file, intentionally attempting to hide it from the Supreme Court attorney.

A Bar Association investigator, Atsushi Oku is setting up a meeting with me, himself, and an interpreter to look over the myriad of new documents I presented to the Supreme Court, including the medical reports, and the station workers attempts to contact my employee to extort money.

I believe the initial meeting will be held at the Tokyo Bar Association headquarters, at least that is the preliminary information I have received.

JS

**Dubois, Richard L**

**From:** Tokyo, CCU
**Sent:** Monday, November 03, 2014 9:42 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** From JackStone: FW: Japan Supreme Court Case No. 394 Update

This email is UNCLASSIFIED.

**From:** J[redacted] S[redacted] [mailto:email@stackjones.com]
**Sent:** Monday, November 03, 2014 6:30 AM
**To:** J[redacted] S[redacted]
**Subject:** Japan Supreme Court Case No. 394 Update

On Nov. 1st, 2014, Japan's inherently racist Supreme Court has refused defense attorney, Shinji Okoshi's request to provide him time to have my statement, exhibits, and other supporting documents, translated for the Court to aid them in making a final determination in the outcome of the case.

I have spent more than one year compiling hospital records, communications, witness statements, photographic, and other information at my own expense, regardless of the fact that Article 37 states that the government must pay for these expenses. This has financially destroyed my family, and in fact we are unable to pay our November rent as a result of fighting these false charges.

The Court is in violation of Article 14 which is Japan's Equal Protection Clause. What the court has said is if you are Japanese, you can submit documents in your native tongue. If you are foreigner, we refuse to acknowledge anything you say because of the inherent racism that exists in these corrupt governmental actors. This is especially egregious when the Court had given the defendant until Oct. 31st to submit his statement, which the defendant had already informed that it would be in English. The Court had notified me to forward the documents to Okoshi directly so he could have them translated for the Court. Again, Okoshis is the attorney that quit without notice on Oct. 2nd, notified the Court that he had quit, and which did not notify us.

What the Court is saying is they will resort to anything to uphold Japan's phony 99.9% conviction rate, which is ridiculed to scorn by the UN, U.S. Dept. of State, and every respectable human rights organization on the face of the planet.

The Court has been made fully aware that I had been preparing documents include medical records that prove Japanese government actors engaged in the use of physical torture to try and extract false confessions, and took extreme measures to cover up their actions such as having a cast removed from my leg the evening before trial began, to hide the fact that police broke my leg in a violent torture that took place on Nov. 8th, 2013 in which the Narashino detention center supervisor and other guards, and police participated in, and which the Chiba Prosecutor's office refused to investigate. The documents overwhelmingly show that police, and prosectors refused to do a proper investigation during the investigation period including interviewing eye witnesses that stated it was the defendant that was the real victim in the matter.

The police, and prosecutors have systematically refused to cooperate with the defense, in violation of Criminal Code 281 (4)(5), stating on the record, that providing the defense with evidence that they have intentionally withheld, violates the privacy rights of the police, and prosecutors. This is stated in Okoshi's own statement to the Court when he tried to obtain evidence that he knows exists, and police, and prosecutors refused to turn over to the defense, including numerous videotape recordings that took place at the Narashino police station, and Chiba Prison.

Japan's minister of justice, Midori Matsushima, a recent appointment of Shinzo Abe, Prime Minister of Japan, who hadn't been on the job for two months, resigned amidst a corruption scandal. The violation of the law is considered a serious one because Matsushima, as justice minister, oversaw the nation's prosecutors.

What makes this case particularly incredulous is where the Japanese officials responsible for this fraud, the Chiba Prosecutor's Office had attempted to deport me to prevent me from raising an appeal, knowing full well that I had an infant son, and where my wife did not want me to be forced out of the country, and to remain and provide for our family, as she is unable to work, and on maternity leave at this time. This matter was so frightening that I was down to 11 days to a forced deportation order before my visa was approved for one year as a "spouse" visa.

J[redacted] S[redacted]

**Dubois, Richard L**

**From:** Tokyo, CCU
**Sent:** Wednesday, November 05, 2014 9:09 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** From J S FW: 11.5.14. Update Returning to Supreme Court With Translations

FYI

-----Original Message-----
From: J S [mailto:email@stackjones.com]
Sent: Wednesday, November 05, 2014 7:44 AM
To: J S
Subject: 11.5.14. Update Returning to Supreme Court With Translations

11.5.14.

We have finalized the translations, and we will return to the Supreme Court when it opens in an attempt to deliver these documents.

The SC had already sent a statement that they would not allow for time to translate the documents in response to a continuance motion we filed last week. We received that denial on 11.1.14., less than 24 hours after the SC received our appeal, which was delivered by Okoshi attorney in person, and through us by letter.

If the SC refuses to accept these translations, I will refuse to leave the building, and demand to be arrested. I will be holding my son at that time, who turned 10 months yesterday. I hope it doesn't come to that, but I will not leave until the Court accepts those documents in making their determination. The deficient three page document that attorney Okoshi gave to the Court will merit no consideration. I'm certain of that.

Three lawyers have represented me. 37 total years of criminal defense practice. Not one case won, or overturned by any of them. Yet, when I worked at the San Bernardino County Public Defender's Office, I only took two cases to trial, and won both of them on constitutional grounds. That in and of itself is an indictment on Japan's pathetic judiciary.

I cannot accept spending more than a year on this injustice, having my voice heard, and denied every right imaginable.

My wife, and I have compiled very damning evidence that tears into intentional procedural errors, Constitutional violations, and international treaty violations that Japanese officials have ratified, and are in violation of.

I'm doing this for my son because he will one day learn of this, and how it has affected our lives, his father, his mother, and our families.

Despite the extreme levels of apathy of many people today, some things are worthy fighting for, and until the very end.

If this was you, I'm sure you'd do the same.

J S

This email is UNCLASSIFIED.

**Dubois, Richard L**

**From:** Tokyo, CCU
**Sent:** Wednesday, November 12, 2014 9:15 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** From J[redacted] S[redacted] FW: 13 Constitutional Questions For Japan's Supreme Court

This email is UNCLASSIFIED.

**From:** J[redacted] S[redacted] [mailto:email@stackjones.com]
**Sent:** Tuesday, November 11, 2014 2:39 AM
**To:** J[redacted] S[redacted]
**Subject:** 13 Constitutional Questions For Japan's Supreme Court

The text below includes both the English, and Japanese translations.

JS

-----

There is nothing the Supreme Court can do to repair the damage to the defendant and his family. However, there are numerous issues that have been raised, and the defendant, a former public defender is asking the Court to answer, and to prevent others from being subjected to the same cruel, and inhumane conduct of those that act on behalf of the Japanese government.

The defendant always said that his action of spitting at a trashcan was a symbolic act of disgust after being subjected to numerous hate crimes in Japan. Hate crimes continue to increase at an alarming rate. Yet, Japan's Ministry of Justice, and its judiciary take no action, despite the high level of disgust the international community has voiced regarding these matters.

Ogura, the station employee who is the real perpetrator of criminal activity in this case spewed hate speech at the defendant, the police, and prosecutors were made aware of this, but intentionally omitted this fact from the case, and refused to properly investigate the matter. In 2013, the year the defendant was detained, two different UN committees on human rights reported more than 360 cases of hate crimes against foreigners in Japan, and urged the government to pass laws to stop hate speech which is clearly escalating.

The recently appointed Ministry of Justice, Yoko Kamikawa, appointed after Midori Matsushima had to resign amidst her own criminal scandal, had already stated that she is against outlawing hate crimes, ignorantly calling it a form of free speech.

Question. With the rise of serious hate crimes in Japan, should hate speech such as calling for the murder of foreigners, the destruction of their businesses, and a call for their genocide be protected speech?

An indictment is a document a defendant receives from the prosecution and used to prepare a defense for trial. The indictment served to the defendant claimed a victim named Ogawa was punched by the defendant three times. There is no one named Ogawa. It is a legal impossibility to commit a criminal act against someone that does not exist.

Question. Where an indictment is served against a defendant, and executed so poorly that it doesn't properly name the victim, should a finding of guilt in the lower court be upheld?

The defendant was kicked by Ogura. The state is calling him the victim. Ogura claimed that he did not assault the defendant. Yet, he left a serious leg injury on the defendant that took several months to heal. The defendant attempted to get that injury, a bloody kick wound photographed by police, prosecutor, and three pretrial judges to be preserved as evidence. They all refused.

Question. Does a prosecutor have Constitutional authority to intentionally fail to preserve evidence, and withhold it from the defendant, and the court for no reason but to assure the defendant can't raise an adequate defense, or have a fair trial? Does this violate the equal protection clause, showing that some can present all the evidence available to them, but others may not?

Question. Should Daiyo Kangkoku guards who are transportation drivers be allowed to operate vehicles owned by the government while under the influence of alcohol? Should they be working on 28 hour shifts without rest, and engage in the use of restraining devices that have been known to cause serious injuries, even death, and in this case, a broken leg, while attempting to force extract a false confession? Does this violate articles 11, 36, and 38?

The defendant was detained for six days after having his leg broken without medical treatment. During that time government officials refused the defendant contact with his embassy, in fact contact was refused for 15 days, until a consulate showed up on their normally scheduled appointment.

Question. Do Japanese officials have authority to circumvent international treaties the nation has ratified regarding the treatment of foreign detainees? Is it an abuse of authority to deny detainees access to their embassies while those officials engage in covering up their criminal conduct?

Question. Can police, prosecutors, and prisons refuse to turn over notebooks, records, videotape recordings, and other pertinent evidence to aid in showing Japan's Highest Court that the defendant was subjected to torture, and abuse of power to extract false confessions? Should the presumption of guilt be applied to government officials who refuse to turn over such evidence?

The defendant was held 38 days without an attorney. Even fifteen days after indictment in violation of Article 34, which requires immediate appointment.

Question. At what point is a defendant allowed access to an attorney? Article 34 says immediately. Does the Court have a different interpretation as to what immediate appointment means? At what point is the refusal of appointment of counsel too long, raising procedural errors, and reliability of statements made at trial?

The police entered the defendant's house to seize a bike without a warrant, and ransacked it, causing damage to the defendant's property.

Article 35 states that all persons have the right to be secure in their homes, and property against entries, searches and seizures, except upon a warrant issued for adequate cause and particularly describing the place to be searched and things to be seized.

Question. Is the police conduct in this case a valid search? Should the defendant be reimbursed for the damage to his property?

A judge ordered a warrant to extract blood from the defendant. The defendant's kidneys were failing in detention, and had already been taken to the hospital because of this. The guards came to the cell the defendant was held in and told the guards were taking him to the hospital to have his kidney checked. Instead, they brought the defendant to the exit door, took numerous photo, read a warrant to take the defendant to the hospital to extract blood. Several police dragged the defendant in chains, and handcuffs through the public area of the hospital where he was seen by scores of people, and treated as a public spectacle, which had no other purpose but to humiliate, and cause great shame. One witness was a doctor, who, along with her son were the defendant's students. The nurse who incompetently performed the blood extraction was terrified, and stabbed the defendant's left arm three times without drawing blood. The pain was unbearable that the defendant offered is right arm instead of being stabbed again in his left arm. Blood then began dripping down the defendant's left arm, and pooling in the palm of his hand, and dropping down onto the floor. The The police could have received the same DNA analysis result at the detention center by simply placing a cotton swab (Q-tip) in the defendant's mouth.

Question. Is this considered cruel, and unusual? Is this considered torture? Is this considered an abuse of authority? Does this violate articles 11, 36, and 38?

Question. Shouldn't the police use the least intrusive method to obtain a DNA sample? Does this violate articles 11, 36, and 38?

Question. Should a defendant be present at a warrant hearing to assure that minimal procedures are used to securely transport that DNA sample? In this case, three vials of blood were taken from the defendant, but only two were photographed, and turned over to the prosecutor. The defendant demands to know where the third vial of blood, and wants to ensure that it is properly destroyed.

The defendant's wife was seven months pregnant at the time of arrest. After numerous attempts at trying to locate the defendant, and several days of no contact from him she believed he abandoned her and their child. This caused great pain, and suffering, both physically, and emotionally. Further, the defendant and his wife had a miscarriage less than one year prior to this pregnancy.

Question. Should police, and prosecutors have such power that they can place the health, safety, and life of an unborn fetus at risk of stillbirth or miscarriage by refusing to contact the defendant's wife and letting her know he was being detained? Does the Court condone such action, or does it consider this an unconscionable, and gross abuse of authority.

Article 37 states that in all criminal cases the defendant has the right to a speedy trial. In this matter, the defendant's damages are greater than 3,400,000 \, as a result of the loss of property, rental deposits, relocation fees, salary, and other expenses, that don't include surgery to the defendant's right wrist that is still needed as a result of the illegal use of two pairs of handcuffs for no other purpose but to force extract false confessions.

Question. The defendant was held for 109 days for a petty offense. This defendant and his wife are still suffering from the damages that resulted from this illegal detention. Further, the defendant was intentionally kept from being present at the birth of his son, and wasn't even notified of his son's birth while detained. Does this violate the defendant's right to a speedy trial? Is this a violation of Article 36? Is this a gross abuse of authority?

**Dubois, Richard L**

**From:** Tokyo, CCU
**Sent:** Friday, November 21, 2014 8:35 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** FW: Shinji Okoshi's Abortion

FYI

**From:** J[redacted] S[redacted] [mailto:email@stackjones.com]
**Sent:** Thursday, November 20, 2014 7:22 PM
**To:** J[redacted] S[redacted]
**Subject:** Re: Shinji Okoshi's Abortion

11.20.14.

The following email was sent to me by attorney Okoshi. In it he states that he couldn't translate my statement for the Supreme Court.

He sent what he completed. Pathetic.

A complaint has been filed to the Tokyo Bar Association. First, he quit without notice, was rebuked by the Court and told he couldn't quit, provided an appeal without my knowledge, or consent, and didn't provide my statement to the Court which he was required to do. See the attachment, which is a mere one paragraph, of 35 pages that included a detailed analysis of all the new evidence, and exhibits provided to the Court.

Note the date. It was delivered to Okoshi timely, as the deadline for the Court to receive this was 10.30.14. Okoshi clearly had enough time to have the bar association do the translation, which the Court would pay for through Court appointed interpreters.

Okoshi clearly did nothing but try to protect his own license by filing a deficient appeal to the Court on the 30th. This is clearly malpractice. I have notified him of that. This is also clear grounds for a new hearing.

J[redacted] S[redacted]

大越 真治 <okoshi_law@live.jp>
To: J[redacted] S[redacted] <email@stackjones.com>
RE: [redacted]

[redacted]

**Dubois, Richard L**

| | |
|---|---|
| **From:** | Tokyo, CCU |
| **Sent:** | Tuesday, December 02, 2014 8:49 AM |
| **To:** | U.S. Embassy Tokyo ACS |
| **Subject:** | From J[redacted] S[redacted] FW: Another Detention Center Murder In Japan |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

-----Original Message-----
From: J[redacted] S[redacted] [mailto:email@stackjones.com]
Sent: Tuesday, December 02, 2014 5:10 AM
To: J[redacted] S[redacted]
Subject: Another Detention Center Murder In Japan

Another foreigner murdered in Japan.

The Department of State has temporarily disabled hyperlinks

Read the comments.

Aren't you sick to death of these criminal actions against foreigners?

I'd like to see a rally at the SC, with foreigners screaming on bullhorns for the judiciary to be dragged into the street, and summarily executed, as the Zaitokukai frequently do.

I'm sick to death hearing that foreigners are being murdered in these detention centers.

Don't believe a word that this guys are in a "weak" physical condition. They are being tortured, and murdered.

JS

This email is UNCLASSIFIED.

**Dubois, Richard L**

**From:** Tokyo, CCU
**Sent:** Friday, October 24, 2014 8:55 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** From J[redacted] S[redacted] FW: U.S. Embassy Intoxicated Guard Confrontation and False Police Reporting

FYI

Privacy/PII
This email is UNCLASSIFIED.

**From:** J[redacted] S[redacted] [mailto:email@stackjones.com]
**Sent:** Thursday, October 23, 2014 6:35 PM
**To:** Jack Stone
**Subject:** U.S. Embassy Intoxicated Guard Confrontation and False Police Reporting

DOCUMENTS AND DESCRIPTION OF COERCED CONFESSIONS, TORTURE, AND HIDING THE RECORDS THAT PROVE THIS.

10.23.14

Narashino police notebook No. 201410190 is addressed by attorney Okoshi in the Supreme Court appeal. The Narashino Police Chief has refused numerous requests to turn over this notebook to the defense counsel, which he is legally required to do so. He cites, "privacy rights" as the reason to not turn over this notebook. The truth is, this notebook contains videotape recordings, and notes taken when I was taken by force into an isolation room, and tortured resulting in numerous injuries on Nov. 8th, 2013.

In the following communications, released by the U.S. Dept. of State under the Freedom of Information Act, communications between Narashino's chief of police, and embassy consulate staff, reveal that what was memorialized in documentation form, is contrary to what those videotapes, and records stated above reveal, and that is the police, and prosecutors are engaging in a cover up of their warrantless, and criminal malfeasance.

The document dated Nov. 25, and highlighted with a yellow marker shows that Mr. Fujisaki, the detention center supervisor, who was one of three police most responsible for breaking my leg, and using excessive force, torture, and attempting to extract false confessions is trying to cover up his illegal activity, by claiming that I was injuring myself. (See first highlighted paragraph.) The videotape recordings noted in Notebook No. 201410190 would show that I sitting alone, quietly in the bathroom, with the door closed, to avoid the constant guard harassment I was being subjected to. I had just been indicted on a false charge, with a second false charge pending investigation. I knew the police, and prosecutors were intentionally keeping me detained as long as possible to hold true to their words that since I would not cooperate by signing false confessions, they themselves prepared, that they would assure that I would not see the birth of my son, and deport me from Japan. I was crying, and this is "breaking the silence rule". So, I entered cell 6-1 bathroom, closed the door, and sat on the toilet. At no time during detention at Narashino did I engage in any physical violence, as I knew those lying bastards would heap on other charges, as they promised they would do. I was terrified at this point. I thought of the Ghanian man Suraj on a daily basis, and couldn't communicate with the guards anyway because of the language barrier. While sitting on the toilet, with the closed lid, suddenly guard 2A appeared at the cell with a camera in his hand. The cell door electronic buzzer went on, and that was a notification to me that the cell door was being opened. Suddenly, numerous guards, and two police officers entered the cell. One of those police officers took part in the phony photo reenactments with state "victim" Ogura. The guards came to the toilet door and told me to exit, I did. I was then told by Fujisaki that they were taking me to an isolation room because I was being noisy. Fujisaki, Guard B, two police officers, guard 2A with camera, guard 2B and 2C, and unnamed others escorted me to the isolation room, with no incident as I knew the camera was on and that information could and surely would be used against me. The camera never went off during the entire torture that took place behind the locked door where two isolation chambers are held. (See attached photo of where the detention center is held in the Narashino Police Station, and where the cell 6-1 is located and where the torture took place.) Guards and police threw me to the floor, and beat me numerous times. They tied me up, and used both thick nylon ropes, and hand restraints. They used them improperly, as they had to refer to a manual, and after placing the hand restraints backward on my arms, which caused a broken finger on my right hand, (noted in TGH records). Fujisaki removed the device, and place it on the way it was meant to be used. By then I already had nerve damage and as stated a broken finger, and severe bruising. I'm absolutely certain that the videotape camera if the audio portion was on, heard

the bone snap in my leg. Fujisaki attempts to play the injury down, first by blaming it on me, and second stating that it was a mere broken toe. X-Rays show that the bone was broken in the mid-section of the foot, and directly where the ropes were attached. All of this has been recorded in detail in writings to the U.S. Embassy, which Fujisaki refused to mail, and in fact no notice was given to the Embassy until Leslie Glass appeared during her regular appointed visit on Nov. 22nd. as describe in her communication to her embassy superiors describing her contact with Guard B, who was most responsible for breaking my leg. In that communication that is also attached, you will find that Guard B, who had just arrived back at the station from his duty as prisoner transportation driver from the prosecutors office. She Ms. Glass confronted Guard B about the broken leg, she noted, twice that he was under the influence of alcohol, and that it was hard to miss. In my experience Guard B often attempted to speak to me. First after nearly a week of not eating, he claimed to be a doctor and tried to get me to eat rice. I refused. The next day I would be rushed via ambulance to TGHospital for kidney failure, severe dehydration and other related matters. Guard B would tell me that he lives in Sakura City, and like to drink California Red Wine. I can go into more details, but those details would be irrelevant. What is important is that the police, and prosecutors are covering up their illegal actions, and the evidence that proves this is intentionally being withheld from the courts. Mr. Okoshi in his appeal statement to the Supreme Court addresses this notebook, and the fact that he has a legally mandated right to it, and the chief of police is intentionally withholding that information.

You will note that this torture took place on Nov. 8th, and it was not looked at by any medical staff until Nov. 12th. During this time, the police and prosecutor, who oddly came to the detention center, escalated their tactics attempting to get me to sign false confessions. I would not be able to walk again at Narashino detention center. I was carried into interrogations, and this too was videotape recorded by guard 2A, or guard 2B. I would be dragged from 6-1 cell in shackles, and leg chains to the upper floor and thrown into a chair, tied to the chair and interrogated for hours. The following morning after being tortured on Nov. 8th, Notebook No. 201410190 would show that an interpreter was brought in and used to communicate with me to force me to sign three different false confessions where "I promised not to injure myself again." Since nobody could speak English in the room, but the interpreter, I told him details of the room and what had occurred, and that my leg was broken by them. I told him to please remember those details because I wanted his statement when I got out. I asked him his name, but he said he couldn't give it to me. I told him that I was telling him the truth, and this was the real reason they were trying to force me to sign those documents. Guard B, and Fujisaki told me that if I didn't sign the document, (with an index finger print), I would be taken back into the room. I signed three of those statements. They made me sign three different statements because they didn't think the first two statements sufficed. This matter took quite some time as it was clear Fujisaki, and Guard B were already conspiring to cover up their criminal activity. Here it must be noted that contact with the U.S. Embassy was denied, while the police went into cover up mode. Releasing that book means the interpreter could be contacted and reveal what I have always stated is fact. The U.S. Embassy was aware that I had written a 40 page detailed statement and that Fujisaki failed to mail it to them on Nov. 9th. The Embassy finally received that statement on Nov. 22nd when it was hand delivered to Ms. Glass, by Guard B himself, and that is how her confrontation with him arose.

It would not be until Nov. 13th, that I was taken to the hospital and cast for the broken leg. This only occurred after fearing gangrene setting into my leg, which after five days of being untreated was purple, blue, and green. The in-house doctor examination that was scheduled for all detainees on Nov. 12th, immediately said, the leg was broken, and asked Fujisaki why he had not taken me to the hospital to have it cast. Fujisaki just lowered his head and gave no response. Prior to being taken in to see that doctor, I was told by Fujisaki and Guard B not to discuss my broken leg.

C05580850 SSIFIED U.S. Department of State Case No. P-2014-06091 Doc No. C05580850 Da

IFICATION: UNCLASSIFIED
..cy/PII

RELEASED IN PART TO CERTAIN PARTIES
PP,B6

REVIEW AUTHORITY:
Reviewer

From: Otokita, Aiko
Sent: Monday, November 25, 2013 2:49 PM
To: Ogier, Hugues P
Cc: Kasai, Chiharu; Itami, Mami; Capistrano, Norm; Duval, Thomas A
Subject: RE: J S - Narashino Police

Around 14:10, November 25, I spoke with Mr. Fujisaki, Detention Section of Narashino Police.

I expressed our concern over Mr. S 's unstable emotional conditions and the injury he rece sustained during the detention.

Mr. Fujisaki said that Mr. Stone has been eating recently, but he usually leaves a half of the po every time. Mr. S told the police that he doesn't eat meat, and the police try to give him without meat.

Mr. Fujisaki reported that after the recent consular visit, Mr. S has been relatively calm. his girlfriend visited him twice, most recently on Friday, November 22.

According to Mr. Fujisaki, on November 8 when he came back from the prosecutor's office (no the date he was indicted for assault causing injury), Mr. S was very angry, and started to himself by punching his face 4 times by his right fist and another 4 times by his left fist. To the police had to place him in a protective cell, using the restraint for the arms and legs. Th uses this kind of restraint only once a year or so. The length of the period Mr. S was tied hour and 13 minutes. The police used a belt with a handcuff. The handcuff was attached to front, and the handcuff itself is not steel, but with cloth. I have seen a controversial leather and asked Mr. Fujisaki whether it was like a leather handcuff. He said no. The ankles and th were tied with ropes.

On November 12 when a doctor made a scheduled regular visit to detainees, he noticed that foot had inflammation and recommended he should visit a hospital. Therefore, Mr. S w a hospital on the following day, November 13, and the doctor found that his middle right toe broken (not the ankle where tied with a rope), and the doctor placed some bandage with cast. However, Mr. S took the cast by himself, and he redid the bandage by himself. He supposed to return to the hospital on November 27. The police has no idea why his middle broken, but the police officers has noticed when Mr. S had bad moods, he hit the steps very hard.

Otokita

videotaped
told Ikushda
didn't happen
after
describing
room in
detail to
Embassy,
Lawyer &
FPBA
police
chang
story

Document titled Drunk Guard explains in graphic details Ms. Glass had with Narashino PD prior to our interview. By this time I had been detained in a kidnapping kind of hostile environment, being starved, hadn't eaten, hospitalized at least four times, and had been interrogated like a murder. I had been dragged to the hospital to have my blood seized in an atrocious violent manner, and my wife had to leave her company provided housing. She was 8 months pregnant, and literally homeless. She finally had to tell her family what had occurred, and return home to Yonezawa to face a family that had refused to meet me for the more than six years we were together. I was being threatened with deportation, and I took that seriously, knowing Japan officials abuse their authority, and then deport people so as to not allow them the ability to file civil action. This is common knowledge. That, and the fact that Japan in on record as one of the worst offenders of The Hague regarding child abduction, and as of this time in detention had not ratified the treaty. So, yeah… Who wouldn't be in an emotional state when those filthy pigs even tried to use that to get me to sign false confessions.

LASSIFICATION: UNCLASSIFIED
Privacy/PII

**To:** Otokita, Akiko; Itami, Mami
**Subject:** FW: J S - Narashino Police

Just FYI

This email is UNCLASSIFIED

---

**From:** Glass, Leslie J
**Sent:** Friday, November 22, 2013 5:58 PM
**To:** Kasai, Chiharu; Ogier, Hugues P
**Subject:** J S - Narashino Police

On November 21, 2013, a Consular Associate (CA) visited detained U.S. citizen J S . Mr. S
was visited after his meeting with the prosecutor's office. Prior to entering the interview room, CA w
informed that Mr. S was in a highly agitated and emotional state and that there would be a few
guards outside his room if assistance was needed. Upon entering the interview room, CA notice Mr.
S was visibly upset and crying. He reported severe mistreatment saying that the prison guards
a torture device where a rope was wrapped around his feet and stretched to the point of breaking a
bone in his foot. He had a previous foot injury that was healing and that the mistreatment received
from the guards resulted in an additional break. He was taken to Tsudanuma Hospital for treatmen
November 13 where his injury was treated and foot placed in a bandaged half cast. It took some tin
get Mr. S composed enough to discuss his situation in a calm manner. He is concerned that he
been in jail for 32 days and no attorney has been assigned to his case. He also concerned that the
prosecutor's office is filing additional charges against him. CA informed him that we cannot solicit
attorney on his behalf but one will be assigned to his case if he cannot afford to pay. Mr. S did
that he was visited by an attorney earlier and he had his name and number in his paperwork. CA
informed him that a representative from the U.S. Embassy ACS unit will visit him monthly until his
sentencing. He was relieved to hear this and was able to give the CA a letter, via the prison official
was too large to fit in an envelope. CA turned letter over to appropriate personnel in ACS. After a
lengthy conversation, no requests were made from CA but Mr. S seemed to be under control
better state of mind.

NOTE: NOT FOR ACS+: Mr. S pointed out the guard that allegedly tortured him. I was able t
this guard for the letter that Mr. S wanted to pass on to us. When he spoke I smelled alcoho
breath. I was accompanied by the embassy driver who assisted me by interpreting. I don't know
smelled alcohol but it was hard to miss. I did not get the guards name or official position.
Also....During the interview, Mr. S knocked on his door several times asking the guards to de
letter to me. After the second time, I informed Mr. S not to touch the door again until our m
was concluded and that the guards weren't there to do his bidding. I told him I would ask for th
when our meeting was over. I was a little harsh but Mr. S seemed to relate to this and was
attentive for the rest of the meeting.

If you have additional questions about this meeting you can email me on my personal account


Isolation/
Torture Rooms
Dete

**Dubois, Richard L**

| | |
|---|---|
| **From:** | Tokyo, CCU |
| **Sent:** | Wednesday, November 19, 2014 2:39 PM |
| **To:** | U.S. Embassy Tokyo ACS |
| **Subject:** | FW: Supreme Court finds "No Constitutional Violations" |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

FYI

-----Original Message-----
From: J S [mailto:email@stackjones.com]
Sent: Wednesday, November 19, 2014 2:00 PM
To: J S
Cc: petitions@ohchr.org; press@idi.org; rotty007@gmail.com; Tokyo, CCU; web@smkw.biz; webmaster@lexdoxjapan.com; ben.stubbings@japantimes.com; jpbruno.min@fairtrials.net; ichikawa@ichikawa-law.net; wbcleary@shudo-u.ac.jp; Simon Scott; davidamcneill@gmail.com; Thomas.Dreves@tuj.temple.edu
Subject: Supreme Court finds "No Constitutional Violations"

11.19.14.

First, I usually Bcc communications, but today I have decided to Cc them in part. Many remain in the Bcc category. If you wish to ignore my statement, and get to the rejection statement motion scroll below the dotted line.

The Supreme Court gave a swift answer to my case. There response was no surprise. The Court hadn't bothered to read anything that was provided to them, and hadn't even bothered to contact the lawyer regarding what they considered the finality of this case. They didn't answer a single constitutional questions raised. The sham Court hadn't even given notice that there were three days to respond with a rejection statement. I discovered this on my own. I made a rejection statement, and filed it timely, addressing a fraction of the "no constitutional issues raised" bullshit. I demanded a new trial, citing the more than 100 new pieces of evidence that I had already provided to the Court.

Those that signed the document were Chief Justice Chiba, whose "favorite" writer is Haruki Murakami. Chiba claims to have read his major works repeatedly! I call that literary masterbation. Kaoru Onimaru, claims, "I take care to deal with each case from a neutral and fair standpoint and make a careful and thorough judgment, with the role as guardian of the Constitution in mind at all times." Onimaru likes Yoga, and pilates, and states that, "Rome wasn't built in a day." This is very profound! Translating that into English seems to say that these abject clowns, mocked and scorned the world over, seem to understand the rise, but fail to recognize the fall. Japan's socio-economic collapse is surely imminent, and I enjoy watching every moment of it. Tsuneyuki Yamamoto another antiquated dinosaur has lived off of the teet of the Japanese slave laborer as a career bureaucrat. He claims to deal with "matters with all my heart and soul." If there is one thing every foreigner that has been subjected to an introductory course in Japan 101 is that "things" don't qualify as a human being, and have no heart or soul. Yoshinobu Onuki, a corrupt career public prosecutor claims, he will "look at the facts with a sense of humility and try to be fair when making judgments."

Each one of these fools state that they deal with cases humbly, and with fairness. Somebody ought to tell these repugnant animals that hide behind the walls of injustice that making legal determinations regarding facts of a case is not based on fairness. It is based on the letter of the law. To the Japanese "fairness" is where one pays twice as much for receiving half as little. The Japanese are greedy, world illiterate, racist, segregationists, and protectionists. Ironically, this attitude as resulted in nearly nothing left to protect, as the corporate world has turned its back on Japan's generally

unskilled, and overpaid slave laborer. No one wants to deal with the Japanese immoral mindset any longer in nearly any business environment. All that remains is greed! I hope these beasts slowly bleed to death in their perpetual state of wanting.

I want to thank William B. Cleary's article, The Law of Criminal Procedure in Contemporary Japan for helping me hash out the issues, and the rule of law that applies.

I want to thank C.P. Jones for all of his communications, and scores of other people that stayed in the loop.

I don't want to thank any of the hundreds of people that contacted me stating that they would help in this matter, but only wasted hundreds of hours of my time, playing a significant role in causing me great physical pain. An example here is when David McNeil stated he wanted to write an article on this matter, but needed Ben Stubbings at the Japan Times to "validate" this for him. First, a good writer never has to have someone validate that he wants to do. He just does it! Ben has shot down many of my articles, I never sought his "approval" to write any of them in advance, and every one that was shot down was published somewhere else anyway. In that, Ben remains a very cool mother fucker! McNeil hadn't realized that there was an article published by the Japan Times where he was one of the writers "reflecting on 3.11.11", and all of the photography in that article were mine. Clowns remain clowns. Most aren't that funny. Neh? In one of McNeil's articles he questioned the veracity of an African man who was subjected to torture while detained in prison, seeking political asylum. This infuriated me. The man described the kind of trauma all foreigners are subjected to while being detained. One example was when he stated that numerous guards wore black gloves as they assaulted him. This immediately made me recall those same gloves that go up about mid forearm. They are clearly used to hide guards fingerprints, and DNA samples in case they end up murdering the prisoner through their willful malfeasance. I can assure you, 15-20 guards in black gloves came to me on numerous occasions, and always had a camera rolling. Every time they did, I spoke into the camera as much of the details of being tortured as possible. During one of those events, one of the guards at Chiba Prison said, "That was Narashino. We didn't break your leg. Narashino did." A compelling statement, you must agree? One can imagine why the defense has sought unsuccessfully to have these videotapes released to present to the Court for their determination if there were any constitutional violations.

Fuck McNeil! He's a shill, and an unskilled writer who has nothing significant to say. McNeil's "contributions" to the Japan Times include such wonderful prose as, "Why I Love Japan Even More After The Earthquake. I ask McNeil, do you enjoy your radiation contaminated green tea more? Are you getting your share of Fukushima cucumbers? If not, you can have mine. Geez! This kind of "reporting" certainly can never be construed as art.

While preparing for this rejection statement, all of the energy I gave this matter finally failed me. I had written, and researched so much that I became unable to type. My shoulder once again locked up on me, and it looked like there was a golf ball directly under the shoulder blade, and it felt like it too. I had no movement left to me in my neck, right hand, and right arm. After five X-rays, three cortisone injections, and an hour of IV painkillers, I returned to finish my rejection statement, typing it out with one hand, which my wife translated for me, and which the Court will receive today. She left out the bits about wanting to put a bullet in the back of their heads, blowing their faces onto the walls that exists across their desks in the offices provided for them at taxpayer costs.

Certainly, no one can accuse me of not being passionate, and colorful as I mock to scorn those pathetic cretins.

Looking back, I can't believe that I had the audacity to hand deliver a letter to Tanigaki, calling him a cunt, and a racist coward that presides over a criminal organization called the MOJ. I even contacted Abe directly, telling him that Japan had no honor to return to, because Japan has never been an honorable nation. I let him know that I am fully aware that his grandfather was a war criminal, and an American puppet, and that he, and all his predecessors, and those that will follow him, in perpetuity, will bend over, and spread their assholes as wide as the U.S. powers that be tell them to. Although barely, I'm surprised that I'm still able to walk around this country, and that they were entirely unsuccessful in having me deported. Although, returning to reside in Hawaii, is in reality quite superior to living in the dead sea, ex-pats know we all float upon.

By the time I was "detained" I already knew that what exists in Japan is a cult of liars. I no longer believe the country qualifies as a culture. There is nothing "superior" in these small minded people. Gen. MacArthur said it best, "Japan is a nation of 13-year-olds." This is a country of world illiteracy, apathy, jealousy, hate, and most notable is the massive amount of fraud that exists in every aspect of the cult like existence. In that, what was most learned by this matter was what was heaped upon my wife, and her entire family. They know I was entirely innocent. Both the lower court attorney Kushida, and the High Court attorney Kato who had the opportunity to view the two available videotapes that the Chiba Prosecutor provided to them (hiding at least three others, and continues to refuse to turn over to me, claiming that I will turn them over to the media), contacted my wife, and her family and said, "He did not do it." That has been my consolation prize. Now, those that had existed for centuries in the traditional, and "loyal" Japanese norm, don't trust their government at all, and ironically this ended up bringing me close to her family, which had rejected me for six years prior to the birth of our son. (My name wasn't even allowed to be stated in her families home. In that, racism, and ignorance is at the heart of nearly each and every one of these little people.) Perhaps the fact that I'm 56, and my wife recently turned 27 may have played a role in that. Ya think?

While strolling with my wife, and son yesterday after mailing the rejection statement to the Court she suddenly turned to me and said, "We didn't lose." I said, "What do you mean?" She then said, "You got to go into the High Court and yell at them, and tell them they are all criminals. The High Court clerk pleaded with you not to go into trial, and make trouble They were afraid of you, but he also didn't want you to get arrested again. They also tried to deport you, and failed. Look how many people you told your story to? Look how many people you got to know, and who got to tell you there story. Remember, you said that their stories sounded so over the top, that they seemed untrue? We know that everything they said is really true! The guards with black gloves. The torture, and abuse of foreigners. We are the winners. We learned a lot. I learned many new English words. And look at this boy? He is beautiful, and every time we go out people stop us, and tell us how beautiful he is. Remember when the old lady stopped us, and began to kiss him? And she kept crying? And told us how beautiful he was? Remember that? We didn't lose. We are the winners."

Maybe what she says is true in some part, but it doesn't help in the myriad of executions I have committed in my mind against Mizokuchi and his supervisor. Of Guard B, and his supervisor. Of Kume, and the unnamed in court prosecutor. And the judges, the emaciated, and timid little squealers that forfeit their right to life. What I've done to them makes ISIS actions appear trivial. I've cut their fucking heads off. Blown their heads off with brain matter landing onto their screaming brats vanilla ice cream. I've tied them to chairs, and broken their legs hundreds, if not thousands of times. I've cut their Achilles tendon, and allowed them to crawl across fields in abject despair knowing that it wouldn't be long before I chopped off a limb or two, and then used a blow torch to cauterize their injuries, so I could repeat the process again, and again. I've beaten out their teeth, and used that same blow torch to dismember them, get rid of any identification markers, and taken them fishing, and to sleep with the fishes. And that was just the first act.

I threw Canon's best printer out of my window during one of my fits of rage over this matter, and in one incident in Yokohama threatened to beat to death about 20 cops, who wanted no part of me. This was after one of my public, and uncontrollable bouts of rage as a result of all of this.

The only thing I have learned from this, is that next time a racist cunt tries to turn his shit on me, I have to make sure not to leave any DNA samples, and beat them into a coma so they won't remember what happened to them. It nearly happened the time some shitbag picked up my wife's bag, and slammed it down on my son's head as she was breast feeding him. The dirtbag wanted the seat next to her, which was in the section for handicapped people and mother's with babies. I called that mother fucker a coward, and cunt to his face with both of my legs planted between his. At the next stop, which I am certain was not his, he raced off of the train. I couldn't beat him to death at the time because I was on my way to the Supreme Court to hand deliver my translation statement that was as thick as the Jews phony "gods word", which the Court never bothered to look at.

I threatened to murder the police, and prosecutors to their faces. I never feared them, even for all of the injuries and pain I suffered at their hands. I only feared losing my son, as these monsters think nothing about destroying families like they have done to my friends Brian Prager, Eric Kalmus, and John Gomez. My finest moment was telling prosecutor Kume that they were corrupt, and that it wouldn't take much money to pay a foreigner from India, Pakistan, or Nepal to

stalk and murder them, and that they were easy to find. I also mocked the office designer, mentioning the gray peeling, and moldy stained walls, and broken blinds that couldn't be opened and let the light in, saying "I consider your life, getting to the Chiba Prosecutors office around 7:00 a.m. on Sunday, a worse prison than the temporary one you have illegally detained me in. You're the prisoner, and your cunt stinks. Do you know your cunt stinks? I can smell it all the way over here. Foul! Quite foul! Have you ever considered douching?"

Mostly, in my moments of contempt during interrogations, and pretending to cooperate, I'd let them prepare their phony statements, entire fabrications every one of them, and when they would dramatically turn the paper, and place the pen in front of me to sign, I could see the drool, and excitement that they would believe that I was finally going to sign something, but first... I would have the interpreter go over it again, and again, and again, and again, infuriating the police, and prosecutors, forcing them to make tiny changes, waiting for them to burst out in rage demanding me to sign. It was always necessary to me to have the rage outburst before I took any action that they thought I would do to favor them. I'd pick up the pen, pull several Art Carneys, and then write "Kume is a corrupt prosecutor." Or, "Mizokuchi is a corrupt cop." And when the interpreter would read what I wrote, they would threaten me with deportation, the furtherance of false charges, physical violence and on, and on. Once I signed, "Micky Fucking Mouse. The Happiest Place On Earth."

After more than a year, of threatening the prosecutors, and police, IN WRITING that I would murder them for their criminal conduct, telling judges they were repugnant pigs, using tax records to find out where they lived, and threaten to picket their homes, and place photos, and fliers of them on the walls of nearby train stations, and bus stops, and neighbors mailboxes, that called them corrupt criminals, I guess I can see why nobody wants to hear my argument.

In prison, I refused to wear jail clothing, and pissed, and shit on them, throwing them into the toilet whenever Chiba Prison guards attempted to force me to wear them. Although all of this may sound irrational to you, I can assure you, the entire facade of Japan's brand of justice brings one to this level. It was the best way to protest the illegal police, and prosecutor conduct. In prison, I chose to remain naked, and froze because of the false charges being heaped on me. Nobody can deny this as fact, as I still have the copy of the punishment committee letter stating this to be so. I spent many, many days in isolation because of this, and refused to eat during those periods. I can go on and on in this area, but why? Who cares about a gaijin in Japan? I'm an American, and the U.S. commits greater injustice, and travesties in massive doses on innocent people who merely struggle to survive in this shitty toxic world, and on a daily basis.

John Lennon said, "Woman is the nigger of the world.? In Japan, foreigners are the niggers. The truth is the Japanese are the niggers of the Asian world. I cannot say that I didn't come out of this a racist. I'd be lying. I hate the Japanese almost as much as zionists. Two nations the UN, and the U.S. give carte blanche to in committing atrocities that go unaccounted for. The best retribution, and vengeance is knowing that the Japanese brats are being raised in uninhabitable lands, filled with ugly dilapidating structures.

In the future, no Japanese wants to run into me in say, Costa Rica, Indonesia, Hawaii, or wherever I chose to paddle out for a surf session. It'll be a "hey brah, let's have a beer tonight, and after that go to the beach, and check out the surf!" Perhaps posting my full statement on the myriad of aryan, or white power hate groups websites is a good way to assure that innocent people receive the undeserved beatings of their lives, and illegal treatment they don't deserve. Or perhaps my brother who is a police officer, and member of the most powerful union in America, could forward my statement to thousands of cops, that will assure Japanese receiving unwanted contacts with law enforcement. After all, there is a thin blue line. Perhaps. Perhaps not.

Find your peace J[redacted]? Peaceful means have never accomplished anything. It got MLK executed. The Dalai Liar, and his CIA backed military committed a million murders for control of the black market heroin trade that runs through the Himalayans. He's won Nobel Peace prizes for this. Kissinger murdered 4 million for his. This world is so abject, and ass backwards that if there was a God, g-d, or whatever else the dyslexic dog is called, it would probably be Satan, Lucifer, Beezlebub, or whatever else this non-existing entity is dubbed with Jesus guarding the gates of hell and baptizing his followers in a lake of fire.

Fuck you Japan, the truth is that you are an insignificant occupied nation. And it will always be that way.

Below is the rejection statement I provided to the Court.

-----

I. Defendant's Right to Appeal

A. The Code of Criminal Procedure Article 405 (1) states that a Jokoku appeal may be filed against a judgment rendered by a court of the first or second instance if there is a Constitutional violation.

1) Article 11, Article 36, and Article 38 constitutional violations.

The defendant was denied fundamental rights when he was subjected to physical torture that took place at Narashino Detention Center. Most notable is a well-documented incident that took place on Nov. 8th, 2013. That incident is now under investigation by the JFBA, Tokyo Bar Association, and Chiba Bar Association. The Narashino police are refusing to cooperate, by turning over a notebook that recorded the details of the torture, and videotape recordings taken while the defendant was being tortured.

The Supreme Court justices were made aware of this illegal conduct through documents and exhibits presented to them by the defendant, yet the Court is taking the position that no constitutional issues were raised under Article 405? This is a gross injustice.

After the Nov. 8th incident the police, and prosecutors refused the defendant medical treatment for six days, and continued to interrogate the defendant, even though he was unable to walk, or stand. The defendant was dragged into interrogations, and in a state of fear, was subjected to numerous threats of violence, and was presented with numerous false confessions prepared by both police, and prosecutors to sign. When he refused to sign, the defendant was threatened with the false filing of other false charges, and elevating charges, which in fact the prosecutor did. This doesn't just violate Article 11, 36, and 38, but numerous treaties Japan has ratified with the U.S., and United Nations regarding the treatment of foreign detainees, which the defendant laid out in detail in his statement the Supreme Court refused to have translated for the Jokoku appeal. This in and of itself is a violation of Article 405 (1) where the Court is refusing to allow the defendant to raise an adequate appeal, resulting in an unfair proceeding.

The UN calls these violations of due process systematic, and "the rule." The U.S. State Department warns U.S. citizens in annual reports of these illegal procedures that violate Japan's Constitution, and calls into question the morality, and competency of Japan's judiciary. Former retired judge Hiroshi Segi has called for the entire judiciary of Japan, as well as the corrupt prosecutors to be removed from power. Former prosecutor Hiroshi Ichikawa who the defendant had consulted with in this case has stated publicly that Japan's prosecutors, and judiciary do not consider foreigners human beings, and this is why there is such a gross imbalance in the absurd 99.9% conviction rate.

As proof that the judiciary is entirely biased against the defendant, he submitted medical reports to the Supreme Court as proof police broke his leg. The defendant also submitted documents from the U.S. Embassy that show the police first denied using torture, but when confronted with overwhelming evidence, and details that described the incident to embassy consulates, the JFBA, Prison Rights Group, and former Tokyo prosecutor Tsutomu Nakamura, the Narashino Chief of Police put in writing that police, and guards admitted to tying up the defendant, and using hand restraints during interrogations which resulted in a broken leg.

Somehow the Supreme Court justices don't consider this a violation of the constitution?

Ironically, the Court claims that no constitutional violations occurred yet it has taken no steps in reviewing anything the defendant submitted in support of these violations. This is typical, and well known, as Japan's judiciary is internationally

condemned for refusing to recognize the rights of defendants, and go out of their way to uphold even the most criminally violent acts of police and prosecutors to uphold their phony 99.9% conviction rate.

New evidence submitted to the Court includes medical reports, X-rays, and documents released under the U.S. Freedom of Information Act (FOIA). Many of those documents, which were presented to the Court, didn't have to be translated, as they came from Tsudanuma General Hospital, as well as other medical reports. They were timely filed. Why is the Court refusing to review those documents? This is a gross violation of due process, and the defendant's right to a fair proceeding.

Police, and prosecutors refused the defendant access to the U.S. Embassy while they attempted to cover up their criminal conduct. Those U.S. Embassy documents were translated for the Court. They show the police first lied, and then got caught in their lies, and admitted their illegal conduct.

Would all Supreme Court justices in Japan agree with Chief Justice Chiba, judge Onaki, Onimaru, and Yamamoto that the use of torture to extract false confessions is not a constitutional violation?

2) Article 34 constitutional violation.

The defendant sought, and was denied the right to the immediate appointment of counsel during every step of the investigation stage. The defendant was mocked and ridiculed every time he requested, and eventually demanded the appointment of counsel. The defendant was told by prosecutor Kume that if he wanted an attorney to get the U.S. Embassy to provide him one. The U.S. Embassy wasn't holding the defendant under illegal conditions, the Chiba police, and prosecutors were. Further, the defendant, a former public defender, and a certified lawyer in the state of California that holds a Juris Doctorate in law finds it unconscionable that the Supreme Court doesn't find this a constitutional violation. One would have to call into question the competence of the judiciary. Is it an issue of competency? Or worse, corruption at the highest level?

The defendant was held for 38 days without an attorney. This is a clear violation of the Constitution, which requires the immediate appointment of counsel. Do the justices in Japan's highest court consider the refusal to appoint defense counsel not a violation of Article 405 (1) as well? The defendant finds that the Supreme Courts determination that there is no constitutional violations when a mountain of exhibits submitted to the court prove exactly the opposite calls into questions the Courts competency. Article 98 makes any determination against the mandated provisions listed above both illegal, and invalid, and the defendant will not abide by such improper determinations.

A serious violation of justice requires that the original judgment be quashed under rule 405.

II. Defendant's Right to have the judgment vacated

A. Article 411 states that even if there does not exist a cause provided in Article 405, the Supreme Court may quash the original judgment if deemed conspicuously contrary to justice:

1) That there exists a violation of laws that affects the judgment;

Under section (1) The use of torture to obtain false confessions is a clear violation of the Constitution, and rules of procedure, as well as international treaties regarding the treatment of prisoner's that Japan has ratified. This clearly is a violation of law that affects a judgment.

2) That the penalty determined is improper;

Regardless of the calloused judiciary claiming that 1.5 years of hard labor suspended for 4 years is an appropriate sentence, every attorney, legal expert, and human rights organization the defendant has consulted with regarding this case is on record stating that the sentencing in this case is grossly excessive, and disproportionate, especially given the

fact that the defendant clearly hadn't been given a fair trial, or had any competent representation. The three attorneys that have so far represented the defendant have amassed 37 years of criminal defense practice. Not one has ever won a single case. Compare that to the defendant who only argued two cases at trial as a public defender and won both of them. Any penalty is improper given the fact that judges are clearly biased against the defendant, and defense lawyers are expected to lose in Japan's legal facade.

3) That there exists a serious error of fact which affects the judgment;

During the initial stage of the first trial dated, the judge asked the defendant if he was guilty or innocent. The defendant responded by saying, "I cannot fight this."

The court took this to mean that he was admitting guilt. He was not, the defendant was unable to tell the judge that the guard who sat behind the defendant during trial, and who was holding the rope that was tied around the defendant's waist, had participated with other guards and police using excessive force that resulted in the defendant's leg being broken, kidney failure, neurological damage, and other serious injuries that required numerous hospitalizations. That guard known to the defendant, as Guard B was most responsible for the defendant's broken leg. That same guard is a transport driver who took the defendant to the Chiba Court, and prosecutor's office, and hospital, and was confronted by U.S. Embassy staff Leslie Glass regarding his role in torturing the defendant. She reported to her supervisor that Guard B was drunk during that confrontation. The defendant also provided that document to the Court, and of course, the Court refused to look at that document as well.

The defendant had his first court appearance on Dec. 19th, 2013. On Dec 18th, 2013 Guard B took the defendant to the hospital under the guise of having the cast on his leg replaced with a new one. Instead Guard B told the Orthopedic surgeon who had X-rayed, and cast the leg to remove the cast because he, and his supervisor didn't want the court to discover the defendant's leg was broken while being interrogated. The defendant was threatened with violence when he was returned to the police station if he reported the broken leg to the judge.

Before trial began the lower court judge walked past the defendant in the hallway at the back of the court and saw the defendant was unable to walk, on the ground crawling, and uncontrollably crying. Yet, that ignorant bastard was somehow incapable of understanding that there was a major issue before the trial even began. During trial the defendant, unable to stand had to hop on one leg to a seat that was placed behind the podium at the center of the room

Even the defense counsel who was aware of the facts did not tell the judge about the use of torture against the defendant to extract false confessions. The lower court attorney told the defendant that if he mentioned the torture at trial, the defendant would be held months longer in prison while the court determined if the defendant was subjected to criminal conduct.

Defense counsels closing statement said the defendant was being treated violently by the detention facility guards, and that he suffered great physical, psychological, and emotional harm as a result. Further, the lower court attorney stated the defendant was not guilty, and had not intended to assault anyone.

The defendant never agreed with the facts presented by the prosecution at trial, and in fact denied all of them. Yet, the court records record the opposite. There are obvious issues with translating what the defendant stated, or intentional acts of the court to falsely record the defendant's statements.

B. The Code of Criminal Procedure Article 308 states that the court shall give the accused an adequate opportunity to present evidence.

The defendant submitted to the Supreme Court more than 100 pages of newly discovered documents, testimony, and photographic evidence that destroys the prosecutions fabricated claims, proves the prosecution and police colluded to plant the defendant's DNA sample, and coached witnesses. Those documents prove that Ogura, and Takeuchi tried to

extort money from the defendant, and his employer even before the trial was concluded. Yet, the Court somehow concludes that there is no need to review such damning evidence that impeaches both state "victims."

Under the guise of phony procedures the Court refused to translate documents that Court was already made aware were in need of translation. The Courts refusal to allow for the defendant to prepare for an appeal adequately violates the defendant's right to due process, and equal protection. The Court seems to be going out of its way to ensure the defendant cannot have a fair proceeding.

Generally, the appellate court limits its investigation of a case by only examining the record of the court below. However due to unavoidable circumstances, the appellate court may allow the introduction of new evidence.

C. The Code of Criminal Procedure. Article 299 (2) states that the court shall hear the opinion of the accused. Submitting evidence at trial must have been unavoidable under the meaning of Article 382 (2) of the Code of Criminal Procedure.

All new evidence that the defendant presented to the Court was obtained by the defendant after the lower court trial, and was unavailable to the defendant while he was being detained. Further, the police, and prosecutors took great efforts to assure the defendant was unable to have certain evidence preserved for trial including a kick wound injury the defendant received by Ogura. The police, and prosecutors and three pretrial judges refused to take a photograph of the injury. The injury wasn't preserved until day 48 when the court appointed interpreter named Shoko Doi took a photo of the injury through the interview window at the Narashino Detention Center. This photo was presented to the Supreme Court, but apparently the preservation of real evidence to ensure a defendant has a fair trial matters little when the Court generally does all it can to uphold convictions, aiding the prosecutors to maintain the preposterous imbalanced conviction rate. A 2012 U.S. Department of State (DOS) report shows that of the 99.9% conviction rates in Japan that year, 91.7% were convictions based on nothing more than the defendant's own confession. Those figures were released by Japan's Ministry of Justice. Clearly the 99.9% conviction rate is a fraud. Only 8.2% of cases presented by prosecutors required them to present evidence.

III. The Examination of New Evidence on Appeal

A. The primary function of the appellate court is to review the proceedings of the trial court to determine if there were erroneous findings of fact, or conclusions and applications of the laws. There are also times when a defendant wants to introduce new evidence at the appellate stage. Including evidence that was not discovered until after the trial.

The defendant must show that introduction of this new evidence was "unavoidable", a term the court considers liberally The Supreme Court held that even when the party seeking the introduction of new evidence is unable to prove unavoidable reasons, the Court may examine the new evidence to determine the appropriateness of the lower court's decision.

B. The Examination of Facts and the Appellate Court's Independent Judgment.

Article 393. An appellate court may, when it is necessary, conduct an investigation, and examine facts upon request of the accused, or upon its own authority.

C. Gross Factual Error as Grounds for Appeal.

The usual grounds for appeal to the Supreme Court are violations of the Constitution or precedence. A kokoku appeal must be shown that the matter is important and that certain rights will be jeopardized if the matter is not corrected prior to the issuance of a final judgment.

IV. New Trials

A new trial may be requested against any court's determination of guilt. The petitioner must prove one of the following:

1) That a document used to convict was forged or altered;

The defendant always maintained that the DNA sample was planted by police officer Mizokuchi in collusion with prosecutor Kume. Kume told the defendant that if he didn't sign confession statements that they would manufacture the required element of intent to obtain a conviction, and that is exactly what they did by planting the defendant's DNA at the center of Ogura's shirt. First, the videotape of the station window shows the defendant did not spit on anyone. Second it shows Ogura wearing a tie where prosecutors claim the defendant spit.

Prosecutor's notes show that the shirt was held for nearly two weeks before the DNA sample suddenly appeared. This occurred after the defendant was subjected to cruel, unusual and degrading extraction of blood at Tsudanuma General Hospital.

Regardless of these glaring facts, all three courts have refused to look at those videotapes, which are available to them. All three defense attorneys have seen the video and have all stated that what the defendant is accused of is impossible. The court appointed interpreter, Shoko Doi who watched the videotape with the defendant, and lower court attorney stated, "This is bullshit." Meaning anyone can see that everything presented by the prosecutor is a fabrication.

2) Testimony of a witness was perjured, or a translation or interpretation has been falsified;

Ogura and Takeuchi contacted the defendant's employer attempting to extort money for their criminal conspiracy to file false police reports against the defendant. This document was presented to the Court, but the Court has refused to inspect this document, which was part of the defendant's Exhibit A. It is a gross injustice that the Court would allow criminals to use the police, and courts to commit felonies to try and financially gain from their criminal conduct.

The defendant's opening statement at trial, "I can't fight this" is a clear translation, or interpretation error.

6) That there is clear evidence which has been newly discovered showing that the defendant should have been found not guilty (muzai) or acquitted on procedural grounds (menso), that the penalty should have been remitted (kei no menjo),

Everything stated above falls under section 6.

7) That a governmental official connected with the case was guilty of corruptions.

Police using torture in violation of Articles 11, 36, and 38 falls under this category.

Officer Mizokuchi planting the defendant's DNA is a clear sign of corruption. The prosecutor refusing to appoint counsel, and resort to the use of threats, intimidation, isolation, and violence are clearly corrupt government actions.

A new trial is part of the defendant's fundamental right to due process as guaranteed by Article 31 and 39 of the Constitution. The newly discovered clear evidence of innocence rule applies through a mere cursory inspection of what the defendant provided to the Court. It's unconscionable that the Court would refuse to inspect those documents, which were presented to the Court.

In order to qualify for a new trial, the petitioner must be able to prove two things in relation to innocence. He must prove that the evidence is "clear" evidence (akiraka na shoko) of innocence. Moreover, he also must prove that it was "newly discovered" evidence (aratani hatsuken shita shoko). The Supreme Court held in the Shiratori Case that newly discovered evidence could merely raise a doubt as to the prior guilty verdict, and the doubt must be weighed in the defendant's favor. In Shiratori a defendant only had to show that there existed a reasonable doubt as to the legitimacy of the guilty verdict.

V. Conclusion

This case has made the defendant indigent, yet the Supreme Court refused to translate documents prepared by the defendant for the Court to aid in a fair proceeding. The Court initially gave the defendant time to prepare documents after the court appointed attorney quit the case. Neither the attorney nor the Supreme Court gave the defendant notice the attorney quit. Further, the Court reassigned that same attorney who filed a deficient appeal without having once met with the defendant, or even notifying the defendant he had submitted the appeal. The Supreme Court statement gave notice to the defendant that what the attorney presented to the Court was deficient, and denied the defendant's appeal. This is a gross injustice, and a violation of due process.

The defendant demands these false charges to be dismissed, and for the Court to provide a remedy for redress of damages, which are extensive. If the Court will not dismiss the charges, the Court should provide the defendant an opportunity for a retrial, as the Court is now already in possession of a large amount of new evidence that proves the state's victims, Ogura, and Takeuchi filed false police reports to financially gain from their criminal conduct, and that the defendant is 100% not guilty, yet has suffered great harm as a result of both police, and prosecutor violations of procedures, Japan's Constitution, and international laws.

**Dubois, Richard L**

---

| | |
|---|---|
| **From:** | Tokyo, CCU |
| **Sent:** | Thursday, October 23, 2014 8:35 AM |
| **To:** | U.S. Embassy Tokyo ACS |
| **Subject:** | J[redacted] S[redacted] FW: Questionnaire response required |

FYI

-----Original Message-----
From: Tyler, Eva O On Behalf Of FOIA Status
Sent: Wednesday, October 22, 2014 11:51 PM
To: J[redacted] S[redacted]; FOIA Status; Tokyo, CCU
Subject: RE: Questionnaire response required

Mr. S[redacted]- Ms. Manheim responded to your below questions in her July 9, 2014 12:15 PM email. See a copy below:

Dear Mr. S[redacted],

Thank you for contacting us regarding your recently completed FOIA request. As stated in the final response letter, the Department searched the Embassy in Tokyo and the Office of Overseas Citizens Services, reviewed all responsive documents located as a result of these searches and released all non-exempt information to you. The photo that you referenced was not located in these searches. As stated in the FOIA response letter, you may file an appeal regarding any adverse determination. Regarding the question you posed, we apologize but the FOIA office is unable to provide a response, as the Freedom of Information Act itself does not require agencies to explain the content or answer questions regarding documents.

Sincerely,
Marianne Manheim

-----Original Message-----
From: J[redacted] S[redacted] [mailto:email@stackjones.com]
Sent: Tuesday, October 21, 2014 7:11 PM
To: FOIA Status; Tokyo, CCU
Subject: Questionnaire response required

10.22.14.

To: DOS/U.S. Tokyo Embassy
From: J[redacted] S[redacted]

I'm requiring the release of the following information, as it was not provided in the documents released under the FOIA.

During a visit to Chiba Prison, Thomas A. Duval took a photo that proved the abusive conditions that I was being held in.
A few of the documents released under the FOIA show that this photo, or photos were turned over to the Tokyo Embassy, and also given to an unnamed doctor. The conversation via email also shows that the consulate staff knew that I would be inquiring into gaining possession of those photos upon release. This was clearly communicated to Thomas A. Duval, the consulate representative I met at Chiba Prison.
This doctor was unnamed and remains so. I have requested his contact information, but those requests, which have been several have all been ignored. This is not acceptable.

The photos were given to Duval, and then to the doctor to make an evaluation regarding his professional opinion as to what caused the injuries in those photos, and whether they rose to the level of torture, and malfeasance.

The above information has been requested severe times, and I have received no response. That information is being sought for a civil liability action against the Japanese Ministry of Justice officials, and for a report being turned over to the UN on Japan's violations of treaties that the nation has ratified. There is nothing that can be done to help me in this matter, but I want to make sure this doesn't happen to anyone else, especially where Japan constantly holds foreigners in detention under false, or trumped up charges.

I need an official response to the above matter.

Please provide me with copies of those photos taken by Thomas A. Duval. I am also requiring contact information with Mr. Duval, as he may be called to give a sworn statement.
Who was the doctor, and provide his contact information because he may be called to give a sworn statement as well.
Further, what was his professional opinion regarding those photos?
Did the doctor consider what he inspected as a form of torture in violation of international protocols regarding the treatment of foreign prisoners which Japan has ratified?

---

Narashino police are refusing to cooperate with an investigation into their illegal conduct by the Tokyo Bar Association, the Japan Federation Bar Association, and with the attorney who is representing me in the Supreme Court case, with a deadline filing of Oct. 31st, 2014.
The same applies to the Chiba Prosecutors office.
Both agencies are refusing to provide my attorney with records that he has a lawful right to. There conduct is illegal, and this has been already filed with the Supreme Court.

One notebook the Narashino police are trying to withhold from the defense, is notebook No. 201410190. This notebook shows the police should have dropped the charge in the early stage of investigation but refused, and proceeded to file false charges. Further, the police chief is refusing to turn over that notebook claiming it would violate privacy rights. (Translate that into English, and this means "they're fucked) My attorney had demanded the release of that notebook, but Narashino police adamantly refuse. This book contains all of the station records, and includes records showing the dates the Narashino police, videotape recorded them using torture on Nov. 8th, 2013, as well as other dates.
We have obtained the hospital records, and the X-Rays, and no longer can the police deny their illegal conduct, and in fact in a questionnaire sent to the Narashino chief of police, by the U.S. embassy, he finally admitted to using torture techniques.

My question is, has either the Narashino police department or Chiba Prison returned questionnaires to the embassy? If so, I'd like to have copies of that information for my Supreme Court appeal, and for the application to the UN. I understand that I must apply for that information under the FOIA. But, I'd like to know if they had in fact responded. If they didn't, I'd like to have that for the record to show that the police and prison officials are not only refusing to cooperate with defense counsel, but the embassy as well. This too is in violation of treaties Japan has ratified with the U.S., and the UN.

There are several videotape recordings at both Narashino police department and Chiba Prison that show the use of torture. I think the embassy should be concerned about those videotapes and want to review them for obvious reasons.

What has been done by the U.S. government, namely the Tokyo embassy, and the DOS to obtain those videotapes/notebook records?

---

Medical records now prove that the Tsudanuma General Hospital prematurely removed a cast from my leg (Dec. 18th) the evening before the initial court trial date (Dec. 19th), in an attempt to collude with Narashino police and hide their criminal conduct. I was taken to TGH the evening before trial under the guise of having the old cast replaced because it was blackened by the filthy condition of Narashino detection center and it was to be replaced for the trial proceedings with a new one. Instead, when I arrived at TGH, the doctor was told by Guard B, who was most responsible for breaking the leg, along with his supervisor, and an unnamed police officer, to remove the cast permanently. After the Dec. 19th trial date, I was transferred to Chiba Prison, and never had a cast, or medical treatment again. The injury has not healed properly as a result of this illegal procedure.

The embassy, and DOS should be concerned with the extent of criminality that exists within Japan's governmental agencies. Especially since hate crimes are continuing to rise in Japan.

Further, when we contacted TGH to obtain medical records, which we had to pay for, we received medical reports that entirely omitted any information about a broken leg. We refused to accept that report and threatened a medical malpractice suit, and the hospital relented, and sent us another report that included a doctor's hanko over false information, and his hand signature including the correct information. There remain other discrepancies, such as the use of the term "hemmoroids" instead of internal bleeding. Narashino, and Chiba Prison cells have no furniture whatsoever. After sitting on the floor for a short time, I as well as others were

bleeding internally. The pain was unbearable. Japan doesn't want to accept that keeping people in such barbaric condition amounts to torture, and duress, heaped on top of the fact that the police, and prosecutors constantly use force, threats, and intimidation including prolonging detention to obtain coerced false confessions.

Has the embassy contacted TGH, and protested their actions?

Please advise.

J[redacted] S[redacted]

This email is UNCLASSIFIED.

**Asada, Tokiko**

**From:** correoseecuador@gmail.com on behalf of Embajada del Ecuador en Japon <info@ecuador-embassy.or.jp>
**Sent:** Wednesday, June 29, 2016 12:33 PM
**To:** U.S. Embassy Tokyo ACS
**Subject:** For your information
**Attachments:** Supreme Court Decision 1.jpeg; Supreme Court Decision 2.jpeg; Supreme Court Decision 3.jpeg; 11.17.14. Motion.doc; 10.29.14. Appeal.docx; 11.3.14. Denial Response.docx

To whom it may concern,

For your consideration, a few days ago, we received the following message from an American citizen searching for advise.
According to the message, the above mentioned citizen contacted the US Embassy before.

Kind regards,

Consular Section
Embassy of Ecuador
Tokyo - Japan

↑
▷ 10.29.14 Appeal
Not printed.
(see email)
35 pages.
▷ 11.3.14
" Not printed.

---------- Forwarded message ----------
From: J[redacted] S[redacted] <email@stackjones.com>
Date: Sun, Jun 26, 2016 at 9:18 PM
Subject: Please Read Thank You
To: eecujapon@mmrree.gob.ec, info@ecuador-embassy.or.jp

Hello,

I am contacting you because I am trying to leave Japan, and I am terrified that this nation will try to prevent me from leaving with my son, who is 2.5 years old.

My son has been assaulted twice, before he was even one year old. Japan has become a violent, and hateful place to live.

I fear that if I attempt to put my son on a plane, because he is both Japanese, and U.S. citizen, that I will be arrested, and my son taken from me.

I was convicted of petty assault in Japan in 2013. I was held 109 days, and tortured extensively while police and prosecutors tried to force me to sign a myriad of false confession statements.

Japan stripped my right to work, and tried to deport me, even where I had a job, a spouse visa. I was down to 9 days to depart while holding my 5 month old in my arms, and told Japanese immigration authorities who had already been made aware of the fact in this matter that I would seek asylum, and force this matter internationally if they continued to try and prevent me from having a father/son relationship. This matter is especially threatening as Japan is one of the worst nations when it comes to child abduction.

My family has been traumatized, and re-traumatized trying to get this matter investigated, and I am met with wall after wall of Japanese official malfeasance, conspiracy, cover up, abuse of authority carried out under the color of office, etc. The irony is I have a law degree, and had once been a public defender in California.

I have collected the medical reports, that show extensive injuries, X-Rays taken while in custody, real evidentiary material and I've been seeking a retrial. Japanese officials do not respond to any of my motions for a retrial.

At the original trial, the prosecutor presented no evidence, no victims, no witnesses, nothing . All the prosecutor did was read from a paper. I told the judge that I could not fight the case, and did not make a plea, as the guard that was holding the rope that I was tied to had already broken my leg, and attempted to force me to sign numerous false confessions, and in the presence of interpreters.

The evening before trial, the cast was removed from my leg because the detention center did not want the judge seeing me being wheeled into court in a wheel chair, and thereafter asking questions.

I was told by the defense attorney that if I remained silent, that the matter would be over within 7-10 days. Instead, the case was held over, and for the next two months, I was tortured so badly that the U.S. Embassy smuggled in a camera to take photos. Those photos were given to an embassy staff doctor to determine if in his opinion, I was subjected to torture. I have obtained those documents under the U.S. Freedom of Information Act

I have sent retrial demands, in Japanese to the Chiba district court, and to the Supreme Court. Neither has responded to these motions.

Last week I went to Chiba Prefectural Police Headquarters to file criminal charges against the Narashino Police Department officers, Detention Center officers, Chiba prison guards, and the Chiba Public Prosecutors office. The police refused to permit me to file a police report. I audio recorded that meeting. It exposes their attempts at stonewalling, including telling me that I had to file a criminal complaint through an attorney. I was also told, even though there are staff interpreters at the Chiba police headquarters, that I had to translate all documents into Japanese for them to even look at them. I was told several times that Japanese government officials don't want this matter going public. With the Chiba police chief recently resigning over the Hacker's case, where the "hacker" had sent emails through other people"s computers, for the sole purpose of catching police extracting false confessions, which Japanese officials are notorious for.

It was the National Police Agency that wrote a letter to me that I must file a criminal investigation against police and prosecutors at the Chiba prefectural police headquarters. I showed that letter to the Chiba headquarters investigator Otsuka, and still they adamantly refused to permit me to file a complaint, even after viewing extensive evidence that I had prepared for them.

Another officer told me that the National Police Agency had told the Chiba prefectural police headquarters that the NPA wanted me to go to their headquarters to begin the investigation. I could not go as I already had an appointment that afternoon with the Ministry of Justice"s HR department as they have now initiated their own investigation. Further, this was an odd statement as the NPA already stated they do not do individual case investigations. I also showed that statement written by the NPA to the Chiba police.

The prosecutors has hidden videos in this case that overwhelmingly show malfeasance, and the planting of evidence. The police planted evidence (my spit), at the center of the "victims' shirt. This was done for the sole purpose of the prosecutors to obtain the required element of intent for assault. The videotapes which are now in the possession of the Chiba Bar Association, show the DNA sample was planted. This is very clear as every lawyer that has seen the videos stated that what the prosecutor has presented is impossible. First, the videotape shows I had spit on nobody, and second that the victims was wearing a tie, and the microscopic particles of my

DNA were "discovered" under the tie.

I never assaulted any one. I was the victim of hate speech, hate crimes, and battery. Thereafter the victims attempted to extort money from my employer, and I have those communications in written form as part of the evidence that I have compiled.

The case is more disturbing that what I have already presented above. I need assistance, as nobody will help me in this matter. Even with Japan's bogus 99.99% convictions this case is winnable, and exposes the level of deception Japanese officials will go to obtain a wrongful conviction.

The most disgusting thing in this case is that my wife was 7 months pregnant when I was first detained, being held in isolation, dragged daily to both police, and prosecutor interrogations that included tying, and handcuffing me to a chair. Further, I was nearly frozen to death as the highest temperature I recorded, while being held without a jacket, or socks was 4 degrees Celsius. During detention, the police refused to contact my wife, and notify here as to where I was. They did this even after being made aware that our first child died from a miscarriage. During detention, and without knowledge as to where I was, my wife thought I abandoned her. Her numerous email communications to me during that time show the great level of psychological trauma she suffered, pleading with me not to abandon her. These reprehensible government officials, acting under the color of law, endangered the life of my child, while still in his mother's womb. This unconscionable level of depravity is inexcusable.

My child was born on 1.4.14., while I was held in isolation, with two pairs of double locking handcuffs placed behind my back. I was certain those savage animals were going to murder me. I was extensively tortured because I violated the "silent" rule, and refused to sign an endless list of false confession statements written by the prosecutor. As part of my evidence, I have a copy from the Chiba Prison Committee which shows that I was sent to a punishment committee, and placed solitary confinement, (I was in solitary confinement the entire 109 days), and in a freezing cell, placed in a strait jacket because I refused to wear prison clothing, frozen so badly that my toes, nose, fingers, and tip of my penis were purple, and yellow, with patches of black skin. I was unable to walk from the broken right leg I received at Narashino, and what Chiba Prison did to my left leg, left me nearly an invalid. Even the floor manager of Cellblock C where I was held, fought tirelessly against his superiors to leave me alone. This man, known as Mr. S. owns a Kendo Studio near the Chiba Prison, and wrote down the name of his school in Japanese in one of my notebooks that I kept detailed, and extensive records of my detention. If it was not for Mr. S interceding on my behalf, I am certain I would have been murdered by Chiba Prison guards, and their equally as violent doctor would have merely stated I died of heart failure, which is what Japanese officials always say about the laundry list of foreigners that die after being tortured in Japan's gulags.

I would not learn about my son's birth until 2.4.14., the day I was released, even though Chiba Prison had known for a full month that my wife gave birth to our son.

I suffer daily knowing that my son was born under those conditions, and that I was not there with my wife during that time. This level of cruelty is unforgivable.

Why was In sent to Chiba Prison, where over 85% of the inmates at that prison have been convicted of murder? I was an unconvicted detainee at that time.

I have been told that my case is the only assault case ever brought to the Supreme Court. I first, brought my case to the Tokyo High Court. That court literally turned their backs on the evidence my attorney showed regarding the photographs of the extensive damage I received while being detained, and where forced confessions were being sought. All three judges refused to look at the photos, never allowed me to speak, even once, and immediately upheld the lower court's ruling. I then filed the case for an appeal to Japan's "court of last resort."

The Supreme Court used every tactic at their disposal to not look at any documents in my case. Further, the appointed lawyer quit the case, less than one week before the filing deadline. He didn't even give me notice that he quit the case. I only learned about it when I went to the Supreme Court, and complained to the clerk of the court that I had tried to communicate with that lawyer numerous times, and that he never responded, and that I had not once met with him. Initially, I had sent that lawyer a 36 page statement, with more than 50 new pieces of evidence, that he was legally obligated to have translated in Japanese for the appeal. That lawyer would later send me an email, after quitting, which stated, that he was only able to get the Tokyo Bar Association to translate one page of my statement. After discovering the lawyer quit, I had to motion to the Supreme Court, with no legal assistance, for an extension. I was given 3 days to prepare my appeal statement, which was backed with 50 pieces of evidence, which I was not permitted to obtain while being detained. That evidence includes U.S. Embassy documents released under the FOIA that show one of the guards who broke my right leg, was drunk when Leslie Glass, one of the U.S. Embassy consulates confronted that guard in his role in breaking my leg. That guard had also just returned from driving me from the Chiba Public Prosecutor's office where the prosecutors continued to extract false confessions after receiving information that the police had broken my leg.

The Supreme Court then denied my motion to allow me to have my statement translated into Japanese. That court then ruled they found no constitutional violation in this matter.

I've attached my motion, and appeal statement which the SC refused to read. I've also attached their decision stamped with their fraudulent 405 ruling, which they stamp on nearly every case they refuse to look at. 405 means there are no constitutional violations. Thereafter, I sent a motion to the Supreme Court, and the Chiba District Court seeking a new trial. This was more than one year ago, and I have not received a response from either court.

It is clear that even at the highest level, Japanese officials are covering up this matter.

Please advise.

Thank you,

J[redacted] S[redacted]

**I. Defendant's Right to Appeal**

A. The Code of Criminal Procedure □Article 405 (1) states that a Jokoku appeal may be filed against a judgment rendered by a court of the first or second instance if there is a Constitutional violation.

1) Article 11, Article 36, and Article 38 constitutional violations.

The defendant was denied fundamental rights when he was subjected to physical torture that took place at Narashino Detention Center. Most notable is a well-documented incident that took place on Nov. 8th, 2013. That incident is now under investigation by the JFBA, Tokyo Bar Association, and Chiba Bar Association. The Narashino police are refusing to cooperate, by turning over a notebook that recorded the details of the torture, and videotape recordings taken while the defendant was being tortured.

The Supreme Court justices were made aware of this illegal conduct through documents and exhibits presented to them by the defendant, yet the Court is taking the position that no constitutional issues were raised under Article 405? This is a gross injustice.

After the Nov. 8th incident the police, and prosecutors refused the defendant medical treatment for six days, and continued to interrogate the defendant, even though he was unable to walk, or stand. The defendant was dragged into interrogations, and in a state of fear, was subjected to numerous threats of violence, and was presented with numerous false confessions prepared by both police, and prosecutors to sign. When he refused to sign, the defendant was threatened with the false filing of other false charges, and elevating charges, which in fact the prosecutor did. This doesn't just violate Article 11, 36, and 38, but numerous treaties Japan has ratified with the U.S., and United Nations regarding the treatment of foreign detainees, which the defendant laid out in detail in his statement the Supreme Court refused to have translated for the Jokoku appeal. This in and of itself is a violation of Article 405 (1) where the Court is refusing to allow the defendant to raise an adequate appeal, resulting in an unfair proceeding.

The UN calls these violations of due process systematic, and "the rule." The U.S. State

Department warns U.S. citizens in annual reports of these illegal procedures that violate Japan's Constitution, and calls into question the morality, and competency of Japan's judiciary. Former retired judge Hiroshi Segi has called for the entire judiciary of Japan, as well as the corrupt prosecutors to be removed from power. Former prosecutor Hiroshi Ichikawa who the defendant had consulted with in this case has stated publicly that Japan's prosecutors, and judiciary do not consider foreigners human beings, and this is why there is such a gross imbalance in the absurd 99.9% conviction rate.

As proof that the judiciary is entirely biased against the defendant, he submitted medical reports to the Supreme Court as proof police broke his leg. The defendant also submitted documents from the U.S. Embassy that show the police first denied using torture, but when confronted with overwhelming evidence, and details that described the incident to embassy consulates, the JFBA, Prison Rights Group, and former Tokyo prosecutor Tsutomu Nakamura, the Narashino Chief of Police put in writing that police, and guards admitted to tying up the defendant, and using hand restraints during interrogations which resulted in a broken leg.

Somehow the Supreme Court justices don't consider this a violation of the constitution?

Ironically, the Court claims that no constitutional violations occurred yet it has taken no steps in reviewing anything the defendant submitted in support of these violations. This is typical, and well known, as Japan's judiciary is internationally condemned for refusing to recognize the rights of defendants, and go out of their way to uphold even the most criminally violent acts of police and prosecutors to uphold their phony 99.9% conviction rate.

New evidence submitted to the Court includes medical reports, X-rays, and documents released under the U.S. Freedom of Information Act (FOIA). Many of those documents, which were presented to the Court, didn't have to be translated, as they came from Tsudanuma General Hospital, as well as other medical reports. They were timely filed. Why is the Court refusing to review those documents? This is a gross violation of due process, and the defendant's right to a fair proceeding.

Police, and prosecutors refused the defendant access to the U.S. Embassy while they attempted to cover up their criminal conduct. Those U.S. Embassy documents were translated for the Court. They show the police first lied, and then got caught in their lies, and admitted their illegal conduct.

Would all Supreme Court justices in Japan agree with Chief Justice Chiba, judge Onaki, Onimaru, and Yamamoto that the use of torture to extract false confessions is not a constitutional violation?

2) Article 34 constitutional violation.

The defendant sought, and was denied the right to the immediate appointment of counsel during every step of the investigation stage. The defendant was mocked and ridiculed every time he requested, and eventually demanded the appointment of counsel. The defendant was told by prosecutor Kume that if he wanted an attorney to get the U.S. Embassy to provide him one. The U.S. Embassy wasn't holding the defendant under illegal conditions, the Chiba police, and prosecutors were. Further, the defendant, a former public defender, and a certified lawyer in the state of California that holds a Juris

Doctorate in law finds it unconscionable that the Supreme Court doesn't find this a constitutional violation. One would have to call into question the competence of the judiciary. Is it an issue of competency? Or worse, corruption at the highest level?

The defendant was held for 38 days without an attorney. This is a clear violation of the Constitution, which requires the immediate appointment of counsel. Do the justices in Japan's highest court consider the refusal to appoint defense counsel not a violation of Article 405 (1) as well? The defendant finds that the Supreme Courts determination that there is no constitutional violations when a mountain of exhibits submitted to the court prove exactly the opposite calls into questions the Courts competency. Article 98 makes any determination against the mandated provisions listed above both illegal, and invalid, and the defendant will not abide by such improper determinations.

A serious violation of justice requires that the original judgment be quashed under rule 405.

**II. Defendant's Right to have the judgment vacated**

A. Article 411 states that even if there does not exist a cause provided in Article 405, the Supreme Court may quash the original judgment if deemed conspicuously contrary to justice:

1) That there exists a violation of laws that affects the judgment;

   Under section (1) The use of torture to obtain false confessions is a clear violation of the Constitution, and rules of procedure, as well as international treaties regarding the treatment of prisoner's that Japan has ratified. This clearly is a violation of law that affects a judgment.

2) That the penalty determined is improper;

   Regardless of the calloused judiciary claiming that 1.5 years of hard labor suspended for 4 years is an appropriate sentence, every attorney, legal expert, and human rights organization the defendant has consulted with regarding this case is on record stating that the sentencing in this case is grossly excessive, and disproportionate, especially given the fact that the defendant clearly hadn't been given a fair trial, or had any competent representation. The three attorneys that have so far represented the defendant have amassed 37 years of criminal defense practice. Not one has ever won a single case. Compare that to the defendant who only argued two cases at trial as a public defender and won both of them. Any penalty is improper given the fact that judges are clearly biased against the defendant, and defense lawyers are expected to lose in Japan's legal facade.

3) That there exists a serious error of fact which affects the judgment;

   During the initial stage of the first trial dated, the judge asked the defendant if he was guilty or innocent. The defendant responded by saying, "I cannot fight this."

   The court took this to mean that he was admitting guilt. He was not, the defendant was unable to tell the judge that the guard who sate behind the defendant during trial, and who was holding the roped that was tied around the defendant's waist, had participated with other guards and police using excessive force that resulted in the defendant's leg being broken, kidney failure, neurological damage, and other serious injuries that required

numerous hospitalizations. That guard known to the defendant, as Guard B was most responsible for the defendant's broken leg. That same guard is a transport driver who took the defendant to the Chiba Court, and prosecutor's office, and hospital, and was confronted by U.S. Embassy staff Leslie Glass regarding his role in torturing the defendant. She reported to her supervisor that Guard B was drunk during that confrontation. The defendant provided that document to the Court as well, and of course, the Court refused to look at that document as well.

The defendant had his first court appearance on Dec. 19th, 2013. On Dec 18th, 2013 Guard B took the defendant to the hospital under the guise of having the cast on his leg replaced with a new one. Instead Guard B told the Orthopedic surgeon who had X-rayed, and cast the leg to remove the cast because he, and his supervisor didn't want the court to discover the defendant's leg was broken while being interrogated. The defendant was threatened with violence when he was returned to the police station if he reported the broken leg to the judge.

Before trial began the lower court judge walked past the defendant in the hallway at the back of the court and saw the defendant was unable to walk, on the ground crawling, and uncontrollably crying. Yet, that ignorant bastard was somehow incapable of understanding that there was a major issue before the trial even began. During trial the defendant, unable to stand had to hop on one leg to a seat that was placed behind the podium at the center of the room.

Even the defense counsel who was aware of the facts did not tell the judge about the use of torture against the defendant to extract false confessions. The lower court attorney told the defendant that if he mentioned the torture at trial, the defendant would be held months longer in prison while the court determined if the defendant was subjected to criminal conduct.

Defense counsels closing statement said the defendant was being treated violently by the detention facility guards, and that he suffered great physical, psychological, and emotional harm as a result. Further, the lower court attorney stated the defendant was not guilty, and had not intended to assault anyone.

The defendant never agreed with the facts presented by the prosecution at trial, and in fact denied all of them. Yet, the court records record the opposite. There are obvious issues with translating what the defendant stated, or intentional acts of the court to falsely record the defendant's statements.

B. The Code of Criminal Procedure □Article 308 states that the court shall give the accused an adequate opportunity to present evidence.

The defendant submitted to the Supreme Court more than 100 pages of newly discovered documents, testimony, and photographic evidence that destroys the prosecutions fabricated claims, proves the prosecution and police colluded to plant the defendant's DNA sample, and coached witnesses. Those documents prove that Ogura, and Takeuchi tried to extort money from the defendant, and his employer even before the trial was concluded. Yet, the Court somehow concludes that there is no need to review such damning evidence that impeaches both state "victims."

Under the guise of phony procedures the Court refused to translate documents that Court was

already made aware were in need of translation. The Courts refusal to allow for the defendant to prepare for an appeal adequately violates the defendant's right to due process, and equal protection. The Court seems to be going out of its way to ensure the defendant cannot have a fair proceeding.

Generally, the appellate court limits its investigation of a case by only examining the record of the court below. However, due to unavoidable circumstances, the appellate court may allow the introduction of new evidence.

C. The Code of Criminal Procedure, Article 299 (2) states that the court shall hear the opinion of the accused. Submitting evidence at trial must have been unavoidable under the meaning of Article 382 (2) of the Code of Criminal Procedure.

All new evidence that the defendant presented to the Court was obtained by the defendant after the lower court trial, and was unavailable to the defendant while he was being detained. Further, the police, and prosecutors took great efforts to assure the defendant was unable to have certain evidence preserved for trial including a kick wound injury the defendant received by Ogura. The police, and prosecutors and three pretrial judges refused to take a photograph of the injury. The injury wasn't preserved until day 48 when the court appointed interpreter named Shoko Doi took a photo of the injury through the interview window at the Narashino Detention Center. This photo was presented to the Supreme Court, but apparently the preservation of real evidence to ensure a defendant has a fair trial matters little when the Court generally does all it can to uphold convictions, aiding the prosecutors to maintain the preposterous imbalanced conviction rate. A 2012 U.S. Department of State (DOS) report shows that of the 99.9% conviction rates in Japan that year, 91.7% were convictions based on nothing more than the defendant's own confession. Those figures were released by Japan's Ministry of Justice. Clearly the 99.9% conviction rate is a fraud. Only 8.2% of cases presented by prosecutors required them to present evidence.

**III. The Examination of New Evidence on Appeal**

A. The primary function of the appellate court is to review the proceedings of the trial court to determine if there were erroneous findings of fact, or conclusions and applications of the laws. There are also times when a defendant wants to introduce new evidence at the appellate stage. Including evidence that was not discovered until after the trial.

The defendant must show that introduction of this new evidence was "unavoidable", a term the court considers liberally. The Supreme Court held that even when the party seeking the introduction of new evidence is unable to prove unavoidable reasons, the Court may examine the new evidence to determine the appropriateness of the lower court's decision.

B. The Examination of Facts and the Appellate Court's Independent Judgment.

Article 393. An appellate court may, when it is necessary to conduct an investigation examine facts upon request of the accused, or upon its own authority.

C. Gross Factual Error as Grounds for Appeal.

The usual grounds for appeal to the Supreme Court are violations of the Constitution or precedence. A kokoku appeal must be shown that the matter is important and that certain rights will be jeopardized if the matter is not corrected prior to the issuance of a final judgment.

**IV. New Trials**

A new trial may be requested against any court's determination of guilt. The petitioner must prove one of the following:

1) That a document used to convict was forged or altered;

The defendant always maintained that the DNA sample was planted by police officer Mizokuchi in collusion with prosecutor Kume. Kume told the defendant that if he didn't sign confession statements that they would manufacture the required element of intent to obtain a conviction, and that is exactly what they did by planting the defendant's DNA at the center of Ogura's shirt. First, the videotape of the station window shows the defendant did not spit on anyone. Second it shows Ogura wearing a tie where prosecutors claim the defendant spit.

Prosecutor's notes show that the shirt was held for nearly two weeks before the DNA sample suddenly appeared. This occurred after the defendant was subjected to cruel, unusual and degrading extraction of blood at Tsudanuma General Hospital.

Regardless of these glaring facts, all three courts have refused to look at those videotapes, which are available to them. All three defense attorneys have seen the video and have all stated that what the defendant is accused of is impossible. The court appointed interpreter, Shoko Doi who watched the videotape with the defendant, and lower court attorney stated, "This is bullshit." Meaning anyone can see that everything presented by the prosecutor is a fabrication.

2) Testimony of a witness was perjured, or a translation or interpretation has been falsified;

Ogura and Takeuchi contacted the defendant's employer attempting to extort money for their criminal conspiracy to file false police reports against the defendant. This document was presented to the Court, but the Court has refused to inspect this document, which was part of the defendant's Exhibit A. It is a gross injustice that the Court would allow criminals to use the police, and courts to commit felonies to try and financially gain from their criminal conduct.

The defendant's opening statement at trial, "I can't fight this" is a clear translation, or interpretation error.

6) That there is clear evidence which has been newly discovered showing that the defendant should have been found not guilty (muzai) or acquitted on procedural grounds (menso), that the penalty should have been remitted (kei no menjo),

Everything stated above falls under section 6.

7) That a governmental official connected with the case was guilty of corruptions.

Police using torture in violation of Articles 11, 36, and 38 falls under this category.

Officer Mizokuchi planting the defendant's DNA is a clear sign of corruption. The prosecutor refusing to appoint counsel, and resort to the use of threats, intimidation,

isolation, and violence are clearly corrupt government actions.

A new trial is part of the defendant's fundamental right to due process as guaranteed by Article 31 and 39 of the Constitution. The newly discovered clear evidence of innocence rule applies through a mere cursory inspection of what the defendant provided to the Court. It's unconscionable that the Court would refuse to inspect those documents, which were presented to the Court.

In order to qualify for a new trial, the petitioner must be able to prove two things in relation to innocence. He must prove that the evidence is "clear" evidence (akiraka na shoko) of innocence. Moreover, he also must prove that it was "newly discovered" evidence (aratani hatsuken shita shoko). The Supreme Court held in the Shiratori Case that newly discovered evidence could merely raise a doubt as to the prior guilty verdict, and the doubt must be weighed in the defendant's favor. In Shiratori a defendant only had to show that there existed a reasonable doubt as to the legitimacy of the guilty verdict.

**V. Conclusion**

This case has made the defendant indigent, yet the Supreme Court refused to translate documents prepared by the defendant for the Court to aid in a fair proceeding. The Court initially gave the defendant time to prepare documents after the court appointed attorney quit the case. Neither the attorney nor the Supreme Court gave the defendant notice the attorney quit. Further, the Court reassigned that same attorney who filed a deficient appeal without having once met with the defendant, or even notifying the defendant he had submitted the appeal. The Supreme Court set notice to the defendant that what the attorney presented to the Court was deficient, and denied the defendant's appeal. This is a gross injustice, and a violation of due process.

The defendant demands these false charges to be dismissed, and for the Court to provide a remedy for redress of damages, which are extensive. If the Court will not dismiss the charges, the Court should provide the defendant an opportunity for a retrial, as the Court is now already in possession of a large amount of new evidence that proves the state's victims, Ogura, and Takeuchi filed false police reports to financially gain from their criminal conduct, and that the defendant is 100% not guilty, yet has suffered great harm as a result of both police, and prosecutor violations of procedures, Japan's Constitution, and international laws.

**Itami, Mami**

| | |
|---|---|
| **From:** | email@stackjones.com |
| **Sent:** | Wednesday, February 01, 2017 7:11 PM |
| **To:** | U.S. Embassy Tokyo ACS |
| **Subject:** | Jason Hyland |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

2.1.17.

To: Jason Hyland
From: J[redacted] S[redacted]

I have an appointment for passport renewal 2.2.17., at 3:00 pm.

I will need to meet Jason Hyland briefly, and present him documents. I have also mailed a statement to Hyland on 2.1.17

The U.S. Embassy in Tokyo destroyed relevant evidence of torture perpetrated by Japanese officials. Hughes Ogier knowingly destroyed that evidence by deleting it from Embassy computers. Embassy documents were retrieved under the FOIA, and they show Ogier directed those document to be destroyed. This means Ogier directed those documents to be removed from government servers.

These acts violate U.S. law, and were clearly intended to obstruct justice. These acts are criminal in nature.

I have initiated several communications regarding this matter with the U.S. Embassy, and they have all been ignored. My communications with the embassy will be ignored no longer.

The documents I have prepared for Jason Hyland are related to a lawsuit filed in U.S. Federal Court, Southern District of Florida.

This action names numerous Japanese officials, and at the highest level within Japan's Ministry of Justice as defendants. The claim is filed under the Alien Tort Statute, and the Torture Victim's Prevention Act, and international laws that both the U.S. and Japan have ratified.

I will be in Florida 1.8.17., and will be meeting with Sen. Mark Rubio regarding this matter.

Today, I received a response from Sen. Bill Nelson regarding the statement on torture that I provided him. A meeting is being scheduled at this time, either in Florida, or Washington.

Further, from 2011-2016, I was general manager of the DaSilva Group, for all Japan territories. This contract has not been terminated, but is also not actively being pursued. That contract makes me the personal agent of Donald Trump, for all matters pertaining to speaking engagements in Japan.

I am seeking at this time to meet with President Trump, regarding this suit, as well as the illegal conduct taken by the Embassy staff in Tokyo.

J S

NO DISCERNIBLE CLASSIFICATION

**Itami, Mami**

**From:** email@stackjones.com
**Sent:** Wednesday, February 01, 2017 9:39 PM
**To:** U.S. Embassy Tokyo ACS
**Subject:** Re: Statement mailed to 52 Republican Senators

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

1.30.17.

Japan Address:
[redacted]
Email: email@stackjones.com

U.S. Address:
[redacted]

My name is J[redacted] S[redacted], and I'm an American that resides in Japan.

The following is a communication that was sent to Jason P. Hyland, U.S. Embassy in Tokyo.

An emergency situation came up with my family in Florida, so I will be traveling to the U.S. Feb. 8th, 2017.

I need to renew my passport prior to leaving as it expires in March of 2017. Due to this emergency I may not return before the passport expires. I need to renew ASAP.

As previously communicated, I have initiated U.S. Federal Charges against Keisei Electric Railway Company, and Japanese officials in U.S. Federal Court under the Alien Tort Statute, and the Torture Victim's Prevention Act, based on being detained in Japan for petty assault, a crime Japanese official know I did not commit, and which video recordings prove this as fact, yet regardless I was detained for 109 days, tied and handcuffed to a chair daily, and tortured so extensively that it resulted in a broken right leg, kidney damage, neurological damage to both hands and wrists, severe frostbite which after three years has not healed, leaving permanent damage, and other irreparable harm. The Dept. of State and U.S. Embassy in Tokyo is entirely aware of these facts as Embassy consulate Thomas A. Duval smuggled in a camera to Chiba prison, taking photos of the conditions I was being detained is, which violate treaties with the U.S. and international law.

Documents released under the FOIA show consulate Leslie Glass confronted one of the Japanese officials that torture me, and noted in an Embassy report that the official was drunk at the time of the confrontation.

While detained, I was refused legal counsel for 38 days. No evidence that supported my claim that I was a victim of hate crime, and assaulted was preserved for evidence, including injuries sustained. On December 18th, the evening before trial at the Chiba District Court, the cast on my leg was violently removed, so the judge would not see be wheeled into the courtroom. Instead, I had to crawl, while a roped was tied around my waste, and the guard who broke my leg holding the rope. I was convicted of petty assault regardless and was the only person in the history of Japan to appeal a minor conviction all the way to Japan's Supreme Court. Two days before filing appeal statements, the attorney assigned to the case, who never met with me, quit, leaving me in a position to file an appeal for a time extension to submit my legal argument. The court denied me the right to have my statement translated into Japanese, and upheld the conviction, never looking at any of the evidence that was to be presented to them. Recently, these officials have been exposed as members of a secretive organization known as Nippon Kaigi, a racist group that wants all foreigners out of Japan, and the return of the Shinto Cult as a state sponsored religion. All of Abe's cabinet members are members of Nippon Kaigi or one of its offshoot.

Upon entry to the U.S., I will be filing several documents regarding this matter, including an initial pleading, a motion for EFiling, and motions to compel the defendants to answer interrogatories, and the disclosure of all evidentiary that has been denied me, including video recordings which I have seen that show I assault no one, but was in fact assaulted by the parties that claimed I had assaulted them. Thereafter, these "victims" attempted to extort money from my employer and myself in their scheme to financially benefit from their crimes, which included hate speech and battery.

Once I am at the Embassy to obtain my new passport I will need to meet with Hugues P. Ogier, Bernard C. Uadan, Thomas A. Duval, and Leslie Glass, as they are witnesses to this matter. Ogier personally authorized the deletion of relevant evidentiary material, the names of doctors that viewed the photographs taken by Thomas A. Duval, and the photographs themselves from Dept. of State servers, and computers. Ogier needs to respond as to why he destroyed government property which he was made aware was to be used as evidentiary material. Ogier has to explain how he managed to have those documents destroyed from government computers and government servers. All documents related to them matter was released under the FOIA, except the documents destroyed by Ogier. Regardless, those files were discussed in the documents obtained under the FOIA, including communication to Thomas A. Duval that those documents had in fact been destroyed. The destruction of government property is illegal, as well as rising to the level of obstruction of justice.

How the U.S. Embassy in Tokyo handles this matter, which so far has been to not respond at all, which is entirely repugnant, depends on the action I take against the U.S. Embassy in Tokyo in the proceedings in U.S. Federal Court. In that, my beef is not with the U.S. Embassy, nor its staff in Tokyo, but with racist Japanese officials that hate the U.S., American citizens, and all non-Japanese which was made quite clear in their communications with me, while being detained.

Further, although Japan's Immigration office in Yokohama has stated that there will be no issue upon returning to Japan, they communicated that very same information to Ric O'Barry's attorney. When Mr. O'Barry returned to Japan after being released from an illegal detention, Japanese officials detained the elderly man in an abusive manner at Narita airport, and thereafter, for 19 days, tied and handcuffed O'Barry to a chair, refused him medication, and resorted to the use of force while attempting to coerce Mr. O'Barry into signing false confession statements that he was a terrorist. If O'Barry had relented to the coercive measures, Japanese authorities would have charged him with terrorism, convicted him and sentenced him to years in a Japanese prison. At 76-years of age, that would have amounted to a life sentence. Upon discovering O'Barry had cancer, Japanese authorities immediately deported the man. I am familiar the tactics the Japanese officials engage in, as I was subjected to them for 109 days, and which resulted in numerous irreparable injuries and violations of human rights and human dignity. Terms that government officials, even in the U.S. toss around at their leisure not at all understanding the gravity of being subjected to such horrific conduct under the guise of official action.

Upon returning to Japan, I will be serving numerous officials with notice. They will have 21 days to respond. As I have attempted to resolve this matter, even through mediation, all named defendants are entirely aware that these proceedings are to follow.

I will be traveling with my 3-year-old son, and without my wife upon returning to Japan. If I am illegally detained and harassed by racists Japanese, they will be detaining my son as well. I will not permit this. I cannot permit myself to be detained, and taken to the same Daiyo Kangoku detention facility and be subjected to torture by the same police, guards, and prosecutors as I was subjected to previously.

Prior to leaving Japan, I will email, and mail, via registered mail, a statement to several U.S. congressmen regarding this matter. Many have been contacted several times over the past three years, but have never once bothered to respond, as if U.S. citizens, including U.S. military soldiers who have had their children kidnapped, sanctioned by Japanese officials, in violation of The Hague matter not to them.

Donald Trump has made it clear to the lazy, slothful officials that bitch and moan in Washington, and take care of their own, and do nothing for American citizens will not be tolerated any longer.

This is notice that upon reentry to Japan, If I am detained, I will not cooperate with Japanese officials at all.

If they attempt to take my son from me, or even touch my child, I will engage in any defensive measures available to me so as to protect my child from those hateful, racist monsters. My son, even before reaching the age of two, had already been subjected to enough disgusting and violent acts committed against him by these racist Japanese.

I want to know why Japan floods America with their garbage gadgets, yet, no American product is sold in Japan. NONE! Japanese goods are so inferior that I have had to ship from the U.S. nearly everything I own, including my son's education material, toys, electrical appliances, and so on. There is little wonder as to how the U.S. has dilapidated to such a repulsive state. I've lived in Japan since graduating law school in 2007. I never seen one American car on the streets of Japan. Why is this? There are no American products in the shops. Why is this? Japan engages in price gouging and price fixing for every product sold in the U.S. Why is this

allowed? Nearly nothing manufactured in the U.S. is sold anywhere in Japan. Why is this? But, you officials, you get your untaxed paycheck don't you? You're responsible for the flood of inferior goods sent to the U.S. You're responsible for the open borders, and the crimes against U.S. citizens, because you take no action whatsoever.

Japan has kidnapped hundreds of U.S. military soldier children. The Hague calls for sanctions. Why after all these years are none in place? Are you bastards too busy lapping up the backside of the trousers of the lobbyists? Grow a set!

Finally, if there is anyone that works at the Embassy that had any semblance of intelligence, they may want to notify Japanese authorities that trying to intimidate me, and harassing me upon entry back into Japan with my child, who is both a U.S. and Japanese citizen, will result in an international story they won't be able to hide from the media.

My wrists are still damaged from the injuries Japanese officials caused by unnecessarily using two pairs of Type II handcuffs, on both wrists as tight as possible, behind my back while trying to coerce me to sign false confession statements, and for not cooperating with their illegal, and criminal proceedings. My feet still show clear signs of the damage caused by keeping me in frozen cells without jacket and shoes while detained at both Narashino Detention Center, and Chiba Prison. Given these facts, which are well documented, I will not permit those third world barbaric savages that hate us, and which the U.S. allows to pretend are first world, to come near me or my son.

In no way, will I allow these criminals that pose as officials to interfere with my father-child-family relationship, as they have with hundreds of military personnel.

My suggestion to you officials in Washington is to watch the latest Scorsese film, Silence. You will immediately be able to see that despite Japan seemingly being modernized, the government still engages in the same crimes against humanity.

I suggest reading Hiroshi Segi's book which exposes the corruption in Japan's courts, and which he has received numerous death threats for writing. I suggest reading Nippon Kaigi which has exposed Japanese officials hatred of America, its policies, Japan's constitution, and who desire to return the Shinto Cult to a state sponsored religion, and emperor worship.

I have presented several issues in this communication. I have asked to be brought to Washington to give a full statement as to the crimes U.S. citizens are subjected to when detained in Japan's gulags.

I am demanding these issues addressed.

All communications made to U.S. officials are easy to obtain through the FOIA. Unless, your hiding a private server in your bathroom as that criminal Hillary Clinton had.

Silence is inaction, and inaction is not what is expected from those that benefit from sucking off of the taxpayer's tit.

From here after, you officials cannot lay claim to not be notified as to what pending actions that I may have to resort to in ensuring no one harms my child.

A copy of this communication has been sent to my own server as proof that this notice was sent.

s/ J[redacted] S[redacted]
J[redacted] S[redacted]



US DEPARTMENT OF STATE

# APPLICATION FOR A US PASSPORT BY MAIL

OMB APPROVAL NO. 1405-0020
EXPIRES 05/31/2005
ESTIMATED BURDEN: See Instruction Page 1

221091957

Date

R D O DP

End. # Exp.

**WARNING:** False statements made knowingly and willfully in passport applications including affidavits or other supporting documents submitted therewith are punishable by fine and/or imprisonment under the provisions of 18 USC 1001, 18 USC 1542, and/or 18 USC 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 USC 1543. The use of a passport in violation of the restrictions contained therein or of the passport regulations is punishable by fine and/or imprisonment under 18 USC 1544. All statements and documents are subject to verification.

**1. Name of Applicant**

Last S [redacted] Suffix (Jr., Sr., III)

First J [redacted] Middle

**2. Date of Birth** (mm/dd/yyyy) [redacted] **3. Sex** ☒ Male ☐ Female

**4. Place of Birth** (City & State Or City & Country) [redacted] **5. Social Security Number** (See Federal Tax Law Notice on Instruction Page 3)

**6. Height** Feet 5 Inches 9 **7. Hair Color** red/blond **8. Eye Color** blue **9. Occupation** teaching **10. Employer** Bowers English



**11. Mail My New Passport To:**

Street / RFD # OR Post Office Box Apartment #

[redacted]

Country (if outside the US) USA In Care Of (if applicable)

**12. Permanent Address or Residence** (If same as mailing address, write "Same As Above")

Street (RFD # or PO Box, not APO/FPO Box) SAME AS ABOVE Apartment #

City State Zip Code

**13. Home Telephone** (Include Area Code) [redacted] **14. Business Telephone** (Include Area Code) ( ) **15. E-Mail Address** (Optional) js[redacted]@gmail.com

**STOP** You must submit your most recent US passport with this form! If you cannot submit your most recent US passport, apply on Form DS-11, Application For A US Passport.

**16. Passport Information**

Name in which most recent passport was issued [redacted] [redacted]

Most recent US passport number [redacted] Issue date of most recent US passport [redacted]

67 6

DS-82
11/2004

Page 1 of 2

[redacted]



NAME OF APPLICANT (Last, First, Middle) S , J

Date of Birth (mm/dd/yyyy)

17. Travel Plans

| Date of Trip (mm/dd/yyyy) | Length of Trip | Countries to be Visited |
|---|---|---|
| 5.15.07 | one year | japan |

18. Emergency Contact -- Provide the information of a person not traveling with you to be contacted in the event of an emergency

Name [redacted]

**NOTE:** You must sign and date the application in the designated area below!

19. Oath & Signature

I declare under penalty of perjury that I am a United States citizen and have not, since acquiring United States citizenship, performed any of the acts listed under "Acts or Conditions" on the reverse of this application form (unless explanatory statement is attached). I solemnly swear (or affirm) that the statements made on this application are true and correct and the photograph attached is a true likeness of me.

X ______________________ Applicant's Signature

3.16.07 Date

DO NOT WRITE BELOW — FOR PASSPORT SERVICES USE ONLY — DO NOT WRITE BELOW

Evidence of Name Change

☐ Marriage Certificate

☐ Court Order

Document Issue Date ______________________

Place of Issue ______________________

Issuing Office/Court ______________________

Previous Name ______________________

Current Name ______________________

FEE ______ EXEC ______ EF ______ OTHER ______

DS-82

Page 2 of 2

Unauthorized Reproduction or Disclosure Prohibited



[redacted] 2/2/2017

RECEIVED
FEB 02 2017
By____

To: Jason P. Hyland
From: J[redacted] S[redacted]

U.S. Department of State
HR/REE
2401 E Street NW
Suite 518 H
Washington, DC 20522

U.S. Embassy Tokyo
1-10-5 Akasaka
Minato-ku, Tokyo 107-8420 Japan
Phone: 03-3224-5000

The following is a communication sent to the U.S. Embassy in Tokyo on 1.30.17.

**No Reply**

Your E-Mail has been received and your Case #(Case-2017- 01-29-008650405) has been created.

To: Stack Jones

We have received your email and will respond accordingly within 1 to 2 business days.

The details are as follows:

| | |
|---|---|
| Date/ Time Case Opened: | 1/29/2017 10:42 AM |
| Description: | 1.30.17.<br><br>An emergency situation came up with my family in Florida, so I will be traveling to the U.S. Feb. 8th, 2017.<br><br>I need to renew my passport prior to leaving as it expires in March of 2017. Due to this emergency I may not return before the passport expires.<br><br>I need to renew ASAP.<br><br>As previously communicated, I have initiated U.S. Federal Charges against Keisei Electric Railway Company, and Japanese officials in U.S. Federal Court. I will also be filing several documents regarding this matter, in person while on this trip. This includes initial pleadings, motions for discovery, evidentiary material release, and a list of parties to be deposed, etc.<br><br>Prior to leaving, I will need to meet with Hugues P. Ogier, Bernard C. Uadan, Thomas A. Duval, and Leslie Glass, as they are witnesses to this matter. Ogier personally authorized the deletion of relevant evidentiary material regarding the above stated claim, and will need to respond accordingly. How the U.S. Embassy in Tokyo handles this matter, which so far has been non-responsive, and to cover up illegal conduct, depends on the action I take against the U.S. Embassy in Tokyo in this proceeding. In that, my beef is not with the U.S. Embassy, nor its staff in Tokyo.<br><br>Further, although Japan's Immigration office in Yokohama has stated that there will be no issue upon returning to Japan, they communicated that very same information to Ric O'Barry's attorney. When Mr. O'Barry returned to Japan, they detained the elderly man in an abusive manner at Narita airport, and thereafter, for 19 days, tied and handcuffed O'Barry to a chair, refused him medication, and resorted to the use of force while attempting to coerce Mr. O'Barry into signing false confession statements that he was a terrorist. As you know thereafter he was deported. I am familiar with these tactics, as I was subjected to them for 109 days, and which resulted in serious and irreparable injuries.<br><br>I anticipate that Japan's racist, and criminal officials, that are entirely aware of these legal proceedings may once again engage in the same criminality which they perpetrated against Mr. O'Barry, and myself.<br><br>I will be traveling with my 3 year old son, without my wife upon return. If I am illegally detained and harassed by those racists, they will be detaining my son as well. I will not permit this.<br><br>Prior to leaving Japan, I will mail out, via registered mail, a detailed statement to several U.S. congressmen, as well as officials in the White House, giving clear notice as to what may occur if I am detained upon returning to Japan. I will not cooperate with Japanese officials if they attempt to detain me, and my son.<br><br>If they attempt to take my son from me, or even touch him, I will engage in any defensive measures available to me so as to protect my child, who has already been subjected to enough disgusting and violent acts committed by these racist Japanese.<br><br>If there was anyone that works at the Embassy that had any semblance of intelligence, you may want to notify Japanese authorities that trying to intimidate me, and harassing me upon entry back into Japan with my child, who is a Japanese citizen, It will become an international story they won't be able to hide from the media. |

| | |
|---|---|
| | My wrists are still damaged from the injuries Japanese officials caused by unnecessarily using two pairs of Type II handcuffs, on both wrists as tight as possible, behind my back while trying to coerce me to sign false confession statements, and for not cooperating with their illegal, and criminal proceedings. My feet still show clear signs of the damage caused by keeping me in frozen cells without jacket and shoes while detained at both Narashino Detention Center, and Chiba Prison. Given these facts, which are well documented, I will not permit those bastards to come near me or my son.<br><br>In no way, will I allow these bastards to interfere with my father-child-family relationship. Further, now that my wife's family has been made aware of the facts in this matter, and have read Hiroshi Segi's book, and that Nippon Kaigi has been exposed, this time they can expect hostile intervention on the part of my wife's family.<br><br>I have presented two issues in this communication.<br><br>I need them addressed. Keep in mind that all communications are easily obtainable through the FOIA. Silence is inaction, and the new president, and embassy staff are probably unaware of these circumstances. Even so, the U.S. Tokyo Embassy can in no way lay claim that they have not received ample notice regarding this matter.<br><br>A copy of this communication has been sent to my own server as proof that this notice was sent.<br><br>Jack Stone |
| Origin: | Email |
| Case Reason: | Passport renewal |
| Case Status: | New |



10.28.14.
J S

Case No. 394
Appeal to the Supreme Court

I. Facts Of The Case.

Prior to detention on Oct. 19th, 2013, for several weeks the defendant had been complaining to his employer, Hitomi Katsuyama, owner of Azalea Language School, and advertiser at several Keisei Electric Railway Company (KERC) stations, and to his fiancé now wife, and mother of their nine month old son, in both oral, and written form that the defendant in this case had been systematically harassed, and targeted with aggressive behavior by KERC employees whose conduct was similar to that of the Zaitokukai, and other hate groups that have created international consternation for Japan. This violent conduct has resulted in numerous calls from the U.N. Human Rights Committee, and the U.N. Committee on the Elimination of Racial Discrimination, for Japan to ban all propaganda advocating racial superiority, and hatred towards foreigners, and punish the perpetrators. Yuval Shany, of the U.N. Human Rights Committee reported that in 2013 alone, the U.N. received more than 360 reports regarding violent hate crimes that took place in Japan, all against foreigners.

Exhibit A. Email communications between the defendant, and his former employer, and fiancé. These communications include the defendant complaining about racially motivated harassment, and assault perpetrated by the KERC employees. Exhibit A also shows that KERC employees Ogura, and Takeuchi contacted the defendant's employer to extort money from their ongoing criminal conspiracy.

Sept. 12th, 2013.

After being physically assaulted on Sept. 12th, 2013, and having his bicycle thrown to the ground at Keisei Tsudanuma station, the defendant called for the police to intervene. They didn't. The station employee Takeuchi was reprimanded by his supervisor, and sent away. It was made known to Takeuchi's supervisor that the defendant was physically disabled. The supervisor apologized for Takeuchi's poor conduct, and allowed the defendant to board the train. The defendant reported this incident to his employer on the following day. Two eyewitnesses also reported the incident to the defendant's employer. In the eyewitness report they stated that a crazy homeless person had attacked the defendant. The information was turned over to the police, and prosecutors, by the defendant, his fiancé, and employer, but they refused to investigate in the matter, and refused to contact the witnesses.

Harassment took place nearly every time the defendant used the Keisei Tsudanuma station after that incident. As a result, the defendant quit his job on Oct. 4th, 2013. Communications that took place between the defendant, his employer, and fiancé as shown in Exhibit A proves this to be factual. Further, Tim Havil-Austin who had trained the defendant when he began working at Azalea language school had warned the defendant about the conduct of KERC employees. The defendant asked Havil-Austin why he was quitting his job at Azalea, and leaving Japan. Havil-Austin stated that he was returning to New Zealand because of being the victim of numerous assaults on the Keisei train line. Exhibit A email communications between the defendant and his employer, and fiancé address the communications between the defendant, and Havil-Austin, and the fact that the employer was aware that there were problems at the station even before the defendant began working for the company.

Question. If the defendant had assaulted Takeuchi on Sept. 12th, 37 days before he was detained, why was he allowed to continue to board trains on the Keisei Line? Why was the defendant not arrested on Sept 12th, if the defendant had committed a crime? Why was the defendant allowed to continue to use the KERC line, and travel to, and from that station at least six times a week prior to Oct. 19th? A police box is located at the Keisei Tsudanuma station, and the police, whom the defendant called on Sept. 12th, took no action. Further, the defendant's place of employment was located directly across the street from the police box. The officers could see the defendant as he walked to and from work, and at his working space in the Azalea school location. The defendant also walked past that police box nearly everyday, going to work, returning home, and during work breaks, such as during lunch breaks. If a crime had occurred on Sept. 12th, the defendant would have been arrested. But, he was not arrested because he had committed no crime.

In Takeuchi's statement to prosecutors, and which is in their report, he admitted to pushing the defendant first, and grabbing the defendant's bicycle, trying to wrestle it from the defendant's hands, which ended up falling to the ground. This was a brand new, and expensive bike. It is also stated in Takeuchi's company report that he pushed the defendant, and grabbed the bike from the defendant's hands. Regardless prosecutors charged the defendant nearly two months into detention with an assault charge. Certainly, when a much younger man, pushes around an elderly disabled person who is trying to commute home, and that person tries to prevent themselves from being injured further, cannot rise to a criminal offense. At most it is a justified use of self defense when the defendant, who admitted to the prosecutors he pushed Takeuchi because 1. He feared falling down the steps that led to the platform, 2. Was already suffering from a well-documented long-term physical injury. Takeuchi's claim that he was pushed, and punched in the chest, head and face several times by the defendant is ludicrous. The prosecutor claims that these numerous punches left no injury. How does one punch someone numerous times, and it result in no injury? There is no evidence to back this fabrication, and Takeuchi's attempt to extort money from the defendant's employer attacks his motive for filing the false charge, and makes this claim suspect.

Question. Where are the videotapes to prove that this assault took place?

Exhibit B. Support that shows the defendant was disabled at the time of the Sept. 12th incident includes X-Rays of the defendant's right leg, which were taken by Dr. Daichi Komei on July 29th, 2013. These X-rays show that prior to the defendant being detained, his leg was not broken, as will become an important matter in this case. Exhibit B also includes a copy of the Indictment delivered to the defendant while being detained at the Narashino daiyo kangoku detention facility.

Dr. Komei's is the owner of a clinic, and an orthopedic surgeon who the defendant visited regarding a serious right leg injury. This injury occurred when the defendant had the right-of-way while walking across a street on his way to work. While crossing the street the driver of a late model light blue Honda ran a red light, lost control of the vehicle, and hit the defendant, causing serious injury to his right leg. When police arrived at the scene, the driver claimed that the defendant punched him. Yet, three eyewitnesses who worked at a nearby real estate office who saw the entire event said that the defendant did not punch the driver, and that it was the defendant had asked them to call the police. Prior to the police arriving at the scene the driver of the car, tried to use force, and the threat of force to chase the defendant away from the scene so the driver could avoid being cited. The police took no action against the driver regarding his recklessness.

The police took no action regarding the driver's attempt at filing a false police report. The defendant pointed out cameras on the street, and told the police the only thing those cameras would show is the culpability of the driver. The police told the defendant he should pay for the damage to the car. The defendant refused to acknowledge the police's irrational remarks, and responded by saying the driver would pay his medical expenses, and damages, which would be much higher. The police told the defendant that the driver, drove professionally for a delivery company and if they ticketed him for causing an accident, he'd lose his job. This is typical police misconduct when it comes to the treatment of foreigners in Japan. It was this injury that caused the defendant to spend 1600.00 USD to order a quality folding bicycle from the U.S. so he could use it to commute to work, because the injury left him nearly unable to walk. It was this folding bicycle that Takeuchi grabbed from the defendant's arm, and threw to the ground, after pushing the defendant near the top of the stairs that headed downward toward the train platform. During the Sept. 12th incident, the defendant showed Takeuchi's supervisor medical devices that he was carrying in his bag, and painkillers, which were prescribed by Dr. Komei. All of this would be made known to the police, and prosecutors who failed to investigate this matter. In fact, it was the defendant that brought up the Sept. 12th, incident to the police, not Takeuchi. The defendant was trying to cooperate with police officer Mizokuchi, who early on in the investigation promised the defendant that he would be unbiased and do a proper investigation. Mizokuchi didn't. He and the prosecutor Kume, took the defendant's words, and used them against him to file a false charge of assault, nearly two months into being detained at Narashino Detention Center, on Oct. 19th, 2013.

Exhibit C. Photo of the defendant's folding bicycle that he had been allowed to use at Keisei Usui station to board the train that he took to work. Later that same day as the defendant tried to return home with the same folding bicycle he would be assaulted by Takeuchi at the Keisei Tsudanuma station. All of this was made known to police, and prosecutors who refused to investigate. Exhibit C includes an article written by the defendant about the folding bike for Nihongo News, which was published Oct. 3rd, 2103. http://nihongonews.wordpress.com/2013/10/03/montague-folding-bike.

Question. Why was the defendant allowed to board the train with the folding bicycle at the Keisei Usui station with no issues, yet upon returning home from the Keisei Tsudanuma station on the same line, the defendant would be treated so violently, with the bicycle being Takeuchi's excuse? The answer is because the Keisei Usui station employees are not racists, and had not been targeting, and harassing the defendant as the Keisei Tsudanuma employees had been. Further, since that incident defendant has used that same folding bicycle numerous times on various lines, and has never been stopped.

There was no reason for Takeuchi to act in such a violent manner toward the defendant, and the fact that the defendant was not arrested, and the actions of Takeuchi's supervisor, apologizing, and allowing the defendant to board the train is proof of this fact. Further, the statements of two eyewitnesses who thought the wrongful conduct of Takeuchi was that of a crazy, homeless person testifies to his assaultive conduct, and sloppy police, and prosecutor's handling of the matter.

In the indictment, which was handed to the defendant on Dec. 3rd, 2013 while still detained at the Narashino Detention Center, it stated that the defendant "thirsted", which the prosecutor meant to record as "thrusted" the bicycle at Takeuchi's face, with his hands. This meant that the defendant had to raise the bicycle up in the air, and lift it over his head to perform such act. This is absurd, as the bicycle weighs 17.2 kilograms, and the act itself was impossible given the fact that the defendant could barely walk. See Exhibit C. Note: The language of the second indictment mirrors the language of the first charge, as will be discusses below.



**II. Facts of case No. 1566.**

The prosecutor's indictment reads in part:

*The defendant committed a battery against Tetsuya Ogura, by spitting on his chest. Furthermore, the defendant punched him once in the face, and once in the head in the concourse area of the station. The defendant also punched Ogawa once in the head of the pedestrian walkway on the Yatsu No. 5 railway crossing road. As a result of the aforementioned unlawful use of force, Ogawa sustained a bruise on the head, and face, which would take approximately one week to heal completely. Crime committed Article 204 of the Penal Code.*

Question. Who is Ogawa? If the prosecution can't get a name correctly stated on a poorly executed indictment for assault that theoretically carried a lengthy prison sentence, which the prosecution was seeking, how can anything the prosecution claims to have occurred be relied upon?

The defendant is accused of assaulting Ogura with a spit that a videotape recording released by KERC shows never occurred. Ogawa several days later would claim to have been punched three times by the defendant. There is no evidence on either of the two videotapes released by KERC to the prosecution that the defendant had assaulted anyone named Ogura, or Ogawa. The two recordings only show Ogura assaulting the defendant, while the defendant, who was fully aware that CCTV cameras were recording the incident, had not even relied on using self-defense.

The indictment contains factual impossibilities, as there is no known victim that goes by the name Ogawa in this case. If there is a third party named Ogawa that claims to have been assaulted by the defendant, it was never raised at trial. If the prosecution's work is so sloppy that they can't recall the names of their own victim, when preparing an indictment for a charge that carries with it the possible sentence of 30 days to 15 years in prison, this raises the issue of competency, and the Court should consider if there is anything in the indictment that could withstand the requisite legal standard for the finding of guilt, beyond a reasonable doubt.

Exhibit D Indictment delivered to the defendant while detained at the Narashino Detention Center. This indictment was served on Nov. 8th, 2014. The same day the police, and guards tortured the defendant, broke his leg, and small finger on his right hand trying to force extract false confessions regarding this case. Certainly, an indictment should be written as concise as possible, and in a manner that the charges accurately reflect the parties involved. There exists no person in this case named Ogawa. Therefore it is a legal impossibility for the defendant to have punched someone in the head, and face three times that does not exist. As a result, Case No. 1566 must be overturned. Article 37 states that in all criminal cases the accused shall be permitted the opportunity to examine all witnesses. A defendant cannot examine a witness that does not exist. Article 34 states that no person shall be detained without immediately being informed of the charge against him. The defendant was held for two weeks before these phony punches were added to the initial charge. Ogura never mentioned being punched by the defendant when he reported this to his KERC superiors. These fabrications came about after Ogura, and Takeuchi began to conspire about extorting money for their false claims; which is a far more serious crime than what the defendant is being charged with.

Oct. 19th, 2013.

On the day the defendant was detained, the ticket machine that he purchased a ticket from on the KERC line malfunctioned, and as a result he had to purchase a ticket that cost more money. The

quickly moved out of the way, and the tie moved, and that's how the DNA sample got on the center of the shirt. A cursory viewing of the window videotape recording shows how absurd this fabrication is. The lower court attorney stated that the defendant had not spit on Ogura in his closing statement, yet the lower court judge refused to acknowledge this statement. At the High Court, the defense attorney who saw the videotape recordings stated in his appeal that what the defendant was accused of was impossible, that he had not spit on anyway. The second videotape recording shows Ogura as the sole assailant, kicking, and punching the defendant. Both the lower court defense attorney Kushida, and the High Court defense attorney Kato, who have reviewed those recordings told the courts that what the defendant is accused of is highly suspect. The defendant will tell you emphatically, as he had always stated in every interrogation, and even after suffering extreme duress, and physical torture that he had not engaged in any criminal activity at any time. So, why the sudden change at the initial trial proceeding? That will be discussed below in great detail.

Question. Why have the courts been derelict in their duties? Why are they allowing Ogura to continue to perjure himself, by continuing to fabricate testimony? Ogura has impeached himself numerous times, yet no person in a judicial capacity has bothered to look into the matter. Why has every judicial officer refused to acknowledge the existence of those videotape recordings, and take the time to view them?

Exhibit E. The defendant is a professional audio-video engineer, and received certification as such in 1996. The defendant received his BA (honors) in Communications for studying film production. The defendant has written 16 full-length feature films, edited award winning feature films, and at one time was partners with Junichi Mimura, a well-known Japanese film producer, and director. The defendant is an expert cameraman, and is an award-winning, published photographer. The defendant knows cameras, and he knows the cameras located near the stairwell, and on the street at the Keisei Tsudanuma statin are CCTV video cameras with wide-angle lenses that captured the entire area where Ogura claims to have been punched three times. The defendant has contacted the prosecutors numerous times to obtain the evidence package, the phony reenactments in which Ogura, and Takeuchi took part in, and the video recordings that are known to exist. The defendant has also sought to gain possession of the videotape recordings that captured the incident near the stairwell, and the street below. The two punches that Ogura claim to have occurred, happened right below a CCTV camera located near the steps leading to the street. The defense has been refused access to these videotape recordings, and this is suspect. If what Ogura claims happened near those steps, let them prove it. Why is it the defendant, and not the prosecutor demanding those videos to be released? This is insulting to logical reasoning.

On 10.17.14., 10.21.14., 10.23.14., 10.24.14., 10.27.14., 10.28.14., the prosecution has stonewalled the defendant, with Kataoka, stating that he will investigate the matter, and return calls to verify his findings. Kataoka never returns those calls. On 10.23.14., the defendant tried to set up an appointment to view the evidentiary material, as originally the prosecutors office agreed to. Kataoka said he would call back to schedule. He did not. The defendant contacted him again, and Kataoka said he needed to contact the Tokyo prosecutor's office, investigate the matter, and would call back after the 27th. Again, he did not. On 10.28.14., Kataoka said the office would give answers about being able to see evidence on 10.29.14. Yet they did not return the call. By 10.29.14., it would be too late to meet the Supreme Court appeal filing deadline, and have the information translated. The prosecutor brought the case. They intentionally failed to do a full investigation, and now they don't want to allow the defendant pick apart their procedural, and constitutional errors. This is unacceptable. Finally, the prosecution states that the defendant can have access to all of the evidence one the Supreme Court case appeal has been exhausted.



Included in Exhibit E are photographs of three cameras at the KERC station that would have captured where Ogura claims the defendant punched him. With at least five cameras that captured the incident, the prosecutor has released but two recordings, and both of those show the defendant committed no crime. The defendant has sought the release of these other recordings to vindicate himself since his reputation has been destroyed, and to show that Ogura has perjured himself, and as a result none of what he has stated is credible. A defendant should be given full opportunity to impeach a witness, especially when the defendant knows that the charges brought against him are false. Criminal Code 281 (4) requires all evidence in their possession to be turned over to the defense for any legal proceedings, including appeals. The only reason the prosecution has given the defendant for refusing to allow access to evidence in their possession is that they are worried that the defendant will go to the media with it. If the police, and prosecution have nothing to hide, and did such a wonderful job on their case then why would they have any concerns about the defendant going to the media? Withholding disputable evidence is denying the defendant the opportunity to raise a valid defense, and to have a fair proceeding. Article 21 of the constitution states that no censorship shall be tolerated, and that no secrecy of any means of communication be violated.

Question. At what point is evidence to be turned over to the defendant? During proceedings when it aids the defendant in preparing an adequate defense, or prepare for an appeal? Or once all proceedings have been exhausted, and where that evidence can no longer serve any purpose? There can be little wonder why less than 1% of cases result in an acquittal, and less than 3% of cases are overturned on appeal when courts allow this level of gross abuse of authority to exist.

Police never questioned the defendant at the scene. Police immediately allowed Ogura to taint their investigation where he claimed the defendant called him a monkey. Weeks later this would change to "yellow monkey." It's ironic when a racist who comes from a nation whose politicians promote race hate, attempts to use it to their advantage, alluding that the defendant is racist. The true racist aspect of this case is where Ogura called the defendant a stupid foreigner (baka gaijin) and where the police, and prosecutors were made fully aware of this intentionally omitted this fact from record. Yet, both the lower court, and the High Court judges mentioned this fabrication in their rulings. No doubt the prosecution intended to incite the judiciary, and confuse the issue, and the courts took the bait. Regardless, if the defendant had called Ogura a monkey, that statement is not a requisite element in determining if the defendant is guilty of assault. The case was entirely tainted with this false information. The Supreme Court defense attorney Shinji Okoshi stated in his appeal that at no time during the videotape recordings is the defendant seen making any offensive gestures, or saying bad things to Ogura.

## IV. Detention at Narashino Detention Center under the Daiyo Kangoku.

The police detained the defendant without asking the defendant a single question at the scene of the incident, and without adequate probable cause. Along with prosecutors they would intentionally fail to record evidence that proved Ogura had in fact assaulted the defendant. Ogura had kicked the defendant leaving a bloody hole in his left shin. The kick was so hard that it was still visible 46 days later when it was finally recorded through the Narashino police station interview window on a cell phone that had poor photographic quality. The court appointed interpreter Shoko Doi, who assisted attorney Kushida in communicating with the defendant, took the photo.

What's the rational in failing to preserve evidence? Certainly, the police, and prosecutors were the only one that could have preserved that evidence since the defendant was being detained, and illegally withheld from legal representation. The only reason this evidence was not preserved was

to ensure that the defendant could not make a showing that he was a victim of assault. What if the injury was a stab wound from a knife? Or a gunshot wound? What if the defendant was a woman who had resorted to using force to stave off a rape, but the police and prosecutors refused to preserve as evidence proof that she had been the victim of rape?

Question. Are criminal proceedings so pathetic that a defendant having to face a 99.9% conviction rate, with an inherent stigma attached to the proceedings due to the fact that the defendant is a foreigner, and on top of that, face intentionally acts of police, and prosecutors refusing to preserve evidence, when they are the only ones in a position to do so, and for no other purpose but to ensure a defendant could not raise a valid defense, or have a fair trial?

Exhibit F. Photograph of a kick wound the defendant received by Ogura, and which police, prosecutors, and three pretrial judges refused to preserve as evidence for trial. Note that the kick wound was so severe that the injury was still noticeable, and the bruising had yet to subside after 46 days. Compare this to Ogura's claim to have received a red mark that took less than a week to entirely heal. A mosquito bite takes longer than that to go away. As proof that this photograph is authentic, the defendant includes a document provided by defense attorney Kushida, which accompanied the photo when it was provide to the defendant.

V. Legal representation.

The defendant sought, and was refused legal representation at every stage of the investigation. He would not see an attorney until day 38, a full 15 days after being indicted, and long after police had broken the defendant's leg attempting to force the defendant to use his index fingerprint to sign false confessions. It took the U.S. Embassy contacting the Chiba district court, protesting the prosecutor's refusal to appoint counsel, and demand the defendant be provided legal representation. Every day the defendant was obtained he sought legal representation. Article 34 calls for the immediate privilege of the appointment of counsel. Yet, the prosecution would make a mockery of this provision. If an attorney was provided, which is constitutionally mandated, much of the damages suffered by the defendant would have been avoided, such as being subjected to torture because police, and prosecutors were angered when the defendant refused to cooperate, and sign false confessions. The defendant wouldn't have raised other issues such as the prior bad acts of Takeuchi, which resulted in a second bogus charge being filed. There would never have been the second charge, and the defendant would have been released, and at his wife's side during the birth of their child.

The defendant is 56 years old. At the time of detention he was 55. This was the first time he had fathered a child. The state stole the right of the defendant to be at the side of his wife, and to be present at the miracle of his son's birth. The defendant will never forgive Japanese authorities egregious, abominable, and unconscionable acts, violating this once in a lifetime opportunity.

The defendant notifies the Court that long after every government official that took part in their despicable, and criminal acts, it will remain in the front of the defendant's mind. The defendant is not guilty, and suffered great indignity, and untold losses as a result of this matter. The defendant has suffered character assassination, financial ruin, the loss of more than 30,00,000 yen in salary earnings, the loss of a home that he was renting, and the security deposit. After being financially ruined the defendant had to relocate, laying down a large sum of money for a security deposit on a rental property that costs the defendant 31,200 yen more than his previous rent. The defendant had to rent a van to move his belongings. The defendant had to spend countless hours, and continues to do so trying to clear his name. The defendant has laid out an enormous amount of money to pay for the material necessary to prepare this appeal. The defendant lost his car as a

9

result of a snowstorm that destroyed it when the carport of the home he was renting collapsed as he was being detained. The defendant's wife lost all of her personal being eight months pregnant when she had to leave her company job to prepare to give birth to their child. The defendant lost the opportunity to bond with his unborn son, and has suffered numerous physical injuries, which the police and prosecutors continue to try and hide from the courts. And for what? To have false charges filed, and for police and prosecutors to intentionally perform an insufficient investigation into those false claims? To be seriously injured in the process, and have every fundamental right denied in the process?

The prosecutors attempted to have the defendant deported during the proceeding. The prosecution was aware that the defendant's visa would expire relatively soon after, or even while he was held in detention. Even where his fiancé, who the defendant was to marry before she gave birth to their son, wanted him to remain in the country, and provide for his family. It came down to 11 days that the defendant's visa was to expire, and then face deportation. Furious, the defendant wrote letters to Justice Minister Tanigaki, the Supreme Prosecutor's Office, the National Police, the Chiba Public Prosecutor's Office, and other governmental agencies, clearly stating that if the Japanese officials tried to interfere with his relationship with his son, he'd resort to whatever means necessary, including the use of deadly force if they tried to use state sponsored abduct child to destroy his family unit. Japan has become the scourge of the planet regarding state sponsored child abduction. Even after Japan signed The Hague Convention regarding child abduction, not one child has been returned to the parent that won custody in other countries. Since ratifying The Hague Convention, not one child has been reunited with their family, and not one parent has even obtained parental visitation rights. The defendant mailed, and hand delivered these communications to numerous officials. Is this what it takes for the Ministry of Justice to understand that there are people in society that will not tolerate gross injustice, and malfeasance heaped upon them?

Question. What is it that the state seems to think it gained in this matter other than bragging rights over a claim of obtaining a false conviction against a U.S. citizen that has a law education, and had worked as a public defender? The defendant has suffered great emotional trauma, including more than a year of sleepless nights continuing to relive this façade. The defendant, and is wife have been financially ruined as a result of this gross injustice. If the Court of last resort refuses to properly address this matter, and overturn this false conviction, and compensate the defendant for the harm he and his wife have suffered, there can be no other recourse but for the defendant to seek retribution.

Early on during the investigative stage, the defendant demanded the prosecutor provide legal representation. The prosecutor would only mock the defendant, and tell him to get his embassy to provide an attorney. The defendant would say that the embassy wasn't detaining him on false charges. The prosecutor would shout back, YOUR GOOD AT WRITING LETTERS. WRITE TO YOUR EMBASSY AND GET THEM TO GET YOU AN ATTORNEY. What this outburst was referring to is the fact that the defendant had already contacted a former prosecutor named Tsutomu Nakamura, the JFBA, the Tokyo Bar Association, the Prison Rights Group, and the U.S. Embassy, giving a detailed account as to the conditions the defendant was being detained under. Those documents would eventually catch the Narashino detention center supervisor, Fujisaki in lies where he told the U.S. Embassy, that he himself, and guards he was responsible for, had not engaged in tying up the defendant, and torturing him. When Fujisaki was made aware that details describing the room where the torture took place, the guards involved, and the devices used, he finally, and in writing, admitted to the U.S. Embassy that in fact, what the defendant had claimed in those communications had occurred, and resulted in the defendant having his right leg broken.

10

they are police officers?

Question. Should police, and prosecutors be able to hide videotape recordings the prove the defendant was tortured while being held in the controversial Daiyo Kangoku detention system that is the subject of great debate in both Japan, and the international communities?

Question. Should the presumption of guilt be applicable where police, prosecutors, and guards who are accused of using torture, and other forms of duress, deny doing so, and refuse to cooperate a defense attorney who is working on a Supreme Court appeal, and where they refuse to cooperate with professional organizations such as the JFBA and the TBA, who are investigating their illegal conduct, and trying to improve Japan's international image regarding the use of torture, coercion to obtain false confession, and other illegal activities that violate the rules of criminal procedure?

Question. At what point is the defendant allowed access to an attorney? According to Article 34 of Japan's Constitution the privilege of appointment of counsel applies immediately after a defendant is detained. What authority is greater than the constitution regarding a defendant's right to legal representation, especially during the investigative stage? Article 98 states that any act of government contrary to the constitution has no validity. Further, the exclusionary rule must apply when evidence, and coerced confessions are used against a defendant, especially where coerced confessions are not reliable whatsoever.

Question. It is during the investigation stage that a defendant needs an attorney the most. What authority permits the prosecutors to hold a defendant without legal representation? Certainly not the Japanese Constitution. At what point is being held without an attorney too long? What does the court consider prolonged detention, which results in excluding invalid statements at trial? After initial detention? After the first 72 hours? After the 21 day investigative period? 38 days? If an indictment results after a defendant has been intentionally refused an attorney to represent them then what need does a defendant have legal representation? Especially when they are probably going to be found guilty when the judiciary in Japan almost always sides with the prosecution, and proof of that is the 99.9% conviction rate, which is unheard of in other civilized nations.

Here, the defendant was held 38 days without legal representation, which was denied him each and every day. The defendant did request an attorney each, and every day. Certainly, 38 days of being denied an attorney, held in isolation 24/7 without the ability to communicate in the Japanese language, and being denied contact with the defendant's embassy, under a technique prosecutors call a "hostage technique", tortured to coerce false confessions resulting in serious harm, and not receiving legal representation until 15 days after indictment violates Article 34. It violates Article 11, and Article 36, both constitutional provisions that address the use of torture, and cruel and unusual punishment. Anyone with minimal understanding would immediately realize that the use of isolation, physical torture, and duress threats, the threat of deportation, and state sponsored kidnapping of the defendant's child would result in unreliable statements, and immeasurable anxiety.

Question. At what point does the exclusionary rule apply in Japan? At what point is evidence so tainted that it cannot be relied upon? At what point does Japan's highest court lower their head, and say this system doesn't work?

Former prosecutor Hiroshi Ichikawa who has consulted with the defendant on this case agrees that the system is a failure. Retired judge Hiroshi Segi, professor at Meiji Law School agrees that



the entire system is hopeless. In fact the title of Segi's book, which was released in February of 2014, the same month the defendant was released from Chiba Prison is, Court Of Despair. I believe former Supreme Court Chief Justice Hironobu Takesaki is familiar with Professor Segi's book?

Question. How many Iwao Hakamada's remain in prison while prosecutors continue to intentionally withhold evidence that is key to a defendant being able to raise a valid defense, thereby deceiving the courts, and deceiving the public, for no other reason but to win a case regardless of it merits? How is it that this court cannot grasp how the international communities, and every respectable human rights organization spends countless thousands of dollars, and hours writing annual reports that condemns Japan for such egregious, and draconian practices that continue unabated?

The police and prosecution produced a myriad of false confessions for the defendant to sign. They tampered with witness statements, intimidated witnesses, engaged in phony photo reenactments, which are entirely contrary to evidence that remains in their possession, and which they have denied the defendant access to.

The police entered the defendant's home ransacked it, and took possession of the defendant's folding bicycle without a warrant, and then failed to use it in their phony reenactment because it weighs 38 pounds, (17.23651 kg) and is too large for the defendant to have raised it over his head, and "thrust" at Takeuchi, who is much larger, and much younger than the defendant. Apparently, the police in their shoddy work also failed to mention that the defendant was disabled at the time, and that he could barely walk regarding the Sept. 12th incident. The defendant would not even learn the police illegally entered his home, and seized his bicycle until after returning home from Chiba Prison on Feb. 4th, 2014. The police never gave notice to the defendant that they had entered his home, and seized his property. How gullible are the courts? Or is it the judiciary is so overloaded with cases that they just don't have the time to look at what is presented to them? If that is the case, Japan needs to introduce plea deals that net the state monetary gains, and presents the kind of damage that scores of defendant's continue to suffer. Article 29 states that the right to own or to hold property is inviolable.

Question. Is a search, and seizure valid when police enter a defendant's home, without a warrant, ransack it, looking for non-related contraband, and seize a defendant's property, never using it in their reenactments, and also never give the defendant notice they are in possession of that seized property? Article 35 states that all persons have the right to be secure in their homes, and effects against entries, searches and seizures, except upon warrant issued for adequate cause and particularly describing the place to be searched and things to be seized. If the police entered the house to seize a bike without a warrant that is bad enough. But, to ransack that home searching for unrelated matters is a violation of this article.

The police and prosecutors conspired, and planted DNA evidence to obtain the requisite element of intent for the crime of assault, which they knew the defendant had not committed. The police and prosecutors refused to accept witness statements regarding prior bad acts of Ogura, and Takeuchi, failed to perform a proper, and thorough investigation, and threatened to deport the defendant through state sponsored child abduction because the defendant refused to cooperate, refused to sign false confessions, which inevitably resulted in the use of various forms of torture that caused the defendant to be hospitalized seven times while held at Narashino detention center. Those injuries included kidney failure, internal bleeding, nerve damage to the defendant's right hand, and a broken leg.

**VI. Cruel and Unusual.**

October 26th, 2013.

As the defendant lay in a near comatose state from already being hospitalized several times, Guard B came to the cell the defendant was held in, and told the defendant that the detention center guards were to transport him to the Tsudanuma General Hospital to have his kidneys checked. The defendant believed this statement factual, as the doctor at the hospital warned the defendant that he had 5-7 days before his kidneys would fail, resulting in permanent damage.

The guards handcuffed, and placed a black nylon rope around the defendant's waist. Due to the defendant's extremely weakened physical condition the guards had to practically carry the defendant to the exit doors, which led out of the back of the detention center. As soon as the rear detention center doors opened, the defendant was met by a group of police, and several flashes from a camera. Mizokuchi blocked the doorway, and read a warrant that stated that the defendant was to immediately be taken to Tsudanuma General Hospital, and forcefully have blood extracted to be used as evidence against him in the ongoing investigation. Apparently, Mizokuchi sought, and obtained a warrant to seize the defendant's property, his blood, without being appointed an attorney, and without being present at the hearing. Accompanied by an interpreter, six officers, and a police photographer would use force to take the defendant to Tsudanuma General Hospital where he would be subjected to one of the most brutal, unconscionable, and humiliating violations of basic human rights imaginable.

Upon arrival at the Tsudanuma General Hospital, the handcuffed, and tied up defendant was chained to a wheel chair, and taken into the main public waiting area, in full view of patients, their families, and whoever else was present. One of the doctors at that hospital, a pediatrician was the defendant's student. So was her son. This abusive, and intentionally humiliating experience would repeat itself again, and again, as the defendant was subjected to numerous coerced visits to the Tsudanuma General Hospital, and treated as a public spectacle.

The defendant was forced to sit in a wheelchair, and wait in an open public area while obvious handcuffed, and with a rope tied around his waste, which was held by Guard B. The photographer kept taking photos of the defendant. Finally, the defendant was wheeled into an examination station, where a trembling elderly female nurse was waiting. It was clear she had not been notified that police were involved in the matter. She stood stunned as the six guards, the interpreter, photographer, and the defendant entered the small room. There was barely room for anyone to stand, and the guards crowded around the nervous woman. Immediately, Mizokuchi stepped forward, and read the warrant while the police photographer continued taking photos. The nurse cautiously stepped forward in an absolute state of fear, and panic. She was trembling so terribly that she dropped the devices that she had in her hands onto the floor. Those devices were to extract blood from the defendant's arm. The defendant stooped, and picked up the devices, and placed them onto the countertop. Several police would force the defendant's left arm onto the countertop, which was entirely unnecessary. The nurse stabbed the defendant in the inside elbow area of the left arm, missing the vein. She then pulled the needle out, and repeated this same process, missing the vein again, and again, pulling the needle out. It was clear to everyone present that the woman was entirely incompetent to perform the task required of her, as she remained in a state of fear, and panic. On her third attempt the woman missed a vein again, and began twisting the needle in the defendant's arm to try and forcefully locate a vein. This was so painful that the defendant, acting in reflex, pushed the needle out of his arm. By this time there were three holes bleeding down the defendant's left arm, and pooling into the palm of his hand. In complete disgust at this barbaric treatment, the defendant turned to Mizokuchi and said, "*Are you happy*?"



Mizokuchi responded by grunting, "*Yes*." The defendant then turned to the dejected nurse who bowed her head downward. She once again dropped the syringe onto the floor. The defendant bent down, and picked it up a second time, and placed it on the counter. The defendant asked Mizokuchi again, "*Does this make you happy*?" The corrupt, and filthy, poor excuse of a human being grunted even louder, "*Yeah*." The defendant turned to the other guards, and glared at them. Each, and every one of them was so ashamed at their conduct that they all had their heads bowed to the floor, unable to look up. The defendant took the nurse by the hand, and in Japanese calmly said, "*Daijobu. Honto, daijobu*." The defendant offered the nurse his right arm, where she would eventually extract three vials of blood.

When the nurse had completed the task of extracting blood in such a violent, and incompetent manner, the defendant was horrified to see Mizokuchi take possession of those three vials, place them in a small, unsealed, light blue Styrofoam cooler, and exit the hospital with no one to oversee where he was going, or what he was going to do with those samples of the defendant's blood. This is exactly why a defendant must have a hearing, to be assured that samples of their DNA, intended to be used as evidence against them in a legal proceeding are transported in a secured, and proper manner, and that corrupt, and violent officials acting on behalf of the state won't have the opportunity to tamper with that material. This is why a constitutionally mandated hearing is essential to determine the intended purpose of property that is to be seized, to limit its scope, and to assure corrupt officials like Mizokuchi who enjoy abusing their authority at every turn do not tamper it with. Article 36 states that the infliction of torture by any public officer, and cruel punishments are absolutely forbidden.

Article 35 states that all persons are to be secure against illegal searches and seizures, and that a warrant must be issued for adequate cause and particularly describing the place to be searched and describing the things to be seized. Each search must be made upon separate warrants issued b a competent judicial officer.

Question. Why would any judicial officer order a warrant to extract blood from a defendant, and allow them to be dragged through a public area of a hospital and be subjected to such barbarity, and treated as a public spectacle when the police could have obtained the same results at the detention center by having the defendant place a cotton swab in his mouth, and be done with it? Shouldn't the police use the least intrusive method to obtain a DNA sample?

Question. Should a defendant be present at a warrant hearing to assure that minimal guidelines are followed when blood is to be seized, and where it is to be used against the defendant in a criminal proceeding? Mizokuchi transported the defendant's blood without any form of supervision. Mizokuchi's conduct was so often so violent, so reprehensible so corrupt, so reckless, and entirely unbiased from the beginning, lacking any sense of rationality, and morality that not only should he never have been assigned to this case, he should be the subject of a full investigate of the court, and removed from being able to act as a public servant. Mizokuchi is a bad cop.

The court owes a duty to the defendant to inquire as to the whereabouts of this third vial of blood. Does the court believe the police acted properly by subjecting the defendant to a continuous barrage of violence, and brutality merely because he insisted that police, and prosecutors follow the rules of criminal procedures, and the constitution? Does the court believe the police acted properly by subjecting the defendant to a continuous barrage of violence, and brutality merely because he refused to confess to crimes he had not committed? Couldn't the Narashino police have just as easily used a much less intrusive manner of achieving the same goal?

Question. Is it acceptable that the police, and prosecutors engage in committing numerous felonies, in order to obtain a conviction for the misdemeanor crime of petty assault?

According to the Correction Bureau Ministry Of Justice's Penal Institutions In Japan, *"Restrictions on unsentenced inmates have been relaxed."* Just how horrific, and inhumane were those conditions prior to these *"relaxed restrictions"* if the conditions the defendant suffered were so egregious? According to that same publication it states, *"It is often said that how offenders are treated is a reflection of the state's socio-cultural conditions. Administration of penal institutions are carried out to the best of its ability in order to offer appropriate and effective treatment for offenders supported by the values, and views on punishment."*

One doesn't have to look beyond recent events to understand the disturbing *"socio-cultural conditions"* that have mired the international communities perspective of Japanese society today. Criminals, such as those responsible for the nuclear debacle at the Fukushima, Daiichi Nuclear Facility, that has caused 267,000 evacuees to continue to remain in dilapidating "temporary" shelters, as entire communities remain in a state of limbo, more than three years on, have never been indicted on any charge. Other disturbing *"socio-cultural conditions"* include, reprehensible prosecutors that lump foreigners, and yakuza into the same non-human category. How can abject government authorities get away with training newly appointed prosecutors that foreign teachers should be lumped into the same category as gangs that peddle child pornography, prostitution, and illicit drugs? Other disturbing *"socio-cultural conditions"* that exists in Japan include popular politicians such as Hashimoto, and Ishihara that fuel racism through unconscionable hate speech the rest of the world finds objectionable, unconscionable, and condemns. Then there are the hundreds of fabricated doctorate, and research work from the University of Tokyo that exposes a mountain of fraud, and deception in the educational industry, not to mention the STAP cell debacle. Recently, Mitsubishi, and Hitachi conspired to price fix, and steal billions from American, and other national consumers of their products. Then there was the Olympus' 1.7 billion accounting fraud scandal, Mamoru Samuragochi, the fraudulent "deaf" composer, biologist, police foreign crime wave falsehoods that promote racism against foreigners, Yoshitaka Fujii data fabrication on more than one hundred and seventy two research scientific research papers, the Takeda Pharmaceutical, and Astellas Pharma falsified Alzheimer's studies, add the fact that Japan has the highest alcoholism, tobacco addiction, and suicide rate per capita, as well as the lowest ability to communicate in a foreign language than any other nation in the world, which causes great shame to the Japanese, that often results in fear, hatred, bullying, and segregation. Clearly, Japan's *"socio-cultural conditions"* appear to be at an all time low. So, why would any court automatically believe whatever the police, or prosecutors claim occurred in a case when there is evidence available to refute it, but the courts refuse to do so?

VII. Use of torture.

Throughout history, torture has been used as a method of interrogation, punishment, and coercion. Often, the motive is an abuse of power in a sadistic gratification of the torturer, most often police, public prosecutors, and military personnel. Torture is prohibited under both international law, and domestic law. Torture is a violation of human rights, and is declared unacceptable by Article 5 of the United Nations Universal Declaration of Human Rights. Torture is also prohibited by the United Nations Convention Against Torture, which has been ratified by 147 states. The use of torture is addressed in three constitutional provision in Japan's Constitution, Article 11, Article, 36, and Article 38. Article 36 states that the infliction of torture by any public officer is absolutely forbidden.

Question. What part of the constitutional provision regarding the use of torture, *absolutely*



*forbidden*, does the police, prosecutors, and judiciary not understand?

National and international legal prohibitions on torture derive from a consensus that torture, and similar ill treatment is immoral, and impractical. Despite these international conventions, organizations that monitor abuses of human rights, such as Amnesty International, and the International Rehabilitation Council for Torture Victims report widespread use condoned by states in many regions of the world. Amnesty International estimates that at least 81 world governments currently practice torture, some of them openly. Japan is considered one of the worst offenders.

The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, known as the United Nations Convention against Torture is an international human rights instrument, under the review of the United Nations, that aims to prevent torture and cruel, inhuman degrading treatment or punishment. Japan as a signatory nation and is therefore obligated to adhere to the rules therein. The Convention requires states to take effective measures to prevent torture within their borders.

Part I (Articles 1–16) defines torture (Article 1), and commits parties to taking effective measures to prevent any act of torture in any territory under their jurisdiction (Article 2). These include ensuring that torture is a criminal offense (Article 4), establishing jurisdiction over acts of torture committed by or against a party's citizens. (Article 5), ensuring that torture is an extraditable offense. (Article 8), and establishing universal jurisdiction to try cases of torture where an alleged torturer cannot be extradited. (Article 5). Parties must promptly investigate any allegation of torture. (Articles 12 and 13), and victims of torture must have an enforceable right to compensation. (Article 14), Parties must also ban the use of evidence produced by torture in their courts. Parties are obliged to prevent other acts of cruel, inhuman or degrading treatment or punishment, and to investigate any allegation of such treatment within their jurisdiction. (Article 16).

Article 1 of the Convention defines torture as: Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining information or a confession, punishing him for an act they may have committed, or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. Convention Against Torture, Article 1.1

Article 2 of the convention prohibits torture, and requires parties to take effective measures to prevent it in its jurisdiction. The prohibition of torture is absolute. There are no exceptional circumstances whatsoever to invoke justifying its use.

Question. Is the judiciary using its best efforts to eradicate the use of torture, and to refuse to accept confessions as a form or evidence used to convict a defendant? Article 38 states that no person shall be compelled to testify against themselves. Confession made under duress, torture, threats, or lengthy detention shall not be admitted in evidence. Is 38 days without legal representation anything but a lengthy detention? Does the court believe that being tied up, restrained, videotaped, humiliated, starved, frozen, kept from bathing, clean clothing, reading, and writing material, contact with the U.S. Embassy, and prevented from preparing for trial are acceptable conditions of detention? Who gave the power to police, and prosecutors to withhold evidence, and to force confessions when a defendant refuses to cooperate? Certainly, the constitution wasn't written to provide government officials with that level of power. Quite the

contrary, the constitution was written, as a line drawn in the sand regarding what kind of conduct is tolerated by government actors, and what is not.

Is the Middle East more stable after nearly two decades of American involvement in the region, and where the government detains, and tortures "enemy" combatants to bring "democracy" to parts of the world that don't want it? Are those tactics working? No they're not. Radical extremism is all that has resulted in America's failed foreign policy. The region is far less stable today than at any point in history with ever increasing hostilities that have absolute implications on a global scale. Torture doesn't work. It doesn't net true results!

Article 3 of The European Convention on Human Rights shows that Japan is in violation regarding inhumane and degrading treatment. There is a mountain of evidence obtained by the U.N. regarding ongoing, and systemic human rights violations. The Human Rights Committee states that violations of even the most basic rights are "the rule." According to the Universal Declaration Of Human Rights, justice is the most fundamental human right.

The police refused to allow the defendant to contact the U.S. Embassy after breaking his leg, as police and prosecutors tried to cover of their malfeasance, and criminal conduct by forcing the defendant to sign a false statement that he "promised not to injure himself again." The defendant was forced to sign similar statements three different times, until the police thought they got the wording stated in a way that would protect them from prosecution. Yet, those documents, along with the videotape recordings of the torture now seems to have vanished into thin air. This is why Daiyo Kangoku "substitute prison" system is condemned by the international community, and doesn't work. This is why the Narashino chief of police has refused to cooperate with the JFBA, and the Tokyo Bar Association, and refused to turn over Notebook No. 201410190 to attorney Okoshi so he could address the illegal conduct the defendant suffered under. Can there still be any wonder why the defendant entered the lower court proceedings, trembling, in a clear state of emotional, and psychological trauma, and stated, "I can't fight this."

The defendant's leg was broken on Nov. 8th, 2013. He was refused medical treatment for six days. Thereafter the defendant was dragged in chains, and handcuffs to interrogations at the Narashino police station, which the prosecutor attended, and to interrogations at the prosecutor's office. Even pretrial judges refused to provide the defendant medical treatment for his broken leg. The pretrial judges were aware the defendant was injured. He was wheeled into the Chiba District Court in a wheel chair, obviously unable to walk. He was brought before those pretrial judges, and the defendant notified them that the Narashino guards, and police had broken his leg. Regardless, the pretrial judges took no action.

On Nov. 12th, a Tsudanuma General Hospital doctor who was making his bi-monthly visits to the detention center to inspect detainees inspected the defendant. When it came time for the defendant to see the doctor, the detention center supervisor, and Guard B, who were most responsible for the torture that took place on Nov. 8th, told the defendant not to discuss his leg injury. The doctor immediately noticed that the defendant was unable to walk, and inspected the leg, which had doubled in size, and turned a dark purple, blue, and green in color. The doctor asked the supervisor what happened? The supervisor only lowered his head and gave no response. The doctor told the supervisor to get the defendant to the hospital immediately because his leg was broken. The supervisor would not have the defendant taken to the hospital. Fearing that his leg might have gangrene due to the exceeding level of pain, on the following day, Nov. 13th, the defendant crawled to the cell bars that faced a guard catwalk. On the other side of that catwalk were large smoked glass windows. The defendant began screaming out toward those windows for help. The police ran to the cell bars, and shouted at the defendant to shut up, but the defendant did



not shut up. He feared for his life, knowing that the Chiba Public Prosecutors office had covered up the murder of the Ghanaian man Suraj who had died in a brutally horrific torture, and where guards had attempted to smuggle his dead boy on a plane to hide their criminal conduct. In great fear, the defendant would not, and could not stop screaming for help. To get the defendant to shut up, he would finally be taken to the hospital, and have his leg X-rayed. The Tsudanuma General Hospital doctor that ordered those X-Reys determined that the broken leg had recently occurred. One of the guards that accompanied the defendant in handcuffs, and chains to the hospital was Guard B. There also was an interpreter who told the defendant that Guard B told the doctor that the defendant had kicked the wall. The defendant told the doctor that Guard B, and others broke his leg. The leg was cast, and when the defendant returned to Narashino, he was immediately charged with a second crime, and handed the charge by officer Mizokuchi, The arrest warrant read that the defendant had "pushed" the Tsudanuma station employee, Takeuchi. The defendant was taken through booking procedures again, and immediately dragged in handcuffs and roped into interrogations, and tied to a chair. The defendant was grilled for hours by officer Mizokuchi, and would learn that he was being charged with assault regarding the Sept. 12th incident that the defendant himself had reported to Mizokuchi himself. This was the incident where KERC employee, Takeuchi had shoved the defendant, who was disabled, grabbed at his bicycle, yanking it from his arm, and tossed it to the ground. Takeuchi would admit that he pushed the defendant, and grabbed his bike from his arm causing it to fall to the ground. Two eyewitnesses who reported the incident to the defendant's employer, Katsuyama stated that a crazy homeless person has assaulted the defendant. The police, and prosecutors never attempted to contact those witnesses to get their statements, even though the defendant provided them with Katsuyama's contact information. The police, and prosecutors were not interested in facts. They were only interested in convicting the defendant.

Question. Why did police and prosecutors bring false charges against the defendant when during their investigation they would become aware that Ogura had filed a false police report, and that videotape recordings available to them did not match Ogura's statement? Why does everything that the defendant was accused of just so happen to appear off camera, or at least not available in the videotape recordings that the prosecution released to the defense? Why did police and prosecutors bring false charges against the defendant when a station employee who claimed to be a witness said he followed Ogura, and the defendant, and saw the defendant pick up Ogura's glasses, but stated that he did not see the defendant assault Ogura? The defendant picking up Ogura's hat came after Ogura had tried to punch the defendant as described above, and shown in Exhibit D. Picking up Ogura's hat came after Ogura had claimed to have been punched twice. How is it that this station employee, eyewitness did not see these two punches? The reason he did not see them is because they never occurred.

At each interrogation the defendant had the interpreter read back what the police, and prosecutors were recording. The police, and prosecutors were always intentionally deceptive, manipulate statements made by the defendant, mislead, intentionally try to confuse the defendant to no avail, and try to intimidate, and force the defendant to confess to something he had not done. When the defendant would ask for pencil and paper to take notes. this request would be denied. When the defendant had the interpreter reread statements prepared by the police, and prosecution, they would become enraged, shout at the defendant, and demand him to sign the statement. During one session the defendant was prepared to sign a document because it was close to the facts, but the defendant wanted one paragraph reworded. Officer, Mizokuchi, who was most corrupt, and most violent, would pretend to edit the statement, while yelling at the defendant. Mizokuchi would reprint the statement, and place it before the defendant to sign. When the defendant would have the interpreter read the statement, the wording was changed where the defendant was now confessing to the crime of assault. When the defendant would have the interpreter reread the

statement again, Mizokuchi would threaten the defendant with violence. At one point, Mizokuchi slammed his fist down on the defendant's right hand. The defendant picked up the paper, and wrote, Your Corrupt. The defendant had the interpreter read the "signature" and Mizokuchi crumpled the paper, and ended the interrogation.

The police always used the same interrogation room. During one session, the window was open behind where the defendant was handcuffed, and tied to the seat. When Mizokuchi went into a violent rage, and threatened the defendant, the defendant began shouting out the window for help. Immediately several officers, and Mizokuchi's supervisor entered the room, shut the window, and threatened the defendant to sign the statement. He refused. The interpreter was a man who wore glasses, and had a child. He had gone to Georgia University in the U.S., and the defendant told him to remember all that he could, as what the police were doing was illegal, immoral and corrupt. The defendant told Mizokuchi's supervisor that they had the station videos by then, and he was certain they knew Ogura's statements were false. The supervisor told the defendant, "The videos don't show everything." The interrogation was ended.

After that interrogation ended the defendant's was taken into the interview room where the defendant's pregnant fiancé was located. She told the defendant that as she walked up the street to the police station she could hear the defendant screaming. This frightened her. As the defendant sat in the interview room, his fiancé repeated to him that he must confess, and that the police again told her that if he didn't confess, they would not let him go.

VIII. False charges.

The more the defendant refused to cooperate, the more the charges were elevated with the original charge of a spit, changing to include three punches. These three punches would not be mentioned in Okoshi's report to his company. The second charge, originally a push, changed to pushing, and then to pushing, and numerous punches to the face, head, and chest, without causing injury. How one receives numerous punches to the face, head and chest, and walks away unscathed is unknown to the defendant. The only known is that the entire case is fraudulent, and Ogura, and Takeuchi tried to monetarily gain from their fraud by contacting the defendant's employer, and attempt to extort money, which is a lot more serious than anything the defendant was charged with.

The police assured the defendant that because he refused to cooperate, and accept the original charge, they would prolong his detention, and that he would not be present at the birth of his child. This is the only truth the police have stated in this case.

Despicable police conduct included guards using driving detours to get to the prosecutor's office by taking local streets, and driving past a large billboard of an illustration of a pregnant woman. They thought driving me past that billboard each day was funny. The defendant even told the embassy consulate that if he had a chance to escape he would take it. The defendant's former girlfriend was Hye Young Choi. She is the only Korean film producer in the world, and her father is a retired Seoul senator. The defendant thought that by stealing a boat, and taking it across the Japan Sea would bring him to the freedom that he desired. After being held in isolation for so long, and under the conditions described herein, this is the state of mind that one eventually succumbs to.

Interrogations at the prosecutor's office always resulted in the defendant being subjected to threats, intimidations, deportation, mockery, humiliation, and the threat of a lengthy prison sentence. The prosecutor was clearly filing false charges, and the prosecutor told the defendant



that they would manufacture the element of intent to obtain a conviction of assault if they had to. At one point the defendant told the investigating prosecutors assistant, "This is not how prosecutions should be done. Don't become someone like them. Their actions are not only illegal, but highly immoral."

The United Nations Committee Against Torture has castigated Japan's criminal justice and prison system, listing a wide range of issues including the lack of an independent judiciary, an extremely low rate of acquittal and most notably human rights abuses among detainees, the lack of appointment of legal counsel, and chronic attempts by police and prosecutors to extract false confessions. There have been numerous calls from the international community, and UN Committees calling on Japan to end police, and prosecutorial false confessions. The committee's most recent findings are revealed in the following online post:

**Committee Against Torture Examines Report Of Japan**
http://ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=13344&LangID=E

**Japan Urged To End False Confessions**
http://news.bbc.co.uk/2/hi/8290767.stm

**Japan: Briefing To The UN Committee Against Torture**
http://refworld.org/docid/517e22df4.html

**UN Standard Minimum Rules For The Treatment Of Prisoners**
Japan has also ratified the UN Standard Minimum Rules for the Treatment of Prisoners and is violation of these charters in almost every aspect.
https://unodc.org/pdf/criminal_justice/UN_Standard_Minimum_Rules_for_the_Treatment_of_Prisoners.pdf

**Convention Against Torture And Other Cruel, Inhuman Or Degrading Treatment Or Punishment**
Japan ratified the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and is in violation of these charters in almost every aspect as well.
http://ohchr.org/EN/ProfessionalInterest/Pages/CAT.aspx

**UN Body Attacks Japan's Justice System**
http://ft.com/intl/cms/s/0/692b3c92-0875-11dc-b11e-000b5df10621.html

**NGO Report** on the Issue of Hate Speech in relation to Issue No. 10 of the List of Issues adopted by the Human Rights Committee
http://imadr.org/wordpress/wp-content/uploads/2014/07/Hate-Speech-in-Japan_ERD-NET_Human-Rights-Committe_111th-session.pdf

**UN Panel Urges Japan To Enact Laws To Prohibit Hate Speech**
http://ajw.asahi.com/article/behind_news/politics/AJ201408300039

**Asia-Pacific Human Rights Information Center**
http://hurights.or.jp/archives/focus/section2/2013/12/rise-of-hate-speech-in-japan.html
**The Justice System Reform Council**
Recommendations of the Justice System Reform Council from June of 2001 have yet to be considered.
http://japan.kantei.go.jp/judiciary/2001/0612report.html

**IX. Injured third parties.**

The defendant committed no crime. He is the victim of what began as a hate crime that escalated to the filing of a false police report, and criminal conduct on the part of numerous government officials, acting on behalf of the state. Yet, he is not the only victim. His employer who had advertised for several years on the Keisei line, and had paid all employee related fees was a victim as well. After more than one year, the defendant's former employer has been unable to replace him, as she continues to pay for advertisements searching for a qualified candidate. Highly educated, and highly qualified employees are extremely difficult to find in Japan, as gross violations of Japan's labor laws, and exploitation of foreign workers force perspective employees to look elsewhere. Tim Havil-Austin the former employee of Katsuyama's company left his employment, and Japan as a result of bad acts of KERC employees. A cursory inspection of the internet shows that foreigners who had once been employed in Japan write extremely negative reviews of their experiences in Japan, and vehemently warn others that the nation is a hostile, and exploitative environment to live, and work in. This shows that the defendant is not the only party to suffer damages from this kind of gross injustice. There are scores of foreigners that have posted their experience in Japan's judicial system relating similar stories of that of the defendant, including police, and prosecutors coercing false confessions, prolonged detention, failure to provide legal representation, and the use of torture. On the day the defendant was released from Chiba Prison, Feb. 4th 2014, two foreigners detained at an Ibaraki detention center died under suspicious circumstances in two different, and unrelated matters.

Exhibit J. An Ohayo Sensei advertisement placed by the defendant's former employer. Showing the company has yet to find a replacement for him, more than one year later.

**X. The defendant's fiancé.**

During the first week of detention, the police, and prosecutors, who were aware that the defendant, and his fiancé's first child had miscarried, refused to contact her to let her know that the defendant had been detained. To the defendant's fiancé it appeared as if he had disappeared off of the face of the earth, or got cold feet, and ran off. She spent the entire week frantically trying to locate him. The email communications she left for the defendant during that time showed the great state of panic that she was in, and which surely was endangering the health and safety of their unborn fetus.

Question. Should police, or prosecutors be allowed to have such power that they can knowingly place the health, safety, and life of an unborn fetus at risk of stillbirth or miscarriage over extremely petty offenses when a mere phone call could prevent all of this? One would think not, in a civilized society anyway. However, the world community is fully aware that Japan never considers the human rights, and dignity of foreign detainees, who are always treated as something less than a human being, as former public prosecutor Hiroshi Ichikawa, who consulted with the defendant in this case, and who he himself admitted that prosecutors are taught that foreigners have no human rights. When the defendant discussed this reality with attorney Ichikawa, he admitted that, "foreigners are not human to public prosecutors, they are closely associated with yakuza, and it's acceptable to use any tactic, including threatening them with murder to obtain false confessions, and be done with it. The only thing that a prosecutor is concerned with is winning the case. They are not concerned with whether a defendant is guilty or not. Prosecutors are trained to believe this." Ichikawa resigned from office as a public prosecutor after threatening to murder a defendant who would not sign a false confession.



The police, and prosecutors were fully aware that the defendant's fiancé, who he was to marry in November of 2013, was to move out of her company apartment on Nov. 15th, 2013. By this time, Ms. S[redacted] was eight months pregnant, could barely walk, and was supposed to move into the defendant's home, and give birth at a clinic in Chiba, which they had paid a deposit to. By Nov. 15th, the police, and prosecutors had already indicted the defendant, and were already in possession of videotape recordings that proved Ogura had filed a false police report, and his statements, which kept changing, were suspect, and therefore not reliable. As noted by Okoshi in his appeal to the Supreme Court, there was enough evidence available at that time that the prosecutors should have dropped the charge during the investigative stage, and released the defendant. They didn't. As a result, the defendant's fiancé had to leave her company apartment, and in the late stage of pregnancy was unable to move any of her property. Ms. Suzuki lost everything she owned, leaving the apartment with only what she could carry away in a handbag.

When the defendant's fiancé tried to bring evidence to the police, and prosecutors that the information they were receiving from Ogura was false, and attempted to show them email communications between herself, and the defendant that the station employee's including Ogura were guilty of assault, and other prior bad acts. The police refused to accept any evidence that she tried to turn over to them, and instead told her, "Tell him he's guilty, and to confess, or we'll bring new charges, and keep him here longer."

The defendant's fiancé had no other option but to return home to Yonezawa, and had great difficulty finding a hospital that would take her since she was in such a later stage of pregnancy.

Exhibit K. The defendant's fiancé's statement the police, and prosecutors refused to accept, and investigate during the initial stages of their investigation.

**XI. International headlines.**

There have been hundreds of cases of coerced false confessions in Japan that made international headlines including several where police, and prosecutors had intentionally fabricated evidence, and or hid evidence from the defendant. The Iwao Hakamada case is but one example of such gross injustice. The defendant's story is set to be released first by Japan Times with writer Simon Scott reporting on the case. The defendant is a reporter who has reported for numerous Japanese publications. His work has appeared in the Japan Times as well. Both NHK, whom the defendant has worked with in the past, and TBS have stated that they will cover the story when it reaches the civil proceedings stage. Writers from The Guardian, the New York Times, Miami New Times, and Israel's Haaretz will be covering the story as well. There are also numerous human rights organizations that have asked the defendant to provide them with his detailed statement, which he has done. The defendant is also writing a book on the matter, and currently engaged in producing a documentary on Japan, and the nation's history on deceptive prosecution, and convictions.

The U.S. Dept. of State annual report of 2013, reported facts that were obtained by Japan's Ministry of Justice. Those facts include of 400,000 cases that resulted in a 99.9% conviction rate, 91.7% of those cases resulted in convictions where there was no evidence presented by the prosecution. Those convictions resulted in nothing more than mere signed confessions. How many of those confessions were coerced, and false? With 91.7% of criminal cases resulting in convictions where no evidence was presented at trial other than the defendant's own confession, means that prosecutors only won cases where they presented evidence in 8.2% of criminal cases. The defendant had worked as a public defender at the San Bernardino County Public Defenders Office in both the adult misdemeanor, and juvenile divisions before relocating to Japan to work in

education. In that capacity, the defendant had only taken two cases to trial. He won both of them. Yet, of the three attorneys that have worked as defense counsel in this case, Kushida in the lower court, Kato at the Tokyo High Court, and Okoshi for the Supreme Court, and a combination of more than 37 years of experience working as defense attorneys, not one of them have ever won a case.

Question. If an attorney who has worked in the field of criminal defense for a decade or more, and has never won a case, possibly be considered competent, as is required by Article 37?

**XII. Human rights.**

After numerous requests to obtain the lower court decision, the defendant finally received a copy of it on 9.28.14., which was more than seven months after being released on 2.4.14., and after the High Court had made its ruling.

Question. How can a defendant properly review and address prosecutorial, and judiciary procedures when the defendant hadn't ever even received a copy of the lower court decision? The defendant wasn't even notified that the lower court decision included receiving hard labor attached to the 1.5 year, 4 year suspended sentence. Further, after the proceedings, the lower court attorney Kushida, never met with the defendant, and an interpreter to have the decision read to him. He was swiftly escorted out of the courtroom, and ushered back to Chiba Prison to be processed for being released.

The Daiyo Kangoku system is a failure. The Internal Commission of Jurists, and Lawasia, and the Japan Federation of Bar Association have long condemned it as such. The recent cases of Iwao Hakamada, Abubakar Awudu Suraj, and Govinda Prasad Mainali are prime examples of the failure of such a system. Upon release from Chiba Prison on Feb. 4th, 2014, the first thing the defendant learned was that two detainees at an immigration center in Ibaraki had been "found dead" in their cells. These men were not criminals. They were seeking political asylum from the countries that had tortured them, and came to Japan seeking refuge. Instead, they found themselves locked in isolation 24/7, psychologically, physically, and emotionally tortured, and left in an obvious state of financial ruin just as the defendant was in this case. The defendant's case is yet but another in a long line of abuses of authority, malfeasance, and corruption where defendant's are afforded the right to present an adequate defense, or receive a fair trial before an unbiased tribunal.

Question. Speedy trials are afforded to all defendants, not only ones the prosecutor impose terms that are unfavorable to the defendant, such as waiving the right for an appeal, and accepting a conviction of guilt. Article 37 calls for a speedy trial in all criminal cases. The defendant asks the court, first where does the constitution provide for the prosecutor the power to pick and choose what cases merit the constitutional provision of a speedy trial? Second, what is a speedy trial?

There are numerous violations of Japan's Rule of Criminal Procedure, Rules of Criminal Code, and the Constitution, which is the supreme law of the land. Article 98 of the constitution states that it is the supreme law of the nation, and no law, or act of government, contrary to these provisions, shall have legal force or validity. The defendant in this case could be blindfolded, and spun around three times, and then pin a dart on the constitution, and probably hit one of the myriad of violations that exists in this case, given the fact that there are so many. Article 11 states that the people shall not be prevented from enjoying any fundamental human rights. They are guaranteed by the constitution, and include the right from being subjected to torture, and include all of the rights that pertain to a defendant presenting an adequate defense, and having a fair trial.



Article 14 states that all people are equal under the law. Therefore there shall be no discrimination between a Japanese national and a foreigner. Article 31 states that no person shall be deprived of life or liberty, nor shall any criminal penalty be imposed upon them except according to procedure established by law, with the constitution being the supreme law of the land. Article 34 states that no person shall be detained without immediately being informed of the charges against them or without the immediate privilege of counsel; nor shall they be detained without adequate cause; and upon demand such cause must be immediately shown in open court in their presence, and the presence of their counsel. The defendant would raise this issue at every interrogation, which would always result in the prosecutor laughing, and telling the defendant he had "a lot to learn about Japan's procedures." It seems the prosecutor has a lot to learn about the rules of procedure, that, or they are so entirely belligerent, that they are unable to be taught morality, and proper conduct in an official capacity.

From the real facts of this case, not the ones fabricated by the prosecutor who conspired with police, and what the rules of procedure state, it is clear that the prosecutor is both corrupt, and incompetent and should be removed from office, as a precautionary measure to protect those who are unable to endure illegal interrogations. Incompetence is where one doesn't have the required skill to perform a particular task. Corruption is where one has that skill, but refuses to use it. Article 35 states that all persons have the right to be secure in their homes, and effects against entries, searches and seizures, and shall not be impaired except upon warrant issued for adequate cause, and particularly describing the place to be searched and things to be seized. Police entering the defendant's home, ransacking it to search for unrelated matters, no doubt to try and find other charges to bring against the defendant, and seizing a bicycle, taking possession of it, and then not even using it in the police phony photo reenactment is illegal, and a gross abuse of discretion, and authority. If the police, namely office Mizokuchi, and his supervisor have such disrespect for the laws of the land that are written to prevent them from obtaining evidence illegally, shouldn't the exclusionary rule apply? If so, the exclusionary rule would have to apply from the initial period of detention where the injury the defendant sustained by Ogura was intentionally not recorded, and preserved for evidence. Shouldn't the court investigate illegal conduct, and if they find such illegal conduct have them removed from office? What other cases are the police, and prosecutors involved in where they have planted evidence, or refused to record facts, and do a full, and proper investigation? What rape cases? What murder cases?

Article 36 states that the infliction of torture by any public officer, and cruel punishments are absolutely forbidden. The term absolute leaves no room for debate. Tying up the defendant, torturing him, breaking his leg, and causing other serious injuries for no other reason but because they are frustrated that the defendant relied on his constitutional rights, is a gross violation of Japan's criminal laws, criminal procedures, constitution, and human rights. No one should be allowed to remain in office after committing such heinous acts. Article 37 states that in all criminal cases the accused shall have a right to a speedy, and public trial by an impartial tribunal. Speedy trials are held to prevent irreparable damage to all parties in a case. The defendant was left in financial ruin while being detained for petty assault that wouldn't net a fifty-dollar fine in the U.S., or even a single day in jail. The defendant would have bailed out after a couple hours, and appeared in court, most likely to plea deal, and avoid a trial.

**XIII. Character evidence.**

The defendant has never been convicted of a crime. The defendant has worked in both the adult, and juvenile divisions of the San Bernardino County Public Prosecutor's Office, and with the Pomona City Family Law Court. The defendant has won the IVAMS Award in mediation, and arbitration, and American Jurisprudence Awards in Conflicts Of Law, and Lawyering Skills

Practicum. The defendant is a published writer, and photographer. Despite these facts, the defendant has suffered numerous assaults while residing in Japan. As surprising as this may first appear to the Court, it is not. Being subjected to hate crimes is a common occurrence in Japan. Japan's government officials, in collusion with the major media outlets fail to report on this incidents, downplay their significance. In one incident that took place recently in Korea town, thousands of Japanese marched along major streets. Some with bullhorns called for the execution of the Korean community. Others called for them to be immediately dragged into the street and murdered, and their businesses burnt to the ground. The international media covered these frightening events as what they were, unwarranted hate crimes. The Japanese media mostly would not cover the incident. The few that did called the Japanese "protesters." In nearly every other society, these volatile elements would be rounded up, tried, and convicted of hate crimes.

Being assaulted by Japanese nationals is not the exception, but has become the rule. The defendant has lived in Japan nearly eight years, and has been subjected to hate crimes on numerous occasions.

Fukui. In July of 2008, the defendant was in an automobile accident in Fukui. In that matter the occupant of the other vehicle immediately made a phone call. Soon, two of his friends arrived at the scene. Police arrived, and so did the defendant's insurance company with another vehicle, since the one he was driving was destroyed. An ambulance arrived and all three men got into an ambulance claiming to have been injured in the accident. All three men had neck braces placed on them, and claimed to have been injured in the accident. The police charged the defendant who refused to cooperate, or sign insurance forms to pay out damages to the criminal coconspirators. The police threatened the defendant with a court hearing and a 60,000 ¥ fine if he would not comply with the insurance companies demands. The defendant adamantly refused to sign anything. This resulted in the insurance company, and police finally performing a proper investigation where they eventually discovered the three men had been in three separate other accidents in less than a one-month period. The insurance company was about to pay out on one of those separate claims to those same three men. Those men were subsequently arrested for causing an accident, and filing three separate false insurance claims. The defendant was not charged with the accident.

Yamagata. In August of 2009, at approximately 1:00 a.m., the defendant was in his apartment watching a movie with his girlfriend, who is now his wife, and mother of his son. The doorbell rang, rang, and kept ringing. The defendant answered the door, and discovered two drunken woman that he did not know. One of them shouted that there were female shoes located in the ginkan area of the defendant's home, and then suddenly punched the defendant in the face. The other woman began to cry. The one who punched the defendant in the face attempted to enter the defendant's home, to assault his girlfriend. The defendant pushed her out the door, and closed it. Minutes later the police arrived because the two women had called them. The women told police the defendant had punched one of them in the face. He, and his girlfriend were taken to the Yamagata police station. Eventually, the police discovered that one of the women, who was married, and had a one-year-old son, had been stalking the defendant. Both women finally admitted that the defendant had not punched the woman, but that the woman had in fact punched him. The police asked the defendant if he wanted to press stalking, and assault charges against the woman. The defendant refused to do so, and asked to be taken home.

Ibaraki. During the immediate aftermath of 3.11.11., the defendant had been building a private international school in Sendai. The triple disaster of 3.11.11. destroyed the business, and the defendant had to resort to taking a job in Ibaraki as an English teacher. After shooting photography, and reporting in Sendai immediately following 3.11.11., and sleeping in his car for



several days, the defendant returned home to Ibaraki. He washed his car at an all night Shell Gas Station, and then pulled up to the pump, paid 3,000¥ for gas, and began pumping. Suddenly, a station employee exited the station wielding two metal pipes, yelling at the defendant that the station refused to serve gaijin. The employee swung the larger metal pipe about, crashing it down on a toolbox near the defendant's front left bumper of his car. Upon finishing the fueling of the car, the defendant took out a camera, and photographed the station employee. He sent the photographs to Shell headquarters in the Netherlands, and continued to fuel his car at that station for the next two years. The station employee was fired.

Note: During this time the defendant appeared two times on MSNBC's Nightline with Brian Williams, America's top news broadcast. The defendant helped raise millions of dollars for Japan's relief aid.

Nagano. While doing photography, and reporting for Tokyo Weekender magazine, on the tourist destination Kigokudani Yaen Koen, the defendant was seriously assaulted by a Nagano bus driver who worked for Nagaden bus company, after asking if that bus went to the Yudanaka station. After the attack, which left the defendant seriously injured, the bus driver went into the station area, and began spewing hate speech at all foreigners in the station. The police took no action, but upon learning that the defendant was in town to write about the tourist attraction, and the bus company not wanting to receive bad publicity, the bus company offered to pay 50,000 ¥ which covered the defendant's medical bills. The defendants sent an email to Yoshifumi Shinoda an executive of the company stating that he would accept the offer, and not write negatively about the company only if they promised not to fire the man because he appeared to be about 60 years old, and it would be nearly impossible for him to find other employment. The article appears at the following link: http://tokyoweekender.com/2014/03/snow-monkey-paradise-in-hell-valley-jigokudani-yaen-koen

The defendant has been refused service at restaurants, and shops, and while shooting photography at a public beach in Chiba was told that foreigners were not permitted at that beach. Earlier when he had attempted to park in a public pay lot, an elderly man ran out of his house screaming at the defendant that foreigners were not allowed to park in those public parking space. The defendant immediately took out a movie camera, and the man's demeanor immediately changed from assaultive, and aggressive to kind, and understanding. The defendant still has that video footage.

Yokohama. The defendant was on his way to the Supreme Court to file a motion of extension regarding this case appeal. The defendant's wife, and nine month old son was also on the train with him. The defendant's wife was holding their son when a Japanese man entered the train, and wanted the seat next to the defendant's wife, which was located in the seats reserved for women with children, and the disabled. Next to my wife was my son's diaper, and bottle bag. The man picked up the bag, and shoved it onto my wife's breast area, and slammed it into my son's head. The defendant was standing at the time, holding onto the baby stroller.

Japan's courts can pretend otherwise, but you would only be pretending that Japan has become an intolerable racist nation. Japan's judiciary, and politicians are the responsible for the rise in hate crimes because they have the power to invalidate it, and invalidate it as the U.S., UK, Australia, Germany, France, and every other civilized nation have.

The defendant has reported in various publications how the Japanese legal system destroys lives. He has interviewed people who have had to resort to living in blue tarp tents along rivers, after having had minor issues with the law, becoming unemployed, and who were too ashamed to return home to their family as a result. Many have never seen their spouses, or children after

suffering that injustice that was heaped upon them. The fact is, the Japanese legal system gives a life sentence of poverty, humiliation and shame to those that have suffered as a result of being refused competent legal representation, the right to raise an adequate defense, and a speedy trial so as to avoid the excessive damages that they would not have suffered had the courts adhered to the letter of the law, and held police, and prosecutors to hire standards.

**XIV. Damages.**

This matter has financially ruined the defendant and his wife. They defendant has lost more than 3,400,000 yen, as a result of this current case, as he continues to fight for a just verdict. Yet, the Japanese prefectural office continues to demand the defendant pay taxes that the Supreme Court has recently ruled that he benefits nothing from because he is not Japanese. The defendant is unable to provide for the Court a translation for this appeal statement, and supporting evidentiary material. He simply does not have the funds. Article 37 states that this is a public expense.

The defendant's wife, and he have a nine-month-old son. They have not paid their November rent, with winter well on its way. The defendant used large sums of money in gathering the medical reports, paying consulting fees, and for other expenses related to this defense, necessary to file this appeal. The defendant has used funds to pay for matters related to this proceeding that the Japanese Constitution requires the state to pay for, such as consulting fees to attorneys, obtaining photographic evidence to show the Court that certain evidence has been intentionally hidden from the courts, and medical records that would easily prove to an unbiased judiciary, that the defendant's sentence should stand. Article 37 states that in all criminal cases the accused shall have a right to an impartial tribunal. He shall have the right of compulsory process for obtaining evidence, and witnesses on his behalf at public expense.

The defendant requests full compensation for all monetary losses including salary, transportation related to this matter, medical expenses, fees related to this matter, and other expenses as a result of the harm caused by the Keisei Electric Railway Companies employers who are racist, liars, and have knowingly committed perjury, and the knowingly filed false charges to convict an innocent human being, despite what the prosecutors are taught during their training, which is supposed to benefit society.

The defendant's younger brother, a police officer, underwent chemotherapy treatment for throat cancer, during the time the defendant was being detained. The defendant wasn't available to encourage his brother in his time of need. The defendant's California brokers license was to be renewed during the time he was held in detention. The defendant had that license for years. Because he was unable to renew the license, which he had done every four years since obtaining it, the defendant would have to return to California to retake the exam, and pay large fees in the process.

The defendant returned home on Feb. 4th to find the unseasonal snow that hit Japan had caused the carport to collapse, resulting in the car being totally destroyed.

Exhibit K. Photos of the defendant's brother, both before, and after suffering through chemotherapy treatment. Exhibit K includes a photo of the defendant's destroyed car. The Court will also find photos of the physical condition of the defendant upon leaving Chiba Prison, and medical descriptions describing neurological injuries the defendant suffered at the hands of prison guards that never considered that the defendant was merely a detainee, and had not been found guilty of anything at the time of treating him in such unconscionable manner. Exhibit K includes a copy of the defendant's broker's license, which was to be renewed at the time he was being



detained in Chiba Prison. On the day the license renewal was required the defendant's son was already two days old, but prisons authorities refused to notify the defendant as to the birth of his son. Included are conversations with the Nagano bus driver that racially targeted, spewed hate speech, and assaulted the defendant. These conversations show that the defendant handled an assault in a gentlemanly manner. This exhibit also includes evidence of the defendant's work as a writer with Japan's media.

The defendant's mother had her 80th birthday, and spent it learning that the defendant was being detained for crimes he had not committed, and had been tortured, receiving serious injuries, including a broken leg. The defendant was to go to his mother's celebration with his fiancé to meet his mother for the first time. Happy birthday mom!

On [redacted] the day the defendant's son was born, which is a time of joy, and celebration, the defendant had been held in isolation since Dec. 31st at Chiba Prison, and again had been physically tortured resulting in serious neurological damage to his right wrist. The defendant recorded the daily temperatures while detained in Chiba Prison with the warmest temperature being recorded at 4 degrees Celsius. The average indoor temperature was 2 degrees Celsius. The defendant was stripped naked, and held in isolation without even a pair of socks. Again, much of this illegal treatment was captured on videotape recorded by Chiba guards. The defendant could identify each officer that took part in that torture, as the one who put two pairs of metal handcuffs behind his back, and locked them down as tight as possible, under instructions by Cellblock C supervisor, had escorted the defendant to court on Feb. 4th, 2014, the day the defendant was released. While being held in Chiba Prison's isolation torture rooms, the defendant witnessed a Korean man chained to the wall, and another led around in chains, and an African man being beaten for no reason other than he couldn't understand what the guards were asking him.

The defendant stopped at cells to look inside and see the conditions that the detainees were being held under. He would be beaten for this, as it is forbidden for detainees to look to their sides, and into the other cells. In every cell, the detainees wore shabby, thin, and torn gray prison outfits that were decades old. Their bodies bobbed up, and down like a complete and utter lunatic. They trembled in a frozen state, and all suffered from extreme frostbite, ass they were forced to sit on the floor, in front of cell doors, in freezing conditions, while blankets that could warm them were folded, and paced on the other side of the cell, forbidden to be used until bed time. Each detainee was in a psychologically deteriorating condition. Men who had enough, and began screaming, and who broke the silent rule, were removed quickly and taken to isolation chambers that existed on the other side of the prison. The defendant would be taken there two times while being detained from Dec. 20th, until Feb. 4th. The first time the defendant was held for five days in utter isolation, with bright lights on 24/7. The conditions violated every human condition imaginable.

The defendant was systematically being frozen, starved, and received even worse physical torture than what he suffered at Narashino Detention Center. At both Narashino Detention Center, and Chiba Prison these tortures sessions would be videotape recorded, and sought by his attorneys to present to the courts, yet both refuse to cooperate, citing privacy rights of the perpetrators. Today, the Chiba Public Prosecutor's Office, the Narashino Police Department, and Chiba Prison refuse to cooperate with the Japan Federation Bar Association, and the Tokyo Bar Association regarding their investigations into police, and prosecutorial illegal conduct. They all refuse to cooperate with the defense attorney Okoshi in his professional capacity to adequately represent the defendant in his appeal to the Supreme Court.

The defendant lost his job with Azalea language school, and in the year to follow his detention has vigorously sought employment, submitting hundreds of resumes to gain employment, and to

take care of his wife, and son. The defendant has worked a total of twelve weeks since being released, with bills, and expenses having to be paid, and with much of his meager saving left being spent to have these false convictions overturned.

After losing his job, his former employer pressured the defendant to leave the home he was renting from her mother. While in detention the former employer sent the defendant a document asking the defendant to allow him to remove from the home all of his property, and dispose of it. This included the defendant's entire life's work, including storage drives that held all of his photography, master audio files, family photos, degrees, certification, and professional audio, and video equipment and a brand new computer. The defendant received that document even though while being detained he continued to pay every bill, including rent that came due on that property. The defendant sought the return of his security deposit when he left the home in better condition that he received it but this request would be ignored. Without employment the defendant relocated to an apartment, and had to pay security deposits and pay rental fees that were much larger than the house that he was renting. The damages suffered by the defendant are enormous.

XV. Further proceedings.

Because the defendant has been unable to have a fair proceeding in Japan he has filed a petition for the matter to be heard before the International World Court. The defendant is also bringing charges against the Keisei Electric Railway Company, and its employees for race hate crimes, and colluding to file false police reports, and for their attempt to extort the defendant, and financially gain from their fraud. The lawsuit will include naming as defendants those who acted on behalf of the Japanese government, in an individual capacity. The U.S. Federal Courts have subject matter jurisdiction, and long arm statues apply. The action will also include civil liability charges under The Alien Tort Act. The rules of discovery are stringently adhered to in U.S. courts, and the defendant will seek to obtain all evidence in possession of the prosecutors that the defendant is aware they have intentionally withheld from the defendant.

In numerous communications with the Chiba Public Prosecutors Office to obtain that evidence, the representatives that have communicated with the defendant's wife only state that they will not release any evidence to the defendant until after all proceedings have been exhausted. Translated into plain English what this means is the prosecutors wants to ensure they continue to deny the defendant the opportunity to present an adequate defense, and to have a fair proceeding, and to assure they win, at any cost. The prosecutors, Narashino detention center, and Chiba Prison will turn over evidence in their possession to the defendant, or KERC, and the defendants will face contempt proceedings, and surely a summary judgment ruling.

The media, and public will eventually discover the great depths of corruption that exists in Japan's Ministry of Justice, and the defendant will not be censored in this regard. The Chiba Public Prosecutor have stated that they don't want to turn over the evidence they have to the defendant because they state that the defendant will turn it over to the media. Regardless of what the defendant will do with evidence once it is in his possession, the defendant must be given the opportunity to prepare and adequate defense, and Criminal Code 281 (4) requires this.

Article 38 states that, no person shall be compelled to testify against themselves. Any confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence. Yet, at the lower court proceeding with no evidence presented by the prosecutors at trial, no witnesses were called to testify, or to be subject to defense questioning, or impeachment, with no videotapes viewed by the judge or any other evidentiary material presented to the court, the defendant was found guilty. Even where the defendant, as Okoshi stated in his



brief to the Supreme Court, had not admitted guilt, but instead, his words, "I can't fight this" were taken as an admission of guilt. The fact is, on Dec. 18th, late in the evening before the morning of trial, the defendant was taken to Tsudanuma General Hospital under the guise of having his cast replaced with a new one because it was "too dirty for the court", instead had it removed so the judge wouldn't see the defendant wheeled into the courtroom with a cast on his legs and asks questions. The defendant was warned not to discuss his broken leg with the judge under the threat of physical violence, and the guard most responsible for breaking the leg was the guard who ushered the defendant into the court, and held the rope that was attached to the defendant's waist during trial. The defendant was forced to walk into the court, and was unable to stand, so he had to sit behind the podium during trial. The defendant was trembling violently, and clearly psychologically, and emotionally terrorized, yet the judge, who no doubt was trained that the defendant was not a human being never took notice of any of this. With the defendant not willing to fight the charges, due to an extreme level of duress, and relying on the words of his defense counsel that told the defendant that if he didn't fight the charges he would be released within ten days. With the defendant's wife scheduled to give birth to their son on Dec. 27th, the defendant listened to his lawyer. Without fighting the charge, the defendant was held over for another 34 days, for an unnecessary continuance. The judge was aware that the defendant's wife was to give birth sometime that week, and cared not. He stood, and walked out of the court.

On Dec. 20th, the morning after the first trial date, the defendant was ordered taken to Chiba Prison by the prosecutor, and held in isolation until after his son was born on Jan. 4th, 2014. The defendant was withheld knowledge of the birth of his son until Jan. 9th. On the day the defendant's son was born, he had been held in an isolation chamber since Dec. 31st, 2013. On the day the defendant's son was born, he had not eaten for five entire days. The Chiba Prison warden personally removed the defendant out of isolation for fear the defendant would die that evening.

Chiba Prison refused to give the defendant the photo of his son, which was sent to him by his wife. The defendant was subjected to numerous bouts of torture, resulting in numerous injuries. The defendant didn't eat approximately one-third of the days he was detained at both Narashino and Chiba Prison, and this was recorded as fact in statements given to the U.S. Embassy by detention center supervisor Fujisaki.

While detained at Chiba Prison a U.S. Embassy consulate Thomas A. Duval came to the prison to inspect the defendant. The defendant's condition was so extreme that Mr. Duval took photos of the frostbite he was suffering from, and smuggled them out of the prison, and turned them over to his superiors, who turned them over to a doctor for his personal opinion as to whether the defendant was being tortured while being detained in Japan's draconian, and outdated prison system. The Embassy set a protest letter to the Chiba Prison warden stating that Mr. Duval had personally witnessed the emaciated, and wasting condition of the defendant, and that the defendant was unable to walk. Mr. Duval stated that the defendant's left leg, (not the right leg that was broken at Narashino), which he had photographed as proof of torture, and violations of international laws related to prisoners treatment, was swollen at the ankle, and three toes were covered in black skin, which means the toes were not receiving any circulation, and dying. When the defendant was released from Chiba Prison on Feb. 4th, 2014 he was unable to walk. The defendant spent four days going cold turkey from all of the drugs the prison was forcing the defendant to take, including injections of some kind of opiate. The defendant was unable to sleep for those four days, and spent much of that time communicating online with his sister overseas, who did her best to try, and help the defendant go through that horrible detoxification process.

Article 76 states that all judges shall be independent in the exercise of their conscience and shall be bound only by this constitution and the laws. The judge allowed the prosecutor to taint the case

with false accusation that the defendant made an offensive statement to Ogura. This was made for no other purpose but to incite the court, and to confuse the issue, which was assault. Assault required the element of intent. There is no element of offensive statement for a charge of assault. The judge deciding to walk out of the trial was an abuse of discretion, given the circumstances of the case. One being the charges was extremely petty. Two, that the defendant had no prior record. Three, that the defendant's fiancé, who he was supposed to marry and where marriage documents were presented to the judge allowed this farce to continue another 47 days.

Article 37 states that in all criminal cases the accused shall enjoy the right to examine all witnesses, and he shall have the right of compulsory process for obtaining witnesses on his behalf at public expense. The defendant has been financially ruined as a result of this matter, and has doesn't have the ability to pay fees related to translating these documents. It is therefore the state's responsibility to pay for the costs related to translating the documents the defendant is submitting to Japan's highest court for their review. After all, it was the state that has brought these false charges, and has forced the defendant to spend countless hours preparing for this final appeal. All out of pocket expenses incurred in preparation of appeals, are sought to be reimbursed by the state as the defendant would not have incurred those costs, but for the illegal conduct on the part of Japanese government officials acting on behalf of the state.

Exhibit L. Documents that support the poor treatment of the defendant while detained at Chiba Prison, including photographic evidenced of severe injuries that could have easily been avoided had prison officials used common sense.

**XVI. Inquiry into the facts.**

In seeking relief, and an investigation by government authorities into the illegal treatment the defendant suffered, he wrote a detailed description, and facts of the case to numerous governmental agencies, including the Supreme Prosecutor's Office, Head of MOJ, Tanigaki, the National Police Agency, etc. No agency has taken this matter seriously as shown by the following documents.

Exhibit M. Documents that support the poor treatment of the defendant while detained at Chiba Prison, including photographic evidenced of severe injuries that could have easily been avoided had prison officials used common sense.

**XVII. Expenses.**

Exhibit N. Expenses incurred as a result of these proceedings supported by receipts.

Exhibit O. The actual statement that the defendant carried into court, which was prepared for the defendant by the lower court attorney Kushida, and Chiba Prison guard, the floor manager of Cellblock C.

Exhibit P. A copy of the Supreme Court appointed attorney Shink Okoshi's appeal statement.

**XVIII. Closing.**

The Supreme Court, Japan's highest honor in the area of law has posted individual statements online regarding their duty in handing down decisions that affect other people's lives, and not that of their own. Many who were dragged into legal proceedings they wanted no part of, and as the defendant can attest, received ill treatment at the hands of those that swore to uphold the



Constitution, and laws to prevent travesties of justice.

Chief Justice Terada, Itsuro. Throughout its long history, Japan has devised ways to ensure that the various disputes among people are settled fairly and that those persons who violate the rules of society are dealt with properly. He states that after the Meiji Restoration, Japan began to steer its course towards the direction of becoming a modern nation and, ever since, tireless and strenuous efforts have been made by our elders in order to build a modern judicial system alongside politics and administration of government.

Justice Sakura, Ryuko. Thinking deeply about the gravity of judging people, I will try to improve myself and pursue my duty carefully so as to make fair and equitable judgments. I think it is important to deal with each and every case with care, while hearing opinions from as many people as possible, thereby accumulating well-balanced court decisions.

Justice Kaneisuki, Seishi. Through my life as a judge over the past forty years, I have engaged in my duties, trying to be faithful and impartial, and to have as broad a perspective as possible. I want to keep this attitude in my future career. In order to make appropriate judgments as a judge in this age of rapid changes.

Justice Chiba, Katsumi. Courts must not merely follow precedents, but strive to meet the needs of a new era, while looking ahead to the future and having flexible ways of thinking and broad perspectives. With this in mind, I will deal with each and every case with a humble attitude and work hard to make better judgments and find better solutions.

Justice Shiraki, Yu. The mission of the court is, in whatever age, to find an appropriate and reasonable solution to each and every case brought to it. It is said that Kyoto Shoshidai governor stationed in Kyoto, when holding a trial, heard the arguments of both parties to a dispute behind a paper screen, grinding tea, so as not to become biased by looking at their faces. This episode describes Itakura's intention of trying to be as fair and sincere to both parties as possible. In my 40-year career as a judge, I have also been engaged in judging cases sincerely and devotedly. I aim to serve my duty, keeping this attitude.

Justice Okabe, Kiyoko. I will try to be impartial and deliberate earnestly to reach a conclusion.

Justice Otani, Takehiko. Hear opinions of both parties impartially. See things straight from a fair and neutral standpoint. Make judgments in accordance with law and following my honest feelings.
Justice Ohashi, Masaharu
See things from many aspects, hear opinions with an open mind, keep trying to find a better way until the last minute, and have the courage to make decision in this manner, and with sincerity.

Justice Yamaura, Yoshiki. Are citizens truly protected by law? Are they substantially guaranteed the right of access to the courts? In order to achieve justice through the law, it is necessary that both parties be equally equipped. I intend to do my best in considering how to truly ensure due process is realized.

Justice Onuki, Yoshinobu. I will look at the facts with a sense of humility and try to be fair when making judgments.

Justice Onimaru, Kaoru. I take care to deal with each case from a neutral and fair perspective, and make a careful and thorough judgment, with the role as guardian of the Constitution in mind at all

times.

Justice Kiuchi, Michiyoshi. I will hear every case with an open mind and make decisions that can gain public trust.

Justice Yamamoto, Tsuneyuki. Being assigned to the post of Justice of the Supreme Court is really more of an honor than I deserve. I will do my best to fulfill my duties, making the most of the knowledge and experience in law that I have acquired through my career as a bureaucrat for more than 40 years, and aiming to make fair and equitable decisions based on law, evidence and my own conscience.

Justice Yamasaki, Toshimitsu. Don't forget the resolution with which you started out. I am determined to handle each and every assigned case faithfully, without easily relying on my experience, by excluding self-conceit, and with the resolution I embraced when I first became a judge.

Justice Ikegami, Masayuki there is no information given about you. You may be interested to know that the defendant named his son M[redacted], which in Japanese means leader, and one who has an innate gift of communicating through speech, and who gains the trust of those that choose to follow him through his leadership role.

The defendant noted some common themes in the justice's statements. They discussed modern trends in a rapidly changing society. They discussed the constitutionally mandated requirement of remaining unbiased in making a determination in a case that affects the lives of others.

The defendant would like to tell Japan's highest, and most influential court to not only study how some former military officer ruled in Japan's military past, as we all know the final results of that era which is now behind us, but to study the most respected, and influential court that there ever was in this world, and ever-changing society. A Court whose collective determination affected million of lives. T Court was the Warren Court that existed between 1953, and 1969. U.S. Chief Justice Earl Warren used his judicial power in dramatic fashion, to the consternation of his conservative opponents. The Warren Court expanded civil rights, civil liberties, and most notably judicial power. The Warren Court brought an end to segregation, which eventually led to a great reduction in hate crimes, and raised the bar for tolerance. The Warren Court is recognized as a high point in judicial authority that has been eroding ever since. Regardless, the Warren Court influence remains, resonating in a substantial manner. In that, it is Japan's Highest Court that has the duty to rule on precedence, and to uphold true constitutional principles.

The defendant has asked this honorable Court to address numerous issues that affects all of us today, and will affect generations to come in a most profound way. Justice Onimaru said it best that you are the guardians of the Constitution. Justice Yamasaki, please don't forget the resolution with which you started out your legal career with.

defendant's employer paid for work related transportation fees, and the defendant wanted to assure that there was no accounting issue regarding transportation costs. Upon arrival at the Keisei Tsudanuma station the defendant tried to get a reimbursement, but was refused service by Ogura. The defendant was told to get out of the station.

Question. Who treats a customer like that? Especially one whose employer advertises on several KERC lines?

After being told to get out of the station, the defendant asked to speak to Ogura's supervisor, which was refused. Ogura then called the defendant a stupid foreigner, (baka gaijin) and yelled at him to go. Then defendant didn't go. He repeated that he wanted to speak with the supervisor. Ogura told the defendant, "Your fault. Go!" At this point the defendant had seen enough unjustified conduct by KERC employees, and other assaults, and injustices heaped upon him. In great disgust the defendant turned to his left, and spit at a garbage can. The spit came in contact with no one, as can be seen in a videotape recording that captured the event at the station window.

The defendant then picked up the overpaid ticket, and left the window to exit the station. To the defendant, the incident was over. He met rudeness heaped upon him with a symbolic act that was equally as rude. Regardless, spitting at a garbage can is not a crime, and certainly does not rise to the level of an assault.

After the defendant left the window, the same videotape recording shows Ogura racing toward a door that exited the window area, and into the concourse, for no other purpose but to try and provoke the defendant into engaging in a physical altercation. A second videotape recording that shows Ogura racing out that same door, and violently assaulting the defendant, who is refusing to engage in a physical altercation, supports this. This recording was turned over to the police, and prosecutors who saw the defendant had committed no crime, and from that point onward, began to engage in a phony reenactment, claiming that all of the incidents that are in dispute, occurred outside of camera view, which the defendant will prove is false, as several cameras captured the incident, and have been intentionally withheld from the defendant.

The only thing the defendant asked the lower court attorney, Kushida to do at trial was to show the videotape recordings to the judge, which easily prove the defendant engaged in no violence, and defeated the prosecutions claim by the standard required in a finding of guilt, which is beyond a reasonable doubt. He did not. The defendant couldn't communicate with the attorney due to the language barrier, and the way courtrooms are set up, the defendant couldn't communicate with the defense attorney anyway, as they are forced to remain apart during proceedings. Article 37 states that at all times the accused shall have the assistance of competent counsel assigned by the state. Is this not a violation of The Lawyer's Act? Kushida was aware of numerous matters pertaining to the defendant including the state's use of physical torture, psychological torture, and extreme duress to coerce the defendant to comply with what the prosecution wanted. This will be discussed in detail below.

The second videotape recordings show the defendant using great restraint, and that he refused to engage in a fistfight. The recording shows the defendant on the defensive, always moving backwards, as he headed toward the exit stairwell, and always avoiding any contact with Ogura, as Ogura attempted to throw kicks, and punches at the defendant.

Question. Is racism so inherent in Japanese society, that the police, prosecutors, and courts, those with authority, would rather turn a blind eye to the criminal acts of a Japanese when it is being used against a foreigner, and in the process, protect that violent conduct, thereby aiding, and



abetting in the furtherance of that criminal process, rather than admit that Ogura's conduct was entirely inappropriate, and would inevitably be the direct result of everything that transpired in the chain of events that resulted in great harm to the defendant?

Ogura repeatedly tried to punch, and kick the defendant as he continued toward the station exit. Finally, at the top of the steps that led two flights down to the street below the defendant raised the large bag that was in his right hand to block yet another one of Ogura's punches that was aimed at the defendant's face, and which was intended to knock the defendant down the two flights of stairs. Ogura's own forward movement caused his forehead to hit the bag the defendant was carrying, as the defendant tried to avoid Ogura's wild swing. During the attack, Ogura's glasses fell to the ground, and the defendant picked them up to hand them to Ogura, while simultaneously telling Ogura to stop attacking him. As the defendant bent over to pick up Ogura's glasses, Ogura tried to kick the defendant in the face. Ogura refused to take his glasses from the defendant, and prepared to engage in another physical assault. The defendant placed Ogura's glasses on his arm, and quickly proceeded to hop down the steps. The defendant hopped down the steps because of the physical disability to his right leg that was described above. Further, the defendant has injured the leg further as he tried to run away from Ogura in the concourse area, as he avoided Ogura's assault, and as the defendant attempted to run away. None of this can be disputed as fact, as this is clearly visible in the videotape recording of the concourse area.

When the defendant arrived at the bottom of the steps the police had already arrived, and the incident was over. Ogura ran down the steps after the defendant, and immediately told the police that the defendant spit on him. He said nothing about being punched. In fact, the defendant was detained because Ogura had claimed to have been spit on.

There are at least three other videotape recordings that caught the incident from beginning to end. These videotapes were turned over to the prosecutor according to KERC management. The Chiba Public Prosecutor's office claims that the defendant can have access to the evidence package once the appeal to the Supreme Court has been finalized. This is incredibly unjust.

Question. What authority gives prosecutors the right to intentionally withhold evidence necessary for a defendant to prepare and adequate defense, have a fair proceeding, and address core issues such as misconduct regarding procedural, and constitutional errors? Certainly the Constitution was never written to allow for such gross imbalances in adjudicating a criminal proceeding. Article 14 states that the people are equal under the law and there shall be no discrimination in social relations, or social status. Certainly a social relationship has been forged where prosecutors drag a defendant into a criminal proceeding, even where that relationship is an adversarial one.

The videotape recording at the window shows Ogura hadn't been spit on, which means he lied to the police, and filed a false police report. The prosecutors relying on Ogura's statement before engaging in an adequate investigation saw that the recording disproved Ogura's claim, and instead of submitting a copy to the lower court judge, removed a static image out of the video, and claimed that it showed the defendant had spit on Ogura. That still is so blurry that no judge could rely on that given the high threshold in determining guilt in a criminal proceeding.

III. Suspect evidence.

A DNA test performed on Ogura's shirt shows the defendant's DNA at the center of the shirt. This sounds convincing However, Ogura was wearing a tie at the time of the incident. When the defendant brought this up to the High Court, that court allowed Ogura to amend his statement. Ogura then claimed that he "anticipated" that the defendant was going to spit on him, so he

NO DISCERNIBLE CLASSIFICATION

[redacted]

**From:** Tokyo, VisaService (no email)
**Sent:** Wednesday, March 08, 2017 11:10 AM
**To:** Gardner, Gregory N; Vasquez, Anne M; [redacted]
**Cc:** Adler, Clay K; [redacted]
**Subject:** Email Received from J S

Hi, all,

CCU received an email from J S (an SCS case a few years ago) through the Visa Call Center inquiry as below. This is more like a notice to us than an inquiry. CCU is not going to respond to him unless otherwise instructed by managers.
He also attached seven photos of injuries. Those are probably the photos the officer took and Mr. S wanted to retrieve in order to make a legal complaint against Japanese authorities.
Please let me know if you would like me to print or forward you the attachments.
Thank you.
CCU/[redacted]

Visa inquiry: Case-2017- 03-06-008802247

email@stackjones.com

3.6.17.

J S, et al. vs. Keisei Electric Railway Company, et al.
U.S. District Court, Southern District of Florida
Case No. 1:17-cv-20694-KMW

I have filed action against Keisei Electric Railway Company, and Japanese officials under the TVPA.

I will be amending the complaint to include the U.S. Dept. of State, U.S. Embassy in Tokyo, Caroline Kennedy, Hughes Ogiers, and Jason Hyland for knowingly destroying government property which was to be used as evidentiary material for trial purposes, refusal to turn over the name of a doctor and that doctor's professional opinion regarding Japanese officials use of torture against plaintiff Stone, obstruction of justice, and failure to investigate, an intercede regarding allegations of torture committed by Japanese officials as required by international law.

Charges against Japanese officials will be amended to include, aggravated kidnapping, hate crimes, aggravated unlawful restraint, aggravated battery with a deadly weapon and residential burglary.

J S

Privacy/PII
This email is UNCLASSIFIED.

[redacted]

**From:** U.S. Embassy Tokyo ACS
**Sent:** Wednesday, March 29, 2017 4:53 PM
**To:** [redacted]
**Subject:** RE: From U.S. Embassy Tokyo

Dear [redacted]

Thank you for your email, regarding [redacted] J[illegible] St[illegible]

We will pass on your message to [redacted] We confirmed with the police that currently [redacted] is held under an incommunicado order; however, the police will allow for him to communicate with his wife. We have also contacted [redacted] wife and asked her to contact you directly. If you have any further messages you want to pass on to [redacted] you may wish to seek her assistance. Otherwise, we can pass them to him during our next consular visit in April.

Please let us know if you have any questions or concerns.

Sincerely,

American Citizen Services
U.S. Embassy Tokyo

**Official - Privacy/PII**
**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Wednesday, March 29, 2017 8:18 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** Re: From U.S. Embassy Tokyo

Dear Mr. Gardner,

Thank you for your gracious phone call.

I truly appreciate your time and concern for [redacted]

At this time, no one [redacted] has the funds or means to retain an attorney for J[illegible]

We ask that you please let [redacted] know that we are all very concerned and ask that he please, eat, take good care of his health and to please cooperate in order to get himself released.

We would also ask the he understand that [redacted] is looking forward to his speedy return back home with his new family in tow.

[redacted]

**From:** U.S. Embassy Tokyo ACS
**Sent:** Wednesday, March 29, 2017 4:53 PM
**To:** [redacted]
**Subject:** RE: From U.S. Embassy Tokyo

Dear [redacted]

Thank you for your email, regarding [redacted] J S.

We will pass on your message to [redacted] We confirmed with the police that currently [redacted] is held under an incommunicado order; however, the police will allow for him to communicate with his wife. We have also contacted [redacted] wife and asked her to contact you directly. If you have any further messages you want to pass on to [redacted] you may wish to seek her assistance. Otherwise, we can pass them to him during our next consular visit in April.

Please let us know if you have any questions or concerns.

Sincerely,

American Citizen Services
U.S. Embassy Tokyo

**Official - Privacy/PII**
**UNCLASSIFIED**

---

**From:** [redacted]
**Sent:** Wednesday, March 29, 2017 8:18 AM
**To:** U.S. Embassy Tokyo ACS
**Subject:** Re: From U.S. Embassy Tokyo

Dear Mr. Gardner,

Thank you for your gracious phone call.

I truly appreciate your time and concern for my brother.

At this time, no one in the family has the funds or means to retain an attorney for J.

We ask that you please let my brother know that we are all very concerned and ask that he please, eat, take good care of his health and to please cooperate in order to get himself released.

We would also ask the he understand that [redacted] is looking forward to his speedy return back home with his new family in tow.

Sincerely,

[redacted]

---

**From:** U.S. Embassy Tokyo ACS <TOKYOACS@state.gov>
**Sent:** Friday, March 24, 2017 4:59 AM
**To:** [redacted]
**Cc:** U.S. Embassy Tokyo ACS
**Subject:** From U.S. Embassy Tokyo

Dear [redacted] As I mentioned, I visited [redacted] J[redacted] S[redacted], this morning at Hodagaya Police Station in Yokohama. He asked that we contact you and ask if you could contact his wife and help engage an English-speaking lawyer. He asked for Hiroshi Tsukawa; however, you may also want to consult the Embassy's list of attorneys, here https://jp.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/attorneys/

Legal Assistance | U.S. Embassy & Consulates in Japan

jp.usembassy.gov

Please note: The Department of State assumes no responsibility or liability for the professional ability or reputation of, or the quality of services provided by, the ...

Additional information on what happens when a person is arrested in Japan is here https://jp.usembassy.gov/u-s-citizen-services/arrest-of-a-u-s-citizen/

Arrest of a U.S. Citizen | U.S. Embassy & Consulates in Japan

jp.usembassy.gov

Japan is an independent, sovereign country. One of the chief attributes of sovereignty is the right of a country to make and enforce laws within its own borders. Just ...

As you said you have no phone number or email address for [redacted] wife, we will see if we are able to locate any information once we open on Monday.

Please let us know if you have any questions.

Regards,

Greg Gardner
Chief, American Citizen Services Unit
Embassy of the United States of America,

1-10-5 Akasaka, Minato ku
Tokyo 107-8420
Japan
+81-3-3224-5000 (switchboard)
https://jp.usembassy.gov/u-s-citizen-services/

U.S. Citizen Services | U.S. Embassy & Consulates in Japan

jp.usembassy.gov

News & Events. Messages for U.S. Citizens. Consular Services in Nagasaki on March 1; Message for U.S. Citizens – Absentee Voting in 2017; Message for U.S. Citizens ...

**Official - Privacy/PII**
**UNCLASSIFIED**

UNCLASSIFIED
Official - Privacy/PII

[redacted]

**From:** [redacted]
**Sent:** Tuesday, March 28, 2017 10:20 AM
**To:** Gardner, Gregory N
**Cc:** Vasquez, Anne M; Ehrendreich, Rachel; Barnhill, Dana A; [redacted]
**Subject:** RE: J S

Greg-san,

As discussed, I called Mr. S 's wife, M S and left a message on March 27. On March 28, the wife called back. She said that she has been in touch with Mr. S 's [redacted] but not [redacted]

I told the wife that Mr. S asked his family in the U.S. to contact his wife and to ask a lawyer "Hiroshi Tsukawa" to handle his case, and we had passed on his message to [redacted] However, since [redacted] said that [redacted] did not have the wife's contact information, we asked the wife to get in touch with [redacted] The wife said that the name of the lawyer should be Hiroshi Ichikawa.

Since Mr. S is held incommunicado, the wife asked if the Embassy could pass a message from Mr. S 's [redacted] to Mr. S that [redacted] wanted him to come back to the U.S. The wife thought that the [redacted] message may ease his mind considering the situation he is facing. She was told by the police that Mr. S 's detention order will expire on April 6. I told the wife that we would pass the [redacted] message to Mr. S when we next visit him.

[redacted]

Official - Privacy/PII
UNCLASSIFIED

---

**From:** U.S. Embassy Tokyo ACS
**Sent:** Monday, March 27, 2017 8:39 AM
**To:** Vasquez, Anne M; Ehrendreich, Rachel; Barnhill, Dana A; [redacted]
**Subject:** FW: From U.S. Embassy Tokyo

Privacy/PII
This email is UNCLASSIFIED.

[redacted]

**UNCLASSIFIED**
**Official - Privacy/PII**

**From:** U.S. Embassy Tokyo ACS
**Sent:** Friday, March 24, 2017 5:59 PM
**To:** [redacted]
**Cc:** [redacted] ACS
**Subject:** From U.S. Embassy Tokyo

Dear [redacted] As I mentioned, I visited [redacted], this morning at Hodagaya Police Station in Yokohama. He asked that we contact you and ask if you could contact his wife and help engage an English-speaking lawyer. He asked for Hiroshi Tsukawa; however, you may also want to consult the Embassy's list of attorneys, here https://jp.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/attorneys/

Additional information on what happens when a person is arrested in Japan is here https://jp.usembassy.gov/u-s-citizen-services/arrest-of-a-u-s-citizen/

As you said you have no phone number or email address for [redacted] wife, we will see if we are able to locate any information once we open on Monday.

Please let us know if you have any questions.

Regards,

Greg Gardner
Chief, American Citizen Services Unit
Embassy of the United States of America,

1-10-5 Akasaka, Minato ku
Tokyo 107-8420
Japan
+81-3-3224-5000 (switchboard)
https://jp.usembassy.gov/u-s-citizen-services/

**Official - Privacy/PII**
**UNCLASSIFIED**

[redacted]

**From:** [redacted]
**Sent:** Monday, March 27, 2017 3:15 PM
**To:** Gardner, Gregory N; [redacted]
**Cc:** Vasquez, Anne M; Ehrendreich, Rachel; Barnhill, Dana A
**Subject:** RE: Prison Visit - J S

According to the Hodogaya Police, Mr. S eats Miso soup for breakfast and drinks hot water with soy-bean sauce (shoyu 醤油), but eats no solid food.
The police is in close communication with a doctor by telephone, and the doctor advised the police to get him water/hot water and salt.
He ate one bite of Japanese radish after a CONOFF saw him last Friday.
Regular check-ups are conducted twice a month and Mr. S can see a doctor next Thursday, March 30. I passed his urological difficulties, heart problem and numbness to a police officer so that a doctor can better understand his health condition when sees him next time.

[redacted]

Privacy/PII
This email is UNCLASSIFIED.

---

**From:** Gardner, Gregory N
**Sent:** Friday, March 24, 2017 5:24 PM
**To:** [redacted]
**Cc:** Vasquez, Anne M; Ehrendreich, Rachel
**Subject:** Prison Visit - J S

BEGIN

On March 24, 2017 a consular officer visited U.S. citizen detainee J S (DPOB ) at Hodogaya police station in Yokohama. Before the interview police indicated to conoff that S has not been eating. He was helped into the interview room by policemen and initially slumped forward. He appeared disheveled and initially appeared to be having trouble holding himself steady; however, he soon sat up and was afterwards entirely responsive and communicative. At times breaking down in tears, S spoke stridently and emotionally about his previous arrest and what he considers to be mistreatment by Japanese authorities over a period of years. He maintained that since his arrest "a week earlier" he had been interrogated "for 19 hours" at a stretch, and had been thrown to the floor and treated roughly. He had no visible injuries, but showed conoff several toes that seemed blue and black, and said this was a consequence of mistreatment while he had been arrested in 2013-2014. S said he takes no medication; however, he complained that since his current detention began, his "heart hurts" and he is numb. He complained of urological difficulties related to past surgery that make it difficult for him to urinate. S said he had asked to see a doctor but had not been allowed to see one. (Note: after the interview, conoff conveyed to a police officer that S wanted to see a doctor; the police officer responded that he had been able to see a doctor, but affirmed that he should be able to see a doctor again if he is having difficulty). Conoff urged S to take care of his health and to eat. S signed a PAW naming specific relatives and Members of Congress, and asked that conoff tell his [redacted] and his [redacted] in Florida about his arrest, and ask that they work with his wife to retain an English-speaking lawyer,

specifically requesting "Hiroshi Tsukawa", who S said is a lawyer that he has engaged in the past.
END

I will call [redacted] this evening and tell her about the lawyer request. We need to ask the Hodogaya police about his medical condition (urological problems), and repeat the request that he be allowed to see a doctor quickly. We should also ask the police to update us about whether S is eating.

Greg Gardner
Chief, American Citizen Services Unit
Embassy of the United States of America,

1-10-5 Akasaka, Minato ku
Tokyo 107-8420
Japan
+81-3-3224-5000 (switchboard)
https://jp.usembassy.gov/u-s-citizen-services/

**Official - Privacy/PII**
**UNCLASSIFIED**

[redacted]

**From:** Gardner, Gregory N
**Sent:** Friday, March 24, 2017 6:01 PM
**To:** [redacted]
**Cc:** Vasquez, Anne M
**Subject:** FW: From U.S. Embassy Tokyo

FYI, [redacted] email is [redacted]
Her number in FL is [redacted]

**Official - Privacy/PII**
**UNCLASSIFIED**

---

**From:** U.S. Embassy Tokyo ACS
**Sent:** Friday, March 24, 2017 5:59 PM
**To:** '[redacted]
**Cc:** U.S. Embassy Tokyo ACS
**Subject:** From U.S. Embassy Tokyo

Dear [redacted] As I mentioned, I visited [redacted], J[redacted] S[redacted], this morning at Hodagaya Police Station in Yokohama. He asked that we contact you and ask if you could contact his wife and help engage an English-speaking lawyer. He asked for Hiroshi Tsukawa; however, you may also want to consult the Embassy's list of attorneys, here https://jp.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/attorneys/

Additional information on what happens when a person is arrested in Japan is here https://jp.usembassy.gov/u-s-citizen-services/arrest-of-a-u-s-citizen/

As you said you have no phone number or email address for [redacted] wife, we will see if we are able to locate any information once we open on Monday.

Please let us know if you have any questions.

Regards,

Greg Gardner
Chief, American Citizen Services Unit
Embassy of the United States of America,

1-10-5 Akasaka, Minato ku
Tokyo 107-8420
Japan
+81-3-3224-5000 (switchboard)
https://jp.usembassy.gov/u-s-citizen-services/

**Official - Privacy/PII**
**UNCLASSIFIED**

[redacted]

**From:** Gardner, Gregory N
**Sent:** Friday, March 24, 2017 5:24 PM
**To:** [redacted]
**Cc:** Vasquez, Anne M; Ehrendreich, Rachel
**Subject:** Prison Visit - J[redacted] S[redacted]

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

BEGIN

On March 24, 2017 a consular officer visited U.S. citizen detainee J[redacted] S[redacted] (DPOB [redacted]) at Hodogaya police station in Yokohama. Before the interview police indicated to conoff that S[redacted] has not been eating. He was helped into the interview room by policemen and initially slumped forward. He appeared disheveled and initially appeared to be having trouble holding himself steady; however, he soon sat up and was afterwards entirely responsive and communicative. At times breaking down in tears, S[redacted] spoke stridently and emotionally about his previous arrest and what he considers to be mistreatment by Japanese authorities over a period of years. He maintained that since his arrest "a week earlier" he had been interrogated "for 19 hours" at a stretch, and had been thrown to the floor and treated roughly. He had no visible injuries, but showed conoff several toes that seemed blue and black, and said this was a consequence of mistreatment while he had been arrested in 2013-2014. S[redacted] said he takes no medication; however, he complained that since his current detention began, his "heart hurts" and he is numb. He complained of urological difficulties related to past surgery that make it difficult for him to urinate. S[redacted] said he had asked to see a doctor but had not been allowed to see one. (Note: after the interview, conoff conveyed to a police officer that S[redacted] wanted to see a doctor; the police officer responded that he had been able to see a doctor, but affirmed that he should be able to see a doctor again if he is having difficulty). Conoff urged S[redacted] to take care of his health and to eat. S[redacted] signed a PAW naming specific relatives and Members of Congress, and asked that conoff tell his [redacted] and his [redacted] in Florida about his arrest, and ask that they work with his wife to retain an English-speaking lawyer, specifically requesting "Hiroshi Tsukawa", who Stone said is a lawyer that he has engaged in the past.
END

→ not aware 3/26

I will call [redacted] this evening and tell her about the lawyer request. We need to ask the Hodogaya police about his medical condition (urological problems), and repeat the request that he be allowed to see a doctor quickly. We should also ask the police to update us about whether S[redacted] is eating.

Greg Gardner
Chief, American Citizen Services Unit
Embassy of the United States of America,

1-10-5 Akasaka, Minato ku
Tokyo 107-8420
Japan
+81-3-3224-5000 (switchboard)
https://jp.usembassy.gov/u-s-citizen-services/

**Official - Privacy/PII**

*Embassy of the United States of America*
*1-10-5 Akasaka, Minato-ku*
*Tokyo 107-8420 JAPAN*
*Fax 81-3-3224-5856*

March 22, 2017

Mr. J[redacted] S[redacted]
c/o Hodogaya Police Station
2-7 Kawabe-cho, Hodogaya-ku
Yokohama-shi, Kanagawa-ken 240-0001

Dear Mr. S[redacted],

We have been notified of your arrest by Hodogaya Police Station. We try to visit U.S. citizens arrested in Japan as soon as we can. In the meantime, we would like to provide you with general information about arrests in Japan, and are enclosing a brochure entitled "Guidelines for Americans Arrested in Japan", and "Penal Institutions in Japan."

Please fill out the enclosed Privacy Act waiver form and mail it to us using the envelope provided. Without your written permission, we will not be able to speak to anyone, including members of your family, friends, or attorneys representing you, about your situation.

Sincerely,

American Citizen Services
U.S. Embassy Tokyo

10:30 –

8:30 – 9:00
11:30 –
13:00 – 2:30

# ARREST WORKSHEET

DATE:

CONS/American Citizen Services: Tel: 03-3224-5166 Fax: 03-3224-5856

Notified by: Hodogaya Police Station (Name of Officer: [struck through] ) 村田 261.
Tel: 045-335-0110 ext. [struck through] 生活安全課 [struck through]課. [struck through]

1. Name (Last/first/middle) [redacted]
2. Sex: Male / Female
3. Date & Place of Birth: [redacted] [redacted]
4. Passport # ____ Date, Place of Issue ____ [redacted]
5. Other Nationalities, if any: None. If yes (Japanese, Israel, other ____)
6. Last Known U.S. Address: ____
7. Date & Place of Arrest: 3/17 横浜市 保土ケ谷区 am/pm (保土ケ谷 Police)
8. Arrest Condition: Normal / Injured / Sick / Others ____
9. Charges: めいわく防止条例いはん
   (Drugs: possession / importation / use : marijuana ____ g, hashish ____ g,
   Stimulant drugs ____ g, others: ____ )
10. Place of Detention: Hodogaya Tel: X242 Mr. Nogushi
    Mr. Fujiwar
11. Brief Status of Case: Initial Investigation held incommunicado. except for the wife (lifted 3/28)
12. Trial date/Hearing Date: Pending talked to Mr. Kusak 3/29
13. Possible Sentence: Max: ____ yrs Min: ____ yrs
14. Attorney: ____ Tel: ____
15. Privacy Act Waiver: ____
16. Next of Kin (NOK): ____ relationship: ____
17. Notification: Date ____ by police / court / immigration
18. Access: visited by duty officer / consular officer on ____
19. Other Americans arrest: Yes / No
20. Mistreatment: Yes ____ / None alleged.
21. Property confiscated: ____
22. Judicial Proceedings: Initial Investigation.
23. EMDA: None.
24. Remarks: Requested notification to the Embassy? Yes / No.
25. Advising NOK or others: ____

3/27 (10 day expires)

STATE-194 [illegible] rele card.

*Embassy of the United States of America*
*1-10-5 Akasaka, Minato-ku*
*Tokyo 107-8420 JAPAN*
*Fax 81-3-3224-5856*

March 22, 2017

Mr. J[redacted] S[redacted]
c/o Hodogaya Police Station
2-7 Kawabe-cho, Hodogaya-ku
Yokohama-shi, Kanagawa-ken 240-0001

Dear Mr. S[redacted]

We have been notified of your arrest by Hodogaya Police Station. We try to visit U.S. citizens arrested in Japan as soon as we can. In the meantime, we would like to provide you with general information about arrests in Japan, and are enclosing a brochure entitled "Guidelines for Americans Arrested in Japan", and "Penal Institutions in Japan."

Please fill out the enclosed Privacy Act waiver form and mail it to us using the envelope provided. Without your written permission, we will not be able to speak to anyone, including members of your family, friends, or attorneys representing you, about your situation.

Sincerely,

American Citizen Services
U.S. Embassy Tokyo

10:30 –

8:30 – 9:00
11:30 –
13:00 – 2:30

# ARREST WORKSHEET

DATE:

CONS/American Citizen Services: Tel: 03-3224-5166 Fax: 03-3224-5856

Notified by: Hodogaya Police Station (Name of Officer: ~~[illegible]~~ ) 村田 261.
Tel: 045-335-0110 ext. ~~[illegible]~~ 生活安全課 ~~[illegible]~~ 261

1. Name (Last/first/middle) [redacted]
2. Sex: Male / Female
3. Date & Place of Birth: [redacted] [redacted] [redacted]
4. Passport # ______ Date, Place of Issue ______
5. Other Nationalities, if any: None. If yes (Japanese, Israel, other ______)
6. Last Known U.S. Address: ______
7. Date & Place of Arrest: 3/17 横浜市 保土ケ谷区 am/pm (保土ケ谷 Police)
8. Arrest Condition: Normal / Injured / Sick / Others ______
9. Charges: めいわく行為防止条例いはん
   (Drugs: possession / importation / use : marijuana ______ g, hashish ______ g,
   Stimulant drugs ______ g, others: ______ )
10. Place of Detention: Hodogaya Tel: x242 Mr. Noguchi, Mr. Fujiwara
11. Brief Status of Case: Initial Investigation held incommunicado except for the wife (lifted 3/28) talked to Mr. Kusaki 3/29
12. Trial date/Hearing Date: Pending
13. Possible Sentence: Max: ______ yrs Min: ______ yrs
14. Attorney: ______ Tel: ______
15. Privacy Act Waiver: ______
16. Next of Kin (NOK): ______ relationship: ______
17. Notification: Date ______ by police / court / immigration
18. Access: visited by duty officer / consular officer on ______
19. Other Americans arrest: Yes / No
20. Mistreatment: Yes ______ / None alleged.
21. Property confiscated: ______
22. Judicial Proceedings: Initial Investigation.
23. EMDA: None.
24. Remarks: Requested notification to the Embassy? Yes / No.
25. Advising NOK or others: ______

3/27 (10 day expires)

STATE-19198 release card

別記様式第１号

平成 29 年 3 月 22 日

領事官への通報要請確認書（意思変更）

Confirmation concerning the request for notification to the consular officer (change of mind)

[redacted] [redacted]

私は、拘禁の当初、私が国籍を有する国の領事官に、拘禁されていることの通報を求める権利及び日本国の法令の範囲内で上記の領事官に信書を発する権利を有していることを知らされたうえ、領事官への通報の要請の意思を確認されましたが、要請しませんでした。

At the beginning of my detention, I was told that I had the right to make my detention known to the consular officer sent from the country of my nationality and that I had the right to write to my consular officer within the limit of Japanese law.

I was then questioned whether I requested that the consular officer be notified of my detention, which I declined.

このたび、あらためて、下記の国の領事官に対する通報を要請します。

Having changed my mind, I now request that the consular officer of my country named below be notified of my detention.

( U.S.A ) ( [redacted] )

国　名 / name of the country

被拘禁者署名 / signature of the detained

[redacted]

[redacted]

[redacted]